IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Howard and Sharon Phillips, et al.,<br><br>                      Plaintiffs,<br><br>v.<br><br>Trevor Cook, et al.,<br><br>                      Defendants. | Case No. 09-CV-1732 (MJD/JJK)<br><br>**AFFIDAVIT OF<br>JASON BO ALAN BECKMAN<br>IN OPPOSITION TO PLAINTIFFS'<br>MOTION FOR TEMPORARY<br>RESTRAINING ORDER AND<br>TEMPORARY INJUNCTION** |

STATE OF MINNESOTA    )
                                    ) ss
COUNTY OF HENNEPIN    )

      Jason Bo Alan Beckman, being duly sworn upon oath, deposes and states as follows:

      1.    I have been named as a defendant in the above-captioned action and understand that Plaintiffs have moved the Court for a Temporary Restraining Order and Temporary Injunction that would have the effect of freezing all of my assets, including funds in the checking account from which I pay all of my household bills and living expenses. Such an Order would cause me to suffer tremendous hardship, including an inability to support my family. I therefore submit this Affidavit, which is based entirely on my personal knowledge, in opposition to Plaintiffs' motion.

2.     I am senior portfolio manager at Oxford Private Client Group ("PCG"), a money management firm located in Minneapolis, Minnesota, that I own. I specialize in equity investments, but believe in managing those equity investments in conjunction with more conservative fixed-income strategies, such as money market funds. Those fixed-income strategies offer protection against the volatility and relative illiquidity of long-term equity investments because they are liquid, typically have a low standard deviation and generally perform above the rate of inflation.

3.     In late 2006 and early 2007, the equity markets began to show signs of weakness and the economic environment created downward pressure on interest rates, both domestic and abroad. As interest rates continued to fall, money market rates became less and less attractive. In addition, the short term instruments supporting the net asset value of money markets were coming into question. For example, Reserve Funds, the largest and oldest money market fund in the country (and the money market fund that I used), "broke the buck" (falling below $1.00) due to the Shearson Lehman Brothers default. This introduced the ever possible, yet rarely recognized, loss to principal in conjunction with below inflation interest rates in a money market fund. This circumstance, in addition to the added pressure on the equity markets and the financial instability of debt markets, caused me to conclude that there was a greater need to modify our asset allocation away from equities. I therefore sought more attractive conservative fixed income strategies for account diversification. Unfortunately, there were very few such strategies available.

4.      It was during this period that Chris Pettengill introduced me to the currency arbitrage methodology managed by Defendant Trevor Cook.  As Mr. Cook explained, his methodology provided what I was looking for in terms of liquidity, a low standard deviation and performance above the rate of inflation.  Mr. Cook also explained that the currency arbitrage methodology that he managed involved some of the largest and most financially solvent institutions globally, including Credit Suisse, Deutsch Bank, Arab Bank, and others.  Mr. Cook demonstrated that the currency arbitrage methodology he managed had performed well, withstanding significant swings in currency prices, because of a hedge utilized in the methodology.

5.      Confident that Mr. Cook's currency arbitrage methodology was an appropriate alternative to other non-equity correlated options, such as money market funds, my wife (Hollie) and I began personally investing in the currency arbitrage strategy in early 2007.  In 2008, as the stock market continued to fall, United States financial institutions showed signs of instability, and the five largest investment banking firms went out of business, I concluded that there was an even greater need for asset diversification.  Accordingly, my wife and I placed more of our money in the currency arbitrage strategy managed by Mr. Cook.  In fact, because we understood it to be safe and liquid, as we liquidated assets and borrowed significant funds that we anticipated using soon for other expenses and investments, we temporarily invested those funds in the currency arbitrage strategy, feeling assured that the funds would be there when needed.

6.      All in all, we invested more than $6.8 million in the currency arbitrage methodology managed by Mr. Cook.  Some of those investments were made as early as

3

the first half of 2007. Others were made in 2008, including, for example, a short term deposit in June 2008 of $1 million in loan proceeds that we borrowed from a bank in anticipation of an upcoming investment. Some of the funds (less than $500,000) were invested in accounts in the name of PCG. We continued to make investments in the strategy in 2009, including a January 2009 transfer by my wife of the entire balance in her individual retirement account.

7. In addition to investing significant personal funds in the currency arbitrage methodology managed by Mr. Cook, I also recommended the strategy to my in-laws, other family members and several PCG clients as a portfolio diversification tool that would serve as an appropriate complement to their equity investments. On my recommendation, my in-laws invested their entire retirement savings in the methodology. Other family members invested in the currency arbitrage methodology, as well, some as recently as June 2009.

8. The only Plaintiffs named in this lawsuit with whom I recall discussing the currency arbitrage strategy managed by Mr. Cook were Mark Sticha and Eric Erickson's clients, Jerry Rachel and Kaye Rachel. I don't recall having any dealings with any of the other Plaintiffs prior to July 2009.

9. Until July 2009, there were—to my knowledge—no problems that my wife and I, our family members or any PCG clients had in withdrawing funds invested in the currency arbitrage strategy managed by Mr. Cook. Some of my wife's and/or my withdrawals are reflected on the Crown Forex LLC and UBS Diversified Growth LLC bank account records from Associated Bank and Wells Fargo (as payments to me and/or

my wife) that are referred to in the Loo Affidavit that Plaintiffs have filed in support of their motion for a temporary restraining order.  At the time we received these withdrawals, we understood, based on information communicated by Mr. Cook, that these withdrawn funds came directly from our currency accounts at Crown Forex, S.A., as reflected in the statements we were receiving from Crown Forex, S.A.

10. While not expressly stated in the Loo Affidavit or Plaintiffs' motion papers, Plaintiffs seem to imply that my wife and I took money that did not belong to us.  That is absolutely untrue.  The money we withdrew from the currency arbitrage strategy managed by Mr. Cook was our own money, which we had invested in Mr. Cook's strategy.  Our situation is no different than Mr. Sticha, for example, who, in February 2009, withdrew all of the funds in one of his accounts, leaving him with a balance of $277,889 in the currency arbitrage methodology.

11. I did not learn of any problems in withdrawing funds from the currency arbitrage strategy managed by Mr. Cook until early July 2009.

12. After learning of these problems, I advised my family members and PCG's clients to submit withdrawal requests to Mr. Cook.  On July 13, 2009, my wife and I also submitted a withdrawal request for the funds remaining in our accounts.

13. To date, my wife and I have not received the funds remaining in our accounts.

14. By their motion, Plaintiffs are trying to freeze and prevent my wife and I from obtaining access to any of the money in our primary checking account (******8793) at Wells Fargo Bank.  We pay all of our general living expenses from that

account, including our home mortgage, child support obligations, car loans, life insurance premiums, groceries, utilities, maintenance expenses, property taxes, income taxes, and credit card purchases. Without access to those funds, we will have no way of paying our bills or supporting our family. Freezing this Wells Fargo family bank account will impose a substantial hardship on my family. This hardship is further exacerbated by the legal fees required to defend claims made in this lawsuit and the fact that we have not received the monies we invested in the currency arbitrage strategy managed by Mr. Cook.

15. At the July 24, 2009 hearing before Chief Judge Michael Davis, my attorney advised the Court that I had agreed not to dissipate my personal assets or funds by sending them overseas, except as necessary to pay attorneys' fees. I have and will continue to abide by that stipulation.

FURTHER YOUR AFFIANT SAYETH NOT.

s/ Jason Bo Alan Beckman
Jason Bo Alan Beckman

Subscribed and sworn to before me
this 9th day of September, 2009.

s/ Deborah A. Hanson
Notary Public