## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Howard and Sharon Phillips
1804 County Road M
Swanton, OH   43558,

Case No. 09-CV-1732 (MJD/JJK)

Joy Phillips
1804 County Road M
Swanton, OH   43558,

**THIRD AMENDED VERIFIED
COMPLAINT**

David Phillips
960 Seven Ponds Town Road
Southampton, NY   11968,

**JURY TRIAL DEMANDED**

Kenneth A. and Judith G. Hale
600 Enterprise Avenue
Wauseon, OH   43567,

Roxanna Holliker
600 Enterprise Avenue
Wauseon, OH   43567,

Timothy Coley
209 Woodland Avenue
Swanton, OH   43558,

Leesa Coley
209 Woodland Avenue
Swanton, OH   43558,

Philip and Joan McDonald
14465 Freesia Way
Apple Valley, MN   55124,

George Helmstetter
221 Massachusetts Ave. #514
Boston, MA   02115,

Sharon DelConte
313 Oxfordshire Lane
Chapel Hill, NC   27517,

Gordon and Kathlyn Schepke
328 Paragon Avenue
Troy, MI   48098-4630,

Jerry and Kaye Rachel
14475 Thomas Trail
Rogers, MN   55374,

Michael and Mary Patterson
355 F Avenue West
P.O. Box 363
Walford, IA   52351,

Paul Migliorelli
373 Chandler Street
Worcester, MA   01602,

Hans "Heiko" and Jerilynn Reske
9708 Amber Court
Denton, TX   76207,

Floyd and Ilene Foster
10901 East Medina Avenue
Mesa, AZ   85209,

Victor and Marianne Sultana
3203 43rd Avenue East
Bradenton, FL   34208,

Dr. Ronald Linari
37 Stone Ridge Road
Franklin, MA   02038,

Bill Salisbury
11115 West 106th Avenue
Broomfield, CO   80021,

Curtis Winn
4208 East Frank Phillips Boulevard
Bartlesville, OK   74006,

Mark Sticha
3840 Dunbar Court
Brooklyn Park, MN   55443,

Russell and Jacquelyn Miller
1041 Princess Drive
Oberlin, PA   17113,

Stephen Flemmons
1107 East Flemmons Lane
Lovington, NM   88260,

Joseph Kalina
10587 West 330th Street
Northfield, MN   55057,

Bill McLeod
P.O. Box 1090
Panhandle, TX   79068,

James Downing III
217 Fredericksburg Avenue
Louisa, VA   23093,

Edgar and Linda Stephenson
P.O. Box 91
Grangeville, ID   83530,

Ronald B. Stolpman
16597 Iredale Court
Lakeville, MN   55044,

Donald Moran
5305 Lindenwood Avenue NE
Louisville, OH   44641,

Shirley Jacobs
121 Pineview Drive
Palmyra, PA   17078,

Janet and Edgar Johnson
13470 Sherwood Circle
Cleveland, OH   44125,

Curtis Harvey
5490 Hedge Brooke Pointe NW
Acworth, GA   30101,

Barry Owens
P.O. Box 820259
Vancouver, WA   98682,

Stephen G. and Elizabeth A. Froehle
332 Floral Drive West
Shoreview, MN  55126,

Kelly Lenti
215 Grand Boulevard
Park Ridge, IL   60068,

John Walencik
2510 North Verona Road
Morris, IL   60450,

Dan and Diann Haynes
3016 Myrtlewood Way
Nampa, ID   83686,

Donna Haynes
2929 Kingsgate Drive
Nampa, ID   83687,

Greg Rutter
2517 Bellamy
Modesto, CA   95354,

Jeffery Timberlake
141 West Jackson 1701A
Chicago, IL   60604,

Larry and Charleyne Swoverland
1599 Quail Glenn Court
Carmel, IN   46032,

Robert Herr
73 Fairfax Lane
Annville, PA   17003,

Allen G. Collins
109 Andrew Drive
Seneca, SC   29678,

Jan Anderson
PR
82801 Edsbyn
Sweden,

Dave Balthaser
2795 Mountain Road
Hamburg, PA  19526,

Timothy and Louis Beatty
3640 Bishop Road
Emmet, ID 83617,

Gunvant Bhatt
12500 47th Avenue North
Plymouth, MN  55422,

David Bratt
1739 Gordon River Lane
Naples, FL 34101,

Frank and Harriett Bright
4570 Vanadium Bend
Cumming, GA 30040,

David R. Burt
20280 Danny Court
Oregon City, OR 97045,

Mark W. Cobb
33 Pleasant Ridge Road
Plattsburgh, NY 12901,

James DeVito
10210 Uppingham Court
Richmond, VA  23235,

Mary Eisenbarth
1616 South Phoebe Drive
Ridgefield, WA 98642,

Craig R. Engel
21 Crested Butte Court
Shamong, NJ 08088,

Kris A. Fink
7419 Buoy Court
Northfield Center, OH 44067,

William K. Fravel
2515 Kissam Court
Orlando, FL  32809,

Robert Freed
2632 W. Gregg Drive
Chandler, AZ  85224,

Myonghui Gass
5215 Winthrop Avenue
Mechanicsburg, PA  17050,

Karen E. Gladstone
3636 East Coconino Place
Phoenix, AZ 85044,

Bonnie E. Gloth
6008 Foxborough Square E.
Brentwood, TN  37027,

Paul H. and Melissa H. Grusche
3 Sea Pines
Aliso Veijo, CA  92656,

Sandra and Harry Grusche
P. O. BOX 6600
16930 Hugh Torance Pkwy
Huntersville, NC 28070,

Viola H. Heinemann
6451 SR 271
Rosalia, WA 99170,

Eugene G. Helfrich
9645 State Route 3
Columbia, IL 62236,

Edward L. Hemenway
8315 Chicago Avenue S.
Bloomington, MN 55420,

Jerome and Edith Hoeppner
19850 Akin Road
Farmington, MN  55024,

Ronald L. Higgins
806 Cedar Avenue
Richland, WA  99352,

Bill Hunt
1340 Katen
Ellensburg, WA 98926,

Donald E. Kincaid
4608 Oakwood Circle
Gastonia, NC 28056-9037,

Karl & Charlene Kokotan
425 Park Lane
Waterloo, IA  50702,

Joseph H. and Cheryl Ann Kraus
N70 W7487 Bridge Road
Cedarburg, WI  53102-1722,

Stephen Laube
1902 Behrend Drive
Phoenix, AZ  85024,

Michael G. Lenti
245 North NW Highway
Park Ridge, IL 60068,

Donald G. Lindberg
55 Sawyer Lane
Holden, MA 01520,

Thomas R. Los
5574 South Denis Court
Hales Corners, WI  53130,

Thomas A. and Katherine R. Marabello
E 3028 Ermina Avenue
Spokane, WA 99207,

Michael Shane McGonnell
9519 Westover Club Cir
Windermere, FL  34786,

David W. Nielsen
14028 87th Avenue North
Maple Grove, MN  55369,

Robert E. Pajor
380 Ridge Circle
Wayzata, MN 55391,

Douglas Patnode
9336 Magnolia Lane North
Maple Grove, MN  55369,

Bruce Todd Peacock
6160 S. 6th Street #W-8
Milwaukee, WI 53221,

Ivan and Sandra Phillips
7800 Stone Avenue North
Seattle, WA 98103,

Daniel Pillar
P. O. Box 1161
Garner, NC 27529,

James H. Renneker and Joyce L. Davis
P.O. Box 328
Warroad, MN  56763-0328,

Jerome Reynolds
726 Spring Hill Circle
Woodbury, MN 55125,

Thomas Rodeck
P.O. Box 1950
Andrews, NC 28901,

Richard J. Roiger
10321 Brunswick Circle
Bloomington, MN  55438,

Robert A. Roof
20706 247th Street
Delhi, IA  52223,

Mary Schafer
10035 Mills Station Rd. Space 78
Sacramento, CA 95827,

Anthony J. Skufka
1516 Stony Hill Road
Hinckley, OH 44233,

David S. Smith
100 E. Broadway Street
Butte, MN 59701,

Dwight A. Smith
10543 Cross Country Lane
Littleton, CO 80125,

Rick and Tamie Steiner
2420 S. Jebel Way
Aurora, CO 80013,

David and Candace Tackett
7403 Blythwood Lane
Charlotte, NC  28227,

Robert Lee Thomssen
1330 Willowbrook Drive
Wayzata, MN  55391,

Kim Treiber
5341 Ridgeside Circle SE
Canton, OH  44707,

Daryl D. Vossler
1844 29th Avenue NW
New Brighton, MN 55112,

Boyd A. Wear
713 Boydston Mill Drive
North Webster, IN 46555,

Andrew and Nancy Weed
3600 Marks Road
Yakima, WA 98903-9710,

Bradley A. Wevodau
3810 Lamp Post Lane
Camp Hill, PA  17011,

Raymond and Patricia Winesburg
13913 Chanwahon Road
Huntly, IL 60142,

Leonard and Kathleen Wisner
12643 SE 113th Place
Tigard, OR 97223,

Rodney & Judith Wylie
16814 E. Euclid Place
Aurora, CO 80016,

Ronald and Sandra Yates
90 Fairview Street
Carlisle, PA  17013,

and,

Stanislaw Zukowski
6275 Townsend Winona Road
Flagstaff, AZ 86004-1490,

      Plaintiffs

**v.**

Trevor Cook
12644 Tiffany Court, Suite 100
Burnsville, MN   55337

and

Patrick Kiley
12644 Tiffany Court, Suite 100
Burnsville, MN   55337

and

Jason "Bo" Alan Beckman
1900 LaSalle Avenue
Minneapolis, MN   55403-3629

and

Christopher Pettengill
14010 48th Avenue North
Plymouth, MN   55446

and

Gerald Durand
20520 Keokuk Ave., Suite 204
Lakeville, MN   55044

and

Oxford Global Partners
1900 LaSalle Avenue
Minneapolis, MN   55403-3629

and

Oxford Global Advisors
1900 LaSalle Avenue
Minneapolis, MN   55403-3629

and

Oxford Private Client Group
1900 LaSalle Avenue
Minneapolis, MN   55403-3629

and

UBFX Diversified
12644 Tiffany Court, Suite 100
Burnsville, MN   55337

and

UBS Diversified
12644 Tiffany Court, Suite 100
Burnsville, MN   55337

and

Universal Brokerage FX
12644 Tiffany Court, Suite 100
Burnsville, MN   55337

and

UBS Diversified FX Advisors, LLC
12644 Tiffany Court, Suite 100
Burnsville, MN   55337

and

UBS Diversified FX Growth LP
12644 Tiffany Court, Suite 100
Burnsville, MN   55337

and

UBS Diversified FX Management, LLC
12644 Tiffany Court, Suite 100
Burnsville, MN   55337

and

UBS Diversified Growth, LLC
12644 Tiffany Court, Suite 100
Burnsville, MN   55337

and

Universal Brokerage Services, LLC
12644 Tiffany Court, Suite 100
Burnsville, MN   55337

and

Associated Bank, N.A.
200 North Adams Street
Green Bay, WI  54304,

and

Entrust Midwest, LLC
12800 Industrial Park Blvd.
Suite 220
Plymouth, MN  55441.


Defendants.
_____

     For their Third Amended Verified Complaint ("Complaint") against Defendants,

Plaintiffs state and allege as follows:

## I.    <u>PARTIES AND OTHER INVOLVED PERSONS</u>

### A.    <u>Plaintiffs</u>

    1.    Plaintiffs are individual investors who invested approximately $35 million

with various Defendants in a foreign currency arbitrage program.  These Defendants

promoted the program and represented that investments in the program were instantly

liquid, fully secure, principal protected, held in segregated accounts, and guaranteed to

earn double digit returns.  However, none of the Plaintiffs have been able to liquidate

their investments, locate any segregated accounts containing their investments, or even

confirm the continued existence of their investments.  Accordingly, Plaintiffs are entitled

to the relief requested herein.

    2.    Plaintiffs Howard and Sharon Phillips live at 1804 County Road M,

Swanton, Ohio 43558.

3.     Plaintiff Joy Phillips is the twenty-two year old daughter of Howard and Sharon Phillips.  She lives with her parents at 1804 County Road M, Swanton, Ohio 43558.

4.     Plaintiff David Phillips lives at 960 Seven Ponds Towd Road; Southampton, New York 11968.  He also maintains a residence at R.R. 3 Box 327, Pennington Gap, Virginia, 24277.

5.     Plaintiffs Kenneth A. and Judith G. Hale live at 600 Enterprise Avenue, Wauseon, Ohio 43567.

6.     Plaintiff Roxanna Holliker is the daughter of Kenneth and Judith Hale.  She lives with her parents at 600 Enterprise Avenue, Wauseon, Ohio 43567.

7.     Plaintiffs Timothy and Leesa Coley live at 209 Woodland Avenue, Swanton, Ohio 43558.

8.     Plaintiffs Philip and Joan McDonald live at 14465 Freesia Way, Apple Valley, Minnesota 55124.

9.     Plaintiff George Helmstetter lives at 221 Massachusetts Avenue, #514, Boston, Massachusetts 02115.

10.    Plaintiff Sharon DelConte lives at 313 Oxfordshire Lane, Chapel Hill, North Carolina 27517.

11.    Plaintiffs Gordon and Kathlyn Schepke live at 328 Paragon Avenue, Troy, Michigan 48098.

12.    Plaintiffs Jerry and Kaye Rachel live at 14475 Thomas Trail, Rogers, Minnesota 55374.

13.     Plaintiffs Michael and Mary Patterson live at 355 F Avenue West, P.O. Box 363, Walford, Iowa 52351.

14.     Plaintiff Paul Migliorelli lives at 373 Chandler Street, Worcester, Massachusetts 01602.

15.     Plaintiffs Hans "Heiko" and Jerilynn Reske live at 9708 Amber Court, Denton, Texas 76207.

16.     Plaintiffs Floyd and Ilene Foster live at 10901 East Medina Avenue, Mesa, Arizona 85209.

17.     Plaintiffs Victor and Marianne Sultana live at 3203 43rd Avenue East, Bradenton, Florida 34208.

18.     Plaintiff Dr. Ronald Linari lives at 37 Stone Ridge Road, Franklin, Massachusetts 02038.

19.     Plaintiff Bill Salisbury lives at 11115 West 106th Avenue, Broomfield, Colorado 80021.

20.     Plaintiff Curtis Winn lives at 4208 East Frank Phillips Boulevard, Bartlesville, Oklahoma 74006.

21.     Plaintiff Mark Sticha lives at 3840 Dunbar Court, Brooklyn Park, Minnesota 55443.

22.     Plaintiffs Russell and Jacquelyn Miller live at 1041 Princess Drive, Oberlin, Pennsylvania 17113.

23.     Plaintiff Stephen Flemmons lives at 1107 East Flemmons Lane, Lovington, New Mexico 88260.

24.     Plaintiff Joseph Kalina lives at 10587 West 330th Street, Northfield, Minnesota 55057.

25.     Plaintiff Bill McLeod lives at P.O. Box 1090, Panhandle, Texas 79068.

26.     Plaintiff James Downing III lives at 217 Fredericksburg Avenue, Louisa, Virginia 23093.

27.     Plaintiffs Edgar and Linda Stephenson live at P.O. Box 91, Grangeville, Idaho 83530.

28.     Plaintiff Ronald B. Stolpman lives at 16597 Iredale Court, Lakeville, Minnesota 55044.

29.     Plaintiff Donald Moran lives at 5305 Lindenwood Avenue NE, Louisville, Ohio 44641.

30.     Plaintiff Shirley Jacobs lives at 121 Pineview Drive, Palmyra, Pennsylvania 17078.

31.     Plaintiffs Janet and Edgar Johnson live at 13470 Sherwood Circle, Cleveland, Ohio 44125.

32.     Plaintiff Curtis Harvey lives at 5490 Hedge Brooke Pointe N.W., Acworth, Georgia 30101.

33.     Plaintiff Barry Owens lives at P.O. Box 820259, Vancouver, Washington 98682.

34.     Plaintiffs Stephen G. and Elizabeth A. Froehle live at 332 Floral Drive West, Shoreview, MN  55126.

35.     Plaintiff Kelly Lenti lives at 215 Grand Boulevard, Park Ridge, Illinois 60068.

36.     Plaintiff John Walencik lives at 2510 North Verona Road, Morris, Illinois 60450.

37.     Plaintiffs Dan and Diann Haynes live at 3016 Myrtlewood Way, Nampa, Idaho 83686.

38.     Plaintiff Donna Haynes lives at 2929 Kingsgate Drive, Nampa, Idaho 83687.

39.     Plaintiff Greg Rutter lives at 2517 Bellamy, Modesto, California 95354.

40.     Plaintiff Jeffery Timberlake lives at 141 W. Jackson 1701A, Chicago, Illinois 60604.

41.     Plaintiffs Larry and Charleyne Swoverland live at 1599 Quail Glenn Court, Carmel, Indiana 46032.

42.     Plaintiff Robert Herr lives at 73 Fairfax Lane, Annville, Pennsylvania 17003.

43.     Plaintiff Allen G. Collins lives at 109 Andrew Drive, Seneca, South Carolina 29678.

44.     Plaintiffs Raymond L. and Patricia A. Winesburg live at 13913 Chanwahon Road, Huntly, Illinois 60142.

45.     Plaintiffs Jerome and Edith Hoeppner live at 19850 Akin Road, Farmington, Minnesota 55024.

46.     Plaintiffs Sandra and Harry Grusche live at P.O. Box 6600, 16930 Hugh Torance Parkway, Huntersville, North Carolina 28070.

47.     Plaintiffs Rick and Tamie Steiner live at 2420 S. Jebel Way, Aurora, Colorado 80013.

48.     Plaintiff Stanislaw Zukowski lives at 6275 Townsend Winona Road, Flagstaff, Arizona 86004-1490.

49.     Plaintiff Craig Engel lives at 21 Crested Butte Court, Shamong, New Jersey 08088.

50.     Plaintiff Richard Roiger, Ph.D, lives at 10321 Brunswick Circle, Bloomington, Minnesota 55438.

51.     Plaintiff William K. Fravel lives at 2515 Kissam Court, Orlando, Florida 32809.

52.     Plaintiffs Frank and Harriet Bright live at 4570 Vanadium Bend, Cumming, Georgia 30040.

53.     Plaintiffs Karl and Charlene Kokotan live at 425 Park Lane, Waterloo, Iowa 50702.

54.     Plaintiffs David A. and Candace J. Tackett live at 7403 Blythwood Lane, Charlotte, North Carolina 28227.

55.     Plaintiffs Ronald and Sandra Yates live at 90 Fairview Street, Carlisle, Pennsylvania 17013.

56.     Plaintiffs Rodney and Judith Wylie live at 16814 East Euclid Place, Aurora, Colorado 80016.

57.     Plaintiff Dave Balthaser lives at 2795 Mountain Road, Hamburg, Pennsylvania  19526.

58.     Plaintiff Robert Freed lives at 2632 W. Gregg Drive, Chandler, Arizona 85224.

59.     Plaintiffs Andrew J. and Nancy J. Weed live at 3600 Marks Road, Yakima, Washington 98903-9710.

60.     Plaintiff Boyd A. Wear lives at 713 Boydston Mill Drive, North Webster, Indiana 46555.

61.     Plaintiffs James H. Renneker and Joyce L. Davis live at P.O. Box 328, Warroad, Minnesota  56763-0328.

62.     Plaintiffs Thomas and Katherine Marabello live at East 3028 Ermina Avenue, Spokane, Washington 99207.

63.     Plaintiffs Timothy and Louise Beatty live at 3640 Bishop Road, Emmet, Idaho 83617.

64.     Plaintiff Mary Schafer lives at 10035 Mills Station Road Space 78, Sacramento, California 95827.

65.     Plaintiffs Leonard and Kathleen Wisner live at 12643 Southeast 113th Place, Tigard, Oregon 97223.

66.     Plaintiff David S. Smith lives at 100 East Broadway Street, Butte, Minnesota 59701.

67.     Plaintiff Thomas Rodeck lives at P.O. Box 1950, Andrews, North Carolina 28901.

68.     Plaintiff James DeVito lives at 10210 Uppingham Court, Richmond, Virginia  23235.

69.     Plaintiff Bonnie E. Gloth lives at 6008 Foxborough Square East, Brentwood, Tennessee  37027.

70.     Plaintiff Daniel Pillar lives at P.O. Box 1161, Garner, North Carolina 27529.

71.     Plaintiff Myonghui Gass lives at 5215 Winthrop Avenue, Mechanicsburg, Pennsylvania 17050.

72.     Plaintiff Jan Anderson lives at PR, 82801 Edsbyn, Sweden.

73.     Plaintiffs Paul and Melissa Grusche live at 3 Sea Pines, Aliso Viejo, California  92656.

74.     Plaintiff Gunvant Bhatt lives at 12500 47th Avenue North, Plymouth, Minnesota  55422.

75.     Plaintiff Karen L. Gladstone lives at 3636 East Coconino Place, Phoenix, Arizona 85044.

76.     Plaintiff Robert Pajor lives at 380 Ridge Circle, Wayzata, Minnesota 55391.

77.     Plaintiff David W. Nielsen lives at 14028 87th Avenue North, Maple Grove, Minnesota  55369.

78.     Plaintiff Stephen Laube lives at 1902 Behrend Drive, Phoenix, Arizona 85024.

79.     Plaintiff Michael S. McGonnell lives at 9519 Westover Club Circle, Windermere, Florida 34786.

80.     Plaintiff Mary Eisenbarth lives at 1616 South Phoebe Drive, Ridgefield, Washington 98642.

81.     Plaintiff Daryl Vossler lives at 1844 29th Avenue Northwest, New Brighton, Minnesota 55112.

82.     Plaintiff Eugene G. Helfrich lives at 9645 State Route 3, Columbia, Illinois 62236.

83.     Plaintiff Thomas R. Los lives at 5574 South Denis Court, Hales Corners, Wisconsin 53130.

84.     Plaintiff Dwight A. Smith lives at 10543 Cross Country Lane, Littleton, Colorado 80125.

85.     Plaintiffs Joseph and Cheryl Ann Kraus live at N70 W7487 Bridge Road, Cedarburg, Wisconsin 53102-1722.

86.     Plaintiff David Bratt lives at 1739 Gordon River Lane, Naples, Florida 34101.

87.     Plaintiff Robert Thomssen lives at 1330 Willowbrook Drive, Wayzata, Minnesota 55391.

88.     Plaintiff Daniel Lindberg lives at 55 Sawyer Lane, Holden, Massachusetts 01520.

89.     Plaintiff Michael Lenti lives at 245 North Northwest Highway, Park Ridge, Illinois 60068.

90.     Plaintiff Ronald Higgins lives at 806 Cedar Avenue, Richland, Washington 99352.

91.     Plaintiff Brad Wevodau lives at 3810 Lamp Post Lane, Camp Hill, Pennsylvania 17011.

92.     Plaintiff Viola Heinemann lives at 6451 SR 271, Rosalia, Washington 99170.

93.     Plaintiffs Sandra and Ivan Phillips live at 7800 Stone Avenue North, Seattle, Washington 98103.

94.     Plaintiff Edward L. Hemenway lives at 8315 Chicago Avenue South, Bloomington, Minnesota 55420.

95.     Plaintiffs Bill and Emma Jean Hunt live at 1340 Katen, Ellensburg, Washington 98926.

96.     Plaintiff Kris A. Fink lives at 7419 Buoy Court, Northfield Center, Ohio 44067.

97.     Plaintiff Mark Cobb lives at 33 Pleasant Ridge Road, Plattsburgh, New York 12901.

98.     Plaintiff Jerome Reynolds lives at 726 Spring Hill Circle, Woodbury, Minnesota 55125.

99.     Plaintiff Anthony J. Skufca lives at 1516 Stony Hill Road, Hinckley, Ohio 44233.

100.    Plaintiff David Burt lives at 20280 Danny Court, Oregon City, Oregon 97045.

101.    Plaintiff Bruce T. Peacock lives at 6160 S. 6th Street #W-8, Milwaukee, Wisconsin 53221.

102.    Plaintiff Donald Kincaid lives at 4608 Oakwood Circle, Gastonia, North Carolina 28056-9037.

103.    Plaintiff Lawrence Kim Treiber lives at 5341 Ridgeside Circle Southeast, Canton, Ohio  44707.

104.    Plaintiffs Robert A. Roof lives at 20706 247th Street, Delhi, Iowa  52223.

105.    Plaintiff Douglas Patnode lives at 9336 Magnolia Lane North, Maple Grove, Minnesota 55369.

**B.    The Oxford Defendants**

106.    Defendant Oxford Global Partners LLC is located at 1900 LaSalle Avenue, Minneapolis, Minnesota, also known as the "Van Dusen mansion."

107.    Defendant Oxford Global Advisors is located at 1900 LaSalle Avenue, Minneapolis, Minnesota.

108.    Defendant Oxford Private Client Group is located at 1900 LaSalle Avenue, Minneapolis, Minnesota.

109.    Upon information and belief, the three Oxford entities are often referred to as "The Oxford Group" or "Oxford," and share employees, marketing materials, and clients, and are otherwise related or affiliated.  The three Oxford Defendants shall be referred to as the "Oxford Companies."  See, e.g.,  ¶ 391; Exhibit 77.

### C.   The UB Defendants

110.   Defendant UBS Diversified is located at 12644 Tiffany Court, Suite 100, Burnsville, Minnesota, 55337.

111.   Defendant Universal Brokerage FX is located at 12644 Tiffany Court, Suite 100, Burnsville, Minnesota, 55337.

112.   Defendant UBFX Diversified is located at 12644 Tiffany Court, Suite 100, Burnsville, Minnesota, 55337.

113.   Upon information and belief, Defendant UBS Diversified FX Advisors, LLC is a predecessor, related entity or otherwise affiliated with UBFX Diversified, UBS Diversified, or Universal Brokerage FX.

114.   Upon information and belief, Defendant UBS Diversified FX Growth LP is a predecessor, related entity or otherwise affiliated with UBFX Diversified, UBS Diversified, or Universal Brokerage FX.

115.   Upon information and belief, Defendant UBS Diversified FX Management, LLC is a predecessor, related entity or otherwise affiliated with UBFX Diversified, UBS Diversified, or Universal Brokerage FX.

116.   Upon information and belief, Defendant UBS Diversified Growth, LLC is a predecessor, related entity or otherwise affiliated with UBFX Diversified, UBS Diversified, or Universal Brokerage FX.

117.   Upon information and belief, Defendant Universal Brokerage Services, LLC is a predecessor, related entity or otherwise affiliated with UBFX Diversified, UBS Diversified, or Universal Brokerage FX.

118.   Upon information and belief, Defendant UBS REFCO IFX Millennium RJO PRG is a predecessor, related entity or otherwise affiliated with UBFX Diversified, UBS Diversified, or Universal Brokerage FX.  The UB Defendants shall be referred to as the "UB Entities."

## D.   Defendants Kiley, Cook, Beckman, Pettengill and Durand

119.   Defendant Trevor Cook ("Cook") represents to the public that he is an investment advisor and/or wealth manager providing financial products and investment opportunities.  Upon information and belief, Cook has identified himself as the Chief Investment Strategist/Managing Partner at Oxford Global Partners LLC, the Chief Investment Director at Oxford Global Advisors, and a partner of Universal Brokerage FX and UBS Diversified.  Exhibit 1a; see, e.g., ¶¶ 232-233, 381; Exhibit 11.  Upon information and belief, Cook is either an owner, employee or otherwise affiliated with the Oxford Companies and UB Entities.  Cook promoted a foreign currency arbitrage program to Plaintiffs through the Oxford Companies and the UB Entities, and has presented the program at presentations and workshops with Defendants Patrick Kiley, Gerald Durand, Bo Beckman and Christopher Pettengill.  See, e.g., Exhibit 11; ¶ 702.

120.   Defendant Patrick Kiley ("Kiley") represents to the public that he is an investment advisor providing financial products and investment opportunities, and identifies himself as the Senior Partner, Chief Economist and Technical Analyst for Defendant Universal Brokerage FX and UBS Diversified. See, e.g., ¶¶ 262; Exhibit 59. Upon information and belief, Kiley is a partner or employee or otherwise affiliated with UBFX Diversified, UBS Diversified, or Universal Brokerage FX, Oxford Global

Partners, Oxford Global Advisors, Oxford Private Client Group, or their related entities. Minnesota Secretary of State records indicate that Kiley is identified as an agent for a number of inactive entities at the same address as UBS Diversified and Universal Brokerage FX (i.e., UBS Diversified FX Growth, L.P., UBS Diversified FX Advisors, LLC, and UBS Diversified FX Management, LLC). Exhibit 1b. Kiley hosts an investment radio show entitled "Follow the Money," which is directed at Christian audiences and broadcasted on hundreds of radio stations throughout the country. Kiley promoted the foreign currency arbitrage program and his investment services to Plaintiffs through the UB Entities, on his radio show, on Christian websites, and in the International Forecaster newsletter. Exhibit 1b.

121.   Defendant Jason "Bo" Alan Beckman ("Beckman") represents to the public that he is a leading equity manager, and identifies himself as the Senior Portfolio Manager for both the Oxford Private Client Group and The Oxford Group's CORE Equity Strategy. Exhibit 1c; see, e.g., Exhibit 11, ¶ 232.  Beckman has promoted the foreign currency arbitrage program to Plaintiffs through the Oxford Companies. See, e.g., ¶¶ 275; 399-402, 683, 1054.  Upon information and belief, Beckman is a principal, partner, owner, employee or otherwise affiliated with Oxford Global Partners, Oxford Global Advisors, Oxford Private Client Group, UBFX Diversified, UBS Diversified, Universal Brokerage FX, or their related entities.

122.   Defendant Gerald Durand ("Durand") hosts a radio show on investments entitled "Wealth Survival," and represents to the public that he is an investment advisor and/or wealth manager providing financial products and investment opportunities. See,

e.g., ¶¶ 157, 217.  Upon information and belief, he is currently Managing Director of Wealth Survival.  Durand was the Managing Member of Oxford Global Advisors. Exhibit 1a.  Durand promoted the foreign currency arbitrage program to Plaintiffs through both the Oxford Companies and the UB Entities.  See, e.g., ¶ 606, 846.

123.   Defendant Christopher Pettengill ("Pettengill") presents himself to the public as an experienced investment professional and financial advisor, and has identified himself as a representative of the Oxford Companies and Universal Brokerage FX.  Pettengill promoted the foreign currency arbitrage program to Plaintiffs through the Oxford Companies and UB Entities. See, e.g., ¶¶ 217, 224, 229. Upon information and belief, Pettengill is or was also part owner of the Oxford Companies. See e.g., ¶¶ 223, 409.  Pettengill was Durand's former co-host on the radio show "Wealth Survival."

**E.     Defendant Entrust Midwest, LLC**

124.   Defendant Entrust Midwest, LLC ("Entrust") is located at 12800 Industrial Park Blvd, Suite 220, Plymouth, Minnesota 55441.  Entrust provides administrative and custodial services for self-directed IRAs, and administers self-directed IRA accounts for numerous Plaintiffs. Entrust is an affiliate of and local office for The Entrust Group.

**F.     Defendant Associated Bank**

125.   Defendant Associated Bank N.A./Associated Banc-Corp (collectively, "Associated Bank") offers banking and financial services throughout Wisconsin, Illinois, and Minnesota.  Defendants held multiple accounts at Associated Bank in which Plaintiffs' funds were deposited.  Associated Bank is a corporation organized and

existing under the laws of Wisconsin, with its principal place of business and headquarters at 200 North Adams Street, Green Bay, Wisconsin 54301.

## G.    Other involved individuals and entities

126.    Crown Forex LLC is a non-registered entity that purports to be located at 5413 Nicollet Avenue, Suite 14, Minneapolis, Minnesota, which is a fictitious address. See e.g., Exhibit 2.

127.    Eric Erickson ("Erickson") is Director of Oxford Private Client Group, and has been identified as a contact person at UBS Diversified.  Erickson advised multiple Plaintiffs regarding their investments in the foreign currency arbitrage program.  See, e.g., ¶¶ 274-275, 384.

128.    John Loebel is a Senior Investment Advisor at Universal Brokerage FX who advised multiple Plaintiffs regarding their investments in the foreign currency arbitrage program.  See, e.g., Exhibit 26; ¶¶ 252-254, 538-539, 617.

129.    Mike Behm is a Senior Investment Advisor at Universal Brokerage FX who advised multiple Plaintiffs regarding their investments in the foreign currency arbitrage program. See, e.g., ¶¶ 448, 469, 733.

130.    Jared Jenkins is a Senior Investment Advisor at Universal Brokerage FX who advised multiple Plaintiffs regarding their investments in the foreign currency arbitrage program.  See, e.g., Exhibit 53; ¶¶ 296, 437, 551-552.

131.    Paul Wood is a former Senior Investment Advisor for Oxford Private Client Group who advised certain Plaintiffs regarding their investments in the foreign currency arbitrage program.  See, e.g., ¶¶ 483-487.

132.    Grant Grzybowski is the Chief Financial Strategist/Technical Analyst for UBS Diversified and Chief Investment Advisor for Oxford Global Advisors who advised multiple Plaintiffs regarding their investments in the foreign currency arbitrage program. See, e.g., ¶¶ 560, 768-775.

133.    Ryan Moeller is an internal accountant for the Oxford Companies who assisted Cook with the foreign currency arbitrage program.  See, e.g., ¶¶ 896, 1160.

134.    Timothy Daley is a former Senior Financial Advisor with Universal Brokerage FX who advised multiple Plaintiffs regarding their investments in the foreign currency arbitrage program.  See, e.g., ¶¶ 629-633, 881-885.

135.    Brian Seiwert is a representative of Oxford Global Advisors, Oxford Global Partners, and Universal Brokerage FX who advised multiple Plaintiffs regarding their investments in the foreign currency arbitrage program. See, e.g., Exhibits 77, 81; ¶¶ 320-326, 1198-1199.

136.    Jerry Watkins is a Chief Financial Strategist/Technical Analyst for UBS Diversified who advised certain Plaintiffs regarding their investments in the foreign currency arbitrage program. See, e.g., ¶¶ 371-372, 850.

137.    Adam Edenborg is an Oxford representative who assisted various Plaintiffs with their investments in the program.  See, e.g., ¶¶ 695, 754.

138.    Mark Trimble is a representative of Universal Brokerage FX who advised certain Plaintiffs regarding their investments in the foreign currency arbitrage program. See, e.g., Exhibit 115; ¶ 403.

139.   Barbara Pefley is an Investment Advisor for Universal Brokerage FX who advised certain Plaintiffs regarding investments in the foreign currency arbitrage program.  See, e.g., ¶¶ 1402-1405.

140.   Jitesh Mehta is a representative of Oxford Private Client Group who advised and assisted certain Plaintiffs regarding their investments in the foreigh currency arbitrage program.  See, e.g., ¶ 1165.

141.   Charlie Reynolds is an Investment Advisor for Universal Brokerage FX who advised certain Plaintiffs regarding their investments in the foreigh currency arbitrage program.  See, e.g., ¶¶ 869-872.

142.   Kyle Garman is a representative of Oxford Global Advisors and Universal Brokerage FX who advised certain Plaintiffs regarding their investments in the foreign currency arbitrage program. See, e.g., ¶¶ 1096-1097.

143.   H. Victor Penn was a Universal Brokerage FX representative who advised certain Plaintiffs regarding their investments in the foreign currency arbitrage program. See, e.g., ¶¶ 1121-1123.

144.   Jeremy Nerenberg is a Universal Brokerage FX representative who advised certain Plaintiffs regarding their investments in the foreign currency arbitrage program. See, e.g., ¶ 908.

145.   Walt Krawza is a former representative of Universal Brokerage FX who advised certain Plaintiffs regarding their investments in the foreign currency arbitrage program.  See, e.g., ¶¶ 1434-1437.

146.   Walter Buckner is a Universal Brokerage Rerpesentative who advised certain Plaintiffs regarding their investments in the foreign currency arbitrage program. See, e.g., ¶ 1000.

147.   Tom Richardson is the Chief Operating Officer of Oxford Global Partners who advised certain Plaintiffs regarding their investments in the foreign currency arbitrage program.  Richardson gave investment workshops and presentations with Cook and Beckman.  See, e.g., Exhibit 11, ¶¶ 232, 483.

148.   Gene Walden is an author of books on investing and, upon information and belief, is an employee or partner of Oxford Private Client Group. See, e.g., Exhibit 11; ¶¶ 232, 331. Walden advised certain Plaintiffs regarding their investments in the foreign currency arbitrage program and contributed articles to the Oxford Private Client Group newsletters. See, e.g., ¶¶ 680-681.

149.   Julia Smith ("Smith") is Kiley's assistant at the UB Entities, that assisted multiple Plaintiffs with account documentation, withdrawals, and fund transfers.  See, e.g., ¶¶ 376, 406, 432.  Smith is also co-signer on bank accounts held by Universal Brokerage FX Management LLC, Crown Forex LLC, and Basel Group LLC.

150.   Laurent Winkelmann and Phillipe Von Bredow are the trustees appointed for Crown Forex SA in its bankruptcy proceedings in Switzerland.

151.   Upon information and belief, Shadi Swais is the Chief Executive Officer of Crown Forex SA.

152.   Millennium Trust Company ("Millennium") is an administrator of self-directed IRA accounts and administers numerous Plaintiffs' retirement accounts.

153.    Oxford Global Partners identified the following entities as "strategic partners:"  Capricorn Asset Management, an established currency manager with a global client base; JDFX Technologies, a supplier of technological expertise to the investment banking community; JP Fund Services, a Geneva-based partner that provides total fund structures for asset managers; OG International, the "international locality in Europe, U.S. and Panama that gives Oxford a 24-hour presence in brokerage and operational functions;" TNT Investments, a commodity trading advisor and pool operator; and Mesa Holdings, Inc., "a leader in helping to fuel Registered Investment Advisor growth by consolidating non-revenue generating activities and new products..."

## II.    JURISDICTION

154.    Pursuant to 28 U.S.C. § 1331, this Court has federal jurisdiction over the subject matter of this action under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et. seq.

155.    Pursuant to 28 U.S.C. § 1331, this Court has federal jurisdiction over the subject matter of this action under the Commodities Exchange Act, 7 U.S.C. § 1, et. seq.

156.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## III.    FACTUAL BACKGROUND

## A.         Phillips, Hales, Coleys and Holliker ("The Ohio Plaintiffs")

157.    Durand had a radio show in which he spoke about investment opportunities and the economy.  On his radio show, Durand discussed the foreign currency arbitrage program and described investments in the program as safe, liquid, and principal protected.

158.    In February 2006, after listening to Durand's investment radio show, Kenneth Hale invested money in the foreign currency arbitrage program with Durand.

159.    Later that year, Durand told Hale that he and Cook would be traveling through Northwest Ohio.  Hale invited them to visit the Hales' home in Wauseon, Ohio to discuss his investment opportunities with Hale and others that he would invite to attend.  Durand accepted Hale's invitation.

160.    In April 2006, Durand came to the Hales' home to make the investment presentation.

161.    Cook accompanied and assisted Durand in making the presentation.

162.    Howard and Sharon Phillips, among others, attended Durand and Cook's presentation.

163.    Following Durand and Cook's April 2006 presentation at the Hales' home, Howard Phillips informed his brother David Phillips of the opportunity to invest with Durand.  They also informed their adult daughter, Joy Phillips, of the opportunity.

164.    Kenneth Hale also informed his adult daughter, Roxanna Holliker, and Pastor Coley about the opportunity to invest with Durand.

165.    Kenneth and Judith Hale, their daughter Roxanna Holliker, Howard and Sharon Phillips, their daughter Joy Phillips, David Phillips, and Pastor Coley all eventually invested with Durand and Cook.

166.    In early 2007, Durand and Cook told Plaintiffs about the foreign currency arbitrage program that would provide a guaranteed 12% return, over one year, with the

principal protected, and, that would be instantly liquid if they wanted to redeem their investment.  Exhibit 3.

167.   Based on these representations, the Ohio Plaintiffs agreed to invest with Durand and Cook in the foreign currency arbitrage program.

168.   At some point, after the year expired on the 12% guaranteed return, Durand and/or Cook placed the Ohio Plaintiffs in the same currency arbitrage investment with the principal protected and that would be instantly liquid if anyone wanted to redeem their investment, except that that the fixed rate of return would be 10.5% for a four-year term.

169.   Durand recommended the "guaranteed 4 year, 10.5% investment" to the Hales and then placed them in it.  Durand and/or Cook placed the other Ohio Plaintiffs in the investment without their knowledge.

170.   In March 2008, around the time the guaranteed 12% investment was supposed to expire, Sharon Phillips e-mailed Durand and Cook to find out what their investment options were following expiration of the 12% investment.  Durand and Cook failed to respond.  Subsequently, the Phillips received a statement showing that all their funds were invested in the "guaranteed 4-year, 10.5% investment."  Sharon Phillips called Durand and Cook for an explanation.  Cook explained that, "We discussed this and felt this would be best for you."  Sharon Phillips understood "we" to refer to Durand and Cook.

171.   The Ohio Plaintiffs invested close to $5 million with Durand and Cook in the foreign currency arbitrage program.

172.   On information and belief, Durand and Cook purported to place the Ohio Plaintiffs' investment with UBS Diversified, Universal Brokerage FX, UBFX Diversified, or UBFX Brokerage FX or their predecessors, or related or otherwise affiliated entities.   The Ohio Plaintiffs initially received statements from UBS Diversified.  Later statements indicated they were from Universal Brokerage FX.

173.   In making contributions to their accounts, the Ohio Plaintiffs have made checks payable to UBS Diversified, Universal Brokerage FX, and UBFX Diversified.

174.   Checks made payable to UBS Diversified were then stamped "Pay to the Order of Wells Fargo Bank, N.A." and "For Deposit Only."   The Wells Fargo bank account number is ******2710.  Exhibit 4.

175.   A check made payable to Universal Brokerage FX appears to have been deposited into the same Wells Fargo bank account listed in Paragraph 174.  A copy of this check is included in Exhibit 4.

176.   Kenneth Hale invested money that was kept with Millennium Trust Co., account number ******6011.   Judy Hale's account number with Millennium is ******8016.

177.   Pastor Coley invested money that was kept with Millennium Trust Co., account number ******1465.

178.   The Ohio Plaintiffs believed that Durand was managing their accounts, and that Cook was assisting him.  In mid-2008, however, the Ohio Plaintiffs had not heard from Durand for some time, which prompted Sharon Phillips to e-mail Cook in July 2008 regarding Durand's whereabouts.   Cook responded that Durand "has been traveling

extensively and has decided to take some time off.  He will be working out of his home for awhile and may not be accessible on a weekly basis."

179.   In summer 2008, Durand spoke with Kenneth Hale.  Durand informed Kenneth Hale that Durand was no longer with his former company or associated with Cook.

180.   During the "guaranteed 4-year, 10.5% investment," UBFX had been paying Howard and Sharon Phillips $2,500.00 a month from the returns on the investment.  The regular monthly withdrawals were paid by check all of which were signed by Kiley.

181.   In April 2009, in addition to the regular monthly $2,500.00 withdrawal, Howard and Sharon Phillips contacted Cook to withdraw $450,000.00 from their account to purchase a farm and to pay certain taxes.  In early May, they increased the amount of the request to $650,000.00.

182.   In response to Howard and Sharon Phillips' request, Cook first indicated there could be significant fees and penalties.  Cook then told Howard and Sharon Phillips that he could avoid the fees and penalties, but there would be substantial taxes due. Howard and Sharon Phillips then informed Cook that they were not going to purchase the property, and, that Howard Phillips was experiencing health issues.

183.   On May 21, 2009, Sharon Phillips informed Cook that they would need $50,000.00, in addition to the regular $2,500.00 monthly check.  Cook processed the request.

184.   On June 4, 2009, Durand called David Phillips to inform him that Durand had heard that a large sum of money invested with Cook was missing, that an

investigation would be forthcoming in approximately three months, and that David should redeem all accounts right away or David would not be able to get his money out.

185.    On June 4, 2009, David Phillips requested that Cook withdraw $500,000.00 from his account with Cook.  Cook said he would wire the money, but never did.

186.    On June 4, 2009, David Phillips told Howard and Sharon Phillips about the message from Durand.  Howard and Sharon Phillips then contacted Cook to close all their accounts and return their money.  Cook inquired as to why they wanted their money.  Howard Phillips told him that one reason was that Howard felt deceived because Cook had misled the Phillips by not telling them that Durand had left the firm.  Cook replied that Durand was still with the firm, and was receiving a paycheck.  Cook even offered to call Durand and they would have a three-way conversation to reassure them.  Knowing of David Phillips' conversation with Durand, the Phillips declined and asked Cook to return all their money.  That same day, Sharon Phillips called Durand and told him what Cook said.  Durand said that Cook was wrong, that Durand had left in June 2008, that he walked away from millions of dollars of client accounts because of differences with Cook, and that Cook was paying Durand severance but not a paycheck.

187.    On June 11, 2009, David Phillips left a message with Cook to fully close his account and to return his funds.  Cook has never responded and is now unreachable.

188.    Cook initially told Howard and Sharon Phillips that he was obtaining the necessary forms for them to close out their accounts.  Cook, however, never sent out any forms or processed any of the Phillips' requests to close their accounts.

189.    The Phillips and their counsel have repeatedly tried to contact Cook since mid-June 2009 to demand that Cook return the Phillips' money, but Cook has never responded.

190.    After the Phillips requested that Cook return their money, Cook met with Durand and requested Durand to ask the Phillips not to demand return of their money. Durand told the Phillips of this conversation.

191.    On June 24, 2009, Kenneth and Judith Hale attempted to contact Cook by e-mail and telephone to close all of their accounts.  The Hales have repeatedly tried to contact Cook since then, but Cook has not returned any of their communications.

192.    Upon information and belief, Durand and Kiley have information regarding the whereabouts of the Ohio Plaintiffs' accounts and funds.

193.    The Ohio Plaintiffs' representatives have attempted to speak to Kiley. While he initially spoke to the Ohio Plaintiffs' representative, he did not disclose any information as to the location of the Ohio Plaintiffs' accounts and has since refused to return telephone calls.

194.    Durand has spoken to the Ohio Plaintiffs and their representatives, but said only that the Ohio Plaintiffs should contact Cook about the return of their money.

195.    Pastor Coley, Roxanna Holliker, and Joy Phillips have asked Cook to return their money, but he has not done so.

196.    According to Universal Brokerage FX statements, Howard and Sharon Phillips' accounts are worth approximately $2 million.  See, e.g., Exhibit 5.

197.   According to Universal Brokerage FX statements, David Phillips' accounts are worth approximately $1.4 million. Id.

198.   According to Universal Brokerage FX statements, Kenneth and Judith Hale's account is worth in excess of $1.1 million. Id.

199.   According to Universal Brokerage FX statements, Joy Phillips' account is worth in excess of $29,000.00.  Id.

200.   According to Universal Brokerage FX statements, Roxanna Holliker's account is worth in excess of $190,000.00.  Id.

201.   According to Universal Brokerage FX statements, Pastor and Leesa Coley's account is worth in excess of $20,000.00.  Id.

202.   On July 6, 2009, the Ohio Plaintiffs' counsel contacted a reference provided by Durand in a solicitation letter named Sally Zimmerman.  Ms. Zimmerman indicated that she had done some tax work for investors with Durand in the past, but stopped doing this work because of unspecified concerns.  She also indicated that the FBI had contacted her regarding Durand but declined to provide more information.

203.   On July 6, 2009, Wells Fargo was contacted by the Ohio Plaintiffs' counsel regarding Account No. ******2710, referenced in Paragraph 174.  Wells Fargo indicated that the account was open and active, but would not freeze the account. Docket No. 5.

204.   On July 7, 2009, the Ohio Plaintiffs brought an *ex parte* TRO Motion to freeze any Wells Fargo accounts held by Defendants, the Millennium Trust Company accounts, and to prohibit Defendants from disposing of the Ohio Plaintiffs' property and funds.  Docket Nos. 1-7.

205.    The Honorable Chief Judge Michael J. Davis granted the *ex parte* TRO Motion and set a preliminary injunction hearing for July 10, 2009.  Docket No. 10.

206.    On July 9, 2009, Wells Fargo submitted a letter identifying accounts held by Defendants that were frozen pursuant to the *ex parte* TRO Order.  The letter indicated that the accounts contained only $290,651.03.  Exhibit 6.

207.    The hearing on the preliminary injunction was held on July 10, 2009.  The Court continued the hearing until July 24, 2009.  Docket No. 20.

208.    Pursuant to the e*x parte* TRO Order, the accounts were to remain frozen through the date of the hearing.  Docket No. 20.

209.    On July 10, 2009, following the hearing, Plaintiff Timothy Coley identified another account belonging to Defendants in which a check he had written was deposited. Docket No. 29. The check was made payable to UBFX Diversified.  The back of the check was stamped "Pay to the Order of Associated Bank, Plymouth, Minnesota 55411-2612" and "For Deposit Only."  The Associated Bank Account No. is ******5601, for which the account holder is Universal Brokerage FX MGMT, LLC.

210.    The Ohio Plaintiffs' counsel contacted Associated Bank regarding account no. ******5601.  Associated Bank indicated that the account was open and active, but would not freeze the account absent a Court Order.  Docket No. 28.

211.    On July 15, 2009, the Ohio Plaintiffs filed an Amended Verified Complaint with the Court seeking additional relief under the *ex parte* TRO Order.  Specifically, the Ohio Plaintiffs sought to freeze Defendants' accounts at Associated Bank.  The Court granted the additional relief.  Docket Nos. 23-32.

212.    Subsequently, Associated Bank provided a letter identifying the five accounts held by Defendants that were frozen pursuant to the *ex parte* TRO Order.  The letter indicated that the accounts contained only $950,175.22.  Exhibit 7.

213.    One of the accounts frozen by Associated Bank was named "Crown Forex LLC," with Patrick Kiley and Julia Smith as the signatories.

214.    At the preliminary injunction hearing held on July 24, 2009, all of the Defendants, except Durand and Oxford Global Advisors stipulated to a preliminary injunction whereby the previously frozen accounts would remain frozen as to the stipulating Defendants during the pendency of this litigation.

215.    During the months of July and August, counsel for the Ohio Plaintiffs was contacted by similarly situated investors who joined this litigation.  On September 9, 2009, Plaintiffs served and filed a Second Amended Verified Complaint including additional Plaintiffs and adding Beckman and Pettengill as Defendants.  Docket No. 96. In conjunction with the Second Amended Verified Complaint, Plaintiffs also brought a TRO to freeze Beckman and Pettengill's accounts at Wells Fargo and Associated Bank. Pending a decision on the Preliminary Injunction Motion, Beckman and Pettengill are permitted access to their accounts for living expenses and attorneys' fees.

216.    After filing the Second Amended Verified Complaint, additional investors contacted Plaintiffs' counsel and have since joined this lawsuit.

B.          **Plaintiffs Phillip and Joan McDonald**

217.    Philip and Joan McDonald ("the McDonalds") learned of the foreign currency arbitrage program in 2007 through Durand and Pettengill, representatives of

Oxford Global Advisors and Oxford Private Client Group, who had a radio show called "Wealth Survival." On the show, Durand and Pettengill presented a unified message in regard to the program.

218. In early March 2007, the McDonalds contacted Gerald Durand for additional information about the program. On March 21, 2007, the McDonalds met with Pettengill and Durand at their office in Eagan. It was the McDonalds' understanding at the initial meeting that Durand and Pettengill represented UBS Diversified, and that they were partners.

219. During the meeting, Durand and Pettengill represented that the program was a good investment for "the little guy," and that there was much less risk in the program than in traditional investing. Durand and Pettengill also represented that, unlike conventional brokers, they had additional incentive to perform because they did not make money unless the client made money.

220. During this meeting, the McDonalds explained to Durand and Pettengill that they only had a small pension plan, had irregular monthly income and that they were ages 79 and 80, respectively. Durand and Pettengill indicated that the foreign currency arbitrage was intended for people like the McDonalds.

221. On March 29, 2007, the McDonalds met with Pettengill at his office and he explained the system for the foreign currency arbitrage program. He represented that the investment principal was safe because the global investment strategy utilized major banks around the world, such as the United Bank of Switzerland (UBS). Pettengill indicated that they moved the money every day, taking advantage of low interest rates to invest the

money at a higher rate. He represented that the investment was fully liquid and that the earned interest would be 12% for the first year, and that there would only be minor fluctuations in interest thereafter. He also represented that the investments were held in segregated accounts, which added to the safety of the investment. Pettengill represented that another "safety feature" of the investment was the simultaneous buying and selling of currency.

222. A major selling point for the McDonalds was Pettengill's representation that he had personally invested $1 million in the program.

223. During the meeting, Pettengill positively discussed the firm and Beckman, and implied that he was one of the owners. He indicated that "we bought the Mansion because it was cheaper to buy than to pay the rent we are paying on the offices in St. Louis Park." Pettengill also spoke of frequent trips to Swiss banks and investment firms.

224. The McDonalds also received investment materials from Pettengill. The first was entitled "Oxford Global Partners: Prudent Management, Diversified Approach, Long-Term Focused, Capital Preservation, Global Scope." In its brochure, Oxford emphasized its "focus on capital preservation, superior yields, and secure long-term returns," and stated that "all our investment strategies—and all our strategic alliances—are designed to generate enhanced yield and dependable performance." See Exhibit 78.

225. A second brochure entitled "A Global Enhanced Return Strategy," which represented that investment in the program is safe because funds are held in individual segregated accounts with well-established, well-capitalized investment and commercial banks, and because the program reduces market exposure. The brochure also represented

that "funds are completely liquid and available on short notice," and that the program provides consistent yields and enhanced returns.  Id.

226.   Based on these representations, the McDonalds rolled over an IRA into self-directed IRA accounts with Entrust and Millennium, and the funds were then invested in the program through UBS Diversified.  See, e.g., Exhibit 8.  The McDonalds also invested cash in the program.

227.   Shortly after this initial investment, Pettengill presented a plan to the McDonalds whereby they would mortgage their home and add to their investment. Pettengill arranged a meeting between himself, the McDonalds, and Brad Kaplan of Mortgage and Investment Consultants, Inc., which took place at Kaplan's office on June 1, 2007.  The McDonalds expressed their concerns about mortgaging their home and incurring closing costs, but Pettengill reassured them that the guaranteed 12% returns would more than cover their mortgage payment and taxes.

228.   As a result of their meeting with Pettengill and Kaplan, the McDonalds mortgaged their home and invested the additional funds with Pettengill in the program. Exhibit 8A.   The total amount of the McDonalds' investment in the program is $431,948.45.

229.   In conjunction with their investment, the McDonalds received account statements from UBS Diversified from July 2007 to December 2007, and from "The Oxford" beginning January 2008.  See, e.g., Exhibit 9.  The McDonalds also received monthly checks from Oxford and UBS Diversified Growth, that purportedly constituted "monthly earnings."  Exhibit 9A.

230.    The McDonalds expressed confusion about the various names being used in conjunction with their investment, and Pettengill made a drawing purporting to show the relationship between these entities.  Exhibit 10.

231.    In 2009, the McDonalds were told that their money was now being held by Crown Forex SA, and that they could view their account online.

232.    On April 1, 2009, the McDonalds attended an investment opportunity workshop sponsored by Oxford Global Partners at the Van Dusen mansion.   The presenters were identified as follows:  Gene Walden, Oxford Private Client Group; Tom Richardson, Chief Operating Officer of Oxford Global Partners; Beckman, Senior Portfolio Manager of Oxford Private Client Group; Cook, Chief Investment Strategist for Oxford Global Partners; and Chris Reedy, Senior Vice President of Mesa Holdings, Inc. Exhibit 11.

233.    At the April 1, 2009 workshop, Cook discussed the program, describing it as "absolute return," "risk free" and "no risk."   He explained that the program was successful because they knew how to take advantage of price differentials with different banks.   He explained that they identify what banks or governments have the highest interest rate, and then borrow at a lower rate to place funds into the higher interest rate of earnings.

234.    At the workshop, Chris Reedy from Mesa Holdings represented that he had researched Oxford's foreign currency arbitrage program, and was so convinced of its success that he recommends it to all of his clients.

235.    Based on these representations, the McDonalds believed that their investments were safe, liquid, and would continue to earn high returns.

236.    In July 2009, the McDonalds received a call from Grant Grzybowski, who had taken over as their advisor for Pettengill, and he informed them of the Crown Forex SA bankruptcy.  Grzybowski indicated that he had no further information on the matter. In a subsequent conversation, Pettengill also indicated that he did not have information about their investment.

237.    On July 21, 2009, Oxford Global Partners posted a "client notice" on its website indicating that it is "unable to fulfill withdrawal or redemption requests."  The McDonalds then received letters from Universal Brokerage FX, UBS Fund and Oxford Global Partners similarly stating that they are "unable to fulfill withdrawal or redemption requests." Exhibits 12-13.

238.    To date, the McDonalds have no access to their funds, and they have received no information from Defendants regarding the existence or location of their investments.

## C.    **Plaintiffs Helmstetter and DelConte**

239.    Plaintiff George Helmstetter ("Helmstetter) learned of the foreign currency arbitrage program through Patrick Kiley's radio show, "Follow the Money," to which he began listening in May 2006.

240.    In August 2006, Helmstetter contacted Kiley at Universal Brokerage FX for a "free consultation" as advertised on the radio show.  After numerous e-mails and calls

to Kiley's assistant, Helmstetter eventually was able to speak directly with Kiley about the foreign currency arbitrage program on multiple occasions.

241.   During their telephone conversation, Kiley indicated that he did not accept money from everyone, but that he felt connected to Helmstetter and believed he was a good person, so he agreed to waive the "minimum investment" requirement.   Kiley represented that investments in the program were held in segregated accounts, were instantly liquid, principal protected, and guaranteed to earn double digit returns.

242.   Based on these representations, Helmstetter invested in the foreign currency arbitrage program with Kiley.   To invest, Helmstetter initially mailed a check in the amount of $50,000.00 payable to "PFG" to Universal Brokerage FX with attention to Kiley on September 21, 2006.  Exhibit 14.

243.   In conjunction with his investment, Helmstetter completed a UBS Diversified Growth application and subscription agreement, and received statements from Universal Brokerage FX and UBS Diversified.  Exhibit 15; see e.g., Exhibits 16-17.

244.   In February 2007, Helmstetter made an additional $10,000.00 contribution to his account.  Per Kiley's instructions, Helmstetter made the check payable to "UBS Diversified."  Exhibit 18.

245.   In August 2007, Helmstetter discussed with Kiley the possibility of rolling over an IRA account to invest further in the program.  Kiley indicated that Helmstetter could do a roll over as long as the funds were greater than $10,000.00.

246.   On August 24, 2007, Helmstetter rolled over $12,010.00 in IRA proceeds into a self-directed IRA account with Millennium, which was then transferred to a second

account with Universal Brokerage FX.  Exhibit 19; see, e.g., Exhibit 20.  The total amount of Helmstetter's investment in the program is $96,782.00.

247.  When Helmstetter received the first statement for his new account, he noticed that the balance was lower than the initial investment.  Helmstetter contacted Kiley, who referred him to Cook "in compliance."  Cook indicated that they had to keep $1,000.00 in a cash account at Universal Brokerage FX.

248.  Helmstetter's mother, Plaintiff Sharon DelConte, also invested in the foreign currency arbitrage program with Kiley and Universal Brokerage in January 2007, after Kiley reiterated his representations of liquidity, security, and enhanced returns during telephone conversations.

249.  To invest, DelConte transferred funds from an existing IRA into a self-directed account with Millennium on February 27, 2007, which then transferred the funds to Universal Brokerage FX for investment in the program.  Exhibit 21.  The total amount of DelConte's investment in the program is $158,952.00.

250.  In conjunction with her investment, DelConte completed a UBS Diversified Growth application and Subscription Agreement, and received account statements from UBS Diversified initially, and then later received account statements from Universal Brokerage FX.  DelConte was told that the change in statement issuer was merely the result of a "renaming of their section."  Exhibit 22; see, e.g., Exhibits 23-24.

251.  On March 22, 2007, DelConte also received an access identification and pin number from Millennium to follow her account online.  After a short time, however, DelConte could no longer access current information about her account online.  When

she apprised Kiley of the situation, he told her not to worry because Millennium could not keep up with the flow of the account, and DelConte should instead rely on monthly statements from UBS Diversified.  When Millennium e-mailed DelConte on August 17, 2007, about a new web product to view her account online, Kiley again advised her to focus instead on the statements from UBS Diversified.  Exhibit 25.

252.    From 2006 through 2008, Helmstetter and Kiley developed a personal relationship and Kiley ultimately offered Helmstetter a position in his firm.   When Helmstetter declined, their relationship became distant and Kiley transferred both Helmstetter and DelConte's accounts to Senior Investment Advisor John Loebel.  In mid-2008, Kiley no longer answered his phone or returned their calls.

253.    After hearing about the Bernie Madoff investment scandal, Helmstetter and DelConte both contacted Loebel in March 2008 regarding the legitimacy and security of their investments.   Loebel assured them that the investment was not a scam and, regardless, their funds were safeguarded by a fidelity bond.

254.    As a follow-up, Loebel sent DelConte a letter regarding the profitability and security of Universal Brokerage FX's investment in the foreign currency arbitrage program.    In his letter, Loebel represented the following:   "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in **segregated** accounts providing safety, security and liquidity."  Exhibit 26.

255.   On July 16, 2009, Helmstetter and DelConte learned of this lawsuit when they received a letter from Millennium.  On July 17, 2009, they both sent demand letters to Universal Brokerage FX and Millennium Trust for liquidation and immediate return of all funds in their accounts.  These letters were sent via e-mail, facsimile, certified mail and FedEx overnight delivery, and receipt was confirmed by facsimile record, certified mail receipt, and a FedEx confirmation signature from Kiley's assistant, Julia Smith. See, e.g., Exhibit 27.

256.   Helmstetter and DelConte also called every office number they had for Kiley, Loebel, Universal Brokerage FX and UBS Diversified, but no one answered and they were unable to leave messages.

257.   On July 21, 2009, Universal Brokerage FX posted a "client notice" on its website informing investors of the lawsuit, the Crown Forex SA bankruptcy proceedings, and indicating that "UBFX and UBS Fund are unable to fulfill withdrawal or redemption requests."  Exhibit 28.

258.   On August 11, 2009, Helmstetter submitted a claim to the Crown Forex SA trustees, but has not received a response.  Exhibit 29.

259.   To date, Helmstetter and DelConte's withdrawal requests have not been honored, and they have received no information from Defendants regarding the existence or location of their respective investments.

D.    **Plaintiffs Gordon and Kathlyn Schepke**

260.    Plaintiffs Gordon and Kathlyn Schepke ("the Schepkes") first learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which they listened on short-wave radio.

261.    On his radio show, Kiley represented that investments in the program were placed in individual accounts, that there was "no risk" to principal, and that he did not make money unless the investors made money.

262.    In early 2006, the Schepkes contacted Kiley at the telephone number provided on his radio show.  In subsequent telephone conversations, Kiley reiterated that the program involved no risk, that the investments were safely held in individual accounts at the long-standing Swiss institution Crown Forex SA, and that the funds could be accessed "24/7" with just a telephone call.  Kiley's business card identified him as "Chief Economist/Technical Analyst" for "UBS REFCO IFX MILLENIUM RJO PFG Wealth Management Clearing Brokerage Foreign Exchange IRA's."  Exhibit 30a.

263.    Prior to investing, the Schepkes received a telephone call from Kiley's partner, Cook, who indicated that he "was coming to town" and would like to visit them at their home to discuss investing in the program.  The Schepkes declined this invitation.

264.    Based on these representations, the Schepkes invested in the foreign currency arbitrage program in March 2006.  The Schepkes understood that they were investing with Kiley, Cook, and Universal Brokerage FX.  The total amount of the Schepkes' investment in the program is $705,106.16.

265.   Initially, the Schepkes' IRA proceeds invested in the program were administered by Peregrine Financial Group.  See, e.g., Exhibit 30b.  Subsequently, the Schepkes transferred their IRA proceeds into a self-directed IRA with Millennium which was then to direct their investment transactions, but were informed by Trevor Cook on June 3, 2009, that the self-directed IRA was transferred to Entrust.  See, e.g., Exhibits 30-31.

266.   In conjunction with their investment, the Schepkes received statements from UBS Diversified, Universal Brokerage FX, and, ostensibly, Crown Forex SA, and remained in contact with Kiley and Cook regarding their investments.  From 2008 to 2009, however, Cook was the primary contact relating to their investment.  See, e.g., Exhibits 32-34.

267.   In early 2009, Kiley contacted the Schepkes to convince them to transfer their gold and silver to Kiley to be sold.  Kiley represented that the government was going to confiscate gold and that the Schepkes would only receive a fraction of the value of their gold when this occurred.  Based on this information, and with the assistance of Trevor Cook, the Schepkes agreed to transfer gold and silver valued at over $140,000.00, to Universal Brokerage FX to be traded and sold.  Exhibit 35a.

268.   On July 10, 2009, the Schepkes received a letter from Millennium concerning this lawsuit, and they immediately began calling Kiley, but their telephone calls were not returned.  Exhibit 35.

269.   The Schepkes also contacted Entrust to locate their last opened account with UBS Diversified.  Entrust indicated that it had directed the IRA funds to United

Commercial Bank, 555 Montgomery Street, San Francisco, California 94111, which then transferred the funds to "Crown Forex" at Associated Bank Account No. ******1705. Exhibit 36.

270.   On July 17, 2009, the Schepkes faxed and e-mailed a written withdrawal request for all accounts pursuant to Cook and Kiley's prior guaranties of instant liquidity. These requests were not honored.  Exhibit 37.

271.   On July 25, 2009, the Schepkes received letters from both Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, indicating that these entities are "unable to fulfill withdrawal or redemption requests."  Exhibit 38.

272.   On August 18, 2009, the Schepkes sent a letter to the attorneys for Crown Forex SA requesting information regarding their accounts, but no response has been forthcoming. Exhibit 38a.

273.   To date, the Schepkes' withdrawal requests have not been honored, and they have received no information from Defendants regarding the existence or location of their investments.

## E.   Plaintiffs Jerry and Kaye Rachel ("the Rachels")

274.   The Rachels first learned of the foreign currency arbitrage program through their financial advisor Eric Erickson after he began working with Beckman as Director of Oxford Private Client Group in 2004.

275.   During subsequent telephone conversations and meetings, both Erickson and Beckman represented that investment in the program was "very safe."

276.   Based on these representations, the Rachels invested in the program through Oxford in 2005, and their funds were placed in both IRA and non-IRA accounts. To invest, the Rachels rolled over funds from an IRA into a self-directed IRA with Millennium, which were then transferred to Oxford for investment in the program.  The administrator of the IRA funds changed from Millennium to Western International Securities, Inc. in 2009.   See, e.g., Exhibit 39.   The total amount of the Rachels' investment in the program is over $535,887.00.

277.   In conjunction with their investments, the Rachels received statements from Oxford Global Partners, which indicated that they should "contact Bo Beckman or Chris Pettengill with questions."  See, e.g., Exhibit 40.

278.   In July 2009, Jerry Rachel read a newspaper article regarding the Ohio Plaintiffs' lawsuit and immediately met with Erickson to withdraw all funds from his accounts.   Erickson provided withdrawal forms that Jerry Rachel completed and submitted.

279.   On July 14, 2009, Erickson sent an e-mail to the Rachels and other Oxford clients indicating that "We have made a decision to withdraw all funds from the currency program.  We have been informed that the process is a first in first out and we can watch the account activity and when we see the positions closed date and time, it is in process. We will keep you posted as developments occur."  Exhibit 41.

280.   On July 17, 2009, Erickson advised the Rachels that their positions had been closed and that the funds would be arriving "any day now."

281.   On July 20, 2009, Erickson forwarded the Rachels e-mails between Beckman and Shadi Swais ("Swais"), who is identified in his e-mail as "CEO Crown Forex."  In his e-mail, Beckman requests information regarding the FINMA investigation and its impact on Crown Forex investors.  In his responsive e-mail, Swais indicates that, "[t]he problem we have with FINMA concerns only a few clients that we had in the past, there was some publicity stunts released by them and what you are reading on the internet is simply false information.  Crown Forex has always respected its obligations toward its clients and will continue to do so…everything is fine.  Crown Forex is doing well as usual, and your client's [sic] investments are safe."  Exhibit 42.

282.   On July 21, 2009, Oxford Global Partners posted a "client notice" on its website, indicating in relevant part that Oxford Global Partners "is unable to fulfill withdrawal or redemption requests."  See Exhibit 28.

283.   To date, the Rachels' withdrawal requests have not been honored, and they have received no information from Defendants regarding the existence or location of their investments.

**F.   Plaintiffs Michael and Mary Patterson**

284.   Michael and Mary Patterson ("the Pattersons") learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which they began listening in early 2008.  On his radio show, Kiley represented that his company, Universal Brokerage FX, used the program to earn investors guaranteed double digit profits with extremely minimal risk.  He stated that investors should "get used to your statements always going one way, UP."

285.   The Pattersons contacted Universal Brokerage FX at the 800-number provided on Kiley's radio show for additional information.   In June 2008, Kiley contacted the Pattersons, and explained how Universal Brokerage FX and the foreign currency arbitrage program operated, how the U.S. dollar was in trouble, and how gold was going to be confiscated by the government.

286.   During their June 2008 conversation, Kiley represented that funds were held in segregated accounts and were invested in the foreign currency arbitrage program in small amounts for each transaction.   Kiley also represented that an amount of $8 to $10 million was transacted at any one time so the risk was very limited.

287.   In July 2008, Mike Patterson visited Kiley at Universal Brokerage FX offices, and they spent an hour discussing personal and financial topics.   During this meeting, Kiley stated that he had enough money to personally sponsor his weekly radio broadcast on approximately 200 stations.   Kiley stated that he and Cook had purchased a $15 million piece of software that handled the foreign currency arbitrage program and was capable of buying and selling currency exchange instantaneously.   Kiley represented that this software insured that there was no risk in the program and that account balances could only increase.

288.   Based on these representations, the Pattersons invested in the foreign currency arbitrage program by transferring funds from an IRA to a self-directed IRA account with Entrust, which was then to wire the funds to Crown Forex SA. See, e.g., Exhibits 43-44.   The total amount of the Pattersons' investment in the program is $457,711.00.

289.    In conjunction with their investment, the Pattersons entered into a Crown Forex SA Customer Trading Agreement for Individual Accounts.  See, e.g., Exhibits 45-46.  In completing the initial paper work, the Pattersons questioned Kiley's assistant, Julia Smith, about some of the documentation requirements.  Smith indicated that the procedures were dictated by the Swiss banking system.  She then indicated that there was a branch Swiss bank in the area called Crown Forex LLC, and money was then sent from there to a bank in Switzerland.

290.    After investing, the Pattersons received account statements from Universal Brokerage FX and, ostensibly, Crown Forex SA.  See, e.g., Exhibits 47-48; 49-50.

291.    On July 21, 2009, Universal Brokerage FX posted a "client notice" on its website indicating that it is "unable to fulfill withdrawal or redemption requests."  See Exhibit 28.

292.    In late July 2009, the Pattersons learned that Crown Forex SA was in bankruptcy and their funds could not be withdrawn.  Mike Patterson then met with Kiley at Universal Brokerage FX offices for two hours.  In discussing the Crown Forex SA bankruptcy, Kiley represented that he was also a victim and was attempting to locate their funds.

293.    To date, the Pattersons have no access to their funds.  The only information regarding the existence or location of the Pattersons' funds is wire transfer documents and instructions, indicating that their funds went to "Crown Forex LLC," at Associated Bank Account No. ******1705, rather than Crown Forex SA.  They have received no

other information from Defendants regarding the existence or location of their investment.  Exhibit 51-52.

G.    **Plaintiff Paul Migliorelli**

294.    Plaintiff Paul Migliorelli ("Migliorelli") learned of the foreign currency arbitrage program through Pat Kiley's radio show "Follow the Money," to which he began listening in late 2008.  On his radio show, Kiley represented that investments with the program are secure because the principal investment is protected from fluctuations in the stock market, the funds are held in segregated accounts, and the funds can be withdrawn seven days a week, twenty-four hours a day.

295.    In early January 2009, Migliorelli requested and received information on Universal Brokerage FX, investing in the Foreign Exchange market, past performance numbers, and arbitrage.  One brochure that Migliorelli received entitled, "Institutional Grade Investments for the Individual Investor," represented the following regarding investments in the program:  "Liquidity:  All positions are 100% liquid on a 24 hour basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured."  See Exhibit 69.

296.    Subsequently, Migliorelli was contacted by Jared Jenkins, a representative of Universal Brokerage FX who represented to Migliorelli that the program was a "no risk investment."  Jenkins also sent Migliorelli a letter that represented the following:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various

exchanges, and the firm itself. Customers funds are held in **segregated** accounts providing safety, security, and liquidity." Exhibit 53.

297. Based on these representations, Migliorelli invested $25,000.00 in the program through Universal Brokerage. To invest, Migliorelli sent a $25,000.00 cashier's check from Bank of America and entered into a Crown Forex Customer Trading Agreement for Individual Accounts on January 23, 2009. Exhibit 54.

298. In March 2009, Migliorelli sent an additional check for $97,802.59 to Entrust Midwest LLC, which was to be directed to Crown Forex SA. Exhibit 55. The total amount of Migliorelli's investment in the program is $122,802.59.

299. In conjunction with his investment, Migliorelli received account statements from Universal Brokerage FX and, ostensibly, Crown Forex SA. Migliorelli's last Crown Forex SA statement was received in July 2009. See, e.g., Exhibit 56.

300. On July 25, 2009, Migliorelli received a letter from Universal Brokerage FX and UBS Fund informing him of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that the entities are "unable to fulfill withdrawal or redemption requests." See, e.g., Exhibit 13.

301. Migliorelli called Jenkins on his cell phone on July 25 and 27, 2009, for information regarding the status of his account, but his calls were not returned.

302. To date, Migliorelli has no access to his funds, and the only information he has regarding the existence and location of his investment is a check copy indicating that a portion of his funds were deposited with "Crown Forex LLC," rather than "Crown Forex SA," in Associated Bank Account No. ******1705. Exhibit 57. He has received

no other information from Defendants regarding the existence or location of their investment.

**H.      Plaintiffs Hans and Jerilynn Reske**

303.    Hans "Heiko" and Jerilynn Reske ("the Reskes") learned of the foreign currency arbitrage investment program in July 2007 through Bob Chapman's newsletter, "International Forecaster."  The newsletter featured commentary from Kiley regarding the program, which included the following representations:

> Our IRA accounts are insured to $500,000 per account and are held in SEGREGATED ACCOUNTS.  They are held with the largest independent custodian in the U.S.—over 9,500 accounts and 900 million in assets.  All accounts are always 24 hours per day liquid.  Statements can also be checked 24 hours per day so you have an up-to the second accountings. Clients also have a choice if they would like to use some of our European based holding companies.  Cash accounts also offer typical FDIC and other insurance and guarantee backing.  This is all you need to know.

304.    Subsequently, the Reskes began listening to Kiley's radio show, "Follow the Money," and visiting his website, www.patkiley.com.  On his website, Kiley provided the following representations:

> Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by various exchanges and the Federal Government.  Customer funds are held in segregated accounts providing safety, security and the liquidity that investors deserve.  IRA, 401K and retirement accounts are audited extensively by OBRE (over 400 hours) on a yearly basis and are externally audited by at least two independent audit firms.  These accounts have the maximum insurance coverage possible for fraud and theft through AIG:   Financial Institution Bond -- $10,000,000: Surety coverage for all illegal acts by employees, directors and owners.  Professional liability (Errors & Omissions) --

$5,000,000: Coverage for the failure to render professional services. Directors and Officers -- $5,000,000: Coverage for wrongful acts by any officer or director. These accounts are cleared through NASD registered brokerage firms and carry SIPC insurance which protects each account to $500,000.

Exhibit 58.

305.   In early September 2007, Heiko Reske contacted Kiley at Universal Brokerage FX for additional information regarding the program. During their conversations, Kiley identified himself as the Senior Partner of Universal Brokerage FX, and indicated that he had convinced Universal Brokerage FX to allow individual investors to participate in the program. Kiley represented that investments in the program were held in segregated accounts, were 100% liquid within 24 hours, that the rate of return would be in the 10-15% range, and that all funds were insured regardless of whether they were in an IRA or cash account. Kiley also represented that Universal Brokerage FX owned a bank in Switzerland, so if the value of the U.S. dollar significantly declined, he could transfer their money to Swiss francs.

306.   Kiley also sent a letter highlighting Universal Brokerage FX's global markets investment strategy. Kiley's letter represented: "Financial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customers funds are held in **segregated** accounts providing safety, security, and liquidity." Exhibit 59.

307.   Kiley provided informational materials to the Reskes that reiterated his representations. Specifically, the Universal Brokerage General Business Terms Currency

Exchange Agreement stated that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and "appropriate stops set so that no single transaction shall risk more than 2% of the Customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance."  Exhibit 60.

308.   Based on this information and Kiley's representations, the Reskes invested in the foreign currency arbitrage program with Universal Brokerage FX.  Kiley told the Reskes to make their checks payable to "Crown," because he would be depositing the funds in Crown Bank.  Exhibit 61.  The total amount of the Reskes' investment in the program is $731,680.00.

309.   In conjunction with their investment, the Reskes completed a Universal Brokerage Client Application, entered into a Universal Brokerage Currency Exchange Agreement, and received account statements from Universal Brokerage FX.  See Exhibits 60, 62-64.

310.   In early July 2009, the Reskes learned of this lawsuit from the International Forecaster, and then located the Star Tribune article detailing the lawsuit.  The Reskes repeatedly called Kiley regarding the status of their investment, but there was no answer.

311.   Heiko Reske and a fellow investor then drove to Minneapolis to meet with Kiley.  On July 12, 2009, Reske met with Kiley and demanded partial withdrawal of funds.  Kiley indicated that he needed Cook's authorization to withdraw the funds, and that he would pass on the Reskes' request to Cook.  The Reskes learned the next day that nothing was done to facilitate this withdrawal request.

312.   On July 13, 2009, Reske again met with Kiley and requested account closure and withdrawal of all funds.   Reske received withdrawal forms from Kiley's assistant, Julia Smith, which he completed.

313.   On the evening of July 13, 2009, Reske met with Kiley, Cook, and Cook's brother Graham Cook.   They informed Reske that he would not be receiving his funds immediately, but that funds could be expected in four weeks for IRA accounts and two to three weeks for cash accounts.   Reske hand-delivered his withdrawal forms to Kiley and Cook at this meeting.   On July 14, 2009, Reske again hand-delivered his withdrawal requests to Graham Cook.   See, e.g., Exhibit 65.

314.   In attempting to withdraw funds through Cook, the Reskes learned for the first time that their funds were purportedly invested with Crown Forex SA, despite Kiley's representations that Universal Brokerage FX had no association with Crown Forex SA.

315.   The Reskes contacted the trustees of Crown Forex SA regarding their investments and were told that there was no record of any accounts in their names. Exhibit 65.

316.   The Reskes then located checks that they had written to "Crown" per Kiley's instructions, and discovered that these checks were deposited with "Crown Forex LLC," Associated Bank Account No. ******1705.   Another check written to "Universal Brokerage" was deposited with "UBS Diversified Growth LLC," Wells Fargo Account No. ******2710.   A wire transfer document also indicated that funds withdrawn by the

Reskes came from Crown Forex LLC's Associated Bank Account No. ******1705. Exhibits 66-68.

317.   On July 21, 2009, Universal Brokerage FX posted a "client notice" on its website indicating that it is "unable to fulfill withdrawal or redemption requests."  <u>See</u> Exhibit 28.

318.   To date, the Reskes' withdrawal requests have not been honored, and the only information they have regarding the existence or location of the their funds are the check copies and wire transfers indicating that their funds were deposited with Crown Forex LLC, 5413 Nicollet Avenue, Suite 14, at Associated Bank Account Number ******1705, rather than Crown Forex SA.  <u>See</u> Exhibits 66-68.  They have received no other information from Defendants regarding the existence or location of their investment.

## I.   <u>Plaintiffs Floyd and Ilene Foster</u>

319.   Plaintiffs Floyd and Ilene Foster ("the Fosters") learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which they began listening in January 2008.

320.   The Fosters inquired about the program with Kiley, who represented that they could expect double digit returns on their investment and that their funds would be held in private, segregated accounts.

321.   Subsequently, the Fosters received a brochure from Kiley entitled "Institutional Grade Investments for the Individual Investor."  The brochure represented the following regarding investments in the program:  "Liquidity:  All positions are 100%

liquid on a 24 hour basis. Trading Discipline: 100% of the time the long USD/JPY position is fully insured." Exhibit 69.

322. The Fosters also received a letter from Tim Daley, a Senior Investment Advisor at Universal Brokerage FX, highlighting the profitability of the global markets strategy. In his letter, Daley represented the following: "Financial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in **segregated** accounts providing safety, security and liquidity." Exhibit 70.

323. On January 7, 2009, the Fosters received an e-mail from Daley, which represented that, "the way trading is done, we do not expose our client's funds to the market; therefore, there is no down side risk to the principle. Bear in mind, these are non-correlated assets; therefore, any 'Crises' anywhere in the world (terrorist attacks or an equity exchange drop, like the 9% drop on the Shanghai Exchange the end of February 2007), only enhances our performance." Exhibit 71.

324. In a follow-up e-mail on January 7, 2009, Daley provided "due diligence" information to the Fosters. Daley represented that The Oxford Private Client Group and Oxford Global Advisors were Registered Investment Advisors, that Universal Brokerage FX was "Registered with the Department of Treasury as a Currency Dealer, Currency Exchanger and Money Transmitter," and that the liquidity providers for the investment included Deutsche Bank, Dresdner Bank, United Arabs Bank, UBS, Royal Bank of Scotland, Royal Bank of Canada, JP Morgan, Bank of America, Saxo Bank, Currenex,

Bear Sterns, Barclays, and Merrill Lynch. The e-mail also indicated that Universal Brokerage Diversified FX had a "clearing and partnership relationship" with JDFX Technologies, Zurich, Switzerland. Exhibit 72.

325. On January 12, 2009, the Fosters visited the Universal Brokerage FX website, which highlighted the 10.5% returns and principal protection of the foreign currency arbitrage program. The website also represented its "liquidity providers" as Saxo Bank, Dresdner Bank, Deutsche Bank, Bank of America, HSBC, and UBS. Exhibit 73.

326. Based on these representations, the Fosters invested $50,000.00 with Kiley. Per Kiley's instructions, the Fosters made their check payable to "Crown Bank." Exhibit 74.

327. In conjunction with their investment, the Fosters received account statements from Universal Brokerage FX, and, ostensibly, Crown Forex SA. See, e.g., Exhibit 74.

328. On July 9, 2009, the Fosters attempted to withdraw $23,862.00 from their account. After the withdrawal request was not honored, the Fosters attempted to contact Universal Brokerage FX on multiple occasions, but received no response.

329. On July 21, 2009, the Fosters saw a "client notice" on the Universal Brokerage FX website, indicating that UBFX and UBS Fund "are unable to fulfill withdrawal or redemption requests." See Exhibit 28.

330. After viewing this notification, the Fosters sought immediate closure of their Crown Forex account and withdrawal of the funds therein. Exhibits 75-76.

331.   The Fosters then located the check they had written to "Crown Bank" per Kiley's instructions, and discovered that this check was deposited with "Crown Forex LLC," in Associated Bank Account No. ******1705.  See Exhibit 74.

332.   To date, the Fosters' withdrawal requests have not been honored, and the only information they have regarding the existence and location of their investment is the check copy indicating that a portion of their funds were deposited with Crown Forex LLC's Associated Bank Account No. ******1705. Id. They have received no other information from Defendants regarding the existence or location of their investment.

**J.**   **Plaintiffs Victor and Marianne Sultana**

333.   Plaintiffs Victor and Marianne Sultana ("the Sultanas") learned of the foreign currency arbitrage program in October 2008, when Victor Sultana came across an Oxford Global Advisors advertisement while doing investment research online.   The advertisement indicated that an investment in the program through Oxford Global Advisors would yield a 10.5% return.   The advertisement had a link to an application form, which Victor Sultana completed and emailed, along with a request for additional information on the 10.5% return.

334.   In response to this inquiry, Brian Seiwert, a representative of Oxford Global Advisors, contacted Victor Sultana about the program via e-mail on October 29, 2008.  In his e-mail, Seiwert provided the following information:

> Oxford Global Advisors, headquartered in Minneapolis, provides professional money-management for institutional and individual investors throughout the world.  With our partner, The Oxford Private Client Group, we offer investors proven strategies in both the equity markets and alternative

asset classes.  Our focus is on capital preservation, superior yields, and consistent long-term returns with little volatility.

Capital preservation is the cornerstone of our strategies.  Our Global Enhanced Return Strategy utilizes a methodology that seeks to take advantage of economic imbalances in the global financial markets.  The strategy is currently yielding about 10.5%.   Client's funds are held in separately managed accounts and are liquid at any time.

Today's dynamic marketplace demands contact consideration and increase determination to accomplish financial and investment goals.  With today's stock market volatility, investors need alternative strategies that perform and offer non-correlated returns to the equity markets.  Oxford's Global Enhanced Return Strategy is a great way for investors to do this and add true investment diversification to their portfolios.

Exhibit 77.

335.   In November 2008, the Sultanas received three brochures about the program from Seiwert.  The first was entitled "Oxford Global Partners:  Prudent Management, Diversified Approach, Long-Term Focused, Capital Preservation, Global Scope."  In its brochure, Oxford emphasized its "focus on capital preservation, superior yields, and secure long-term returns," and stated that "all our investment strategies—and all our strategic alliances—are designed to generate enhanced yield and dependable performance."  Exhibit 78.

336.   The second brochure entitled "A Global Enhanced Return Strategy," represented that investment in the program is safe because funds are held in individual segregated accounts with well-established, well-capitalized investment and commercial banks, and because the program reduces market exposure.  The brochure also represented

that "funds are completely liquid and available on short notice," and that the program provides consistent yields and enhanced returns. Exhibit 79.

337.    The third brochure entitled "Currencies," further described the benefits of the foreign currency arbitrage program.  After reviewing these materials and discussing the program with Seiwert, the Sultanas initially decided to wait to invest and advised Seiwert of this on November 19, 2008.  Exhibit 80.

338.    In a follow-up e-mail dated November 20, 2008, Seiwert urged the Sultanas to reconsider their decision to wait, stating "I disagree with the idea of not taking action because of uncertainty.  Many people are fearful of changing their investment portfolio because they don't want to miss out on the rebound.  By doing that you are taking the same risks that lead you into the decline."  Exhibit 81.

339.    Seiwert went on to state:

> In times of uncertainty one thing you can do is reduce exposure and lower the risk of further losses.  We have alternative strategy that continues to perform through this financial mess.  Our equities portfolio manager [Beckman] has successfully called the last two bear markets and our track record shows it.  Would it make sense to trust his judgment in identifying when a good time to get back into the market is?  In the meantime we have an alternative that is non-correlated to stocks that is currently yielding 10.5%.  The long-term average of the Dow is less than what we have been getting with that strategy.  Allocating to this in financial uncertainty and having the liquidity to move back into the market when it recovers may be worth some thought.  None of my clients have ever had a negative fiscal year.  The best way to outperform the markets consistently is to not ride them down.  Oxford's focus for our clients is on capital preservation, superior yields, and consistent long-term returns with less volatility than traditional investments.

Id.

340.    In response to Seiwert's e-mail, Victor Sultana asked questions about the program, including the potential impact of narrowing global spreads and the safety of the investment.  Seiwert replied that "if long term yields do come down and the spreads get smaller we would not be able to return as high of a yield with this strategy.  This however would not result in negative returns," and "the banks and financial firms we work with are well capitalized and strong.  We use only the largest most established financial institutions in the world."  <u>See</u> Exhibit 81.

341.    Based on these representations, the Sultanas sent $100,000.00 to Oxford Global Partners to be invested with Crown Forex SA into two segregated accounts.  The $100,000.00 check was made payable to "Crown Forex SA."  Exhibit 82.

342.    In conjunction with their investment, the Sultanas entered into a Management Agreement with Oxford Global partners and a Crown Forex Trading Agreement.  Exhibit 82A.

343.    At the Crown Forex website (www.crownforex.com), the Sultanas were able to download the trading station to view their account and see trading activities.  The Sultanas were also able to print their account detail statements from the Crown Forex website.  They could also partially view their account information on the Oxford Global Partners website; however, they were not able to print or see a full detail statement on the Oxford Global Partners website.  The partial account information on the Oxford Global Partners website had the header "C.G.I. Group."  Exhibit 83.  In conjunction with their investments, the Sultanas received statements from Crown Forex SA.  Exhibit 83a.

344.    The Sultanas' primary contact at Oxford Global Partners was Brian Seiwert.  After several calls and emails to Seiwert to inquire about their investment, Seiwert finally contacted the Sultanas on July 21, 2009.  Seiwert informed the Sultanas that several investors in Ohio had filed a lawsuit against Oxford alleging fraud.  Seiwert expressed his concern about the situation and advised the Sultanas to learn more about the lawsuit in the Star Tribune newspaper. Seiwert indicated that he did not know what was going on and was "in the dark" about the status of their investment.

345.    Seiwert sent the Sultanas a Crown Forex SA withdrawal form by email and advised them to submit a completed form to Oxford.  The Sultanas immediately completed the form and sent it to Oxford via fax and overnight mail, and according to the mail service, it was delivered to the Van Dusen mansion on July 22, 2009.  Victor Sultana subsequently searched the Internet for information and learned that Swiss regulators had placed Crown Forex SA into bankruptcy on May 19, 2009. See Exhibit 84.

346.    The Sultanas' withdrawal request was not honored, and since that time, the Sultanas have been unable to reach Seiwert or any other Oxford Global Advisors representatives.

347.    The Sultanas made a withdrawal request to Crown Forex SA on July 23, 2009 (see Exhibit 85a), but subsequently learned that the check that they had written to "Crown Forex SA" and delivered to Oxford Global Partners was ultimately deposited with "Crown Forex LLC," in Associated Bank Account No. ******1705.  Exhibit 85.

348.    The Sultanas also contacted their bank to track the check that was written to invest in the program.  Their bank has identified that the check was deposited with a U.S.

Bank account at one point during the transfer process, but the bank's investigation continues.

349.   To date, the Sultanas' withdrawal requests have not been honored, and the only information they have regarding the existence and location of their investment is the check copy indicating that a portion of their funds were deposited with Crown Forex LLC's Associated Bank Account No. ******1705. See Exhibit 85. They have received no other information from Defendants regarding the existence or location of their investment.

**K.**     **Plaintiff Dr. Ronald Linari**

350.   Plaintiff Dr. Ronald Linari ("Linari") learned of the foreign currency arbitrage program through Patrick Kiley's radio show, to which he began listening in early 2008.  On his radio show, Kiley represented that investments in the program had "overnight wiring availability," were held in segregated accounts, and earned double digit returns.

351.   In early 2008, Linari sought additional information from Kiley on the program.  In response, Kiley sent a letter highlighting the benefits of Universal Brokerage Services' global markets investment strategy.  Exhibit 86.

352.   In his letter, Kiley represented the following:   "Financial security is paramount to every investor.  The safety and integrity of customers funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in **segregated** accounts providing safety, security and liquidity."  See id.

353.   Kiley's letter was printed on letterhead that referenced, "UBS SAXO IFX Millennium RJO PFG CHASE."  Id.

354.   Based on Kiley's representations, Linari invested in the foreign currency arbitrage program with Kiley and Universal Brokerage FX.

355.   Linari initially invested $100,000.00 in the foreign currency arbitrage program on March 1, 2008 ($50,000), and March 20, 2008 ($50,000), by directing his investment transactions to Universal Brokerage FX.  Exhibit 87.

356.   Linari then invested an additional $50,000.00 in the foreign currency arbitrage program by utilizing a self-directed IRA account with Millennium and by sending a check in that amount to "Millennium Trust FBO Ronald F. Linari, IRA Rollover."  See, e.g., Exhibit 88.  To date, the total amount of Linari's investment in the program is $158,360.00.

357.   In conjunction with his investments, Linari completed a Universal Brokerage Client Application Form and received statements from Universal Brokerage FX.  Exhibit 89; see, e.g., Exhibit 90.

358.   On July 10, 2009, Linari received a letter from Millennium notifying him that this lawsuit had been initiated against UBS Diversified.  Linari then researched the lawsuit on the Internet and located the Star Tribune articles detailing the lawsuit.  Exhibit 91.

359.   Subsequently, Linari contacted Millennium, which directed him to Kiley. Linari called Kiley's cell phone twice and left message both times, but the calls were not returned.

360.   In July 2009, Linari contacted Kiley's attorney who indicated that Kiley was pursuing his clients' funds by hiring forensic accountants to review Crown Forex documents.

361.   On July 21, 2009, Universal Brokerage FX posted a "client notice" on its website indicating that "UBFX and UBS Fund are unable to fulfill withdrawal or redemption requests."  See Exhibit 28.

362.   To date, Linari has no access to his funds, and the only information he has received regarding the existence and location of his investment is a check copy and oral confirmation from his bank indicating that his funds were deposited into Universal Brokerage FX Management, LLC's Associated Bank Account No. ******5601.  Linari has received no other information from Defendants regarding the existence or location of his investment.  Exhibit 92.

**L.     Plaintiff Bill Salisbury**

363.   Plaintiff Bill Salisbury ("Salisbury") learned of the foreign currency arbitrage program when he began listening to Kiley's radio show, "Follow the Money" on November 17, 2007.

364.   On his radio program, Kiley advised listeners to place their investments into managed foreign currency arbitrage and gold. Kiley represented that his "money management group" made money regardless of fluctuations in other markets.  He also urged listeners to call his 800-number and view his website (www.patkiley.com) to obtain a personal consultation about their investments.

365.   In December 2007, Salisbury contacted Kiley for additional information, and was able to speak with Kiley personally.  During their conversation, Kiley advised Salisbury to invest all of his funds with Kiley and UBFX, and claimed he could provide diversification through UBFX gold investments.

366.   In a subsequent conversation with Kiley on December 13, 2007, Kiley advised Salisbury to roll over his  401(a) plan to UBFX, to take equity out of his home, and set up an additional managed foreign currency account with Kiley.  During this conversation, Kiley indicated that he was sending an application for a self-directed IRA through UBFX, and represented that, "you're really going to like these returns, which will be in the 15-20% range."  He also represented that the foreign currency account, in addition to its growth advantages, would fully protect and preserve Salisbury's capital, would be segregated, would be fully safe and liquid, and would provide numerous tax benefits.   Kiley stated that "corporate and smart individual investors have their investments spread all around the world, and you should too."

367.   On  December 21,  2007,  Salisbury  again  spoke  with  Kiley,  who recommended managed foreign currencies because, "your principle is not at risk, and you will receive returns of 15-22%."  Kiley indicated that he contacts European bankers each day to obtain information on international markets, interest rates and currencies.

368.   During  their  December 21,  2007  telephone  conversation,  Kiley  also recommended that Salisbury send Kiley his gold, which Kiley would place with Salisbury's IRA at UBFX.  Kiley represented that his European banking connections uniquely positioned UBFX to outperform other gold investments.

369.   In late December 2007, Kiley sent Salisbury a letter highlighting the advantages of investing with UBFX, and stating the following:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in **<u>segregated</u>** accounts providing safety, security and liquidity."  Exhibit 93.

370.   Subsequently, Salisbury received and completed a Universal Brokerage FX application, which included a document representing the following:  "Liquidity: We maintain your account to be instantly liquid.  Daily wires or checks fulfill your need to access your cash….Segregated Account:  Your account is in a segregated account, not co-mingled with the general assets of the custodian, bank or dealer…"  Attached to the application was a letter from Jared Jenkins, again stating that:  "Financial security is paramount to every investor.  The safety and integrity of customers funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in **<u>segregated</u>** accounts providing safety, security and liquidity."  Exhibits 94-95.

371.   On January 1, 2008, Kiley again urged Salisbury to take equity out of his home and to invest his gold in an IRA with UBFX.

372.   On January 3, 2008, Salisbury established a self-directed IRA account with Millennium for his 401(a) retirement plan funds.  Kiley represented that Salisbury's investment would be managed by UBFX, and that his IRA would receive the attention and expertise of Kiley's staff.  When Salisbury asked Kiley about the other principals

with UBFX, Kiley stated that he was the senior investment officer at UBFX.  See Exhibit 96.

373.    On January 3, 2008, Salisbury rolled over $158,600.00 from his 401(a) retirement plan into a self-directed account with Millennium, which was then directed to UBFX. Exhibit 96.   The total amount of Salisbury's investment in the program is $170,588.00.

374.    In conjunction with his investments, Salisbury received statements from Universal Brokerage FX and Millennium.   Beginning in December 2008, Salisbury noticed discrepancies between his UBFX and Millennium statements.   For example, contributions sent directly to UBFX from Millennium were not accounted for or properly credited in Salisbury's UBFX account.  Salisbury's requests to have these contributions reflected in his UBFX statements were not honored.  Exhibit 97.

375.    On May 4, 2009, Salisbury requested that Kiley withdraw $100,000.00 from his accounts.  On June 2, 2009, Salisbury requested that Kiley and UBFX withdraw $120,000.00 from his account.  These requests were not honored.  Exhibit 98.

376.    In mid-July, 2009, Salisbury received a letter from Millennium notifying him that this lawsuit had been initiated.  Exhibit 99.

377.    On July 21, 2009, Salisbury again submitted withdrawal forms to Universal Brokerage FX, requesting that his entire $170,588.00 investment be liquidated.   These requests were not honored.  Exhibit 100.

378.   Subsequently, Universal Brokerage posted a "client notice" on its website and sent a letter to Salisbury indicating that "UBFX and UBS Fund are unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibits 13 and 28.

379.   To date, Salisbury's withdrawal requests have not been honored, and he has received no information from Defendants regarding the existence or location of his investment.

## M.   **Plaintiff Curtis Winn**

380.   Plaintiff Curtis Winn ("Winn") learned of the foreign currency arbitrage program through Patrick Kiley's radio program, "Follow the Money," to which he began listening in 2006.  On his radio show, Kiley represented that investments in the program were available at any time and could be withdrawn by a telephone call, were not subject to the fluctuations of the stock market, were held in segregated accounts, and would earn 10% to 12% returns.

381.   In fall 2006, Winn called the telephone number provided on Kiley's radio show for additional information regarding the foreign currency arbitrage program, and Kiley answered the call.  During their one hour conversation, Kiley explained the foreign currency arbitrage program "that Trevor Cook had discovered," and indicated that UBS Diversified managed funds for 9,000 corporations and that the program only recently became available to individual investors.  Kiley also advised that mutual funds are a "churning operation," that gold and silver are poor investments due to pending government confiscation, and that investors should be cautious of American banks.

382.    During their conversation, Kiley represented the following regarding the program:  that UBS Diversified only made money on the increase in returns; that client funds are held in segregated accounts; that all invested funds are located in Europe; and that the investment is guaranteed to earn 10% to 12% returns.

383.    After their telephone call, Kiley immediately sent Winn a UBS Diversified Growth Application and Subscription Agreement application.   Winn completed the application on March 14, 2007, with the assistance of Kiley's assistant, Julia Smith. Exhibit 101.

384.    Kiley also sent a brochure with additional information about the program, which was entitled "Institutional Grade Investments for the Individual Investor."  The brochure made the following representations about the foreign currency arbitrage program:  "Liquidity:   All positions are 100% liquid on 24 hour basis.   Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

385.    In summer 2007, Winn received an unsolicited telephone call from Jerry Watkins, the "Chief Financial Strategist/Technical Analyst" for UBS Diversified. Watkins' business card indicated affiliations with "UBS SAXO IFX MILLENNIUM RJO PFG CHASE."  Watkins also indicated an investment affiliation with Cook.

386.    During their telephone call, Watkins indicated that his clients were earning 10% on his investments in the program and that Winn should consider rolling over his IRA to invest in the program.

387.    Based on these representations, Winn invested in the program with Kiley and Universal Brokerage FX/UBS Diversified.  Winn rolled over an IRA in the amount of $50,022.57 to Millennium, which was to be invested with Universal Brokerage FX. On September 14, 2007, Winn received confirmation that the rollover proceeds to Millennium had been sent.  The total amount of Winn's investment in the program is $277,306.22.  Exhibit 102.

388.    Winn also sent the following checks to be invested in the program:  (1) a $65,000.00 check to "Universal Brokerage FX" on December 5, 2007, which was deposited into UBS Diversified Growth LLC's Wells Fargo Account No. ******2710; (2) a $30,000.00 check to UBS Diversified Growth LLC on March 26, 2007, which was deposited into a UBS Diversified Growth LLC's Wells Fargo Account No. ******2710; and (3) two $50,000.00 checks dated February 9 and February 10, 2009, for the benefit of "UBFX," which were deposited into Universal Brokerage FX MGMT, LLC's Associated Bank Account No. ******5601.  Exhibit 103.

389.    In conjunction with his investment, Winn received account statements from UBS Diversified and Universal Brokerage FX.  See, e.g., Exhibits 104-105.  However, at one point, Watkins directed that Winn send his investment funds to "Oxford" at 1900 LaSalle, Minneapolis, Minnesota.

390.   In spring 2009, Winn sent Kiley the rest of his investment funds in the amount of $100,000.00, in order to capture the guaranteed 10% returns.   Julia Smith instructed Winn in regard to endorsing the checks from GE Funds where his investments were held.

391.   In spring 2009, Winn also contacted Kiley for information on how to report his gains for tax purposes, and to request a 1099 form.   Kiley indicated that a 1099 was not required, and that gains made in the program were not reportable due to their "grandfathered corporate status."

392.   Subsequently, Kiley requested that Winn execute investments documents with Crown Forex SA, because Kiley did not like dealing with Millennium and because Winn could obtain better returns with Crown Forex SA.   Per Kiley's request and in light of his representations, Winn completed the Crown Forex SA materials.

393.   On July 10, 2009, Winn called Kiley and Universal Brokerage FX to follow-up on the status of his Crown Forex SA account, but there was no response.

394.   In mid-July 2009, Winn received an e-mail from a fellow investor who advised him to read a Star Tribune article about this lawsuit.   Winn immediately called Kiley multiple times, but was always told that Kiley was unavailable.

395.   On July 21, 2009, Universal Brokerage FX posted a "client notice" on its website indicating that "UBFX and UBS Fund are unable to fulfill withdrawal or redemption requests."   See Exhibit 28.

396.   To date, Winn has no access to his funds, and he has received no information from Defendants regarding the existence or location of his investment.

N.    **Plaintiff Mark Sticha**

397.    Plaintiff Mark Sticha ("Sticha") learned of the foreign currency arbitrage program through Beckman, with whom he had invested since 2001 when Beckman was at Fisher Investments.

398.    In June 2004, Sticha purchased an annuity from Beckman, Pettengill, and Gene Walden who were partners in Capital Management Group, also known as "CMI." On July 6, 2004, Sticha received a letter indicating that Beckman had changed his company name to "The Oxford Private Client Group."  On September 1, 2004, Beckman sent a letter introducing Erickson as a new employee of Oxford Private Client Group.

399.    On August 21, 2006, Beckman sent Sticha a letter indicating that "the Oxford" was ranked number one in a Morningstar comparative study and had been ranked as one of the fastest growing firms in the industry by The Financial Adviser Magazine.  In a subsequent mailing in fall 2006, Beckman stated that "The currency addition has been working as planned and better than planned in most cases!"  Exhibit 106.

400.    On October 31, 2006, Sticha received a mailing indicating that "The Oxford Group-Core Strategy" had formed to provide individuals both active portfolio management and financial planning with institutional tools, strategies, and management historically only available to the institutional investor.  Included with this mailing was a fact sheet showing that Oxford was earning higher returns than the S&P with lower risk: "Our Senior Portfolio manager Bo Beckman takes pride in our above market performance while enjoying an approximated 1/3 less volatility."

401.    In a January 31, 2007 e-mail, Beckman indicated that he had a foreign currency arbitrage investment that was fixed for 12 months, paid 12% earnings, and was backed by UBS—"not someone we met on the street."  Sticha understood the reference to "UBS" to mean "UBS in Switzerland."  Exhibit 107.

402.    When Sticha sought additional information from Beckman on the currency exchange program, Beckman provided mailings from UBS Diversified, which represented 100% capital protection, liquidity, performance and yield.  The mailings listed Erickson as the contact person for the foreign currency arbitrage investment. Beckman also indicated that he had invested a large amount of personal funds in the program.  Exhibit 108.

403.    Based on these representations, Sticha opened a self-directed IRA with Millennium, and these funds were then directed to Beckman's foreign currency arbitrage program.   Exhibit 109.   The total amount of Sticha's investment in the program is $279,399.00.

404.    In conjunction with his investment, Sticha received an account statement on July 1, 2007, from UBS Diversified, 12644 Tiffany Court, Suite 100, Burnsville, MN 55337.  Exhibit 110.

405.    In the February 2008 statement, the investment company was listed as "The Oxford (Wealth Management, Clearing Brokerage, Foreign Exchange IRA's) at 1900 LaSalle Ave., Suite 100, Minneapolis, MN 55403."  Exhibit 111.

406.   In the June 2008 statement, the investment company was listed as:  Oxford Global Advisors at 1900 LaSalle Avenue, Suite 100, Minneapolis, MN 55403.   The investment contacts were listed as Beckman and Pettengill.  Exhibit 112.

407.   In an e-mail dated June 2, 2008, Beckman stated: "Considering Millennium's inability to provide timely and efficient reporting we should change the custodian to Entrust via Crown."  On August 8, 2008, the custodian for Sticha's account was changed to Entrust.

408.   In light of the issues with account statements, Sticha informed Beckman that better transparency of account information was needed.  Beckman represented that the Securities and Exchange Commission reviewed his methodology and reporting procedures to make sure they were legal.  Beckman also indicated that "real time trading platform reporting" would be available in the future.

409.   After the Star Tribune newspaper published an article that referenced Cook's sale of the Van Dusen mansion to Beckman, Sticha inquired about Beckman's relationship with Cook.  During their conversation, Beckman indicated that Cook was his employee, and Cook had mostly institutional investors.  Beckman also represented that Cook had $4 billion dollars in the foreign currency arbitrage program and was now allowing select individual clients in the program.  In another conversation, Beckman also represented that he owned 96% of Oxford and Pettengill owned the remaining 4%.

410.   Sticha initially learned of this lawsuit when a friend advised him of the July 9, 2009 article in the Star Tribune.  On July 10, 2009, Beckman e-mailed Sticha a Crown Forex SA withdrawal form and indicated that he should contact him.  Exhibit 113.

411.    On July 14, 2009, Sticha met with Erickson, Beckman and Gene Walden at the Oxford offices to complete the necessary documentation for withdrawing funds from Sticha's Entrust and Crown Forex SA accounts.  Beckman indicated that he was hopeful that Sticha's funds would be returned.  Beckman also stated that he had just invested his in-laws' funds in the program in June 2009.  Id.

412.    On or around July 21, 2009, Sticha received letters from Oxford Global Partners, LLC, and Universal Brokerage FX/UBS Fund, which indicated that these entities are "unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

413.    To date, Sticha's withdrawal requests have not been honored, and the only information he has regarding the existence or location of his investments is a wire transfer document indicating that a portion of his funds were wired from Entrust to "Crown Forex LLC," rather than "Crown Forex SA."   The wire transfer document indicates the Beneficiary Info (OBI) as "FBO Mark Sticha," the Beneficiary Bank as Associated Bank, and the Beneficiary Account as Associated Bank Account No. ******1705.  Exhibit 114.

## O.    Plaintiffs Russell and Jacquelyn Miller

414.    In 2005, Plaintiffs Russell and Jacquelyn Miller ("the Millers") learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which they began listening in 2005.

415.    In 2005, the Millers requested additional information on the program and Crown Forex SA, the investment platform that Kiley endorsed.  Subsequently, the Millers received a Crown Forex SA brochure and telephone calls from Kiley and Universal

Brokerage representatives encouraging them to invest in Crown Forex SA.  At that time, the Millers decided against investing with Kiley in Crown Forex SA.

416.   In November 2008, the Millers again heard Kiley's "Follow the Money" program, and requested additional information from Kiley on the foreign currency arbitrage program through Crown Forex SA.

417.   In response, the Millers received a letter from Mark Trimble, a representative of Kiley and Universal Brokerage, which highlighted Universal Brokerage's global markets strategy.  The letter also stated:  "Financial security is paramount to every investor.  The safety and integrity of client funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in **segregated** accounts providing safety, security and liquidity." Exhibit 115.

418.   The Millers also received a brochure regarding the foreign currency arbitrage program.  In the brochure, Kiley and Universal Brokerage represented the foreign currency arbitrage program as follows:  "Liquidity: All positions are 100% liquid on a 24 hour basis.  Trading Discipline:  100% of the time the long USD-JPY position is fully insured…"; and "fully protected principal."  The brochure also represented an annualized return of 32.04%, a "Worst monthly drawdown" of 0%, a "Worst peak to valley drawdown" of 0%, and an average monthly return of 2.49%.  Exhibit 116.

419.   In November 2008, the Millers also received a telephone call from Trimble, during which he indicated that the Millers' stock holdings were losing 42% and that they should pull their money out of the stock market as soon as possible and invest in the

foreign currency arbitrage program with Crown Forex SA through Universal Brokerage FX.  Trimble represented that their investment with Crown Forex SA would be safe, and that their returns would be significant, with 46.59% returns in 2006 and 8.5% returns in 2008, even with the economic downturn.  After several more calls containing the same representations, Trimble persuaded the Millers to invest with Crown Forex SA through Universal Brokerage.

420.    Based on these representations, the Millers transferred IRA proceeds into a self-directed IRA account with Entrust, which were then directed to Universal Brokerage FX.  Julia Smith of Universal Brokerage assisted them with the documentation for transferring the IRA proceeds.  See, e.g., Exhibit 117.

421.    The total amount of the Millers' investment in the program is $108,840.00. As part of their investment, the Millers completed a Crown Forex Customer Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage and, ostensibly, Crown Forex SA.  Exhibit 118; see, e.g., Exhibits 119-120.

422.    After Universal Brokerage received their investment funds, the Millers had difficulties getting anyone at Universal Brokerage to respond to questions and concerns. Eventually, Jacquelyn Miller was able to reach Kiley, who assured her that their funds were safe and that they would make money on the investment.

423.    On February 25, 2009, the Millers requested withdrawal of $1,500.00 from their Crown Forex SA account.  Despite the representation of instant liquidity, it took approximately one week to receive the requested funds.  The funds were transferred from Associated Bank Account No. ******1705, held by "Crown Forex LLC."  Exhibit 121.

424.   On May 27, 2009, the Millers requested another withdrawal of $2,700.00 from their Crown Forex account, and experienced a similar lapse in receiving these funds.  These funds were also transferred from Associated Bank account ******1705, held by "Crown Forex LLC."  Exhibit 122.

425.   On July 1, 2009, the Millers requested a third withdrawal of $2,700.00, which was not honored.   The Millers contacted Universal Brokerage about the withdrawal request but received no response.

426.   On July 23, 2009, after learning of this lawsuit, the Millers contacted the bankruptcy trustees for Crown Forex SA to request return of their funds.  They have not received a response.  Exhibit 123.

427.   On July 21, 2009, Universal Brokerage FX posted a "client notice" on its website indicating that Universal Brokerage FX and UBS Fund are "unable to fulfill withdrawal or redemption requests."  See Exhibit 28.

428.   The Millers subsequently obtained a check copy from their bank indicating that a portion of their funds were not deposited with "Crown Forex SA," but were instead deposited with "Crown Forex LLC," at Associated Bank Account No. ******1705. Exhibit 124.

429.   To date, the Millers' withdrawal requests have not been honored, and the only information they have regarding the existence and location of their investment is check copies and wire transfers indicating that their funds were deposited with Crown Forex LLC's Associated Bank Account No. ******1705.  They have received no other information from Defendants regarding the existence or location of their investment.

P.     **Plaintiff Stephen Flemmons**

430.    Plaintiff Stephen Flemmons ("Flemmons") learned of the foreign currency arbitrage program through Patrick Kiley's radio show "Follow the Money," to which he began listening in January 2009.  On the radio show, Kiley represented that the program provided double digit returns.

431.    Flemmons contacted Kiley for additional information on the program.  In response, Kiley sent Flemmons a letter highlighting the global markets strategy.  The letter also stated:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customers funds are held in **segregated** accounts providing safety, security and liquidity."  Exhibit 125.

432.    In addition, Flemmons had several conversations with Kiley prior to investing, wherein Kiley represented that the program never lost money, that it was "impossible" to earn less than 11.25% interest, and that funds were held in segregated accounts, FDIC insured, and "liquid 24/7."

433.    Based on these representations, Flemmons invested with Kiley and Universal Brokerage's foreign currency arbitrage program.  Flemmons rolled over IRA funds to a self-directed IRA with Entrust, which then transferred the funds to Universal Brokerage.  Exhibit 126.  Universal Brokerage allegedly placed the funds with Crown Forex SA.  The total amount of Flemmons' investment in the program is $125,639.00.

434.    In conjunction with his investment, Flemmons received account statements from Universal Brokerage, Entrust and, ostensibly, Crown Forex SA.  See, e.g. Exhibit 127.

435.    After Flemmons noticed discrepancies between his Crown Forex and Entrust statements, he contacted Kiley.  Kiley indicated that this was Entrust's error and a result of their failure to receive updates.  When his second quarterly report continued to have discrepancies, Flemmons again contacted Kiley, but Kiley never returned his call.

436.    In July 2009, Flemmons received a letter from Oxford Global Partners informing him of this lawsuit and the Crown Forex SA bankruptcy, and indicating that it was "unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 12.

437.    To date, Flemmons has no access to his funds, and he has received no information from Defendants regarding the existence or location of his investment.

**Q.    Plaintiff Joseph Kalina**

438.    Plaintiff Joseph Kalina ("Kalina") learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which he began listening in 2008.

439.    On or about November 4, 2008, Kalina spoke with Kiley about investing in the foreign currency arbitrage program through Universal Brokerage FX.  They arranged a meeting at Universal Brokerage FX offices to further discuss investing in the program.

440.    On November 11, 2008, Kalina met with Kiley and Smith at Universal Brokerage FX.  During their meeting, Kiley explained that he had worked 22 years in the financial industry, and was constantly monitoring the markets overseas in order to make

money for his investors.  When Kalina asked if it was possible to lose an investment in the program, Kiley represented that there was "no way to lose" because even if the stock market collapsed, investments in the program would still earn a minimum of 10-12%. Kiley also represented that Kalina could withdraw his investment "24/7," that his funds would be held in a separate account, and that he would not have to pay taxes on earnings. In response to Kalina's inquiry about tax-free earnings, Kiley indicated that there were "legal ways of getting around" taxes.

441.   Kalina also received a letter and investment materials from Kiley.  In the letter, Kiley highlighted the profitability of Universal Brokerage FX's global market strategy and stated that this strategy "can perform regardless of what the stock market does."  Kiley also represented the following:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in **segregated** accounts providing safety, security and liquidity."  Exhibit 128.

442.   The brochure entitled "Institutional Grade Investments for the Individual Investor" represented the foreign currency arbitrage program as follows:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.

Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." Exhibit 129.

443.   Another brochure entitled "Currencies," also represented that the program provides "liquidity or access to your funds 24 hours per day," "stability," and "strong returns." Id.

444.   Based on these representations, Kalina invested in the program with Kiley and Universal Brokerage on November 12, 2008.  To invest, Kalina rolled over IRA proceeds to Entrust, which then transferred the funds to Universal Brokerage.  Exhibit 130.  Universal Brokerage was to invest the funds through Crown Forex SA.  The total amount of Kalina's investment in the program is $101,497.84.

445.   In conjunction with his investment, Kalina entered into a Customer Trade Agreement for Individual Accounts with Crown Forex SA, and received account statements from Universal Brokerage FX and, ostensibly, Crown Forex SA.  Exhibit 131; see, e.g., Exhibits 132-133.

446.   After investing his funds, Kalina learned that he had two accounts.  In early December 2008, Kalina contacted Kiley and Smith to question why he had two accounts, but did not receive a response.  On December 16, 2008, Kalina finally received a return call from Smith, who indicated that there were two accounts because two checks were deposited to fund his investment.  Smith stated that Kalina's next account statement would reflect the incorporation of the two accounts into a single account.

447.   Throughout January and February 2009, Kalina contacted Kiley via e-mail and telephone with questions regarding his account, but never received a response.

448.    On    April 29,    2009,    Kalina    e-mailed    customer    support    at www.crownforex.com, about setting up an online account, but did not receive a response.

449.    On April 30, 2009, Kalina was able to reach Smith who provided him an online account password to access his account.  Exhibit 134.  During this conversation, Kalina requested copies of his investment paperwork from Smith, and she stated that she would follow-up with Kiley.

450.    On or about May 4, 2009, Kalina again contacted Smith about obtaining his paperwork.  Smith stated that his account file would now be handled by Jared Jenkins, who would be contacting Kalina shortly.

451.    On or about May 6, 2009, Jenkins contacted Kalina and agreed to provide the requested paperwork.  During this conversation, Kalina asked if there was any chance that he could lose his investment, to which Jenkins responded "no way."   Jenkins represented that the worst case scenario was that Kalina would not earn income on his investment, but that his principal would remain secure.   Jenkins never provided the requested paperwork.

452.    On July 21, 2009, Kalina received a letter informing him that Crown Forex SA was in bankruptcy and directing him to the Crown Forex SA website for more information.  See Exhibit 13.  After visiting the website, Kalina e-mailed the Crown Forex SA trustees about recovering his funds, but received no response.

453.    On July 21, 2009, Universal Brokerage FX posted a "client notice" on its website indicating that Universal Brokerage FX and UBS Fund are "unable to fulfill withdrawal or redemption requests."  See Exhibit 28.

454.   On July 27, 2009, Kalina contacted Entrust for information on the status of his investment, who directed him to Star Tribune newspaper articles about this lawsuit.

455.   Subsequently, Kalina sent his Crown Forex SA and Universal Brokerage documentation to the Crown Forex SA trustees, but has received no response.

456.   To date, Kalina has no access to his funds, and the only information he has regarding the existence and location of his investment are wire transfer documents indicating that his funds were deposited with Crown Forex LLC's Associated Bank Account No. ******1705.   He has received no other information from Defendants regarding the existence or location of his investment.  Exhibit 135.

## R.    Plaintiff Bill McLeod

457.   Plaintiff Bill McLeod ("McLeod") first learned of the foreign currency arbitrage program through Patrick Kiley's radio show, "Follow the Money," to which he began listening in 2007.  McLeod considered Kiley credible given that he hosted well-known economist Bob Chapman on his radio show.

458.   On his radio show, Kiley represented that investments in the foreign currency arbitrage program had always earned "double digits," were instantly accessible with "the push of a computer key," and were held in a safe location.

459.   In 2007, McLeod sought additional information from Kiley regarding the foreign currency arbitrage program, and they had numerous telephone conversations wherein Kiley represented that he was earning 40% returns for his clients, and that he was constantly monitoring the investments and the markets.

460.    Based on these representations, McLeod invested with Kiley in the foreign currency arbitrage program.  To make the investment, McLeod surrendered an annuity and wrote a check in the amount of the annuity.  Exhibit 136.  The total amount of McLeod's investment in the program is $97,555.91.00.

461.    In conjunction with his investment, McLeod completed a UBS Diversified Growth application and entered into a UBS Diversified Subscription Agreement, and received account statements from both Universal Brokerage FX and UBS Diversified. Exhibit 137; see, e.g., Exhibits 138-139.

462.    When his earnings were far less than represented, McLeod contacted his Universal Brokerage advisor, Mike Behm, who forecasted higher future earnings. McLeod's returns never reached these forecasted amounts, much less the amounts represented by Kiley.

463.    In July 2009, McLeod learned of this lawsuit when Bob Chapman was a guest on a radio show and commented that investors with Kiley had lost their money and would likely never see it again.

464.    McLeod immediately went on the Internet to gather information about Kiley and Universal Brokerage.  During this search, McLeod learned for the first time of Kiley's affiliation with Cook.  McLeod contacted Cook and left a message, but did not receive a return call.  McLeod also contacted Kiley, Universal Brokerage and UBS to withdraw his funds, but there was either no answer or his messages were not returned. Calls to Behm's telephone number revealed that it had been disconnected.

465.   On July 21, 2009, Universal Brokerage FX posted a "client notice" indicating that Universal Brokerage FX and UBS Fund are "unable to fulfill withdrawal or redemption requests." See Exhibit 28.

466.   To date, McLeod has no access to his funds, and he has received no information from Defendants regarding the existence or location of his investment.

## S.        **Plaintiff James Downing III**

467.   Plaintiff James Downing III ("Downing") learned of the foreign currency arbitrage program through Patrick Kiley's radio show, "Follow the Money," to which he had listened since 2004.  On his radio show, Kiley discussed how the average investor was being "robbed" by their broker or 401(k) provider through fees and commissions. Kiley advised listeners to invest in the program because he could guarantee double digit returns with no ties to the stock market.  Kiley represented that investments in the program made money regardless of fluctuations in the stock market, and that the investments were secure, held in segregated accounts, and available for withdrawal 100% of the time.

468.   In April 2006, Downing contacted Kiley for additional information on the program because of lack of earnings of his 401(k) plan.  During their telephone conversation, Kiley explained the procedure for rolling over 401(k) proceeds into a self-directed IRA, which Kiley and his company "Universal Brokerage Services" would then invest on Downing's behalf.  Kiley also reiterated his representations that the investment would be secure, liquid, held in a segregated account, and earn double digit returns.

469.    During their conversation, Downing asked questions regarding where his funds would be invested, the tax status of the investment, and the contact people for his investment.  Kiley responded that the funds were being invested in foreign currencies, the investment was tax-deferred, and that Kiley and Cook would be his contacts.

470.    Subsequently, Downing invested in the program with Kiley and Universal Brokerage FX.  To invest, Downing rolled over 401(k) proceeds into a self-directed IRA with Millennium.  Exhibit 140.  The total amount of Downing's investment in the program is $38,346.00.

471.    To fund Downing's Universal Brokerage FX account, Millennium was required to send a wire transfer to "PFG, Inc. Forex Customer Segregated Funds Account," account number ******796, at J.P. Morgan Chase, Bank Swift #CHASUS33, New York, New York, Bank ABA: ******0021.  Exhibit 141.

472.    In conjunction with his investment, Downing received account statements from Universal Brokerage FX and UBS Diversified.  Downing was also able to check the status of his account on Millennium's website.  See, e.g., Exhibits 141-142.

473.    Downing checked his account on the Millennium website and was surprised to learn that his portfolio summary was not earning the types of returns that Kiley had represented.

474.    In January 2008, Downing contacted Kiley and left a message asking him to explain the low 9% rate of return on his investment in 2007.  In response, Downing received a call from Brian Seiwert on January 10, 2008, who indicated that the

opportunities for making larger returns were not available in 2007, as they had been previously.  See Exhibit 143.

475.   In summer 2008, Kiley announced on his radio show that frequent guest Bob Chapman would no longer be on the air with him under advisement of Kiley's attorney.  Kiley claimed that he did not want to get involved in Chapman's "legal issues."

476.   Downing first learned of this lawsuit through Chapman's July 2009 newsletter.  The newsletter provided a link to the Star Tribune articles detailing this lawsuit.

477.   Downing immediately contacted Kiley regarding the lawsuit and the status of his investment, but was told that Kiley "is out of town" and would respond when he returned.  Kiley never responded to this message.

478.   On July 21, 2009, Downing received letters from both Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, which informed him of the lawsuit and Crown Forex SA's bankruptcy proceedings, and indicated that these entities are "unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

479.   To date, Downing has no access to his funds, and he has received no information from Defendants regarding the existence or location of his investment.

**T.**         **Plaintiffs Edgar and Linda Stephenson**

480.   Plaintiffs Edgar and Linda Stephenson  ("the Stephensons") learned of the foreign currency arbitrage program when they began listening to Kiley's radio show, "Follow the Money" in early 2008.  On the show, Kiley represented that investments in the program were fully liquid, transparent, protected, and would earn double digit returns.

481.   During January 2008, the Stephensons had multiple telephone conversations with Kiley about investing in the program.  During these conversations, he again represented that the investments were thoroughly safe, that the program had earned double digit returns for twenty-one years, and that the accounts were segregated.  Kiley also stated that he is "no Bernie Madoff."

482.   Kiley also sent the Stephensons a letter in which he represented the following:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customers funds are held in **segregated** accounts providing safety, security and liquidity."  Exhibit 144.

483.   Prior to investing, the Stephensons also spoke with Universal Brokerage representative, Mike Behm.  Behm encouraged them to invest, and indicated that clients were getting from 11.5% to 18% returns on their investments.

484.   Based on these representations, the Stephensons invested in the foreign currency exchange program with Kiley and Universal Brokerage on January 29, 2008.  To invest, the Stephensons rolled over two IRA accounts into self-directed IRAs with Millennium and Entrust, and wrote two checks to Universal Brokerage in the amount of $125,000.00.   See, e.g., Exhibits 145-147.   The total amount of the Stephensons' investment in the program is $310,627.86.

485.   In conjunction with their investment, the Stephensons completed a Universal Brokerage Client Application, entered into a Customer Trading Agreement for Individual Accounts with Crown Forex SA, and received account statements from

Universal Brokerage FX and, ostensibly, Crown Forex SA.  Exhibits 148-149; see, e.g., Exhibit 150.

486.    On November 24, 2008, the Stephensons made a $1,000.00 withdrawal request from their IRA account to confirm that their funds were instantly liquid as represented.   They contacted their Universal Brokerage representative, Jared Jenkins, who had them send withdrawal forms directly to Millennium.  Shortly thereafter, Linda Stephenson received a telephone call from Julia Smith, Kiley's assistant, who inquired if they had received their $1,000.00 withdrawal.  Linda Stephenson told Smith that they had sent the withdrawal forms directly to Millennium per Jenkins' instructions.  Smith stated that this was not the correct procedure and that the Stephensons should make future withdrawal requests directly to Universal Brokerage.  Jenkins later indicated that Kiley maintained extreme control over client funds, and micro-managed all transactions.  The Stephensons subsequently received $1,000.00 pursuant to their request.  Exhibit 151.

487.    On July 10, 2009, the Stephensons received a notification from Entrust informing them of the lawsuit against Universal Brokerage FX.   The Stephensons immediately attempted to contact Kiley and Trevor Cook to obtain information about their investment.  Kiley and Cook never returned these calls.

488.    The Stephensons then called every telephone listing for Universal Brokerage and the other UB Entities, but received automated messages that "all agents are busy" and that they should leave a message.   The Stephensons never received responses to the messages they left.

489.   On July 17, 2009, the Stephensons made written withdrawal requests to Kiley, Universal Brokerage, and the other UB Entities, demanding closure of their accounts and return of all invested funds.  No response was received, and these requests were not honored.  See, e.g., Exhibit 152.

490.   The Stephensons also faxed withdrawal requests to Entrust and Millennium.  Entrust and Millennium contacted Kiley and Universal Brokerage regarding the withdrawal requests, but never received a response.  See, e.g., Exhibit 153.

491.   The Stephensons also contacted Crown Forex SA via telephone, but could not reach anyone.

492.   On July 21, 2009, Universal Brokerage FX posted a "client notice" indicating that Universal Brokerage FX and UBS Fund are "unable to fulfill withdrawal or redemption requests."  See Exhibit 28.

493.   On August 19, 2009, the Stephensons sent a letter to the Crown Forex SA trustees requesting information on the status of their accounts, but have yet to receive a response.

494.   To date, the Stephensons' withdrawal requests have not been honored.

495.   The only information regarding the existence or location of the Stephensons' funds is a wire transfer document indicating that a portion of their IRA proceeds went to Crown Forex LLC, 5413 Nicollet Avenue, Suite 14, at Associated Bank Account Number ******1705, rather than Crown Forex SA. Exhibit 154.  They have received no other information from Defendants regarding the existence or location of their investment.

U.            **Plaintiff Ronald B. Stolpman**

496.   Plaintiff Ronald B. Stolpman ("Stolpman") learned of the foreign currency arbitrage program through an April 2009 article in "Twin Cities Business" magazine about Oxford and Beckman.   The article, written by Mr. Tony Carideo, featured Beckman and his "remarkable achievement" of keeping his investment performance for 2008 to only a 3% loss as compared to a 39% loss by the S&P 500 for the same time period.  Stolpman was very impressed by these figures and was looking for an investment advisor who could demonstrate that kind of conservative approach to investing.  Exhibit 155.

497.   On April 16, 2009, Stolpman contacted Oxford for additional information, and spoke with Tom Richardson, who identified himself as Chief Operating Officer for Oxford Global Partners, and Paul Wood, who identified himself as Senior Investment Advisor for Oxford Private Client Group.  Exhibit 156.  They discussed the article and transferring Stolpman's investment portfolio to the Oxford Companies.

498.   On April 20, 2009, Stolpman again spoke with Wood about investing funds with Oxford, transferring his portfolio to Oxford, and Oxford's "Global Enhanced Return Strategy."   Wood represented that the Global Enhanced Strategy provided instant liquidity and segregated accounts with the enhanced returns of a foreign currency arbitrage.

499.   Wood provided Stolpman with various materials to review.   These materials included a "Global Enhanced Return Strategy" brochure, which indicated that the strategy involves "segregated client accounts in one of the most well-capitalized

financial institutions in the world," "daily liquidity," "capital protection" and "24/7 account reporting." Exhibit 157.

500.   Wood also provided a brochure entitled "The Oxford Core Equity Portfolio," which stated that "our active portfolio management seeks to maintain a risk level (standard deviation) less than that of an index while realizing above index performance." Id.

501.   In an Oxford Private Client Group quarterly report provided by Wood, Beckman represented that "the Oxford Core" had returns "a full 35 percent better than the S&P 500." Id.

502.   The information provided to Stolpman also included marketing materials by Oxford Global Partners and Oxford Private Client Group, both of which emphasized a focus on "capital preservation." Id.

503.   Based on the foregoing information and representations, Stolpman transferred $377,000.00 to Entrust, as directed by Wood, $100,000.00 of which was to be put in the Global Enhanced Return Strategy, with the remaining amount to be held temporarily in a money market fund. This would allow time for Stolpman to devise an investment strategy with Beckman at Oxford Private Client Group.

504.   To invest, Stolpman converted the portfolio of stocks held in his Vanguard SEP-IRA to cash and rolled over those funds from his Vanguard IRAs to a self-directed IRA with Entrust. Exhibit 158. The funds transferred to Entrust ($100,000.00) were then to be transferred to Crown Forex SA. In conjunction with his investment, Stolpman

completed a Crown Forex Customer Trading Agreement for Individual Accounts. Exhibit 159.

505.    On May 15, 2009, Wood provided Stolpman information on his "Crown Forex" account, and installed software on Stolpman's computer so that Stolpman could access account activity.

506.    On June 2, 2009, Stolpman received his Crown Forex SA account number and personal identification number, which enabled him to track his investment.  When Stolpman checked his account, he learned that, contrary to his instructions, the entire $377,000.00 investment had been placed in the Crown Forex account.  Stolpman contacted Wood about the issue, and was told that Beckman had decided that the Crown Forex account was the best location for temporarily investing all of the funds.

507.    On July 8, 2009, Wood contacted Stolpman to inform him that something "suspicious" was going on regarding Crown Forex.  Wood recommended that Stolpman withdraw his funds from Crown Forex, SA.

508.    Stolpman then contacted Oxford and spoke to Erickson, who advised him to visit the Crown Forex website (www.crownforex.info) for more information. Stolpman visited the website and discovered that Crown Forex SA was in receivership and had been put into bankruptcy on May 19, 2009.  Exhibit 160.

509.    Based on this information, Stolpman completed a Crown Forex withdrawal form seeking liquidation of all funds in his account.  Exhibit 161.  Stolpman submitted the completed withdrawal form to Wood, who indicated that he had left Oxford a week earlier.  Wood also indicated that Cook was the Oxford representative responsible for the

Crown Forex SA investments.  Wood told Stolpman that he would give the withdrawal form to Ryan Moeller, an associate of Cook responsible for handling the Crown Forex SA paperwork, that same day.

510.   Stolpman also asked Entrust to provide him with its withdrawal form for submission to Cook and Crown Forex SA.  Stolpman completed the form and faxed it back to Entrust  who forwarded it to Cook at Oxford.

511.   On July 17, 2009, Stolpman called Eric Erickson at Oxford regarding his withdrawal request.  Erickson stated that Stolpman's Crown Forex account was closed and that the funds would be remitted shortly.

512.   When his funds were not forthcoming, Stolpman contacted the trustees of Crown Forex SA to inquire about his account.  Exhibit 162.  Stolpman was told "unequivocally that [his] money was never received by Crown Forex SA."

513.   Stolpman then had several conversations with Beckman regarding the status of his investment.  Beckman indicated that he had used "auditors" to investigate Crown Forex SA before he decided to get involved.  Beckman indicated that Cook was responsible for the Crown Forex SA investments.  Beckman also passed along an e-mail from Shadi Swais, CEO of Crown Forex, who indicated that "Crown Forex is doing well as usual, and your client's investments are safe."  Exhibit 163.

514.   Subsequently, Stolpman requested and received a copy of the wire transfer from Entrust to Crown Forex SA.  The wire transfer information indicated that Stolpman's funds went to "Crown Forex LLC" instead of "Crown Forex SA."  The funds were deposited into Associated Bank Account No. *******1705.  Exhibit 164.

515.   Stolpman later learned that "Crown Forex LLC" was not an active, registered entity.

516.   When Stolpman attempted to contact the Associated Bank representative named in the wire transfer instructions, he learned that the representative had been terminated on July 21, 2009.

517.   To date, Stolpman's withdrawal requests have not been honored, and he has received no other information from Defendants regarding the existence or location of his investment.

## V.         **Plaintiff Donald Moran**

518.   Plaintiff Donald Moran ("Moran") learned of the foreign currency arbitrage program through Kiley's show, "Follow the Money," to which he began listening in late 2007.  On the radio show, Kiley represented that investments in the program were liquid, immediately available, held in segregated accounts, and would earn substantial returns.

519.   In early 2008, Moran called the 800-number provided on Kiley's radio show to obtain additional information.  Kiley returned the call and reiterated the liquidity, security, and rate of return of investments in the program.  Kiley sent Moran an informational packet that detailed the double digit yearly returns that the program consistently returned to investors.

520.   Based on these representations, Moran invested in the foreign currency arbitrage program through Kiley.  To invest, Moran rolled over IRA proceeds to a self-directed IRA account with Entrust, which were then to be invested with Crown Forex SA. Exhibit 165.

521.   As part of his investment, Moran also wrote three checks totaling $100,000.00, which were to be invested with Crown Forex SA.   One $50,000.00 check was made payable to Universal Brokerage FX on April 4, 2008.   Per Kiley's instructions, the other two checks were made payable to "Crown" on October 17, 2008.   The total amount of Moran's investment in the program is $330,000.00.   Exhibit 166.

522.   In conjunction with his investment, Moran completed a Universal Brokerage Client Application, entered into a Crown Forex Customer Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage FX and, ostensibly, Crown Forex SA.   Exhibits 167-168; see, e.g., Exhibit 169.   After investing, Moran's primary contact at Universal Brokerage FX was Brian Seiwert.

523.   On July 23, 2009, Moran received a letter from Universal Brokerage FX/ UBS Fund informing him of the lawsuit, and indicating that these entities "are unable to fulfill withdrawal or redemption requests."   See Exhibit 13.

524.   Moran immediately called Universal Brokerage's offices and left messages regarding the status of his investment, but his calls were never returned.   Moran also left messages on Brian Seiwert's cell phone, but also did not receive a response.

525.   Moran then visited the Crown Forex SA website and submitted a claim to the trustees pursuant to the instructions.   Moran has not received a response from the Crown Forex SA trustees.

526.   To date, Moran's withdrawal requests have not been honored.   The only information Moran has regarding the existence or location of his investment is a wire transfer document indicating that a portion of his funds went to "Crown Forex LLC,"

rather than "Crown Forex SA."   The funds were deposited in Crown Forex LLC's Associated Bank Account No. ******1705.  Exhibit 170.

527.   Moran has received no other information from Defendants regarding the existence or location of his investment.

## W.        Plaintiff Shirley Jacobs

528.   Plaintiff Shirley Jacobs ("Jacobs") learned of the foreign currency arbitrage program through Pat Kiley's radio show, "Follow the Money," which she heard about from a relative in the fall 2007.

529.   In November 2007, Jacobs contacted Kiley for additional information on the program.   During subsequent telephone conversations, Kiley represented that investments in the program were safe, guaranteed, backed by gold, held in segregated accounts at Crown Forex SA in Switzerland, liquid, and "always made double digits." Kiley advised Jacobs to immediately take her money out of the stock market before she "went broke," and invest in the foreign currency arbitrage program.   Kiley stated that Jacobs would never lack for money if she invested with him.

530.   Jacobs also received investment materials from Kiley, which represented the following:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  Exhibit 171.

531.   In addition, Jacobs received a letter from Kiley highlighting Universal Brokerage's investments in global markets.  The letter also stated:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customers funds are held in **segregated** accounts providing safety, security and liquidity."  Exhibit 172.

532.   Based on these representations, Jacobs invested in the program with Crown Forex SA through Kiley in January 2008.  To invest, Jacobs rolled over IRA proceeds into self-directed accounts with Millennium, which were then to be invested with Crown Forex SA.  Exhibit 173.  The total amount of Jacobs' investment in the program is $321,000.00.

533.   In conjunction with her investments, Jacobs received account statements from Universal Brokerage FX, UBS Diversified and, ostensibly, Crown Forex SA.  See, e.g., Exhibits 174-176.

534.   In July 2009, Jacobs requested a $12,000.00 withdrawal from her Millennium account.  The withdrawal was handled by Cook and Smith, and Jacobs subsequently received a $12,000.00 check from Universal Brokerage FX Management LLC.  Exhibit 177.

535.   Subsequently, Kiley contacted Jacobs and advised her to switch her self-directed IRA from Millennium to Entrust because they were "much better to work with."  Jacobs followed Kiley's advice and transferred her IRA account to Entrust.  Exhibit 178.

536.   In late July 2009, Jacobs learned of Crown Forex SA's bankruptcy proceedings in Switzerland while searching the Internet.

537.   On July 31, 2009, she contacted Kiley regarding the bankruptcy proceedings and the status of her investment.   Kiley indicated that the bankruptcy involved a Swiss bank called "Crown Forex" and not Crown Forex SA.   He represented that Jacobs' investment was safe, and that he had no affiliation with the Oxford Companies that were responsible for the Ohio Plaintiffs' situation.   Kiley indicated that he had previously warned Cook that Durand was "trouble" and should not do business with him.   During their conversation, Kiley condemned Bernie Madoff as a "criminal," and reiterated that Jacobs' funds were safe with him.

538.   On August 3, 2009, Jacobs received a letter from Millennium informing her of this lawsuit.   Exhibit 179.   Jacobs immediately called Kiley's office, but was told that she could not speak with Kiley.   When she asked to speak with Kiley's assistant, Smith, she was told that Smith was not taking calls.   Subsequent calls were never returned.

539.   Jacobs then contacted Crown Forex SA trustee Phillip Von Bredow by telephone regarding the status of her account, and he indicated that Crown Forex SA does not have any accounts with Oxford, UBS, or Patrick Kiley.   He stated that all Crown Forex SA account numbers begin with the number "2" and her account number beginning with "3" does not exist.   Von Bredow also indicated that they have a small account with UBFX, but that there are no segregated accounts relating to UBFX.

540.   To date, Jacobs has no access to her funds, and the only information she has received regarding the existence or location of her investment is a wire transfer document

indicating that Entrust wired her funds to a "Crown Forex" account at Associated Bank Account Number ******1705.  Exhibit 180.  She has received no other information from Defendants regarding the existence or location of her investment.

**X.**        **Plaintiffs Janet and Edgar Johnson**

541.   Plaintiffs Janet and Edgar Johnson ("the Johnsons") learned of the foreign currency arbitrage program through Kiley's radio program, "Follow the Money."

542.   In summer 2008, the Johnsons contacted Kiley for additional information relating to the foreign currency arbitrage program.  In their subsequent conversations, Kiley represented that investments in the foreign currency arbitrage program were safe, never earned below 12%, and could be withdrawn at any time with just a telephone call to Kiley.  Kiley represented that he was an honest Christian who could provide the Johnsons "a good return on their hard earned money."

543.   Based on these representations, the Johnsons invested in the foreign currency arbitrage program with Kiley.  Per Kiley's instructions, the Johnsons wrote and endorsed checks to UBS Diversified, UBS Diversified Fund, and "Crown" in order to invest.  Exhibit 181.  The total amount of the Johnsons' investment in the program is $840,934.00.

544.   In conjunction with their investment, the Johnsons completed a UBS Diversified Growth Application, and received account statements from UBS Diversified and Universal Brokerage FX.  See, e.g., Exhibits 182-183.

545.   On August 4, 2009, the Johnsons received a letter from Universal Brokerage FX and UBS Fund informing them of the lawsuit and the Crown Forex SA

bankruptcy proceedings, and indicating that they are "unable to fulfill withdrawal or redemption requests." See Exhibit 13.

546.   To date, the Johnsons have no access to their funds, and the only information they have regarding the existence or location of their investment are check copies indicating that portions of their funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705; and UBS Diversified Growth LLC's Wells Fargo Account No. ******2710.   See Exhibit 181.   They have received no other information from Defendants regarding the existence or location of their investment.

**Y.       Plaintiff Curtis Harvey**

547.   In May 2008, Plaintiff Curtis Harvey ("Harvey") learned of the foreign currency arbitrage program through a friend who had previously invested with Universal Brokerage FX and Kiley.

548.   In June 2008, Harvey researched the program by listening to his radio show, "Follow the Money," and visiting Kiley's website.   On his radio show, Kiley discussed the poor performance of the stock market, a pending market collapse, and the declining value of the U.S. dollar due to inflation and spending.   Kiley indicated that investors could protect themselves by investing in the program.   Kiley represented that the program protected principal investments and maintained investor funds in segregated Swiss accounts at Crown Forex, which managed accounts for Universal Brokerage FX.

549.   In July 2008, Harvey contacted Kiley to discuss his investment philosophy and to better understand the foreign currency arbitrage program.

550.    During telephone conversations with Kiley in late July and early August 2008, Kiley represented that the program had a guaranteed rate of return of 11.5 to 12%. Based on these guaranteed returns, Kiley encouraged Harvey to invest in the program rather than pay off his home mortgage.  When Harvey asked Kiley about ownership of gold bullion or coins, Kiley warned Harvey that the government would eventually confiscate gold like it did in the 1930s.

551.    In August 2008, Harvey discussed rolling over an IRA to invest in the program.  Kiley instructed him to have the brokerage company make the check payable to Harvey rather than to Crown Forex SA, and then send the check to Kiley made out for deposit.

552.    In August 2008, Harvey also spoke with John Loebel, Senior Investment Advisor at Universal Brokerage FX. Harvey requested an informational packet to review, and Loebel sent a brochure and a Crown Forex SA application.  The brochure represented that the program was a secure investment with no risk, and that the returns would be high enough to out-pace inflation.

553.    Harvey sought Loebel's assistance in completing the Crown Forex SA application, and answering additional questions about the investment.  When Harvey asked about the liquidity and availability of funds after being transferred to Crown Forex SA, Loebel represented that it was easy to access and move funds.

554.    Harvey also received a letter from Kiley highlighting Universal Brokerage's investments in global markets.  The letter also stated: "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are

ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customers funds are held in **segregated** accounts providing safety, security and liquidity." Exhibit 184.

555.   Based on these representations, Harvey invested in the foreign currency arbitrage with Kiley on August 19, 2009.  To invest, Harvey rolled over IRA proceeds to a self-directed IRA account with Entrust Midwest, LLC.  Entrust was then to transfer the funds to Crown Forex SA.  Exhibit 185.  The investment was also partially funded in cash.  Per Loebel's instructions, Harvey made the checks payable to "Crown."  See, e.g., Exhibit 186.  The total amount of Harvey's investment in the program is $198,242.23.

556.   In conjunction with his investment, Harvey completed a Crown Forex Customer Trading Agreement, and received account statements from and Universal Brokerage FX and, ostensibly, Crown Forex SA.  Exhibit 187; see, e.g., Exhibits 188-189.

557.   On June 18, 2009, Harvey and his wife visited Kiley and Loebel at the Universal Brokerage office to become more comfortable with their operations prior to investing more funds in the program.  During this visit, Kiley explained the foreign currency arbitrage program and demonstrated trades on the proprietary software.  Kiley also introduced Harvey and his wife to his "partners" Beckman and Cook at the Oxford offices in the Van Dusen mansion.

558.   When Harvey asked about the risk associated with the foreign currency arbitrage program, Kiley represented that the program is less risky than a mutual fund, that the principal is secure, and that most trades result in positive returns.

559.   Following the visit, Harvey rolled over another IRA to Entrust to be invested in the foreign currency arbitrage program.  However, Harvey never received an acknowledgement that the transaction was completed.

560.   On July 10, 2009, Harvey called John Loebel to obtain an application for his wife to roll over some 401(k) funds into an arbitrage account.  Loebel indicated he would send the application via regular mail, but it never arrived.  Harvey repeatedly called Kiley and Loebel, but the phones were not being answered.  Kiley and Loebel also did not respond to e-mails.

561.   When Kiley and Loebel could not be reached, Harvey became concerned about his investment.  He visited Kiley's website, which linked him to information about Crown Forex SA's bankruptcy proceedings.

562.   Harvey contacted Entrust to withdraw his funds, but the funds had been transferred to Universal Brokerage FX.  Harvey also requested withdrawal of his funds from the Crown Forex SA trustees, but they advised him to contact the Securities and Exchange Commission.

563.   To date, Harvey's withdrawal requests have not been honored, and the only information he has regarding the existence or location of his investment are a wire transfer document and a check copy both indicating that his funds were deposited with "Crown Forex LLC" rather than "Crown Forex SA."  Exhibit 190.  The Crown Forex LLC account is at Associated Bank Account No. ******1705.  Id.  He has received no other information from Defendants regarding the existence and location of his investment.

**Z.**      **Plaintiff Barry Owens**

564.   Plaintiff Barry Owens ("Owens") first learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money."

565.   In May 2009, Owens contacted Universal Brokerage FX for additional information on the program.  Owens spoke with Jared Jenkins, a Senior Investment Adviser for Universal Brokerage, who indicated that he worked closely with Kiley.

566.   During their conversations in May 2009, Jenkins informed Owens that the program protected the principal investment and that the principal could not be lost in any transactions.  This representation was particularly significant to Owens who had lost substantial portions of an investment the previous year.

567.   Based on these representations, Owens invested in the program with Crown Forex SA through Patrick Kiley and Universal Brokerage FX.  To invest, Owens rolled over proceeds from an IRA into a self-directed IRA account with Entrust, which was to then transfer the funds to Crown Forex SA.  Exhibit 191.  The total amount of Owens' investment in the program is $345,268.33.

568.   In conjunction with his investment, Owens entered into a Crown Forex Customer Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage FX and, ostensibly, Crown Forex SA.  Exhibit 192.

569.   On June 15, 2009, Owens contacted Jenkins seeking clarification of a statement.  Jenkins returned the call on June 16, 2009, and indicated that he would send a new statement and would explain the statement to Owens upon receipt.  The statement never arrived and subsequent telephone calls were not returned.  On July 6, 2009, Jenkins

again indicated that a quarterly statement would be forthcoming and that he would explain the statement when it arrived.  Again, the statement never arrived.

570.    On July 24, 2009, Owens received letters from Universal Brokerage FX/UBS Fund, and Oxford Global Partners, informing him of this lawsuit, Crown Forex SA's bankruptcy proceedings, and indicating that these entities are "unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

571.    Owens immediately contacted every telephone number for Universal Brokerage, but no one answered and all voicemail boxes were full.  Owens also visited the Crown Forex SA website, but learned that all claims had to be submitted by June 30, 2009.

572.    To date, Owens' has no access to his funds, and the only information he has regarding the existence or location of his investment are a wire transfer document indicating that his funds were deposited with "Crown Forex LLC" rather than "Crown Forex SA."   The Crown Forex LLC account is at Associated Bank Account No. ******1705.  See Exhibit 191.  He has received no other information from Defendants regarding his investment.

**AA.        Stephen G.  and Elizabeth A. Froehle**

573.    Plaintiffs Stephen G. and Elizabeth A. Froehle ("the Froehles") first learned of the foreign currency arbitrage program after seeing a favorable June 2007 article about Oxford Global Partners, Oxford Global Advisors, and UBS Diversified in the Star Tribune newspaper.  Exhibit 193.

574.  In summer 2007, Stephen Froehle attended a Saturday informational session at Oxford headquarters at 1900 LaSalle Avenue, Minneapolis, Minnesota. During the session, it was represented that the program fully hedges the principal investment.  At this meeting, Froehle was introduced to Grant Grzybowski and told that Grzybowski could assist him in learning more about the program.  Grzybowski's business card identified him as "Chief Financial Strategist/Technical Analyst" for UBS Diversified and listed the following affiliations:  "UBS SAXO IFX MILLENNIUM RJO PFG CHASE."  Beginning in late 2007 or early 2008, Grzybowski became affiliated with the Oxford Companies, and his business card identified him as "Senior Investment Advisor" for Oxford Global Advisors. Exhibit 193.

575.  The Froehles received a brochure from "UBS Diversified" dated February 16, 2007, which represented the program as "instantly liquid," "segregated account, not co-mingled with the general assets of the custodian, bank or dealer," "principal protected," and "current yield of 12%+ annually."  The brochure also stated that "[t]he utilization of both our exclusive technology and unparalleled banking relationships negate all currency risks," and "[y]our principle [sic] is fully hedged by our liquidity providers and affiliate banks."  The liquidity providers included Deutsche Bank, Dresdner Bank, Barclays Capital, UBS, JP Morgan, Saxo Bank, Bank of America and RBS.  Exhibit 194.

576.  Oxford Global Partners also provided the Froehles with a brochure entitled "The Oxford Global FX Carry Arbitrage Fund" that similarly represented that the program preserves capital and offers investment liquidity.  The brochure described the

program's swap offsetting positions and represented that "the net end result is that the carry, interest rate differential, is captured and the FX price risk is eliminated."   The brochure further noted, "Options are an investment security whose primary function is risk management.   The first goal of every investment ought to be the preservation of capital."   Id.

577.   The Froehles also received other brochures about foreign currency arbitrage, which indicated that accounts are segregated, funds are instantly liquid, and investment principal remains protected.   Id.

578.   Based on these representations and the explanations of the program in the Subscription Form, Potential for Performance document, and the representations made to Stephen Froehle orally, the Froehles invested in the foreign currency arbitrage program through the UB Entities and Oxford Companies.   Exhibit 195.   The first investment was for $20,000.00, for which the Froehles wrote two checks.   The first check for $10,000.00 dated August 3, 2007, was made payable to UBS Diversified.   The second check for $10,000.00 dated November 30, 2007, was, at the direction of Grzybowski, made payable to "Oxford Global Advisors" for the benefit of the Froehles.   Exhibit 196.   Both $10,000.00 checks were deposited into Wells Fargo Bank, N.A.  Exhibit 196A.

579.   In conjunction with this initial investment, the Froehles completed a UBS Diversified client application form and a Subscription Form.   The Subscription Form represented that the program offered "daily liquidity minus any applicable surrender and/or early redemption fees."   The Subscription Form also indicated a 4-year fixed note

with "12% annualized credited monthly at 1%," and a "1.2% Capital Protection Fee." See Exhibit 195; Exhibit 197.

580.   The "Potential for Performance" document accompanying the Subscription Form represented the "worst case scenario" for an investor in the program as follows: "The portion called 'Guarantee Trigger' represents the absolute worse case scenario. Should all G5 interest rates collapse to 0 following the initial 12 month period—the note will pay 0.1% per annum until spreads widen or are larger than US Fed Funds." See Exhibit 195.

581.   Initially, the Froehles received statements from UBFX Diversified in conjunction with their investment, but beginning in 2008, the monthly statements came from "The Oxford." See, e.g., Exhibit 198.

582.   During a telephone conversation on March 27, 2008, Grzybowski told Stephen Froehle that the program provided a 4-year guaranteed return of 10.5%, if an investor did not draw monthly income checks from the investment; and 10.125%, if an investor drew monthly checks from the investment.

583.   At an April 28, 2008 Oxford Companies' seminar, it was represented to Stephen Froehle that the investment program was safe and fully hedged, and would earn consistently high returns.

584.   On August 1, 2008, Grzybowski told Stephen Froehle that the investment was liquid, redeemable in mere days, and was targeted to earn a 12% return.

585.   At Grzybowski's request, the Froehles completed and sent to Oxford a Crown Forex SA Joint Trading Agreement on August 18, 2008.   Exhibit 199.

Grzybowski represented that Oxford would handle external administration of the Froehles' separate, managed accounts at Crown Forex SA.  In conversations with Stephen Froehle, Grzybowski represented that the funds would be placed in Crown Forex SA, and had a "4 year, 10% return guarantee."

586.   At this same time, in August 2008, the Froehles also completed, at Oxford's request, a "Management Agreement" with Oxford Global Advisors.  The Management Agreement represented that "the strategy is known as a fully hedged carry trade" and that the hedging "directly offsets the currency fluctuation risk."  The Management Agreement also stated "the account seeks to generate a return of 10.5% per annum.  Should global interest rates change, leverage may be modified to increase or decrease the interest bearing currency pairs and offsetting positions so the fixed return is achieved for the client."  Exhibit 199.  Grzybowski orally confirmed to Stephen Froehle several times, both before and after the Management Agreement was executed, that the leverage would not exceed three times, and through December 2008, represented that the program included a guaranteed return of 10% for 4 years.

587.   In conjunction with their Crown Forex SA account, Grzybowski provided the Froehles access to the Crown Forex SA account.  Initially, access to the Crown Forex SA trading platform was obtained through a download, but this changed to live access via the Internet in spring 2009.  The Froehles were also able to access their accounts through the Oxford Global Partners website; however, these statements appeared with the header "C.G.I. Group."  Exhibit 200.

588.    On October 13, 2008, the Froehles requested a withdrawal from their accounts in the amount of $1,300.00.  Exhibit 201.  On November 28, 2008, the Froehles requested a $1,400.00 withdrawal from their accounts.  Id. In both instances, the funds were wired to their bank account within a few days.  The Froehles' bank confirmed that the wire transfers came from "Crown Forex LLC."  Id.

589.    During a December 8, 2008 conversation with Stephen Froehle, Grzybowski again represented that this investment program would provide a "4 year, 10% return guarantee."  In reliance upon this representation and previous representations made to them regarding the program, on December 16, 2008, the Froehles invested an additional $10,000.00 in the program, which, in accordance with directions received from Grzybowski, they funded by check made payable to "Crown Forex for the benefit of Stephen and Elizabeth Froehle."  Exhibit 202.

590.    During this August through December 2008 time frame, the Froehles were told that they had two individual accounts with Crown Forex SA, one holding long positions and one holding short positions.  On January 13, 2009, Grzybowski informed Stephen Froehle that the accounts had been combined into a single Crown Forex SA account.

591.    Between December 2008 and early July 2009, Grzybowski would occasionally send documents to the Froehles which purported to be, and which the Froehles believed to be, the account statements for their accounts at Crown Forex SA. See, e.g., Exhibit 203.

592.   On March 9, 2009, Grzybowski e-mailed an account statement to Stephen Froehle showing their Crown Forex SA account balance to be $30,531.17.   Exhibit 204. On April 4, 2009, the Froehles received in an email from Grzybowski, a complete copy of what purported to be their Crown Forex SA statement for March 31, 2009, showing a balance of $30,714.47.   See Exhibits 193, 204.

593.   On May 25, 2009, Stephen Froehle e-mailed Grzybowski about potentially investing additional funds into the foreign currency arbitrage program.   In a responsive e-mail, Grzybowski instructed the Froehles to "Make the check out to Crown and on the memo section of the check put FBO:  Stephen Froeh [sic] and your current Act. number." Exhibit 205.  Grzybowski later repeated the direction that the check for investment from the Froehles be made payable to "Crown."

594.   On June 2, 2009, Stephen Froehle had another conversation with Grzybowski regarding investments.   During that conversation, Grzybowski discussed with Froehle the "YEAT" program offered by Oxford through its relationship with Basel Management, which involved investing in gold and then borrowing against the gold, or purchasing gold on credit, to invest in the foreign currency arbitrage program.   In discussing this investment, Grzybowski reiterated that investments in the foreign currency arbitrage program were fully hedged, safe and principal protected, and represented that the worse case scenario was that the Froehles earn nothing on the investment.   During this June 9, 2009 conversation, Grzybowski also represented that funds in the program would earn a fixed 10.5% return.

595.   The Froehles decided against participating in the YEAT program at that time, and instead decided to invest additional funds in the foreign currency arbitrage program based on all of the representations they had received regarding the program, including the recently repeated representations that their principal was safe, would be fully protected, and that the only risk was failure to earn a return on the investment.

596.   On June 15, 2009, the Froehles mailed to Grzybowski at Oxford a $170,000.00 official bank check payable to "Crown," to fund their Crown Forex SA account.   Exhibit 206.   On June 30, 2009, Ryan Moeller of Oxford sent an e-mail to Stephen Froehle that pasted into the e-mail what purported to be a valid statement from the Froehles' account at Crown Forex SA, which showed that the $170,000.00 had been received into their account at Crown Forex SA.   Exhibit 207.

597.   At some time in either late June or early July 2009, after making the June 15, 2009 investment, Stephen Froehle had another conversation with Grzybowski and Cook regarding the YEAT program.   During that conversation, Grzybowski, Cook, and Froehle discussed the foreign currency arbitrage program in which the Froehles had already invested, and which the Froehles were weighing against the YEAT program and other alternatives for their next planned investment.   Froehle specifically asked Cook to confirm with respect to the foreign currency arbitrage program that "the worst that could ever happen is that I would not receive any gains, right?"   In response, Cook represented, "that's right, as you know, we buy both long and short positions, so your investment is fully hedged and your principal is fully protected and guaranteed."   Additional statements during the time frame of late June and early July confirmed that there was no risk of

losing principal.  The Froehles decided to invest additional funds in the foreign currency arbitrage program based on all of the representations they had received regarding the program, including the recently repeated representations that their principal was safe, would be fully protected, and that the only risk was failure to earn a return on the investment.

598.   On July 7, 2009, the Froehles mailed Grzybowski a $50,000.00 official check from their bank payable to "Crown" for deposit into their Crown Forex SA account.   Exhibit 208.   The Froehles had multiple conversations with Grzybowski regarding these investments and their Crown Forex SA account.

599.   On July 9, 2009, the Froehles read a news article about Oxford in the Star Tribune, and immediately attempted to withdraw all of their funds.

600.   The Froehles contacted Grzybowski, Cook and Jill Lechner of Oxford via telephone, e-mail, and facsimile multiple times on July 9, 2009, demanding that the $50,000.00 check not be cashed, that their account be closed, and the entire amount of their account be immediately withdrawn and remitted to them via wire transfer.  Exhibit 209.

601.   Grzybowski initially indicated on July 9, 2009 that the check for $50,000.00 placed in the mail by the Froehles on July 7, 2009 would not be cashed, and that he would obtain the $50,000.00 "Official Check" from the Froehles' bank and hold it for delivery to them.  However, the check was cashed and not returned to the Froehles. Id.

602.   At the request of Grzybowski, the Froehles submitted official Crown Forex withdrawal forms to him on July 9, 2009, requesting withdrawal of their account balance. After speaking with Cook, Grzybowski assured the Froehles that "it is business as usual" with respect to processing customer requests for withdrawal, and that they could expect the funds in their bank account shortly.   Grzybowski also indicated that Cook was handling over 150 withdrawal requests. Id.

603.   The following week, Grzybowski requested new withdrawal forms that did not contain an account balance amount, which he picked up from the Froehles and promised to submit. Id. On July 15, 2009, Grzybowski confirmed via telephone that he had submitted the new withdrawal forms, which indicated that the accounts should be closed and the Froehles' funds wired to their bank account.

604.   On July 13, 2009, Stephen Froehle spoke with Grzybowski about the status of their withdrawal requests.   Grzybowski indicated that the "money was all there and accounted for," and that Cook was working diligently to make sure the withdrawal requests were done properly.   Immediately following this conversation, the Froehles checked their bank account and confirmed with Grzybowski that they had yet to receive a wire transfer with their funds.

605.   On July 14, 2009, Stephen Froehle contacted Grzybowski and Cook by e-mail requesting additional information and transparency relating to the situation, and reiterating the request for withdrawal of the entire investment.  Exhibit 210.

606.   On July 18, 2009, the Froehles learned of the Crown Forex SA bankruptcy from the Crown Forex SA website.   Because they had yet to receive their funds from

Oxford, on July 20, 2009, the Froehles sent e-mails with withdrawal forms to the Swiss trustees of Crown Forex SA, and the Crown Forex SA Compliance and Account Withdrawals division.  In these e-mails, the Froehles directed the closure of their Account and requested that all funds be wired to their bank account.  Exhibit 211.

607.   On July 23, 2009, Stephen Froehle spoke with Crown Forex SA trustee Laurent Winkelmann who indicated that there has never been any Crown Forex SA account opened or in existence under the Froehles' names; that since December 9, 2008, he and his co-trustee are the only persons who had legal authority to receive or transmit funds from Crown Forex SA; that he personally spoke with Trevor Cook on December 10, 2008, and informed him that Crown Forex SA accounts were frozen; and that the Oxford account with Crown Forex SA was empty.

608.   The Froehles subsequently obtained check copies from their bank indicating that their funds that were the subject of the June 15 check of $170,000.00 and the July 7 investment of $50,000.00, were not deposited with "Crown Forex SA," but where instead deposited with "Crown Forex LLC" at Associated Bank Account No. ******1705.  See Exhibits 206, 208.

609.   To date, the Froehles' withdrawal requests have not been honored in whole or in part, and they have received no other information from Defendants regarding the existence or location of their investments.

BB.          **Plaintiff Kelly Lenti**

610.    Plaintiff Kelly Lenti ("Lenti") learned of the foreign currency arbitrage program through Kiley's articles in the International Forecaster newsletter.  Throughout 2006, Lenti followed Kiley's investments on his website.

611.    In August 2006, Lenti contacted Kiley via e-mail to inquire about opening an account with Kiley's foreign currency arbitrage program.  Exhibit 212.

612.    In October 2006, Lenti and Kiley spoke on the telephone regarding the foreign currency arbitrage program.  During this conversation, Kiley represented that investments in the program are instantly liquid, protected, and earn a guaranteed 12% annual return.

613.    Based on these representations, Lenti invested in the foreign currency arbitrage program through Kiley.  To invest, Lenti transferred funds from her retirement accounts to a self-directed IRA with Millennium, which then transferred the funds to be invested in the program.  See, e.g., Exhibit 213.  The total amount of Lenti's investment in the program is $1,269,379.00.

614.    In conjunction with her investment, Lenti completed a UBS Diversified Growth Application, and received account statements from UBS Diversified and Universal Brokerage FX.  Exhibit 214; see, e.g., Exhibits 215-216.

615.    In early 2007, Kiley and Cook came to Lenti's home to discuss the foreign currency arbitrage program with her relatives and neighbors.  During this presentation, both Kiley and Cook represented that the investment was instantly liquid, protected through options, and would earn a guaranteed 12% annual return.  Because the

investment was "secure," Kiley and Cook encouraged those in attendance to mortgage their homes and invest as soon as possible.

616.    In July 2009, Lenti received a letter from Millennium notifying her that this lawsuit had been initiated.  See e.g., Exhibit 91.

617.    Lenti immediately attempted to contact Kiley but he did not answer the telephone.  When Lenti attempted to visit his website, it was not operational.

618.    To date, Lenti cannot access her funds and has received no information from Defendants regarding the existence or location of her investment.

## CC.        **Plaintiff John Walencik**

619.    Plaintiff John Walencik ("Walencik") learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which Walencik had listened on short-wave radio for years.  On the radio show, Kiley represented that investments in the program were safe because they were not tied to fluctuations in the stock market, were held in segregated accounts and not co-mingled, and could be immediately liquidated with just a telephone call.

620.    In 2007, Kiley hosted Durand on his radio show to discuss investments, which prompted Walencik to contact Durand for additional investment information. When the information arrived, Walencik was surprised to see that it came from Kiley's address at Universal Brokerage FX.

621.    In June 2007, Walencik called the telephone number provided on Kiley's radio to inquire about investing.  In a subsequent telephone conversation, Kiley reiterated

that investment in the program was safe, instantly liquid, and would result in double digit returns.

622.    Based on these representations, Walencik invested in the foreign currency arbitrage program with Universal Brokerage FX.   Walencik was told by Kiley and Kiley's "partner" Cook that Crown Forex SA would be the holding company for the funds invested in the program.   To invest, Walencik rolled over IRA proceeds to a self-directed IRA account with Entrust, and transferred annuity and trust funds to Universal Brokerage FX and UBS Diversified.   See, e.g., Exhibit 217.   The total amount of Walencik's investment in the program, personally, and on behalf of his trust is $319,000.00.

623.    In conjunction with his investment, Walencik completed a UBS Diversified Growth Application and entered into a Crown Forex Customer Trading Agreement for Individual Accounts.  Exhibits 218-219.

624.    Initially, Walencik did not receive any statements relating to his investment.   In early July 2009, he spoke with Universal Brokerage FX representative Jared Jenkins about the lack of account statements, and subsequently received statements from Universal Brokerage FX and, ostensibly, Crown Forex SA.   See, e.g., Exhibits 220-221.

625.    In mid-July 2009, Walencik learned of this lawsuit when Bob Chapman, frequent guest on "Follow the Money," discussed it on his radio show.

626.    Walencik immediately called Kiley and Universal Brokerage, but there was no answer.  Walencik also contacted Entrust about the status of his investment, but Entrust was unable to assist.

627.    To date, Walencik cannot access his funds and the only information he has regarding his investment is a wire transfer document indicating that a portion of his funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA.  Exhibit 222.  He has received no other information from Defendants regarding the existence or location of his investment.

## DD.        **Plaintiffs Dan, Diann and Donna Haynes**

628.    Plaintiffs Dan and Diann Haynes ("the Haynes") first learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which they began listening in November 2007.

629.    On his radio show, Kiley made the following representations:

> All I can tell you is bottom line, Truth Seekers, the firm that I am senior partner of for 22 years, we do offer you the solution to this extreme financial uncertainty in this country, and if you are truly concerned about what's happening to your 401ks, IRAs, etc. I'd have to say listen very carefully because for 22 years, we worked with various governments, countries, currencies and their bank interest rates and we are not connected to stocks, bonds, real estate, the items that I just previously mentioned.  So we really don't care a hoot if they go up or down as we are totally detached and unaffected by them.  So, in other words, what I am telling you is we profit from chaos and there is plenty of it out there and we've done this for companies and corporations, national and multinational for 22 years plus, <u>but just in the last 5 years we opened up to the private investors with all the corporate style profits and returns and our client funds are held in segregated accounts under your own name and fully liquid back to you</u>

> 24/7, seven days a week and you cal also view your account
> online 24 /7[.]

630.    In mid-August 2008, the Haynes called the telephone number provided on the radio show to obtain additional information on the program. They spoke with Julia Smith who took their information and indicated that someone would be returning their call.

631.    On August 25, 2008, the Haynes received a return call from John Loebel, Senior Investment Advisor with UBFX. During that conversation, Loebel represented that investments in the program are fully liquid and would never earn less than 10% interest.

632.    Following their conversation, the Haynes received a package of materials from Loebel. These materials included a brochure entitled "Currencies," which represented that the program provides "liquidity or access to your funds 24 hours per day," "stability," and "strong returns."

633.    After multiple conversations with Loebel and review of the materials provided regarding the investment, the Haynes determined that the foreign currency arbitrage program was a safe investment.

634.    Based on these representations, Diann and Dan Haynes invested in the program with Crown Forex SA through Kiley and UBFX. To invest, the Haynes rolled over their retirement funds into self-directed IRA accounts with Entrust, which was then to direct the funds to Crown Forex SA. Exhibit 223. The total amount of Diann and Dan Haynes' investment in the program is $116,321.89 and $103,019.14, respectively.

635.   Subsequently, Dan Haynes informed his mother, Plaintiff Donna Haynes ("Donna Haynes"), of his conversations with Loebel about the foreign currency arbitrage program, and Loebel's representations that investments in the program are safe, secure, and would earn double digit returns.  Donna Haynes then listened to Kiley's radio show to confirm these representations.

636.   On October 2, 2008, Donna Haynes called the telephone number provided on Kiley's radio show for additional information.  On October 8, 2008, Loebel contacted Donna Haynes about the foreign currency arbitrage program, and he represented that the investment was safe and that she could get her money out of the program at any time by writing Loebel a letter and requesting a full withdrawal.

637.   Based on this information, Donna Haynes invested in the program with Crown Forex SA through Kiley and UBFX.  Per Loebel's instructions, Donna Haynes signed over or wrote her checks to "Crown," and then sent the checks to Loebel for deposit in her individual Crown Forex SA account.  See, e.g., Exhibit 224.  The total amount of Donna Haynes' investment in the program is $45,249.74.

638.   In conjunction with their investments, Dan, Diann and Donna Haynes each entered into Crown Forex Customer Trading Agreements for Individual Accounts, and received account statements from Universal Brokerage FX and, ostensibly, Crown Forex SA.  Exhibit 225; see, e.g., Exhibits 226-227.

639.   In January and May 2009, Dan, Diann and Donna Haynes had conversations with John Loebel regarding their accounts, and he indicated that they were earning 9 to 11% returns on their investments.

640.   On July 30, 2009, the Haynes received a letter from Universal Brokerage FX/UBS Fund informing them of this lawsuit and the Crown Forex SA bankruptcy, and indicating that these entities are "unable to fulfill withdrawal or redemption requests." See Exhibit 13.

641.   To date, Dan, Diann and Donna Haynes' withdrawal requests have not been honored, and the only information they have regarding the existence or location of their investments are wire transfer documents indicating that a portion of their funds were deposited with "Crown Forex LLC" rather than "Crown Forex SA."  The Crown Forex LLC account is at Associated Bank Account No. ******1705. Exhibit 228.  They have received no other information from Defendants regarding the existence or location of their investments.

## EE.        Plaintiff Greg Rutter

642.   Plaintiff Greg Rutter ("Rutter") learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which he began listening in August 2008.  On the radio show, Kiley represented that the funds invested in the program through Universal Brokerage would be safe, secure, held in segregated accounts, and liquid 24 hours a day, seven days a week.  He also represented that investment in the program would generate "corporate style returns" for the individual investor, regardless of economic conditions, stock market fluctuations, the bond market, and real estate performance.

643.   In September 2008, Rutter contacted Universal Brokerage FX for additional information on the program, and spoke with Tim Daley.  During their conversation,

Daley reiterated the safety and security of investing in the program, particularly in comparison to conventional investments.

644.    Rutter also received a letter and investment materials from Daley.  In the letter, Daley highlighted the profitability of Universal Brokerage FX's global market strategy, and stated that this strategy "can perform regardless of what the stock market does."  Daley also represented the following:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in **segregated** accounts providing safety, security and liquidity."  Exhibit 229.

645.    The materials provided by Daley reiterated Kiley's representations on his radio show and Daley's oral and written representations.   The brochure entitled "Institutional Grade Investments for the Individual Investor" represented the foreign currency arbitrage program as follows:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name. Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See, e.g., Exhibit 129.

646.   Another brochure entitled "Currencies," also represented that the program provides "liquidity or access to your funds 24 hours per day," "stability," and "strong returns." See id.

647.   From October through November 2008, Rutter received follow-up phone calls from Daley, who emphasized problems in the financial markets and the solution to these problems that Universal Brokerage FX and the program offered.

648.   Based on these representations, Rutter invested with Crown Forex SA through Universal Brokerage FX on December 18, 2008.  To invest, Rutter rolled over 401(k) and other retirement funds to a self-directed IRA with Entrust, which was then to direct the funds to Crown Forex SA.  See, e.g., Exhibit 230.

649.   In conjunction with his investment, Rutter entered into a Crown Forex Customer Trading Agreement for Individual Accounts, and received account statements from Crown Forex SA and Universal Brokerage FX.  Exhibit 231; see, e.g., Exhibits 232-233.

650.   On December 30, 2008, Rutter contacted Daley regarding a 5.9% entry free that was debited from his account and of which he had not been informed prior to investing.  During this conversation, Daley represented that Universal Brokerage FX would "guarantee a minimum of 10% return annually."

651.   On March 26, 2009, Rutter made a $3,000.00 IRA contribution to his account through Entrust, but never received a statement reflecting this deposit.  When his July 1, 2009 Crown Forex statement did not show the deposit, Rutter contacted Universal

Brokerage.  Rutter was told that Kiley would return his call, but he never received a response.

652.   On July 10, 2009, Rutter again contacted Universal Brokerage and insisted on speaking with Kiley.  Kiley indicated that he had terminated Daley's employment and that he would personally clear up the matter of the $3,000.00 deposit with Entrust.  Kiley did not give any indication of adverse circumstances relating to Rutter's investment.

653.   The total amount of Rutter's investment in the program is $50,835.89.

654.   On July 24, 2009, Rutter received letters from Oxford Global Partners, LLC and Universal Brokerage/UBS Fund providing notification of this lawsuit and Crown Forex SA's bankruptcy proceedings, and indicating that they are "unable to fulfill withdrawal or redemption requests."  The letters indicated that investors should refer to the Crown Forex SA website.  See Exhibit 13.

655.   Rutter immediately visited the Crown Forex SA website, where he discovered that Crown Forex SA was in bankruptcy and liquidation proceedings.  Rutter immediately contacted Entrust to withdraw his funds from Crown Forex SA.  Rutter also contacted the Crown Forex SA trustees on July 29, 2009, seeking their assistance in withdrawing his funds.  Exhibit 234.

656.   To date, Rutter's withdrawal requests have not been honored, and the only information he has regarding the existence or location of his funds is a wire transfer document indicating that the entire $50,835.89 investment was deposited with "Crown Forex LLC" rather than "Crown Forex SA."  The Crown Forex LLC account is at

Associated Bank, account number \*\*\*\*\*\*1705. Exhibit 235.  He has received no other information from Defendants regarding his investment.

**FF.        Plaintiff Jeff Timberlake**

657.    In 2007, Plaintiff Jeff Timberlake ("Timberlake") learned of the foreign currency arbitrage program, Kiley, Cook and Universal Brokerage through a friend.

658.    Subsequently, Timberlake spoke with Kiley and Cook about the program. They represented that investments in the program were principal protected and that Timberlake could expect returns of 10 to 12% based on past performance.

659.    In subsequent telephone calls, Kiley reiterated the representation that there would be no risk to Timberlake's principal investment in the program.

660.    Based on these representations, Timberlake invested in the foreign currency arbitrage program with Universal Brokerage FX in 2007.   The total amount of Timberlake's investment in the program is $1,207,264.70.

661.    In conjunction with his investment, Timberlake completed a UBS Diversified Client Application, entered into UBS Diversified General Business Terms Currency Exchange Agreement; and received quarterly account statements from Universal Brokerage FX.  Exhibits 236-237; see, e.g., Exhibits 238-239.

662.    Over the next two years, Timberlake had at least eight conversations with Kiley, who represented that Timberlake was "making money."   During these conversations, Kiley repeatedly tried to convince Timberlake to invest additional funds in the foreign currency arbitrage program.  Kiley also bragged to Timberlake that he had business associates in Switzerland who were able to "hide assets."

663.   On one occasion, Timberlake met with Kiley and Cook in Chicago at a club to which Kiley and Cook belonged.   At this meeting, Kiley and Cook demonstrated on a computer how the foreign currency arbitrage program worked.   At this meeting, Kiley and Cook again represented that Timberlake's principal investment was safe.

664.   In 2009, Timberlake found it more and more difficult to reach Kiley and Universal Brokerage FX representatives for information regarding his investment.

665.   In early July 2009, Timberlake received an account statement from "Crown Forex SA" and wire transfer information from Universal Brokerage/Crown Forex.  See Exhibit 239; Exhibit 240.  The wire instructions provided the following:

> **WIRING INSTRUCTIONS**
> **Crown Forex**
> US Dollars
> Domestic Fed Wires
>
> Wire To:
>
> Universal Brokerage FX
> Associated Bank
> 5353 Wayzata Blvd
> St. Louis Park  MN  55416
> 952 591 2793
> Routing # ******575
> Acct # ******1705

666.   When Timberlake inquired with Smith about this information, he was informed that his funds had been transferred from Oxford Global to Crown Forex SA. See Exhibit 241. Timberlake did not authorize this transfer and it was done without his knowledge.   A statement dated July 2, 2009 indicates that the funds were ostensibly transferred to Crown Forex SA on April 1, 2009.  See Exhibit 239.

667. On and after July 8, 2009, Timberlake attempted to contact Kiley and Smith, but was unsuccessful.

668. Subsequently, Timberlake learned of this lawsuit from Plaintiff Kelly Lenti, and immediately contacted Kiley and Smith, but was either unable to reach anyone or did not have his messages returned.

669. Timberlake also contacted Crown Forex SA regarding the status of his account. In response, Timberlake received an e-mail from the trustees indicating that his "name does not appear in the trading system of CROWN FOREX SA we have been provided with. Hence the document you have provided us does not suffice to evidence a claim against the Company." The e-mail also stated that they had no record of Timberlake's funds being transferred to Crown Forex SA in April 2009. Exhibit 242.

670. To date, Timberlake has no access to his funds, and he has received no information from Defendants regarding the existence and location of his investment.

## GG.     Plaintiffs Larry and Charleyne Swoverland

671. Plaintiffs Larry and Charleyne Swoverland ("the Swoverlands") learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which they had been listening since summer 2008. On his radio show, Kiley represented that investments in the program were safe, liquid, and would earn double digit returns.

672. In November 2008, the Swoverlands called Universal Brokerage FX for additional information regarding the foreign currency arbitrage program. In response, the Swoverlands were contacted by John Loebel, a Universal Brokerage FX representative.

673.   In November and December 2008, the Swoverlands had multiple conversations with Loebel about the foreign currency arbitrage strategy.   During these conversations, Loebel represented that their investment would never be at risk and guaranteed a 10-12% return on their investment.

674.   Loebel also sent a letter and investment materials to the Swoverlands in November 2008.   In his letter, Loebel emphasized the financial security and integrity of customer funds on deposit, and represented that funds are insured by the "Federal Government, various exchanges, and the firm itself.   Customers funds are held in **segregated** accounts providing safety, security, and liquidity."   See, e.g., Exhibit 26.

675.   The materials provided showed substantial monthly and annual returns from 1999-2008, and represented the following regarding investments in the program: "Liquidity:  All positions are 100% liquid on a 24 hour basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured."  Exhibit 243.

676.   Based on these representations, the Swoverlands invested in the program with Universal Brokerage.   The Swoverlands understood that Crown Forex SA would be used to invest the funds in the foreign currency exchange.   Per Loebel's instructions, the Swoverlands wrote a check made payable to "Crown."  Exhibit 244.  The total amount of the Swoverlands' investment in the program is $109,000.00.

677.   In conjunction with their investment, the Swoverlands entered into a Crown Forex Joint Trading Agreement, and received account statements from Universal Brokerage FX and, ostensibly, Crown Forex SA.  Exhibit 245; see, e.g., Exhibits 246-247.

678.   In December 2008, the Swoverlands requested access to their account and Loebel instructed them on how to view their Crown Forex SA account.  The Swoverlands also received statements via mail on two occasions.

679.   In early July 2009, the Swoverlands saw information on the Internet suggesting that Crown Forex SA was in bankruptcy.  Loebel assured them that their funds would not be affected because they were held in a segregated account.

680.   Subsequently, the Swoverlands received a letter from Universal Brokerage FX and UBS Fund informing them of the lawsuit and Crown Forex SA's bankruptcy proceedings, and indicating that they are "unable to fulfill withdrawal or redemption requests."  See Exhibit 13.

681.   To date, the Swoverlands have no access to their funds, and they have received no information from Defendants regarding the existence and location of their investment.

## HH.          Plaintiff Robert Herr

682.   Plaintiff Robert Herr ("Herr") learned of the foreign currency arbitrage program through Plaintiff Shirley Jacobs, who listened to Kiley's radio show, "Follow the Money."  Herr started listening to Kiley's radio show in 2008.

683.   In early fall 2008, Herr contacted Kiley for additional information on the foreign currency arbitrage program.  In response, Kiley sent a letter emphasizing the profitability of the program, and representing the following:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the

firm itself.  Customer funds are held in **segregated** accounts providing safety, security and liquidity."  Exhibit 248.

684.  Kiley also provided a brochure about the foreign currency arbitrage program, which represented the following:  "Liquidity:  All positions are 100% liquid on a 24 hour basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured," and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  Exhibit 249.

685.  Herr spoke with Kiley in detail about the foreign currency arbitrage program, and Kiley advised him to pull his money from the stock market and roll it over to Universal Brokerage FX.  During this conversation, Kiley represented that investment in the program was safe because Herr would be using IRA accounts, the funds would be held in separate accounts, he could get his money back at any time, and he could expect 10-12% return on the investment.

686.  Based on Kiley's representations, Herr invested in the program through Kiley and Universal Brokerage.  To invest, Herr rolled over IRA proceeds into a self-directed IRA with Entrust, which was then to wire the funds to Crown Forex SA.  Exhibit 250.  The total amount of Herr's investment in the program is $385,746.18.

687.  In conjunction with his investment, Herr entered into a Crown Forex Customer Trading Agreement for Individual Accounts, and received statements from

Universal Brokerage FX and, ostensibly, Crown Forex SA.   Exhibit 251; <u>see, e.g.</u>, Exhibit 252.

688.   On April 27, 2009, Herr requested a withdrawal of $13,500.00 from his Crown Forex account.   Exhibit 253.   To make the withdrawal request, Herr contacted Julia Smith and indicated that he wanted to withdraw funds, and Kiley subsequently returned the call to approve the withdrawal.

689.   In early July 2009, Herr attempted to make another withdrawal but Kiley and Smith would not return his calls.

690.   Subsequently, Herr learned of the Crown Forex SA bankruptcy through Plaintiff Shirley Jacobs.   On July 25, 2009, Herr received a letter from Universal Brokerage FX/UBS Fund informing him of this lawsuit and the Crown Forex SA bankruptcy proceedings, and indicating that the entities are "unable to fulfill withdrawal or redemption requests."   <u>See</u> Exhibit 13.

691.   Herr visited the Crown Forex SA website and made a claim with the trustees pursuant to the instructions, but they have not accepted the claim.   Exhibits 254-255.   Herr also made repeated telephone calls to Kiley, Smith, and Ryan Moeller, but he was either unable to leave a message or did not receive return calls.

692.   To date, Herr has no access to his funds, and the only information he has regarding the existence or location of his funds are check copies and wire transfer documents indicating that his funds were deposited with "Crown Forex LLC" rather than "Crown Forex SA."   The Crown Forex LLC account is at Associated Bank Account No.

******1705.   Exhibit 256.   He has received no other information from Defendants regarding the existence or location of his investment.

## II.         **Plaintiff Allen G. Collins**

693.   Plaintiff Allen G. Collins ("Collins") first learned of the foreign currency arbitrage program in June 2008 when he contacted Oxford Private Client Group after seeing its advertisement in an investment magazine.

694.   Collins initially spoke with Gene Walden who mentioned that, instead of placing funds in a money market, Collins should consider Oxford Private Client Group's foreign currency arbitrage investment that had a 10.5% return through Crown Forex SA.

695.   On July 1, 2008, Collins received materials about the investment from Walden via email.   Exhibits 257-258.   A "Term Sheet" described the foreign currency arbitrage program as "linked to fixed swap rate arbitrage utilizing the highest spread between the G5 currency pairs.   Currency fluctuation risk is hedged through a "no swap" Sharia compliant bank or liquidity provider."   The Term Sheet showed average annual returns of 10.34%, the largest monthly loss as 0%, the number of losing months as 0%, and downside risk measures as 0%.   Exhibit 257.

696.   Another brochure entitled "A Global Enhanced Return Strategy," represented that investment in the program is safe because funds are held in individual segregated accounts with well-established, well-capitalized investment and commercial banks, and because the program reduces market exposure.   The brochure also represented that "funds are completely liquid and available on short notice," and that the program provides consistent yields and enhanced returns.   Exhibit 258.

697.   During the next few weeks in July 2008, Collins spoke with Walden and Beckman on several occasions about the foreign currency arbitrage program.   During these conversations, Walden and Beckman represented that investments in the program were held in Swiss bank accounts at Crown Forex SA; were "no risk" given the off-setting hedge account funded with money borrowed interest free from Islam-compliant banks; and were safer than funds held in bank accounts in the United States.

698.   When Collins expressed discomfort about investing in a program that he did not understand, Walden assured him that Beckman understood the foreign currency arbitrage methodology and reiterated that the investment was safer than placing money in a savings account.

699.   Based on these representations, Collins invested in the foreign currency arbitrage program.  To invest, Collins rolled over $47,930.33 in IRA proceeds into a self-directed IRA with Entrust, which was directed to invest the funds with Crown Forex SA. Exhibit 259.

700.   Collins also established a non-IRA Crown Forex SA account, which he originally funded with a $50,000 check drawn on his E*TRADE checking account. Exhibit 260.

701.   In conjunction with his investment, Collins entered into a Management Agreement with Oxford Global Advisors, which described the foreign currency arbitrage program as "fully hedged," and further stated, "The account seeks to generate a return of 10.5% per annum. Should global interest rates change, leverage may be modified to increase or decrease the interest bearing currency pairs and offsetting positions so the

fixed return is achieved for the Client." Exhibit 261.  Collins also completed a Crown Forex SA Limited Power of Attorney form authorizing Oxford Global Advisors to transact on his behalf with Crown Forex SA, and Crown Forex SA Customer Trading Agreement for Individual Accounts. Exhibits 261-262.

702.   After setting up his account, Collins insisted that he receive account statements.  In response, Collins received only two Crown Forex SA account statements dated September 5, 2008. Collins was also able to view his accounts online after Walden assisted him in setting up the Crown Forex SA program.  Exhibit 263.

703.   In February 2009, Collins became concerned about his managed assets sitting in a money market, so he contacted Walden about transferring another $100,000.00 into his Crown Forex SA accounts.

704.   In an email dated February 16, 2009, Collins specifically inquired whether Beckman thought it would be prudent to invest 25% of his liquid assets into the Crown Forex SA investment.  In a follow-up email, Walden indicated that Beckman answered in the affirmative that investing this amount in the Crown Forex SA investment was a good idea and safe, and indicated that some of his clients have to 50% of their assets invested in Crown Forex SA. Exhibit 264.

705.   Based on the foregoing, Collins invested an additional $100,000.00 into the foreign currency arbitrage program in March 2009, by transferring IRA funds through Western International Securities, Inc., to Entrust for investment with Crown Forex SA. See Exhibit 265.  The total amount of Collins' investment in the program is $210,244.83.

706.   On July 10, 2009, Collins received an email from Walden indicating that "Bo Beckman has recommended that you withdraw your funds from both Crown accounts," and attaching a withdrawal form. Exhibit 266.

707.   Collins immediately contacted Walden for additional information. Walden stated that Beckman had noticed a "glitch" with Crown Forex S.A., and had recommended that his clients close their Crown Forex SA accounts.

708.   On July 12, 2009, Collins submitted his withdrawal forms, which requested that his Crown Forex SA accounts be closed and all funds wired to his personal bank account.  Exhibit 267.  On July 16, 2009, trading on Collins' accounts ceased, which Walden stated was an indication that his withdrawal forms had been received.

709.   On July 12, 2009, Collins also sent a letter and email to Adam Edenborg at Oxford Private Client Group requesting notification of receipt of paperwork and information regarding when he could expect the transfer of funds to his personal account.

710.   On July 23, 2009, Collins received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners informing him of this lawsuit and the Crown Forex SA bankruptcy proceedings, and indicating that the entities are "unable to fulfill withdrawal or redemption requests." See Exhibit 13.

711.   After Edenborg failed to respond to Collins' inquiry for twelve days, Collins sent him another email and left a voicemail on July 24, 2009. Three days later, Collins received an email regarding a meeting with Beckman and his clients at Beckman's attorney's office.

712.    Collins contacted Beckman and told him that he did not appreciate learning of the "glitch" with Crown Forex SA through Walden, who was no longer an Oxford employee, and that he had yet to receive a response from Edenborg despite multiple emails and messages.   Beckman stated that no one could find the money and that Beckman's clients would be invited to join a class action suit that Oxford would fund.

713.    To date, Collins' withdrawal requests have not been honored, he has no access to his funds, and Beckman's purported "class action" never came to fruition. The only information that Collins has regarding the existence and location of his investment funds is a check copy and wire transfer information indicating that his funds were deposited with "Crown Forex" at Associated Bank Account No. ******1705. See Exhibits 260, 265.

714.    Collins' has received no information from Entrust as to why it failed to follow the instructions in his Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, which is located in Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC. Collins also has received no explanation for why his accounts statements from Entrust showed that his investment funds had been transferred to Crown Forex SA at St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, when this was not the case. See Exhibit 267.

**JJ.**        **Plaintiffs Raymond L. and Patricia A. Winesburg**

715.   Plaintiffs Raymond L. and Patricia A. Winesburg ("the Winesburgs") first learned of the foreign currency arbitrage program through their niece, Plaintiff Kelly Lenti.

716.   In November 2006, the Winesburgs had a personal meeting with Kiley and Cook regarding the program.  Both provided business cards to the Winesburgs, which identified Cook as "Managing Partner/Institutional Sales" and Kiley as "Chief Economist/Technical Analyst" for "UBS SAXO IFX MILLENNIUM RJO PFG Wealth Management Clearing Brokerage Foreign Exchange IRA's." Exhibit 268.

717.   During the November 2006 meeting, Kiley and Cook represented that investments in the foreign currency arbitrage program were principal protected, earned a 12% rate of return, were held in individual accounts, and could be withdrawn instantly with just a telephone call.

718.   Based on these representations, the Winesburgs invested in the foreign currency arbitrage program in December 2006.  To invest, the Winesburgs wrote a check for $50,000.00 to "UBS Diversified Fund."  Exhibit 269.

719.   In conjunction with this initial investment in the program, the Winesburgs completed a UBS Diversified Growth Application and Subscription Agreement, and received account statements from Universal Brokerage FX. Exhibits 270-271.

720.   On January 15, 2008, the Winesburgs invested additional funds in the foreign currency arbitrage program by rolling over $34,000.00 of Patricia Winesburg's

IRA proceeds into a self-directed IRA with Millennium.  Exhibit 272.  The total amount of the Winesburgs' investment in the program is $91,949.00.

721.   In conjunction with this additional investment, Patricia Winesburg completed a Universal Brokerage Client Application Form, and received account statements from Universal Brokerage FX.   Exhibits 273-274.

722.   In July 2009, the Winesburgs received a letter from Universal Brokerage FX/UBS Fund informing them of this lawsuit, and indicating that the entities are "unable to fulfill withdrawal or redemption requests." See, e.g., Exhibit 13.

723.   The Winesburgs immediately contacted Kiley's office to obtain information regarding the status of their accounts, and were told by Julia Smith that Kiley would return their call.  Kiley never returned this call, and multiple other telephone calls to Kiley and Cook were also not returned.

724.   To date, the Winesburgs have no access to their funds and have no received no information from Defendants regarding the existence and location of their investment.

**KK.**       **Plaintiffs Jerome and Edith Hoeppner**

725.   Plaintiffs Jerome and Edith Hoeppner ("the Hoeppners") first learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which they began listening in January 2009.

726.   Subsequently, the Hoeppners contacted Kiley's office for additional information on the program.  On February 10, 2009, the Hoeppners received a letter from Jared Jenkins, Investment Advisor for Universal Brokerage FX, regarding the profitability and security of Universal Brokerage FX's investment in the foreign currency

arbitrage program.  In his letter, Jenkins represented the following:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in **segregated** accounts providing safety, security, and liquidity." Exhibit 275.

727.   The Hoeppners also received a brochure from Universal Brokerage FX entitled, "Institutional Grade Investments for the Individual Investor," which represented the following regarding investments in the program: "Liquidity: All positions are 100% liquid on a 24 hour basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured."  See Exhibit 69.

728.   On February 10 and March 1, 2009, the Hoeppners also had telephone conversations with Jenkins and Kiley regarding the foreign currency arbitrage program.  Both Jenkins and Kiley represented that investments in the program were instantly liquid, principal protected, would earn a 10-12% rate of return, and were held in secure individual accounts.

729.   Based on these representations, the Hoeppners invested $100,000.00 in the foreign currency arbitrage program through Kiley and Universal Brokerage FX on April 13, 2009.  To invest, the Hoeppners rolled over IRA proceeds into a self-directed IRA account with Entrust, and wrote checks from their personal account, which were then to be invested in the program through Crown Forex SA.  See, e.g., Exhibit 276.

730.   In conjunction with their investment, the Hoeppners completed a Crown Forex SA Customer Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage FX and Crown Forex SA.  Exhibits 277-278.

731.   On July 23, 2009, the Hoeppners received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners informing them of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that the entities are "unable to fulfill withdrawal or redemption requests." See, e.g., Exhibit 13.

732.   The Hoeppners immediately submitted a Sell Direction letter to Entrust requesting transfer of all funds in their Crown Forex SA account.   Exhibit 279. Subsequently, the Hoeppners received a letter from Entrust indicating that it was subpoenaed by the Security and Exchange Commission, which is "soliciting all of our active clients files pertaining to investments transacted through [Defendants]."  Exhibit 280.

733.   The Hoeppners also immediately contacted Jenkins and Kiley regarding the status of their investment and seeking withdrawals; however, Jenkins offered no assistance and Kiley refused to return the Hoeppners' calls.

734.   To date, the Hoeppners withdrawal requests have not been honored and they have no access to their investment funds.  The only information the Hoeppners have regarding the existence and location of their investment funds is a wire transfer document indicating that Entrust wired their funds to "Crown Forex" at Associated Bank Account No. ******1705.  Exhibit 281.

LL.        **Plaintiffs Sandra and Harry Grusche**

735.    Plaintiffs Sandra and Harry Grusche ("the Grusches") first learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which they began listening in 2006.

736.    In January 2007, the Grusches contacted Kiley's office for additional information on the foreign currency arbitrage program.   In subsequent bi-monthly telephone calls with Kiley from February 2007 through November 2007, Kiley consistently represented that investments in the program were instantly liquid and "available any time," "safe," "low risk," would earn a "double digit return—average of 12%," and would be held in "segregated accounts."   Kiley also indicated that his firm "has a proprietary computerized arbitrage program."

737.    In November 2007, Harry Grusche had a personal meeting with Kiley and Cook during which Kiley and Cook reiterated Kiley's earlier representations relating to the program. Kiley and Cook also stated that they had substantial knowledge and expertise in foreign currency arbitrage with Crown Forex SA, and that they had a relationship with Crown Forex SA's Swiss office and staff.  During this meeting, Cook provided Harry Grusche with a demonstration of the proprietary computer program used in the foreign currency arbitrage investment.

738.    Based on these representations, the Grusches invested in the foreign currency arbitrage program through UBS Diversified, Universal Brokerage and Kiley. To invest, the Grusches wrote the following checks from their personal bank account: (1) a $125,000.00 check dated August 29, 2007, payable to UBS Diversified; (2) two

$50,000.00 checks dated November 16, 2007, both made payable to UBS Diversified; (3) a $23,000.00 check (Canadian dollars) dated December 31, 2007, made payable to UBS Diversified; (4) a $50,000.00 check dated January 1, 2008, made payable to UBS Diversified; (5) a $182,000.00 check dated January 9, 2008, made payable to "UB-FX"; (6) a $100,000.00 check dated January 9, 2008, made payable to "UB-FX"; and (7) a $250,000.00 check dated December 16, 2008, made payable to "Crown" per Kiley's instructions. Exhibits 282-283.

739. The Grusches also rolled over IRA proceeds in the amount of $56,242.22 into a self-directed IRA account with Millennium, which was then to be invested in the program through Kiley and UBS Diversified/UB-FX. Exhibit 284. The total amount of the Grusches' investment in the program is $962,433.00.

740. In conjunction with their investments, the Grusches completed a Universal Brokerage Client Application and Subscription Agreement, a UBS Diversified Growth Application and Subscription Agreement, and Millennium roll-over documents. Exhibit 285. The Grusches received assistance from Julia Smith in completing these documents, and Smith and Cook worked collaboratively to open the Grusches' accounts. Exhibit 286.

741. The Grusches received account statements from Universal Brokerage FX in the mail. See, e.g., Exhibit 287. The Grusches also communicated with Kiley regarding the status of their investments in bi-monthly telephone calls during which Kiley reiterated the "liquidity" of the investments and that the investments were held in "segregated accounts," and reassured the Grusches that "we're not Bernie Madoff."

742.   In April 2009, the Grusches received a letter from Millennium advising them that, "[i]n reviewing the annual 2008 valuations, we did notice some unusually large increases or decreases in comparison to the December 2007 valuations.   UBS informed us that these changes in value may be due to additions or withdrawals that were made by some clients directly with UBS, rather than through us as the IRA custodian…As a reminder, your IRA holds the investment in UBS and all transactions regarding your IRA must flow through Millennium Trust Company as your IRA Custodian." Exhibit 288.

743.   When the Grusches questioned Kiley about the Millennium letter, he advised them to transfer the IRA from Millennium to Entrust Group.   The Grusches followed Kiley's advice and completed the paperwork for the transfer with the assistance of Julia Smith.   Because Entrust was to invest the funds in the foreign currency arbitrage program with Crown Forex SA, the Grusches also completed Crown Forex SA paperwork at the same time.   Unlike with previous transactions, however, the Grusches never received copies of this paperwork.   Exhibit 289.

744.   On July 27, 2009, the Grusches learned of this lawsuit and Crown Forex SA's bankruptcy from a relative who had also invested in the program.   The Grusches went to the Universal Brokerage FX website, where they saw the client notice indicating that "UBFX and UBS Fund are unable to fulfill withdrawal or redemption requests." Exhibit 290.

745.   To date, the Grusches have no access to their investment funds, and the only information they have regarding the existence and location of their investment funds

are check copies showing that their funds were deposited in UBS Diversified Growth LLC's Wells Fargo Account No. ******2710 and Crown Forex LLC's Associated Bank Account No. ******1705, and wire transfer documents indicating that Entrust wired their funds to "Crown Forex" at Associated Bank Account No. ******1705.  See Exhibit 282 and Exhibit 291.

## MM.        Plaintiffs Rick and Tamie Steiner

746.   Plaintiffs Rick and Tamie Steiner ("the Steiners") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they began listening in October 2007.

747.   In January 2008, the Steiners contacted Kiley for additional information regarding the program, and received a telephone call in response from Michael Behm, who identified himself as Senior Financial Advisor for Universal Brokerage FX.

748.   During this conversation, Behm represented that principal invested in the foreign currency arbitrage program could never be lost and that the investment would generate a 10-14% rate of interest per year.

749.   Based on these representations, the Steiners invested in the program through Kiley and Universal Brokerage FX on January 25, 2008.  To invest, the Steiners made checks payable to Universal Brokerage FX, and rolled over IRA proceeds into self-directed accounts with Millennium.  See, e.g., Exhibit 292; Exhibit 293.

750.   When the Steiners received copies of their Millennium paperwork, they noticed that Rick Steiner's signature had been forged on the document.  When Rick Steiner confronted Behm and Kiley about the forged signature and expressed anger over

the fact that it may create problems withdrawing funds from the account, they both assured him that it would not be an issue and that the signature was forged to expedite the paperwork.

751.   In conjunction with their investments, the Steiners also completed Universal Brokerage Client Applications and Subscription Agreements, a UBS Diversified FX Growth Subscription Agreement and a Universal Brokerage General Business Terms Currency Exchange Agreement, with the assistance of Julia Smith. Exhibits 294-295.   The opening of the Steiners' accounts was handled by Smith and Cook.  Exhibit 294.

752.   The Universal Brokerage General Business Terms Currency Exchange Agreement stated that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and "appropriate stops set so that no single transaction shall risk more than 2% of the Customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance."  Exhibit 295.

753.   The Steiners failed to receive any account statements for four months following their investments. When they inquired about the lack of statements, Behm indicated that the accounts were "not fully setup on Milleniums [sic] end" and that "the issue was some of the accts size." Exhibit 296.  Eventually, the Steiners began to receive accounts statements from Universal Brokerage FX by mail.  See, e.g., Exhibit 297.

754.   In February 2009, the Steiners requested a $20,000.00 withdrawal from their accounts, and received a check from Universal Brokerage FX Management, LLC,

signed by Kiley.  Exhibit 298.  The funds were drawn from Universal Brokerage FX Management, LLC's Associated Bank Account No. ******5601. Id.  To date, the total amount of the Steiners' investment in the program is $53,024.87.

755.   The Steiners first learned of this lawsuit when they received letters from Millennium advising them of this lawsuit and attaching "client notice" letters from Oxford Global Partners and Universal Brokerage FX/UBS Fund indicating that these entities "are unable to fulfill withdrawal or redemption requests." Exhibit 299.

756.   The Steiners immediately directed Millennium to remove their funds from UBS Diversified, but there were no funds available. Exhibit 300. To date, the Steiners have no access to their investment funds, and Defendants have offered no information regarding the existence or location of their funds.

**NN.**      **Plaintiff Stanislaw Zukowski**

757.   Plaintiff Stanislaw Zukowski ("Zukowski") first learned of the foreign currency arbitrage program in mid-September 2008, when he attended a retirement seminar and met a couple who had invested in the program.  The couple recommended that Zukowski contact Joe Mack ("Mack"), a financial advisor and owner of Mack Financial Group and Secure Retirement Solutions Private Client Group, for additional information on the program.  Exhibit 301.

758.   Subsequently, Zukowski had a personal meeting with Mack, during which Mack recommended investing in the foreign currency arbitrage program with Oxford Global Advisors and Oxford Global Partners.  Mack represented that investments in the program through Oxford Global Advisors were instantly liquid, principal protected with

no exposure to market risks, backed by the largest banks in the world, earned an annual guaranteed rate of return of 10.5%, and held in individual accounts.  Mack also indicated that he had successfully invested his own money in the program.

759.    Following this meeting, Mack sent Zukowski Oxford Global Partners' materials on the foreign currency arbitrage program. Exhibit 302. According to the materials, Oxford Global Partners is a "professional asset management firm with over $4 billion in AUM," that focuses on "capital preservation, superior yields and consistent, secure long-term returns," and "utilizes a proprietary solution to take maximum advantage of imbalances in the foreign banking and the international currency markets." The materials also indicated that "Capital preservation is the cornerstone of all our strategies, no matter what the global market conditions."

760.    The Oxford Global Partners' materials represent that investments in its foreign currency arbitrage program: offer "low, arguably zero principal risk"; involve "a 'perfect hedge' of international currency pairs (G5 only) neutralizes principal risk"; provide "predictable, consistent double-digit returns (10.5% annually compounded); and are held in "individual managed accounts in clients' name."  Exhibit 302.

761.    Based on these representations, Zukowski invested in the foreign currency arbitrage program on September 24, 2008.  To invest, Zukowski wrote a check for $300,000.00 to "Crown Forex" to establish an individual account at Crown Forex SA in Switzerland, and rolled over IRA proceeds into a self-directed IRA account with Entrust, which was then to invest the funds with Crown Forex SA.  Zukowski's Interested Party Designation and Limited Power of Attorney form with Entrust identified "Oxford Global

c/o Bo Beckman" as an interested party and authorized Bo Beckman to act as a limited power of attorney on Zukowski's accounts. Exhibits 303-304.   Zukowski's total investment in the program is $500,000.00.

762.   In conjunction with his investment, Zukowski entered into a Crown Forex SA Customer Trading Agreement for Individual Accounts, completed a Management Agreement with Oxford Global Advisors, and received Crown Forex SA statements via online access from the Forex Trading Station and Oxford Global Partners' website. See, e.g., Exhibits 305-307.

763.   Zukowski first learned of this lawsuit in July 2009, after reading an article in the Star Tribune, and immediately contacted Joe Mack.   Mack sent Zukowski the necessary withdrawal and sell direction letters, which he completed and returned.   Exhibit 308.

764.   To date, Zukowski's withdrawal requests have not been honored and he has no access to his funds.   The only information he has regarding the existence and location of his investment funds is a check copy indicating that his a portion of his funds were deposited into Crown Forex LLC's Associated Bank Account No. ******1705, instead of with Crown Forex SA. See Exhibit 303.

## OO.        **Plaintiff Craig Engel**

765.   Plaintiff Craig Engel ("Engel") first learned of the foreign currency arbitrage program in 2008 through his fiancée's sister, who referred him to Beckman at Oxford Private Client Group.

766.    On September 25, 2008, Engel spoke with Gene Walden of Oxford Private Client Group regarding the foreign currency arbitrage program, which Walden referred to as Oxford's "Global Enhanced Strategy Return."   Walden described the program as an investment in the currency/bond market that was "modestly leveraged," "capture[d] the spread between major G5 currencies," maintained a "perfect hedge" against currency fluctuation, which made the risk of the investment "zero." Walden also represented that rate of return on investment in the program is "10.5% fixed" for all investors, and that the investment earns compound interest when an investor's balance increases by $10,000.00. See Exhibit 309.

767.    Walden indicated that each investor would have two separate brokerage accounts with a limited power of attorney.  One account would hold a "long position" and the other account a "short position." He explained that "Oxford" had relationships around the world, including a $10 billion line of credit with a Jordanian bank that complies with Islamic law.  Walden indicated that Oxford uses Islamic banks for the short position account because Islamic-compliant banks cannot charge interest, "so we get the short side for free."

768.    On January 23, 2009, Engel spoke directly with Beckman and Oxford representative Adam Edenborg about investing in the foreign currency arbitrage program. During this conversation, Beckman represented that investments in the program would earn a fixed rate of 10.5%; involved no risk due to hedging and modest leveraging; would earn compound interest when investors' balances increased by $10,000.00; would be held in two brokerage accounts, one for the long position and one for the short position; and

would be instantly liquid and/or easily moved to Beckman's stock market strategy. Beckman also indicated that funds invested in the program would be deposited with Crown Forex S.A. in Switzerland.

769. During their conversation, Beckman implied that he was closely affiliated with the foreign currency arbitrage program, and that his "partner" handled investment in the foreign currency arbitrage program. Beckman recommended the foreign currency arbitrage program over other investments.

770. Both Beckman and Walden presented "Oxford" as a single entity, and indicated that Engel could move his funds out of the foreign currency arbitrage program/Global Enhanced Return Strategy and into a stock market strategy without penalty because he would be keeping his investment "in-house."

771. Based on these representations, Engel invested in the foreign currency arbitrage program on March 30, 2009. To invest, Engel rolled over IRA funds in the amount of $350,000.00 into a self-directed IRA account with Entrust, which was then to be invested in the foreign currency arbitrage program with Crown Forex SA. Exhibit 310.

772. In conjunction with his investment, Engel completed a Management Agreement with Oxford Global Advisors, entered into a Crown Forex SA Customer Trading Agreement for Individual Accounts, and completed a Customer Order Authorization and Limited Power of Attorney giving "Oxford" limited power of attorney over his account. Exhibit 311-312. Engel received account statements ostensibly from Crown Forex SA. See, e.g., Exhibit 313.

773.    During the time period that his paperwork was being processed, Engel learned of FINMA's (Swiss Financial Market Supervisory Authority) investigation of Crown Forex SA and its decision to liquidate Crown Forex SA.   Engel contacted Edenborg regarding the impact on Oxford's clients and was told that "this has nothing to do with the safety of client funds or the methodology we employ."  Exhibit 314.

774.    On March 25, 2009, Engel had a telephone conference with Beckman to further discuss the Crown Forex SA situation and the security of his investment.  During this conversation, Beckman stated that Engel should not expect to lose any principal in the foreign currency arbitrage program.   Beckman also stated that the FINMA investigation was related to Crown Forex SA's application to become a Swiss bank, which was required for Oxford to continue to do business with Crown Forex SA. Beckman indicated that the decision on the investigation would be issued by April 1, 2009, and that the Oxford had contingency plans depending on that decision.  Beckman represented that the FINMA concerns related to only 40 accounts originating in areas of the world that are off-limits for banks in light of money laundering and illegal activities. Beckman indicated that no other Crown Forex SA accounts had been frozen.  Based on this information, Engel continued with his investment.

775.    On April 14, 2009, Engel received email confirmation from Oxford Private Client Group that his "account has been funded and positions have been placed at Crown Forex."  Exhibit 315.

776.    On July 25, 2009, Engel first learned of this lawsuit through a Star Tribune article. Subsequently, Engel received client letters from Universal Brokerage FX/UBS

Fund and Oxford Global Partners LLC, informing him of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that the entities are "unable to fulfill withdrawal or redemption requests." See, e.g., Exhibit 13.

777.    Engel also received a personal letter from Oxford Private Client Group advising him that "[d]ue to recent developments with Crown Forex we are deciding to withdrawal [sic] all funds.    This conservative decision is being based solely on preservation of capital." Exhibit 316.

778.    The letter from Oxford Private Client Group attached a withdrawal form, which Engel completed and returned.    Engel also contacted Entrust regarding his investment and submitted a Sell Direction Letter.  Exhibit 317.

779.    Engel requested a copy of his account statement from Entrust and the wire transfer documentation for the transfer of funds from Entrust to Crown Forex S.A.  While the account statement indicated that his funds had been transferred to Crown Forex SA in Switzerland, the wire transfer information indicated that his funds were transferred to Crown Forex LLC's Associated Bank Account No. ******1705, in Green Bay, Wisconsin.  Exhibit 318.

780.    To date, Engel's withdrawal requests have not been honored, he has no access to his funds, and Defendants have provided no information regarding the existence and location of his investment funds.    The only information Engel has regarding the location and existence of his funds is the above-referenced wire transfer documentation. See Exhibit 318.

781.   Entrust has refused to explain how and why his Entrust account statement reflects a transfer to Crown Forex S.A. in Switzerland when Entrust clearly wired the funds to Crown Forex LLC Account No. ******1705 in Green Bay, Wisconsin.  Entrust also has refused to provide the wire request that Entrust received from Defendants regarding Engel's funds.

**PP.**        **Plaintiff Richard Roiger, Ph.D**

782.   Plaintiff Richard Roiger ("Roiger") first learned of the foreign currency arbitrage program in mid-2007, when he received a telephone call from Grant Grzybowski, who identified himself as an Investment Advisor for Oxford Global Advisors.  Grzybowksi had initially called Roiger's mother about the program and she referred him to Roiger.  In this initial conversation, Grzybowski described the program as a secure investment that consistently yielded high rates of return.

783.   On June 14, 2007, Grzybowski sent Roiger a letter about UBS Diversified and its "financial planning and diversification strategies through the use of uncorrelated asset classes."  In the letter, UBS Diversified was described as an investment advisory firm founded in 1987 that offered minimum portfolio investments, including "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 319.

784.   The letter also stated that "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are insured by measures enacted by the Federal Government, exchanges and UBS.  Client funds are held in

segregated account's [sic] providing safety, security and the liquidity that our client's [sic] deserve and should demand." Id.

785.   The letter listed three references: (1) Bo Beckman at The Oxford; (2) James Pieron at JDFX Technologies in Switzerland; and (3) Mikkel Thorup at Capricorn Asset Management in Switzerland.   The letter identified Grzybowski as "Chief Financial Strategist" and was printed on the following letterhead: "UBS SAXO IFX MILLENNIUM RJO PFG CHASE Wealth Management Clearing Brokerage Foreign Exchange IRA's." Id.

786.   In August 2007, Roiger met with Grzybowski and they discussed the foreign currency arbitrage program offered by UBS Diversified. Grzybowksi represented that the program was a completely safe, high yield investment with a 12% annual rate of return.

787.   At the August 2007 meeting, Grzybowski gave Roiger a brochure about the program, which indicated that the program is structured to provide "consistent and predictable income and the safety of principal you desire," and "genuine wealth preservation investment vehicles, that employ low to no risk of capital strategies."   The brochure also represented that investments in the program are "instantly liquid," held in "a segregated account, not co-mingled with the general assets of the custodian, bank or dealer," come with the benefit of "unparalleled banking relationships negat[ing] all currency risks," and are "fully hedged by our liquidity providers and affiliate banks." The liquidity providers were listed as Deutsche Bank; Dresdner Bank; Barclays Capital;

UBS; JP Morgan; Saxo Bank; Bank of America; and the Royal Bank of Scotland. Exhibit 320.

788. Based on these representations, Roiger invested in the program through Grzybowski and Oxford Global Advisors in September 2007. To invest, Roiger rolled over 403-B retirement proceeds in the amount of $132,067.04 to a self-directed IRA account with Millennium, which was then to be invested in the program through UBS Diversified. Exhibit 321. However, Grzybowski represented to Roiger that his funds would ultimately reside in his Millennium account and would be directly available to Roiger at the end of each day.

789. In conjunction with his investment, Roiger initially received account statements from "The Oxford" and Millennium. Exhibits 322-323. When Roiger inquired about the inconsistencies between his Oxford and Millennium statements, he was told that this was the result of Millennium only updating his account balance once a year. Subsequently, Roiger was able to view his Oxford account balances online at www.oxfordglobalpartners.com. Exhibit 324.

790. On November 24, 2008, Roiger invested an additional $14,122.33 in the program by rolling over deferred compensation retirement funds into a self-directed IRA with Entrust. Exhibit 325. The total amount of Roiger's investment in the program is $146,189.37.

791. Subsequently, Grzybowski informed Roiger that Entrust would be the new custodian for all Oxford accounts, that Roiger's original account would be transferred

from Millennium to Entrust in January 2009, and that all funds would then be invested in the foreign currency arbitrage program through Crown Forex SA in Switzerland.

792.    While online statements from the Oxford Global Partners website indicated that all of Roiger's funds were transferred to Entrust and then invested with Crown Forex SA, Millennium has no record of the purported transfer to Entrust and Roiger continued to receive statements from Millennium through June 30, 2009, showing an account balance of $151,078.52.   See Exhibit 323.  Entrust has indicated that the only funds it received was the $14,122.23 transfer in November 2008, and Roiger's Entrust statements confirm that only this portion of his funds was ever ostensibly transferred to Crown Forex SA.  Exhibit 326.

793.    On July 10, 2009, Roiger received a letter from Millennium notifying him that this lawsuit had been initiated against UBS Diversified.   Exhibit 327. Roiger immediately contacted Millennium and Entrust seeking withdrawal of his funds from the UBS Diversified and Crown Forex SA investments and placement of the funds into a money market account, but these requests were not honored.

794.    Roiger then began researching the existence and location of his investment funds.   Millennium informed him that, on September 21, 2007, $130,000.00 was transferred from his Millennium account to Wells Fargo Account No. ******2710, which Roiger later learned belonged to UBS Diversified.  An Entrust employee indicated that funds from his Entrust account were transferred to an Associated Bank account.

795.    To date, Roiger has no other information regarding the existence and location of his funds, and has no access to his investment funds.

QQ.        **Plaintiff William K. Fravel**

796.    Plaintiff William K. Fravel ("Fravel") first learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which he began listening in November 2008.

797.    In January 2009, Fravel called the telephone number provided on Kiley's radio show for additional information on the program, and received a telephone call from John Loebel, Investment Advisor for Universal Brokerage FX.   During their conversation, Loebel represented that investments in the foreign currency arbitrage program were held in **segregated accounts**, could be accessed 24 hours per day/seven days per week, involved no risk and would earn returns of 10% or more per year.   These representations were consistent with what Kiley had stated about the program on his radio show.

798.    After their telephone conversation, Loebel sent a letter to Fravel about Universal Brokerage FX and its "financial planning and diversification strategies through the use of uncorrelated asset classes."   In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market.   These managers have direct access to all international markets and can capitalize on rising and falling markets."   Exhibit 328.

799.    Loebel's letter also stated that, "Financial security is paramount to every investor.   The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.   Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

800.   Prior to investing, Fravel also received a brochure entitled "Institutional Grade Investments for the Individual Investor," which represented the following regarding investments in the program: "Liquidity:  All positions are 100% liquid on a 24 hour basis"; "Trading Discipline:  100% of the time the long USD/JPY position is fully insured," "Funds are deposited with a  commercial bank in the client's name"; "Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds"; "Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  Exhibit 329.

801.   Based on these representations, Fravel invested in the foreign currency arbitrage program through Universal Brokerage FX on January 26, 2009. To invest, Fravel rolled over IRA proceeds in the amount of $516,303.00 into a self-directed account with Entrust, which was then to be directed to Crown Forex SA.  Exhibit 330. The total amount of Fravel's investment in the program is $535,123.48.

802.   In conjunction with his investment, Fravel completed a Crown Forex SA Customer Trading Agreement for Individual Accounts with the assistance of Loebel and Julia Smith, and received account statements purportedly from Crown Forex SA and Universal Brokerage FX.  See, e.g., Exhibits 331-333.

803.   Eventually, Fravel was able to view his account statements online by downloading the trading platform from www.crownforex.com. See, e.g., Exhibit 334.

804.   On July 26, 2009, Fravel unsuccessfully attempted to access his account online.  On July 28, 2009, Fravel received a letter from Universal Brokerage FX and UBS Fund informing him of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that

the entities are "unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

805.   Fravel immediately attempted to call Universal Brokerage FX, Kiley and Loebel, but there was no answer on any of the lines and no way to leave a voicemail message.  Fravel also emailed Loebel, but never received a response.

806.   To date, Fravel has no access to his funds and the only information he has regarding the existence and location of his investment funds are wire transfer documents indicating that the funds were transferred to Crown Forex LLC's Associated Bank Account No. ******1705, rather than to Crown Forex SA in Switzerland. Exhibit 335.

**RR.**          **Plaintiffs Frank and Harriet Bright**

807.   Plaintiffs Frank and Harriet Bright ("the Brights") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they first began listening in November 2007.

808.   The Brights visited Kiley's website for additional information, and had multiple telephone conversations with Kiley regarding investment in the program. During these conversations, Kiley represented that investments in the program were held in secure, separate accounts and would earn double digit returns.

809.   In January 2008, the Brights received a follow-up letter from Kiley regarding Universal Brokerage FX and investments in the program, which indicated that "Universal Brokerage FX utilizes the latest technology to achieve maximum profits and diversification through global markets."  The letter also stated that: "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are

ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in **segregated** accounts providing safety, security and liquidity." Exhibit 336.

810. The Brights also received a brochure from Kiley entitled, "Institutional Grade Investments for the Individual Investor," which represented the following regarding investments in the program: "Liquidity: All positions are 100% liquid on a 24 hour basis"; "Trading Discipline: 100% of the time the long USD/JPY position is fully insured," "Funds are deposited with a commercial bank in the client's name"; "Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds"; "Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." Exhibit 337.

811. Based on these representations, the Brights invested in the program through Kiley and Universal Brokerage beginning in March 2008. To invest, the Brights wrote a personal check dated March 25, 2008, in the amount of $50,000.00 payable to "UB-FX," and transferred $314,821.00 of their Charitable Remainder Trust on April 1, 2008. Exhibit 338. The total amount of the Brights' investment in the program is $364,821.00.

812. In conjunction with their investment, the Brights received account statements from Universal Brokerage FX via mail. Exhibit 339.

813. On December 2, 2008, the Brights made a withdrawal request for $33,753.18, based on Kiley's instructions that they had to receive a disbursement from their trust in December 2008. They subsequently received two checks for $16,876.59

from Universal Brokerage FX Management, LLC Account No. \*\*\*\*\*\*5601 on December 8, 2008.  Exhibit 340.

814.    The Brights first learned of potential problems with their investment in August 2009, when they attempted to contact Kiley to withdraw $5,000 from their account for their grandson who was starting back to college.  When they did not receive any return calls from Kiley or staff at Universal Brokerage FX, the Brights began searching newspapers for information about Kiley and eventually found the Star Tribune articles about this lawsuit.

815.    To date, the Brights have no access to their funds and the only information they have regarding the existence or location of their investment funds is a check copy and wire transfer documentation indicating that their funds were deposited into Universal Brokerage FX Management LLC's Associated Bank Account No. \*\*\*\*\*\*5601. Exhibit 341.

**SS.**        **Plaintiffs Karl and Charlene Kokotan**

816.    Plaintiffs Karl and Charlene Kokotan ("the Kokotans") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they began listening in 2008.

817.    In November 2008, the Kokotans arranged a personal meeting with Kiley at Universal Brokerage FX offices in Eagan, Minnesota.  During this meeting, Kiley represented that investments in the program were insured up to $250,000.00 and earned guaranteed annual returns of 10-12% or more.

818.    At the meeting, Kiley provided the Kokotans with two brochures regarding investments in the program.  The first brochure entitled "Institutional Grade Investments for the Individual Investor," represented investments in the program as follows:  "Funds are deposited with a commercial bank in the client's name.   Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  Exhibit 342.

819.    The other brochure entitled "Currencies," further described the benefits of the foreign currency arbitrage program as "safety, liquidity, and stability." Exhibit 343.

820.    Based on these representations, the Kokotans invested in the program through Kiley and Universal Brokerage FX on November 17, 2008.  To invest, the Kokotans transferred 401(k) funds in the amount of $77,647.01 to a self-directed IRA account with Entrust.  The Kokotans then directed Entrust to invest in the program through Crown Forex SA in Switzerland. Exhibit 344.

821.    In conjunction with their investment, the Kokotans completed a Crown Forex SA Customer Trading Agreement for Individual Accounts with the assistance of Kiley and Julia Smith, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA. Exhibits 345-346.

822.    In late July 2009, the Kokotans received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing them of the lawsuit, the Crown Forex SA bankruptcy proceedings, and indicating that these entities "are unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

823.   The Kokotans immediately contacted Entrust regarding their account and were told that there was no money in their Entrust account.  On September 10, 2009, the Kokotans received a letter from Entrust indicating that it had been subpoenaed by the SEC and would be providing client files in response to the subpoena. Exhibit 347.

824.   To date, the Kokotans have no access to their funds and the only information they have regarding the existence and location of their funds is wire transfer information indicating that Entrust transferred the funds to Crown Forex LLC's Associated Bank Account No.  ******1705, rather than to Crown Forex SA in Switzerland.  Exhibit 348.

825.   Entrust has offered no explanation as to why it failed to follow the instructions in the Kokotans' Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247, Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC. Entrust has also failed to explain why its account statements provided to the Kokotans showed that the funds had been transferred to Crown Forex SA in Switzerland when this was not the case.  Compare Exhibit 344 with Exhibit 348.

**TT.**          **Plaintiffs David A. and Candace J. Tackett**

826.   Plaintiffs David and Candace Tackett ("the Tacketts") first learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," to which they began listening in August 2007.

827.   In August 2007, the Tacketts contacted Kiley for additional information regarding the program.  During their subsequent conversations in August and September

2007, Kiley represented that investments in the program were held in arbitrage accounts, were 100% principal protected and safe, earned rates of return ranging from 10-15%, and were instantly liquid and available on demand.  Kiley also represented that in his 21 years of experience with the program, he had never seen an annual return of less than 10%. Kiley indicated that he and his partners had bought a bank in Switzerland where client funds could be sent if the United States experienced further economic upheaval.

828.   Based on these representations, the Tacketts invested in the foreign currency arbitrage program through Kiley and UBS Diversified/Universal Brokerage in October 2007.  To invest, the Tacketts rolled over IRA proceeds in the amounts of $11,134.53 and $70,094.63 to self-directed IRAs with Millennium and wrote the following personal checks:  (1) a $50,027.99 check dated November 5, 2007, payable to Millennium; (2) a $97,050.00 check dated November 12, 2008, payable to "Crown"; and (3) a $121,600.00 check dated November 12, 2008, payable to "Crown."  The Tacketts also submitted additional payment in the amount of $16,457.36 for fees associated with their investments.  Exhibits 349-350. The total amount of the Tacketts' investment in the program is $366,364.51.

829.   In conjunction with their investments, the Tacketts entered into Self-Directed IRA Agreements with Millennium Trust Company, completed UBS Diversified Client Applications, entered into Crown Forex Customer Trading Agreements for Individual Accounts, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA. See, e.g., Exhibits 351-354.

830.   While the Tacketts were in the process of completing their investment documentation, Julia Smith advised them, "never, under any circumstances, to call Crown Forex with any questions about your accounts," and to instead refer all questions to UBS Diversified.  She indicated that telephone calls to Crown Forex would result in immediate account closure.

831.   On July 10, 2009, the Tacketts received a letter from Millennium notifying them that this lawsuit had been filed against various entities including UBS Diversified and Universal Brokerage FX.  Exhibit 355.

832.   Subsequently, the Tacketts received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing them of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that these entities are "unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

833.   The Tacketts repeatedly attempted to contact Kiley, Julia Smith, and other employees of Universal Brokerage FX and UBS Diversified, but no one answered and the Tacketts' voicemails and emails were never returned.

834.   On September 10, 2009, the Tacketts submitted a written withdrawal request to Kiley and Smith seeking closure of all accounts and transfer of the funds therein to their personal banking account.  Exhibit 356.

835.   To date, the Tacketts' withdrawal request has not been honored and they have no access to their investment funds.  The only information they have regarding the existence and location of their funds are check copies indicating that their investment funds, and fees paid in conjunction with their investments, were deposited in Crown

Forex LLC's Associated Bank Account No. ******1705, and UBS Diversified Growth

LLC's Wells Fargo Account No. ******2710.  See Exhibit 350; see also Exhibit 357.

**UU.**          **Plaintiffs Ronald and Sandra Yates**

836.    Plaintiffs Ronald and Sandra Yates ("the Yates") first learned of the foreign

currency arbitrage program through Kiley's radio show, to which they began listening in

spring 2007.

837.    In April 2008, the Yates contacted Kiley for additional information

regarding the program.  During this and subsequent conversations during spring 2008,

Kiley represented that investments in the program were principal protected, safe, held in

separate accounts, would earn an annual return of 10-12%, were backed by gold and

placed in Swiss accounts, and could be withdrawn within twenty-four hours upon request.

838.    As a follow-up to these conversations, Kiley sent the Yates a letter about

Universal Brokerage FX and its "financial planning and diversification strategies through

uncorrelated asset classes." In the letter, Universal Brokerage FX was described as an

investment advisory firm founded in 1987 that offered minimum investments, including

"Money Managers not correlated to the stock market.  These managers have direct access

to all international markets and can capitalize on rising and falling markets." Exhibit 358.

839.    Kiley's letter also stated the following: "Financial security is paramount to

every investor.  The safety and integrity of customer funds on deposit are ensured by

measures enacted by the Federal Government, various exchanges, and the firm itself.

Customer funds are held in **segregated** accounts providing safety, security and liquidity."

840.   The Yates also received Universal Brokerage's General Business Terms Currency Exchange Agreement, which stated that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and "appropriate stops set so that no single transaction shall risk more than 2% of the Customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance."  Exhibit 359.

841.   Based on these representations, the Yates invested in the program through Kiley and Universal Brokerage FX on June 20, 2008.  The Yates believed that Kiley would be personally managing their funds, which would be held in a Universal Brokerage FX account.

842.   To invest, the Yates wrote two personal checks:  (1) a $65,000.00 check dated June 20, 2008, payable to "Crown," and (2) a $15,000.00 check dated July 31, 2008, payable to "Crown."  Exhibit 360.   The total amount of the Yates' investment in the program is $82,565.00.

843.   In conjunction with their investment, the Yates completed and signed the Universal Brokerage General Business Terms Currency Exchange Agreement and a Universal Brokerage Client Application, and received account statements from Universal Brokerage FX via mail.  Exhibits 359, 361-362.

844.   In late July 2009, the Yates received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing them of this lawsuit and that these entities are "unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

845.   After receiving these letters, the Yates repeatedly called Kiley, but there was no answer.   On August 11, 2009, the Yates sent a letter to Kiley requesting information about the location of their investment funds, but never received a response. Exhibit 363.

846.   To date, the Yates have no access to their funds, and the only information they have regarding the existence and location of their funds are check copies indicating that their funds were deposited in Universal Brokerage FX Management, LLC's Wells Fargo Account No. ******5601, and Crown Forex LLC's Associated Bank Account No. ******1705.  See Exhibit 360.

## VV.        **Plaintiffs Rodney and Judith Wylie**

847.   Plaintiffs Rodney and Judith Wylie ("the Wylies") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they began listening in May 2007.

848.   Subsequently, the Wylies visited Kiley's website for additional information on the program.   On his website, Kiley made the following representations regarding investments in the program through his company:   "Since our inception, The Wealth Management Group has produced ***double-digit annual returns*** for all clients"; "[arbitrage] is known in the industry as a "risk-less" transaction";   "The Wealth Management Group has **_no_** hidden fees, charges, or penalties"; "The Wealth Management Group client accounts are ***totally liquid***—accessible 24/7 ***without penalty***"; and "The Wealth Management Group client accounts are ***individually insured*** for $500,000."  Exhibit 364 (emphasis in original).

849.   Kiley's website also contained the following representations:

> Financial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by various exchanges and the Federal Government. Customer funds are held in segregated accounts providing safety, security and the liquidity that investors deserve. IRA, 401K and retirement accounts are audited extensively by OBRE (over 400 hours) on a yearly basis and are externally audited by at least two independent audit firms. These accounts have the maximum insurance coverage possible for fraud and theft through AIG: Financial Institution Bond--$10,000,000: Surety coverage for illegal acts by employees, director and owners. Professional Liability (Errors & Omissions)--$5,000,000: Coverage for the failure to render professional services. Directors and Officers--$5,000,000: Coverage for wrongful acts by any officer or director. These accounts are cleared through NASD registered brokerage firms and carry SIPC insurance which protects each account to $500,000.

Exhibit 364.

850.   The Wylies also reviewed a newsletter containing an article by Kiley regarding the foreign currency arbitrage program. The newsletter article contained the following representations:

> All in all, 2006 was much more profitable than 2007; however we still turned out well into double digits with no down months. **I repeat that. No down months.** Client funds in protection strategies have been like an odometer on a car. It only moves one way—and that is higher. Current interest rate spreads in global markets are simply offering opportunities that were not here 3 or 4 years ago. Investors need to understand the importance of timing and shifting out of asset classes that are over valued and into asset classes that are under valued. These opportunities will not necessarily be here forever. Most strategies in this section are arbitrage (my vocabulary word of the work) based—meaning NO MARKET EXPOSURE!!! This is how I sleep safe and sound at night. Now, more than ever—with collapsing CD and Bond yields—people need to educate themselves about other

strategies outside of the retain norm. Trust me—the institutional arena is much bigger—it dwarfs the retail arena. This is by far the best area to be in to protect your principal and to beat inflation. I think you already know that most fixed products (Bonds, CD's, Annuities, Savings Account's, etc.) sold to the retail public fail to do this. You need to educate yourselves and "bullet-proof" your money with our strategies and methodologies. I am happy to do a free assessment for any of Bob's subscribers. As always, any International Forecaster readers may call me for free information. Our IRA accounts are insured to $500,000 per account and are held in **SEGREGATED ACCOUNTS.** They are held with the largest independent custodian in the U.S.— over 9,500 accounts and 600 million in assets. All accounts are always 24 hours per day liquid. Clients also have a choice if they would like to use some of our European based holding companies. Cash accounts also offer typical FDIC and other insurance and guarantee backing. This is all you need to know.

Exhibit 365 (emphasis in original).

851. During telephone conversations in August through September 2007, Kiley reiterated to the Wylies the representations made on his website and in the newsletter article.

852. On October 23, 2007, the Wylies traveled to Minnesota for a personal meeting with Kiley. Michael Behm, a Universal Brokerage FX representative, picked the Wylies up at their hotel and took them to the meeting at Universal Brokerage FX offices in Burnsville, Minnesota. The meeting was attended by Kiley, Behm and Trevor Cook, all of whom represented the safety, liquidity, security, and segregated nature of investments in the program through Universal Brokerage FX.

853. At the meeting, the Wylies were provided additional information about the program, which stated: "The transparency of our activities is essential to our client's

satisfaction.  Trades can be checked at any time by the investors 24 hours a day via the internet.  Client funds are held in segregated accounts that are insured by a Fidelity 14 bond at Deutsche Bank in New York City.  On the client can withdraw their funds— liquidity is 24 hours per day."  Exhibit 366.

854.   Based on these representations, the Wylies invested in the program through Kiley and Universal Brokerage FX on October 23, 2007.  To invest, the Wylies wrote a personal check in the amount of $75,000.00, payable to "Universal Brokerage."  Exhibit 367. The total amount of the Wylies' investment in the program is $83,817.

855.   In conjunction with their investment, the Wylies completed a Universal Brokerage Client Application and entered into a Universal Brokerage FX General Business Terms Currency Exchange Agreement, which stated that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and "appropriate stops set so that no single transaction shall risk more than 2% of the Customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance."  Exhibits 368-369.

856.   The Wylies also received quarterly account statements from Universal Brokerage FX. See, e.g., Exhibit 370.  Based on the last statement received, the total amount of the Wylies' investment in the program is $83,817.00.

857.   In late July 2009, the Wylies received a letter from Universal Brokerage FX and UBS Fund informing them of this lawsuit and indicating that these entities "are unable to fulfill withdrawal or redemption requests." See, e.g., Exhibit 13.  The Wylies

immediately attempted to contact Kiley and Behm, but their calls were not returned. When they visited Kiley's website for additional information, it had been shut down.

858.    To date, the Wylies have no access to their investment funds and the only information they have regarding the existence and location of their funds is a check copy indicating that the funds were deposited into UBS Diversified Growth LLC's Wells Fargo Account No. ******2710.  See Exhibit 367.

**WW.**        **Plaintiff Dave Balthaser**

859.    Plaintiff Dave Balthaser ("Balthaser") first learned of the foreign currency arbitrage program through Kiley's radio show, "Follow the Money," and Durand and Pettengill's radio show, "Wealth Survival."

860.    In early October 2006, Balthaser called the telephone numbers provided on these radio shows to obtain additional information on the foreign currency arbitrage program.  In response, Balthaser received letters from Kiley and Durand, both of which were sent from 12644 Tiffany Court, Burnsville, MN 55337, and were printed on the following letterhead:  "UBS REFCO IFX MILLENIUM RJO PFG Wealth Management Clearing Brokerage Foreign Exchange IRA's."  Exhibit 371.

861.    In his letter, Kiley provided information UBS and its "financial planning and diversification through uncorrelated asset classes."  In the letter, UBS was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 371.

862.   Kiley's letter also stated that "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are insured by measures enacted by the Federal Government, exchanges and the firm itself.  Customer funds are held in **segregated** accounts providing safety, security and the liquidity."  Id.

863.   Durand's letter to Balthaser similarly discussed UBS Diversified and its "financial planning and diversification strategies through the use of uncorrelated asset classes."  Durand also represented that "Client funds are held in segregated account's [sic] providing safety, security and the liquidity that our client's deserve and should demand."  Durand's letter provided the following references:  Nolan Schiff at Peregrine Financial Group, Inc.; Libra Carter at Millennium Trust Company; and Mikkel Thorup at Capricorn Asset Management. Exhibit 371.

864.   On October 31, 2006, Balthaser received a letter from Jerry Watkins, who identified himself as Chief Financial Strategist for UBS Diversified.  Watkins encouraged Balthaser to promptly convert his investments into the program as "[t]he market will stay elevated for only a short time and I think you should maximize your profits and get out before we see any substantial declines."  Exhibit 371.

865.   After receiving these letters, Balthaser had telephone conversations with Kiley, Durand and Watkins, during which they represented that investments in the program offered liquidity, principal protection, a 12% rate of return, the security of segregated accounts with establish banks and foreign exchange institutions, and no risk or market exposure.

866.   In January 2007, Watkins also sent Balthaser a brochure entitled "Capital Protected Fixed Yield Enhancement," which represented the following about the foreign currency arbitrage program:  "Investment Safety—The 100 percent capital protected strategy means that investors are assured that the money they invest is fully protected from volatility at all times.  Client funds are held in segregated accounts with the largest, most well-established banks and foreign exchange institutions"; "Capital Protection—All currency exposure is hedged with an offsetting position…Because the transaction is done on the same inter-bank market, the positions offset, eliminating all market risk.  It is a 100 percent hedged position"; "Zero Volatility—No market exposure means that the account equity is not subject to the "ups and downs" of the market.  Similar to an odometer on a car, account balances only move in one direction—forward. Mathematics and account management guarantee that there is no risk or market exposure"; "Enhanced Returns—The strategy will outperform similar fixed income alternatives…The strategy is able to leverage interest bearing investments up to 2.5 times.  That means when average fixed income yields are at 4%, the strategy will net about 10%"; and "Daily Liquidity— Funds are generally available on short notice.  Client money is always held with the largest investment banks, commercial banks and FX institutions." Exhibit 372.

867.   Based on these representations, Balthaser invested in the program through UBS Diversified in January 2007.  Balthaser's investment was funded by the following personal money market checks:  (1) a $100,000.00 check dated January 10, 2007, payable to UBS  Diversified Growth; (2) a $109,000.00 check dated May 2, 2007, payable to UBS  Diversified; (3)  a  $191,000.00  check  dated  May  2,  2008,  payable  to  UBS

Diversified; (4) a $100,000.00 check dated November 13, 2007, payable to UBS Diversified; (5) a $100,000.00 check dated August 15, 2008, payable to Universal Brokerage FX; and (6) a $300,000.00 check dated November 25, 2008, payable to Universal Brokerage FX. Exhibit 373. The total amount of Balthaser's investment in the program is $955,082.00.

868. In conjunction with his investment, Balthaser completed a UBS Diversified Growth Application and Subscription Agreement/Limited Power of Attorney, Subscription Forms, and a Management Agreement with Universal Brokerage FX. Exhibits 374-375.

869. Originally, Balthaser's account statements were from UBS Diversified. Beginning in 2008, he received the account statements from Universal Brokerage FX. See, e.g., Exhibits 376-377. In addition to his account statements, Balthaser received monthly withdrawal checks from UBS Diversified Growth LLC, signed by Kiley. Exhibit 378.

870. After investing, Balthaser's primary contact at Universal Brokerage FX was Cook. In November 2008, after learning of the Bernie Madoff investment scheme, Balthaser contacted Cook to inquire about the safety of his investment. Cook responded with "due diligence" regarding the foreign currency arbitrage program.

871. Cook's "due diligence" included a letter from Beckman asking Crown Forex SA to confirm that "Oxford Capital Group" had certain assets under management that was subsequently signed and verified by Shadi Swais; a letter from Shadi Swais responding to "complaints that you have recently received regarding delays payments and

other issues"; purported confirmations from various banks that Crown Forex SA is a customer in good standing; and an opinion letter from Gary Saunders, Esq., indicating that he has reviewed the Oxford Global Advisors Client files and management of such files, and past performance records, and concluding that that Oxford Global Advisors "provided approximately an 11% annual return for their clients. The accounts are maintained at global prime banks, international and domestic financial institutions and domestic Banks and Brokerage Firms. All accounts have 100% liquidity." Exhibits 379-386.

872.   After he failed to receive his July 2009 withdrawal check, Balthaser called and emailed Cook and Watkins multiple times but they did not return his messages. Balthaser then visited the Universal Brokerage FX website and discovered the "client notice" informing investors of this lawsuit, the Crown Forex SA bankruptcy proceedings, and that Universal Brokerage FX and UBS Fund "are unable to fulfill withdrawal or redemption requests." See, e.g., Exhibit 28.

873.   Subsequently, Balthaser read the articles about this lawsuit in the Star Tribune, and made additional attempts to contact Cook, Watkins, Kiley, and Universal Brokerage regarding the status of his investments. He received no response to his emails and telephone calls.

874.   To date, Balthaser has no access to his funds, and the only information he has regarding the existence and location of his investment funds are check copies indicating that the funds were deposited into UBS Diversified Growth LLC's Wells

Fargo Account No. ******2710, and Universal Brokerage FX Management LLC's Associated Bank Account No. ******5601. <u>See</u> Exhibit 373.

## XX.        **Plaintiff Douglas Patnode**

875.    Plaintiff Douglas Patnode ("Patnode") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in 2005. On his radio show, Kiley represented that investments in the program were liquid, secure, principal protected, and held in individual accounts.

876.    In November 2006, Patnode called the telephone number provided on the radio show to obtain additional information on the program, and spoke directly to Kiley. During their conversation, Kiley represented that investments in the program were fully liquid, held in individual accounts, would earn 10-12% annual returns, and were "riskless" due to the arbitrage.  Kiley stated that the program had earned double-digit returns for the last twenty-two years.  Patnode also received materials from Kiley about investments in the program that reiterated these representations.

877.    Based on these representations, Patnode invested in the program through Kiley and UBS Diversified in November 2006.   To invest, Patnode rolled over $44,628.44 in IRA proceeds into a self-directed IRA with Millennium, which was then to invest the funds in the program with Peregrine Financial Group's Forex Division. Exhibit 387.  Patnode also wrote a personal check in the amount of $30,000.00, payable to "UBS," to invest in the program in a cash account.  Exhibit 388.

878.    In conjunction with his investment, Patnode completed Millennium and Peregrine Financial Group applications and contracts and a UBS Diversified Growth

Application and Subscription Agreement with the assistance of Julia Smith.  See Exhibits 389-391.  Patnode initially received account statements for his accounts via regular mail from UBS Diversified, but beginning in 2008, the statements came from Universal Brokerage FX.  Exhibits 392-393.

879.   Subsequently, Patnode invested additional funds into his IRA and cash accounts as follows:   (1) a $4,000.00 check dated February 13, 2007, payable to Millennium for deposit into his IRA account; (2) a $20,000.00 check dated February 26, 2008, payable to "Universal Brokerage FX" for deposit into his cash account; (3) a $5,000.00 check dated February 26, 2008, payable to Millennium for deposit into his IRA account; and (4) a $50,000.00 check dated May 10, 2008, payable to "Universal Brokerage FX" for deposit into his cash account.  Exhibits 394-395.  The total amount of Patnode's investment in the program is $142,000.00.

880.   Patnode first learned of this lawsuit after he read an article in the Star Tribune.  He immediately called Kiley's office to check on the status of his investments, but no one answered the calls.  Patnode also went to Kiley's office but the doors were locked.

881.   To date, Patnode has no access to his funds and the only information he has regarding the existence and location of his investments are check copies indicating that the funds were deposited in Universal Brokerage FX Management, LLC's Associated Bank Account No. ******5601.  See Exhibits 396-397.

**YY.**          **Plaintiff Robert Freed**

882.    Plaintiff Robert Freed ("Freed") first learned of the foreign currency arbitrage program and the gold investment plan through Kiley's radio show, to which he began listening in October 2008.

883.    In May 2009, Freed called the telephone number provided on Kiley's radio show for additional information on the gold investment plan.  Freed spoke with Charlie Reynolds, an Investment Advisor for Universal Brokerage FX, about the gold investment plan offered through Universal Brokerage FX.

884.    During their conversations in early June 2009, Reynolds represented that there was "no risk" involved in the gold investment plan because the investor personally purchased the gold, the gold was placed in the investor's individual account, and the gold could be sold and the proceeds remitted to the investor the same day with only a telephone call to Universal Brokerage FX.  Reynolds also represented that Freed would earn dividends of $8.99 per day from the gold investment plan.  When Freed indicated that he was going to borrow money for the investment against his home, Reynolds advised him that this course of action was a good idea.

885.    Subsequently, Freed received a letter and materials from Reynolds regarding the foreign currency arbitrage program.  In his letter, Reynolds described Universal Brokerage FX and its "financial planning and diversification through uncorrelated asset classes."  In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These managers have direct access

to all international markets and can capitalize on rising and falling markets." Exhibit 398a.

886.     Reynolds' letter also stated the following: "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in **segregated** accounts providing safety, security and liquidity." Id.

887.     The materials provided by Reynolds included a brochure entitled "Capital Protected Fixed Yield Enhancement," represented the following about the foreign currency arbitrage program:   "Investment Safety—The 100 percent capital protected strategy means that investors are assured that the money they invest is fully protected from volatility at all times.  Client funds are held in segregated accounts with the largest, most well-established banks and foreign exchange institutions"; "Capital Protection—All currency exposure is hedged with an offsetting position…Because the transaction is done on the same inter-bank market, the positions offset, eliminating all market risk.  It is a 100 percent hedged position"; "Zero Volatility—No market exposure means that the account equity is not subject to the "ups and downs" of the market.  Similar to an odometer on a car, account balances only move in one direction—forward. Mathematics and account management guarantee that there is no risk or market exposure"; "Enhanced Returns—The strategy will outperform similar fixed income alternatives…The strategy is able to leverage interest bearing investments up to 2.5 times.  That means when average fixed income yields are at 4%, the strategy will net about 10%"; and "Daily Liquidity—

Funds are generally available on short notice.  Client money is always held with the largest investment banks, commercial banks and FX institutions." <u>See</u> Exhibit 371.

888.    Another brochure entitled, "Institutional Grade Investments for the Individual Investor," represented the foreign currency arbitrage program as follows: "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.   Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." <u>See, e.g.,</u> Exhibit 129.

889.    Based on these representations, Freed invested in the gold investment plan through Universal Brokerage FX on June 15, 2009.  To invest, Freed, as trustee for the Robert L. Freed Revocable Trust, mailed a cashier's check in the amount of $50,000.00 to Universal Brokerage FX, which was then to be used to purchase 50 ounces of gold from Basel International in Switzerland.  Per Reynolds' instructions, Freed made the check payable to "Basel," with the notation "for gold."  Exhibit 398.

890.    In conjunction with his investment, Freed completed a Basel Institutional Customer Agreement.  Exhibit 399.  Instead of receiving account statements from Basel International, however, Freed received account statements ostensibly from Crown Forex SA.   Exhibit   400.   Freed   also   accessed   his   account   online   through www.universalbrokeragefx.com.  Exhibit 401.

891.    Freed first learned of potential issues with his account in July 2009, when Kiley's radio show was canceled and his website was shut down.  Freed searched the Internet for additional information and located Star Tribune articles regarding this lawsuit.  Freed immediately attempted to contact Kiley and Reynolds, but his messages were never returned.

892.    Freed then sent letters via certified mail to Kiley and Basel International seeking information about the status of investment, but these letters were returned because the receiver could not be determined using the given address.  Exhibit 402.

893.    To date, Freed has no access to his investment funds and Defendants have provided no information regarding the existence and location of those funds.

## ZZ.          Plaintiffs Andrew J. and Nancy J. Weed

894.    Plaintiffs Andrew and Nancy Weed ("the Weeds") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they began listening in mid-2006.   On his radio program, Kiley repeatedly represented that investments in the program earned double digit returns, were held in safe, segregated accounts, and were fully liquid.

895.    In January 2008, the Weeds called the telephone number provided on Kiley's radio show and left their contact information in order to receive additional information about the foreign currency arbitrage program.

896.    On February 21, 2008, Tim Daley, who identified himself as a Senior Financial Strategist/Technical Analyst for Universal Brokerage FX, called Andrew Weed in response the request for additional information. During this conversation, Daley

explained that the foreign currency arbitrage trading was done electronically in split seconds and trades were made only when profitable.  Daley represented that the principal investment was protected, there was no downside risk, that the funds were held in segregated accounts, and were instantly liquid 24/7.  Daley also indicated that the funds were held in segregated accounts with a Swiss bank, but that investors did not have to pay any foreign taxes.

897.   On February 21, 2008, Daley also sent the Weeds an email indicating that "Last year, we acquired a majority interest in the parent company of the hi-tech firm that we had been doing business and partnering with in the International Foreign Currency Market.  This acquisition not only solidifies our relationship with the hi-tech firm in Zurich that has unparalleled capability in the International Banking industry; but also, gives us additional ability to further enhance the profitability of our clients[.]"  Daley's email went on to state that, "the way trading is done, we do not expose our client funds to the market; therefore, there is no down side risk to the principle.  Bear in mind, there are non-correlated assets; therefore, any "Crises" anywhere in the world (terrorist attacks or an equity exchange drop, like the 9% drop on the Shanghai Exchange the end of last February), only enhances our performance."  Exhibit 403.

898.   Subsequently, Andrew Weed received a letter and materials from Daley. The letter discussed Universal Brokerage FX and its "financial planning and diversification through uncorrelated asset classes."  In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These

managers have direct access to all international markets and can capitalize on rising and falling markets."

899.    Daley's letter also stated the following: "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in **<u>segregated</u>** accounts providing safety, security and liquidity." Exhibit 404.

900.    The materials provided by Daley included a brochure entitled "Currencies," which represented that the foreign currency arbitrage program provides "liquidity or access to your funds 24 hours per day," "stability," and "strong returns." <u>See, e.g.,</u> Exhibit 80.

901.    Another brochure entitled, "Institutional Grade Investments for the Individual Investor," represented the foreign currency arbitrage program as follows: "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.   Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." <u>See, e.g.,</u> Exhibit 129.

902.    Based on these representations, the Weeds invested in the program through Universal Brokerage FX in March 2008.  To invest, the Weeds wrote a $255,000.00 check dated March 26, 2008, payable to Universal Brokerage FX.  Exhibit 405.

903.   In conjunction with their investment, the Weeds completed a Universal Brokerage Client Application, entered into a Universal Brokerage General Business Terms Currency Exchange Agreement, and received statements from Universal Brokerage FX. Exhibits 406-407.

904.   Following their initial investment, the Weeds received emails from Daley regarding Universal Brokerage FX and the foreign currency arbitrage program.  In his emails, Daley indicated that Universal Brokerage FX had purchased a bank called Crown Forex SA in Switzerland.  Another email responded to an article about the "very large downside risks" associated with the foreign currency exchange, which Daley distinguished as "un-hedged" as opposed to their investments being "100% hedged." Exhibit 408.

905.   Daley also made numerous telephone calls to the Weeds emphasizing the economic downturn and advising them to move their remaining investments from stocks and bonds to the foreign currency arbitrage program.

906.   In October 2008, the Weeds contacted Daley about investing an additional $100,000.00 into the program.  Daley indicated that they should make the check payable to "Crown Bank."  When they questioned this instruction, Daley indicated that it would "save us a step."  Because of concerns regarding the banking industry, the Weeds researched Crown Bank on the Internet and learned that it is a well-established bank located in Minneapolis.

907.   Based on the foregoing, the Weeds invested $100,000.00 in the program on October 14, 2008, and another $100,000.00 on December 9, 2008.  Per Daley's

instructions, both checks were made payable to "Crown Bank." Exhibit 409. The total amount of the Weeds' investment in the program is $455,000.00.

908.   On February 13, 2009, the Weeds received an email indicating that Daley was no longer with Universal Brokerage FX, and that their account would now be managed by Jeremy Nerenberg. Exhibit 410. Kiley indicated in a subsequent conversation that he had terminated Daley because he was not giving his clients enough attention.

909.   In spring 2009, the Weeds started inquiring about the tax consequences of their investment and the commission fees related thereto.  In early April 2009, Kiley contacted the Weeds regarding the tax questions, and stated that there would not be any tax consequences because they had "unrealized gains" rather than profits.  Kiley indicated that the Weeds would not have to pay taxes until they closed the account. Kiley also agreed that he would contact their accountant to discuss the investment.

910.   After learning that Kiley had never contacted their accountant, the Weeds called Ryan Moeller, an accountant with Universal Brokerage FX, on April 14, 2009, regarding concerns about possible taxable gains. Shortly thereafter, Kiley called the Weeds and stated they should not contact Moeller without his knowledge.  On May 19, 2009, Kiley, Moeller and the Weeds had a conference call regarding the tax situation, during which Kiley reiterated that they had unrealized gains that were not taxable.

911.   In June 2009, the Weeds had a subsequent conversation with Kiley during which he talked about living in Panama and encouraged them to contact him if they ever wanted to move there.  In light of multiple bank failures, the Weeds inquired about the

security of their funds.  Kiley represented that the funds were securely held in a Swiss account.

912.   On July 25, 2009, the Weeds noticed that Kiley's radio show was not broadcast at its usual time.  That same day, the Weeds received a letter from Universal Brokerage FX/UBS Fund informing them of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that they "are unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

913.   To date, the Weeds have no access to their funds and the only information they have regarding the existence and location of their funds is check copies indicating that the funds were deposited in Crown Forex LLC's Associated Bank Account No. ******1705, and Universal Brokerage FX Management, LLC's Associated Bank Account No. ******5601. See Exhibits 405, 409.

**AAA.**        **Plaintiff Boyd A. Wear**

914.   Plaintiff Boyd A. Wear ("Wear") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening to in April 2005.  On the radio show, Kiley described investments in the program as very safe and earning consistently high returns.

915.   In May 2005, Wear called the telephone number provided on Kiley's radio show, and spoke with Kiley about the program.   During this and subsequent conversations over the next year, Kiley repeatedly stated that the foreign currency arbitrage program is better than the stock market because it produced consistent and stable returns with no downside or losses.

916.   In one conversation with Kiley, Wear asked him if he would guarantee the 12-15% returns that he claimed the program earned.   Kiley answered that he would guarantee a minimum of 8-12% returns on investments in the program because the program "had never come close to that low of a percentage."

917.   As a follow-up to these conversations, Wear received letters from Kiley and Jared Jenkins, Investment Advisor for Universal Brokerage FX.   These letters discussed these entities and their "financial planning and diversification strategies through uncorrelated asset classes."   Both entities were described as investment advisory firms founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.   These managers have direct access to all international markets and can capitalize on rising and falling markets."

918.   Both letters also stated the following: "Financial security is paramount to every investor.   The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in **<u>segregated</u>** accounts providing safety, security and liquidity." Exhibit 411.   Wear also received e-mails from Jenkins including projected numbers under the program and fees.   Exhibit 411A.

919.   Beginning in late 2005, Wear also had numerous conversations with Tim Daley, who identified himself as Senior Financial Strategist/Technical Analyst for Universal Brokerage FX.   Daley represented that Universal Brokerage FX clients always make at least 12-15% annual return on their investments in the program, and have never lost money.   Daley also described Universal Brokerage FX's state-of-the-art computer

system that follows the foreign currency arbitrage market 24 hours per day and permits them to quickly move money if any banking failures occur.  Daley credited the computer system for helping Universal Brokerage FX produce the consistent double-digit returns that other companies cannot deliver.  Wear also received e-mails from Daley, including one representing that "this is the bank in Zurich, Switzerland we just bought & now also control 10% of the retail Forex Market – yet we are not retail here with Pat."  Exhibit 411B.

920.   In his conversations with Kiley and Daley, Wear indicated that he took a very conservative approach to investing due to prior losses, and could only invest if he could be assured of not losing his principal investment.  Both Kiley and Daley reassured Wear that he would not lose money, that he would earn consistent returns, and that there was no chance of loss of capital.

921.   Prior to investing, Wear received materials from Universal Brokerage FX that reiterated the representations made by Kiley and Daley regarding the foreign currency arbitrage program.  One brochure entitled "Global Enhanced Return Strategy," represented that investment in the program is safe because funds are held in individual segregated accounts with well-established, well-capitalized investment and commercial banks, and because the program reduces market exposure.  The brochure also represented that "funds are completely liquid and available on short notice," and that the program provides consistent yields and enhanced returns.  See, e.g., Exhibit 79.

922.   Another brochure entitled, "Capital Protected Fixed Yield Enhancement," represented the following about the foreign currency arbitrage program:  "Investment

Safety—The 100 percent capital protected strategy means that investors are assured that the money they invest is fully protected from volatility at all times.  Client funds are held in segregated accounts with the largest, most well-established banks and foreign exchange institutions"; "Capital Protection—All currency exposure is hedged with an offsetting position…Because the transaction is done on the same inter-bank market, the positions offset, eliminating all market risk.  It is a 100 percent hedged position"; "Zero Volatility—No market exposure means that the account equity is not subject to the "ups and downs" of the market.  Similar to an odometer on a car, account balances only move in one direction—forward. Mathematics and account management guarantee that there is no risk or market exposure"; "Enhanced Returns—The strategy will outperform similar fixed income alternatives…The strategy is able to leverage interest bearing investments up to 2.5 times.  That means when average fixed income yields are at 4%, the strategy will net about 10%"; and "Daily Liquidity—Funds are generally available on short notice.  Client money is always held with the largest investment banks, commercial banks and FX institutions." See Exhibit 371.

923.   The brochure entitled, "Institutional Grade Investments for the Individual Investor," made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other

clients' or company funds. Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." See Exhibit 69.

924. Based on these representations, Wear invested in the program in October 2007. To invest, Wear transferred $59,316.76 of IRA funds into a self-directed IRA with Millennium, which he understood would then be invested through some combination of Universal Brokerage FX, UBS Diversified, JDFX Technologies, and Capricorn FX. Exhibit 412. The total amount of Wear's investment in the program is $64,181.00

925. In conjunction with his investment, Wear completed a UBS Diversified Growth Application and Subscription Agreement, and received statements from Universal Brokerage FX and Millennium. Exhibits 413-414.

926. Following his investment, Wear received frequent emails from Daley regarding Universal Brokerage FX and the foreign currency arbitrage program. In his emails, Daley indicated that Universal Brokerage FX had purchased a bank called Crown Forex SA in Switzerland. Another email responded to an article about the "very large downside risks" associated with the foreign currency exchange, which Daley distinguished as "un-hedged" as opposed to his clients' investments being "100% hedged." Exhibit 415.

927. Daley also made numerous contacts with Wear emphasizing the economic downturn and advising him to transfer the remainder of his IRA funds into the program. Exhibit 415. In late 2008, Jared Jenkins took over managing Wear's account and also advised transferring the rest of the IRA funds given the consistent returns and zero risk.

928.   On July 10, 2009, Wear received a letter from Millennium informing him of this lawsuit.   Exhibit 416.   Subsequently, Wear received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing him of this lawsuit and indicating that these entities "are unable to fulfill withdrawal or redemption requests." See, e.g., Exhibit 13.

929.   Wear repeatedly called Universal Brokerage FX, Daley, and Jenkins regarding the status of his investment, but he received no response.   Wear then submitted a form to Millennium requesting immediate transfer of his funds from Universal Brokerage FX, but the funds could not be released.   Exhibit 417.

930.   To date, Wear has no access to his funds and Defendants have provided no information regarding the existence or location of his funds.

**BBB.**       **Plaintiffs James H. Renneker and Joyce L. Davis**

931.   Plaintiffs James Renneker and Joyce Davis ("Renneker and Davis") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they began listening in January 2005.

932.   In April 2008, Renneker and Davis had a telephone conversation and personal meeting with Kiley regarding the program.   During their conversations, Kiley represented that investments in the program would be held in segregated accounts, were very liquid, would earn a 12% rate of return, and would not require reporting to the IRS.

933.   Based on these representations, Renneker and Davis invested in the program through Universal Brokerage FX in April 2008.   To invest, Renneker and Davis

wrote a $75,000.00 check from their inheritance account payable to Universal Brokerage FX. Exhibit 418.

934.   In conjunction with their investment, Renneker and Davis completed a Universal Brokerage Client Application and entered into a Universal Brokerage General Business Terms Currency Exchange Agreement, which stated that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and "appropriate stops set so that no single transaction shall risk more than 2% of the Customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance." Exhibits 419-420. After investing, Renneker and Davis received account statements from Universal Brokerage FX. Exhibit 421.

935.   In November 2008, Renneker and Davis requested a $3,000.00 withdrawal during a telephone conversation with Kiley and they subsequently received a check for $3,000.00 from Universal Brokerage FX Management LLC, and signed by Kiley. Exhibits 422-423.  At the time of this request, however, Renneker and Davis were told that all further requests should go through John Loebel, a new employee, as Kiley was overloaded.  In July 2009, Renneker and Davis requested a withdrawal of $1,500.00 during a telephone conversation with Loebel, who indicated that he would process the request but that it would take a couple of weeks to send the money because Universal Brokerage FX was updating its system to better serve is clients.  The requested funds were not forthcoming and Renneker and Davis never heard from Loebel again.

936.   In July 2009, Renneker and Davis learned of this lawsuit through an article in the Star Tribune.  They immediately spoke with Kiley and requested withdrawal of their funds.

937.   To date, their withdrawal request has not been honored and the only information they have regarding the existence and location of their investment funds is a check copy indicating that their funds were deposited into Universal Brokerage FX Management, LLC's Associated Bank Account No. ******5601.  Exhibit 423a.

## CCC.     **Plaintiffs Thomas and Katherine Marabello**

938.   Plaintiffs Thomas and Katherine Marabello ("the Marabellos") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they began listening in April 2007.

939.   In February 2008, the Marabellos contacted Kiley for additional information on the program.   During their two subsequent conversations, Kiley represented that investments in the program were held in separate and segregated accounts, were instantly liquid 24 hours, seven days a week, and involved no risk to principal.

940.   In March 2008, the Marabellos also accessed Kiley's website and newsletter articles to learn more about investing in the program.  On his website, Kiley represented the following:

> Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by various exchanges and the Federal Government.  Customer funds are held in segregated accounts providing safety, security and the liquidity that investors deserve.  IRA, 401K

and retirement accounts are audited extensively by OBRE (over 400 hours) on a yearly basis and are externally audited by at least two independent audit firms. These accounts have the maximum insurance coverage possible for fraud and theft through AIG:   Financial Institution Bond -- $10,000,000: Surety coverage for all illegal acts by employees, director and owners.   Professional liability (Errors & Omissions) -- $5,000,000:  Coverage for the failure to render professional services.  Directors and Officers -- $5,000,000:  Coverage for wrongful acts by any officer or director.  These accounts are cleared through NASD registered brokerage firms and carry SIPC insurance which protects each account to $500,000.

Exhibit 424.

941.   Based on these representations, the Marabellos invested in the program through Kiley and Universal Brokerage FX in March 2008.  To invest, the Marabellos initially sent cashier's checks totaling $100,000.00, payable to Universal Brokerage, care of Kiley. Exhibit 425.   Subsequently, the Marabellos rolled over 401(k) funds in the amount of $16,580.082, into a self-directed IRA account with Millennium, which was to then to be transferred to Universal Diversified Growth Fund and managed by Kiley. Exhibits 426-427.

942.   In conjunction with their investments, the Marabellos completed Universal Brokerage Client Applications and entered into a Universal Brokerage General Business Terms Currency Exchange Agreement, which stated that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and "appropriate stops set so that no single transaction shall risk more than 2% of the Customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance."

Exhibits 428-429. The Marabellos completed these documents with the assistance of Kiley's assistant, Julia Smith.

943.   The Marabellos received quarterly account statements from Universal Brokerage FX for both their cash and IRA accounts. See, e.g., Exhibit 430.

944.   The Marabellos invested additional amounts of $8,000.00 and $3,000.00 with Universal Brokerage on January 16 and May 14, 2009.  Exhibit 431.  The total amount of the Marabellos' investment in the program is $127,000.00.

945.   The Marabellos first learned of this lawsuit on July 10, 2009, when they received a letter from Millennium.  Exhibit 432.  Subsequently, the Marabellos received a letter from Universal Brokerage FX/UBS Fund informing them of this lawsuit and indicating that they "are unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

946.   The Marabellos repeatedly emailed and called Universal Brokerage FX and Kiley, but there messages were not returned.  See Exhibit 433.  The Marabellos also completed a form requesting that Millennium transfer their funds out of UBS Diversified, but have not received a response.  Exhibit 433.

947.   To date, the Marabellos have no access to their funds and the only information they have regarding the existence and location of their investment funds is a check copy indicating that at least a portion of their funds were deposited into Universal Brokerage FX Management, LLC's Associated Bank Account No. ******5601. Exhibit 434.

DDD.       **Plaintiffs Timothy and Louise Beatty**

948.   Plaintiffs Timothy and Louise Beatty ("the Beattys") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they began listening in summer 2006.

949.   In fall 2006, the Beattys called the telephone number provided on Kiley's radio show to obtain additional information on the program, and reached Kiley directly. During this and subsequent telephone conversations in the following weeks, Kiley represented that investments in the program were held in separate accounts with Millennium as the "custodian," and his employees draw money out of these segregated Millennium accounts to take positions in foreign currencies on clients' behalf.  Kiley described client accounts as "like a checking account," from which they could draw money at any time simply by calling his office.

950.   Kiley also represented that the program was a "conservative" investing strategy and the principal was completely safe.  He stated that they would always earn good returns because trading in foreign currencies was not affected by the U.S. dollar or the stock market.  Kiley indicated that his clients had been earning returns in the 20% range, but that he expected returns to rise into the 30% range.

951.   As a follow-up to these conversations, Kiley sent the Beattys a packet of materials and a letter regarding the foreign currency arbitrage program in late fall 2006. Included in these materials was a brochure entitled, "Institutional Grade Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on 24 hours basis.

Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  <u>See</u> Exhibit 69.

952.  Another brochure entitled, "Saxo Bank Capital Guaranteed Bond," described the foreign currency arbitrage program as providing "the security of a guaranteed 100% return of their initial investment."  Exhibit 435.

953.  In his letter, Kiley described Universal Brokerage Services and its "financial planning and diversification through uncorrelated asset classes."  In the letter, Universal Brokerage Services was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 436.

954.  Kiley's letter also stated the following:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in **<u>segregated</u>** accounts providing safety, security and liquidity." <u>Id.</u>

955.  Based on these representations, the Beattys invested in the program through Kiley and Universal Brokerage Services in December 2006.  To invest, the Beattys rolled

over IRA funds totaling $45,881.02 into self-directed IRA accounts with Millennium. Exhibit 437.

956.   In conjunction with their investment, the Beattys completed Peregrine Financial Group Applications and a Limited Power of Attorney authorizing UBS Diversified to direct Peregrine Financial Group (Forex Division) in investing their funds in the program. The Beattys understood from Kiley that they were investing with Universal Brokerage Services, and did not have any dealings with Peregrine Financial Group after completing the applications. For these original two IRA accounts, the Beattys' first account statements came from "Advisor Web." Thereafter, the Beattys received account statements from UBS Diversified and Universal Brokerage FX. Exhibit 438.

957.   After their initial investment, the Beattys' primary contacts at Universal Brokerage Services were Brian Seiwert and John Loebel, both of whom repeatedly assured the Beattys that their funds were completely safe.

958.   In February 2008, the Beattys invested additional funds totaling $5,072.91 in their existing self-directed IRA accounts with Millennium by rolling over Roth IRA proceeds. Exhibit 439.

959.   In February 2008, the Beattys opened another self-directed IRA account with Millennium by rolling over IRA proceeds in the amount of $24,881.22. Additional funds in the amount of $10,802.31 were added to this account in March 2008. Exhibits 440-441. In conjunction with this new account, the Beattys completed a Universal

Brokerage Client Application, and received accounts statements from Universal Brokerage FX.  Exhibit 442.

960.   In August 2008, the Beattys rolled over $35,000.00 of IRA proceeds into a self-directed IRA account with Entrust, which was then to be invested in the program through Crown Forex SA.  Exhibit 443. In conjunction with this account, the Beattys completed a Crown Forex SA Customer Trading Agreement, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA. Exhibit 444.  The total amount of the Beattys' investment in the program is $95,758.00.

961.   After establishing their accounts, the Beattys made multiple withdrawal requests in amounts ranging from $5,000.00 to $12,000.00; however, it would frequently take Universal Brokerage Services a week or more to fulfill these requests. See, e.g., Exhibit 445.

962.   In July 2009, the Beattys attempted to contact Loebel, Smith and Kiley to arrange a transfer from one account into another investment.  The Beattys' faxes, voice messages, and emails were never returned, and they subsequently learned of this lawsuit.

963.   To date, the Beattys have no access to their funds, and the only information they have regarding the existence or location of their funds are wire transfer documents indicating that their funds were deposited in and withdrawal requests drawn from Crown Forex LLC's Associated Bank Account No. ******1705. See, e.g., Exhibit 446.

## EEE.        Plaintiff Mary Schafer

964.   Plaintiff Mary Schafer ("Schafer") first learned of the foreign currency arbitrage program through Kiley's radio program.  On his show, Kiley represented

investments in the program as held in separate accounts, available "24/7," and profitable "no matter if the market went up or down."

965.   On April 9, 2009, Schafer called the number provided on Kiley's radio show for additional information on the program and spoke with John Loebel, an Investment Advisor for Universal Brokerage FX.

966.   Following their telephone conversation, Loebel sent Schafer a letter about Universal Brokerage FX and its "financial planning and diversification through uncorrelated asset classes."   In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 447.

967.   The letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are insured by measures enacted by the Federal Government, exchanges and the firm itself.  Client funds are held in **segregated** accounts providing safety, security and the liquidity." Id.

968.   Loebel also sent Schafer a packet of materials regarding the foreign currency arbitrage program.  One brochure entitled, "Institutional Grade Investments for the Individual Investor," made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other

clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

969.    Another brochure entitled, "Capital Protected Fixed Yield Enhancement," represented the following about the foreign currency arbitrage program:  "Investment Safety—The 100 percent capital protected strategy means that investors are assured that the money they invest is fully protected from volatility at all times.  Client funds are held in segregated accounts with the largest, most well-established banks and foreign exchange institutions"; "Capital Protection—All currency exposure is hedged with an offsetting position…Because the transaction is done on the same inter-bank market, the positions offset, eliminating all market risk.  It is a 100 percent hedged position"; "Zero Volatility—No market exposure means that the account equity is not subject to the "ups and downs" of the market.  Similar to an odometer on a car, account balances only move in one direction—forward. Mathematics and account management guarantee that there is no risk or market exposure"; "Enhanced Returns—The strategy will outperform similar fixed income alternatives…The strategy is able to leverage interest bearing investments up to 2.5 times.  That means when average fixed income yields are at 4%, the strategy will net about 10%"; and "Daily Liquidity—Funds are generally available on short notice.  Client money is always held with the largest investment banks, commercial banks and FX institutions." See Exhibit 371.

970.    Another brochure entitled, "Currencies," also represented that the program provides "liquidity or access to your funds 24 hours per day," "stability," and "strong returns." See Exhibit 169.

971.    Based on these representations, Schafer invested in the program through Kiley and Universal Brokerage FX on April 17, 2009. To invest, Schafer sent a $100,000.00 check to Loebel at Universal Brokerage FX.   Per Loebel's instructions, Schafer made the check payable to "Crown" only, rather than Crown Forex SA.  Exhibit 448.

972.    In conjunction with her investment, Schafer completed a Crown Forex SA Customer Trading Agreement for Individual Accounts, and received statements from Universal Brokerage FX and, purportedly, Crown Forex SA via regular mail. Exhibits 449-450.

973.    In July 2009, Schafer received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing her of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that these entities "are unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

974.    Schafer immediately sent Universal Brokerage FX a withdrawal request for all funds, but she received no response and the request was not honored.  Exhibit 451.

975.    To date, Schafer has no access to her investment funds, and the only information she has regarding the existence and location of her funds is a check copy indicating that the funds were deposited into Crown Forex LLC's Associated Bank Account No. ******1705. See Exhibit 448.

**FFF.       Plaintiffs Leonard and Kathleen Wisner**

976.    Plaintiffs Leonard and Kathleen Wisner ("the Wisners") first learned of the foreign currency arbitrage program through Kiley's radio commercial.

977.    The Wisners contacted the number provided in the commercial for additional information regarding the foreign currency arbitrage program.  In response, the Wisners received a letter from Kiley and materials regarding the program.

978.    In his letter, Kiley discussed Universal Brokerage Services and its "financial planning and diversification through uncorrelated asset classes."  In the letter, Universal Brokerage Services was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 452.

979.    The letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are insured by measures enacted by the Federal Government, exchanges and the firm itself.  Customer funds are held in **segregated** accounts providing safety, security and the liquidity."  Id.

980.    The materials provided included a brochure entitled, "Institutional Grade Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

981.    Another handout showed UBS Diversified's Growth Portfolio as earning consistent double-digit returns.  Exhibit 452.

982.    In subsequent telephone calls, Kiley repeatedly stated that investments in the program were safe and secure because they were held in segregated accounts, and would earn 10-13% annual returns.  The Wisners also spoke with Cook and Michael Behm, a representative of Universal Brokerage, on a few occasions and they reiterated these representations.

983.    Based on these representations, the Wisners invested in the program through Kiley and Universal Brokerage Services in November 2007.  To invest, the Wisners rolled over $260,000.00 in IRA proceeds into self-directed IRAs with Millennium, which were then to be invested in the program through Universal Brokerage.  See, e.g., Exhibit 453.  The Wisners also wrote checks totaling $200,000 from their savings to invest in the program. The total amount of the Wisners' investment in the program is $312,512.00. Exhibit 453.

984.    In conjunction with their investments, the Wisners completed a Universal Brokerage Client Application, and received account statements from UBS Diversified and then later Universal Brokerage FX.  Exhibit 454.

985.    In late 2008 and early 2009, the Wisners contacted Kiley and expressed concerns about the investments and their desire to withdraw.  Subsequently, they were unable to reach Kiley.

986.    In July 2009, the Wisners received a letter from Millennium Trust Company informing them of this lawsuit.  The Wisners contacted Julia Smith several

times after learning of the lawsuit to request withdrawal of their funds and to speak directly with Kiley, but their requests were not honored and they were not able to speak with Kiley.  The Wisners asked Smith, "is this a scam?" and she did not respond.

987.    To date, the Wisners have no access to their funds and Defendants have provided no information regarding the existence and location of their investment.

**GGG.        Plaintiff David S. Smith**

988.    Plaintiff David Smith ("Smith") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in December 2007.  On his show, Kiley described the program as a very safe way to invest because he used the arbitrage program in a way that eliminated the risk.

989.    In December 2007, Smith called the telephone number provided on Kiley's radio show to obtain additional information on the program.  In response, Smith received a letter from Tim Daley, Senior Financial Strategist/Technical Analyst for Universal Brokerage FX.   In his letter, Daley described Universal Brokerage Services and its "financial planning and diversification through uncorrelated asset classes."  In the letter, Universal Brokerage Services was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 455.

990.    The letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are insured by measures

enacted by the Federal Government, exchanges and the firm itself.  Customer funds are held in **segregated** accounts providing safety, security and the liquidity."  Id.

991.   Smith also received a brochure entitled, "Institutional Investments for the Individual Investor, which made the following representations about the foreign currency arbitrage program: "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

992.   In a subsequent conversation with Kiley and Daley in February 2008, they reiterated that there was no risk to principal investments based upon their sophisticated method of managing money, and indicated that Smith could expect 10-12% annual returns.

993.   In an email dated February 8, 2008, Daley indicated that "Last year, we acquired a majority interest in the parent company of the hi-tech firm that we had been doing business and partnering with in the International Foreign Currency Market.  This acquisition not only solidifies our relationship with the hi-tech firm in Zurich that has unparalleled capability in the International Banking industry; but also, gives us additional ability to further enhance the profitability of our clients[.]"  Daley's email went on to state that, "the way trading is done, we do not expose our client funds to the market; therefore, there is no down side risk to the principle.  Bear in mind, there are non-

correlated assets; therefore, any "Crises" anywhere in the world (terrorist attacks or an equity exchange drop, like the 9% drop on the Shanghai Exchange the end of last February), only enhances our performance." Exhibit 456.

994.    Another email dated February 28, 2009, responded to an article about the "very large downside risks" associated with the foreign currency exchange, which Daley distinguished as "un-hedged" as opposed to their investments being "100% hedged." Exhibit 457.

995.    Other emails from Daley indicated that Universal Brokerage FX had purchased Crown Forex SA in Switzerland, and had a "firm" in Switzerland.  Exhibit 458.

996.    Based on these representations, Smith invested in the foreign currency program through Universal Brokerage FX in September 2008. To invest, Smith rolled over $434,862.90 in IRA proceeds into a self-directed IRA with Entrust, which was then to transfer the funds to Crown Forex SA in Switzerland. Exhibit 459.  The total amount of Smith's investment in the program is $444,335.20.

997.    In conjunction with his investment, Smith completed a Crown Forex SA Customer Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA. Exhibit 460-461.

998.    While Smith was completing the documentation for his account, he inquired with Daley about how the funds are invested and about getting online access to his accounts. Daley responded that, "They are managed in the Foreign Currency Market. And the way we do it there is no downside risk to the principle.  You will have access

online at the end of the first quarter (October, in your case)." In reality, Smith was only able to access his account online on one occasion.   Exhibit 462.

999.   After investing, Daley encouraged Smith to invest more in the program, stating "Remember, our clients received a 2.9% increase in the 3rd quarter.  With no downside to principle, the way we do it."  Exhibit 463.

1000. In April 2009, Smith was no longer receiving responses from Daley in regard to the status of online access.  In a subsequent conversation with Kiley, Smith was told that Kiley would be managing his account and that online access would be forthcoming.  Kiley again assured Smith that the foreign currency arbitrage program guaranteed no capital risk.

1001.  In July 2009, Smith received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing him of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that these entities "are unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

1002.  To date, Smith has no access to his funds, and the only information he has regarding the existence and location of his investment funds is a wire transfer document indicating that his funds were transferred from Entrust to Crown Forex LLC at Associated Bank Account No. ******1705. Exhibit 464.

1003.  Smith has received no information from Entrust as to why it failed to follow the instructions in his Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, and instead

transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC.  See Exhibit 459.

**HHH.**        **Plaintiff Thomas Rodeck**

1004.  Plaintiff Thomas Rodeck ("Rodeck") first learned of the foreign currency arbitrage program through the January 2006 International Forecaster newsletter, which featured information about Kiley and the program.

1005.  Subsequently, Rodeck contacted the telephone number for Kiley provided in the newsletter for additional information on the program.   In response, Rodeck received a letter from Kiley about Universal Brokerage Services and its "financial planning and diversification through the use of uncorrelated asset classes."  In the letter, Universal Brokerage Services was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 465.

1006. The letter also stated that "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, exchanges and the firm itself.  Customer funds are held in **segregated accounts** providing safety, security and the liquidity."  Id.

1007.  Based on these representations, Rodeck opened a currency trading account with Universal Brokerage Services in April 2006.   Universal Brokerage Services then opened a forex account with Peregrine Financial Group, Inc., in June 2006.  To invest, Rodeck wrote a check for $50,000.00 to Peregrine Financial Group.  Exhibit 466.

1008. In conjunction with his investment, Rodeck completed a Peregrine Financial Application and a Limited Power of Attorney to UBS Diversified, and received account statements from Peregrine Financial Group and UBS Diversified. Exhibits 467-468.

1009. In June 2008, UBS Diversified closed Rodeck's account with Peregrine Financial Group. Since that time, Rodeck has received quarterly account statements from Universal Brokerage FX, which show that the total amount of Rodeck's investment in the program is $74,197.00. See, e.g., Exhibit 469.

1010. On July 17, 2009, Rodeck requested a withdrawal of $50,000 from his account, but the only response he received was a form letter from Universal Brokerage FX/UBS Fund informing him of this lawsuit and indicating that they "are unable to fulfill withdrawal or redemption requests." Exhibit 470; see, e.g., Exhibit 13. Rodeck's telephone calls to Kiley and UBS were never returned.

1011. To date, Rodeck has no access to his funds, and Defendants have provided no information regarding the existence and location of his funds.

## III.      Plaintiff James DeVito

1012. Plaintiff James DeVito ("DeVito") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in May 2008.

1013. DeVito contacted the telephone number provided on the radio show to obtain additional information on the program. In response, DeVito received a brochure entitled, "Institutional Grade Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program: "Liquidity: All

positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds. Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." See Exhibit 69.

1014.  In October 2008, DeVito had a conversation with Kiley and Walter Buckner, a Universal Brokerage representative, regarding the program.  They represented that the principal investment would be protected, that the funds would be held in safe reputable banks, and that the investment could be expected to return a rate of investment between 7 and 21%.

1015.  Based on these representations, DeVito invested in the program through Kiley and Universal Brokerage FX.  In October 2008, DeVito personally invested by rolling over $40,000.00 in IRA proceeds into a self-directed IRA account with Entrust, which was then to be transferred to Crown Forex SA in Switzerland. Exhibit 471. In conjunction with this investment, DeVito completed a Crown Forex SA Currency Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA. Exhibits 472-473.

1016.  In October 2008, DeVito also invested in the program as trustee for the Diane Fleur Special Needs Trust.  To invest on behalf of the trust, DeVito rolled over $17,000.00 in IRA proceeds and endorsed the check "FBO Crown" with the understanding that the proceeds would be invested with Crown Forex SA.  Exhibit 474.

In conjunction with this investment, DeVito completed a Crown Forex SA Currency Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA. Exhibits 475-476.

1017. DeVito also invested in the program on behalf of the DeVito Living Trust. To invest, DeVito wrote the following two checks from the trust account:  (1) a $38,000.00 check dated October 22, 2008, payable to "Crown"; and (2) a $70,000.00 check dated December 29, 2008, payable to "Crown Forex." Exhibit 477.  DeVito was told that the funds would be invested with Crown Forex SA.  In conjunction with this investment, DeVito completed a Crown Forex SA Customer Trading Agreement for Individual Accounts, and received statements from Universal Brokerage FX and, purportedly, Crown Forex SA.  Exhibits 478-479. The total amount of DeVito's personal investment and investments on behalf of the trusts is $176,271.48.

1018. In March 2009, DeVito contacted Kiley after reading on the Internet that an investor was unable to withdraw his funds from Crown Forex SA.  Kiley assured him that the funds were not withdrawn because the particular investor was a felon in a foreign country.  Kiley represented that he could return the funds from the accounts at any time within 24 hours.

1019. In early July 2009, DeVito called Buckner to ask a question about his investment, but there was no answer and no way to leave a message.  DeVito then began calling different numbers at Universal Brokerage FX, but was only able to reach an answering service.  A few days later, DeVito realized that Kiley's radio show was not being broadcast at its normal time.

1020.  On July 24, 2009, DeVito received a letter from Universal Brokerage FX/UBS Fund informing him of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that they "are unable to fulfill withdrawal or redemption requests."  See Exhibit 13.

1021.  DeVito immediately filed a withdrawal request with Entrust, but he still has no access to his funds or the funds belonging to the trusts.  To date, the only information DeVito has regarding the existence and location of the investment funds are check copies and wire transfer instructions indicating that the funds were transferred to and deposited with Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA. See Exhibits 474, 477, 480.

1022.  DeVito has received no information from Entrust as to why it failed to follow the instructions in his Buy/Sell Direction Letter that his personal IRA funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC.  See Exhibit 471.

**JJJ.**        **Plaintiff Daniel Pillar**

1023.  Plaintiff Daniel Pillar first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening to on or about August 20, 2007.  On his radio show, Kiley represented that investments in the program were held in individual segregated accounts, were instantly liquid at any time, would earn double digit returns, and were insured up to $500,000.00.  Bob Chapman was a regular guest on Kiley's radio show, which further influenced Pillar to learn more about Kiley's foreign currency arbitrage program.

1024.  On or about October 22, 2007, Pillar called the telephone number provided on Kiley's radio show to obtain additional information about the program.  Pillar spoke with Michael Behm, who identified himself as Senior Investment Advisor for Universal Brokerage FX.

1025.  On or around October 24, 2007, Pillar (who used the name "Noah" when originally requesting information about the program) received a letter and materials about the program from Behm.  In his letter, Behm described Universal Brokerage Services and its "financial planning and diversification through uncorrelated asset classes."  In the letter, Universal Brokerage Services was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market. These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 481.

1026.  The letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1027.  The materials provided included a brochure entitled, "Institutional Grade Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name. Statements are issued quarterly.  Customer funds are held in segregated accounts—they

are not co-mingled with other clients' or company funds. Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." See Exhibit 69.

1028. Another brochure entitled, "Currencies," also represented that the program provides "liquidity or access to your funds 24 hours per day," "stability," and "strong returns." See Exhibit 129.

1029. A UBS Diversified brochure entitled, "Federal Funds Income Advantage," represented the program as "instantly liquid," "segregated account, not co-mingled with the general assets of the custodian, bank or dealer," "principal protected," and "current yield of 12%+ annually." The brochure also stated that "[t]he utilization of both our exclusive technology and unparalleled banking relationships negate all currency risks," and "[y]our principle [sic] is fully hedged by our liquidity providers and affiliate banks." The liquidity providers included Deutsche Bank, Dresdner Bank, Barclays Capital, UBS, JP Morgan, Saxo Bank, Bank of America and The Royal Bank of Scotland. See Exhibit 194.

1030. Based on these representations, Pillar invested in the program through Kiley and Universal Brokerage FX in November 2007. To invest, Pillar rolled over IRA proceeds in the amount of $27,462.30 into a self-directed IRA account with Millennium. Exhibit 482a. In January 2008, Pillar contributed an additional $5,000.00 in IRA proceeds to his account. Exhibit 482b. The total amount of Pillar's investment in the program is $32,462.30.

1031.  In conjunction with his investment, Pillar completed a Universal Brokerage Client Application with the assistance of Julia Smith, and received account statements from Universal Brokerage FX. Exhibit 482c.

1032.  After investing, Pillar spoke periodically with Universal Brokerage FX representatives Behm and Jared Jenkins about the status of his investment.  Following the Bernie Madoff scandal, Pillar contacted Jenkins to verify that his investment was secure and Jenkins assured him that the investment was safe.

1033.  Pillar first learned of potential problems with his investment in April 2009, when he read in Bob Chapman's International Forecaster that Kiley investors should contact Chapman immediately.  Pillar eventually contacted Chapman who indicated that he believed Kiley was perpetrating a "Ponzi scheme."

1034.  Pillar learned of this lawsuit in July 2009, when he was listening to a radio program on which Chapman was a guest.  Pillar located the Star Tribune articles regarding the lawsuit and then immediately contacted Universal Brokerage FX to demand withdrawal of his funds.  The individual that Pillar reached indicated that she could not provide any information about Kiley or the status of Pillar's account.   Pillar continued to call Kiley and leave messages demanding return of his funds, but these calls were not returned.  On the third day of attempting to reach Kiley, the phone line was disconnected.

1035.  To date, Pillar's withdrawal requests have not been honored and he has no access to his funds.  Defendants have offered no information regarding the existence and location of his investment funds.

**KKK.**          **Plaintiff Myonghui Gass**

1036.  Plaintiff Myonghui Gass ("Gass") first learned of the foreign currency arbitrage program through Kiley's radio show, to which she began listening in October 2008.

1037.  In November 2008, Gass contacted the telephone number provided on the radio show to obtain additional information regarding the program.  In her subsequent conversation with Kiley, investments in the program were represented as instantly liquid, principal protected, held in segregated accounts, and would earn double-digit returns.

1038.  Based on these representations, Gass invested in the program through Universal Brokerage FX, which she understood would then establish an account on her behalf with Crown Forex SA. To invest, Gass wrote a $34,000.00 check dated December 11, 2008, which she made payable to "Crown," per Kiley's instructions.  Exhibit 483.

1039.  In conjunction with her investment, Gass completed a Crown Forex SA Customer Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA. Exhibits 483a-483b.

1040.  In late July 2009, Gass received a letter from Universal Brokerage FX/UBS Fund informing her of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that they "are unable to fulfill withdrawal or redemption requests." See Exhibit 13.

1041.  To date, Gass has no access to her investment funds and the only information she has regarding the existence and location of her funds is a check copy indicating that the funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA.  See Exhibit 483.

**LLL.**          **Plaintiff Jan Anderson**

1042.  Plaintiff Jan Anderson ("Anderson") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in 2006.

1043.  Anderson called the telephone number provided on Kiley's radio show for additional information on the program.  In response, Anderson received a letter from Kiley describing Universal Brokerage Services and its "financial planning and diversification through uncorrelated asset classes."  In the letter, Universal Brokerage Services was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 484.

1044.  The letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1045.  Anderson also received materials from Kiley regarding the foreign currency arbitrage program, including a brochure entitled, "Institutional Grade Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on 24 hours basis. Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled

with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

1046.  In early 2007, Anderson had conversations with Kiley regarding the program.  Kiley indicated that this investment opportunity was previously only available to corporations, but that it was now open to small investors and the general public.  Kiley indicated that Anderson was "lucky" to have the opportunity to invest with Kiley and Universal Brokerage Services.

1047.  During their conversations, Kiley represented that investments in the program would earn above 11% annual returns, were held in segregated accounts, were instantly liquid 24 hours a day, seven days a week, and offered safety and security.  Kiley also represented that if Anderson's account was ever in trouble, the funds would be automatically transferred to a Swiss bank owned by Universal Brokerage Services.  Kiley indicated that Anderson would never have to worry about his money because, "we take care of your money and you take care of yourself and your daily business."

1048.  Based on these representations, Anderson invested in the program through Kiley and Universal Brokerage in March 2007.  To invest, Anderson initially sent Kiley a $34,000.00 cashier's check dated March 16, 2007, payable to "UBS Diversified." Exhibit 484a.

1049.  In conjunction with his investment, Anderson completed a UBS Diversified Growth Application and Subscription Agreement with the assistance of Julia Smith, and received account statements from Universal Brokerage FX.  Exhibits 484b-484c.

1050. In March 2008, Anderson invested additional funds in this account by writing checks in the amount of $14,900.00 and $16,983.00, payable to UBS Diversified. Exhibit 485. The total amount of Anderson's investment in the program is $74, 928.00.

1051. Anderson first learned that there were potential problems with his investment when Kiley stopped appearing on his radio program and his website shut down. Subsequently, Anderson received a letter from Universal Brokerage FX/UBS Fund informing him of this lawsuit and that they "are unable to fulfill withdrawal or redemption requests." See Exhibit 13.

1052. To date, Anderson has no access to his funds and the only information he has regarding the existence and location of his funds is a check copy indicating that his funds were deposited into Universal Brokerage FX Management LLC's Associated Bank Account No. ******5601. Exhibit 486.

**MMM.      Plaintiffs Paul and Melissa Grusche**

1053. Plaintiffs Paul and Melissa Grusche ("the P. Grusches") first learned of the foreign currency arbitrage program in March 2007 through Plaintiffs Harry and Sandy Grusche, who listened to Kiley's radio show.

1054. Subsequently, the P. Grusches visited Kiley's website. When Harry Grusche, the father of Paul Grusche, informed Kiley that his son was interested in investing in the program, Kiley indicated that Paul Grusche should contact him. The P. Grusches then called Kiley to obtain additional information on the program. In response, the P. Grusches received a letter and materials from Kiley. Exhibits 487-488.

1055. In his letter, Kiley described Universal Brokerage FX and its "financial planning and diversification through uncorrelated asset classes."  Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 487.

1056. The letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1057. Included in the materials provided the P. Grusches was a brochure entitled, "Institutional Grade Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds. Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

1058. Another brochure entitled, "Currencies," further described the benefits of the foreign currency arbitrage program.  See Exhibit 80.

1059. In a telephone conversation with Kiley in May 2008, Kiley guaranteed a return of 10-12% on investments in the program, but indicated that investments were experiencing returns of 25% or more during certain quarters. Kiley stated that he was expecting 25% returns in the future given fluctuations in the currency exchange.  As Kiley explained, the greater the changes in currency exchanges, the more investors stand to make.

1060. During their conversation, Kiley represented that the principal investment was always secure and investors could not lose the principal amount invested.  He also represented that investments funds could be withdrawn at any time.  When asked about the amount of money under his control, Kiley stated, "oh, billions."

1061. Based on these representations, the P. Grusches invested in the program through Universal Brokerage FX in June 2008.  To invest, the P. Grusches wrote a personal check to Universal Brokerage in the amount of $30,000.00, which represented proceeds from the sale of a cabin.  Exhibit 488.

1062. In conjunction with their investment, the P. Grusches completed a Universal Brokerage Client Application and entered into a Universal Brokerage General Business Terms Currency Exchange Agreement, which stated that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and "appropriate stops set so that no single transaction shall risk more than 2% of the Customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance." Exhibits 489-490.

1063.  The P. Grusches received quarterly account statements from Universal Brokerage FX via regular mail, which showed the total amount of their investment in the program as $31,318.00.  Exhibit 491.

1064.  On July 21, 2009, the P. Grusches received a letter from Universal Brokerage FX/UBS Fund, which informed them of this lawsuit and that they "are unable to fulfill withdrawal or redemption requests."  See Exhibit 13.

1065.  To date, the P. Grusches have no access to their investment funds, and the only information they have regarding the existence and location of their funds is a check copy indicating that the funds were deposited into Universal Brokerage FX Management LLC's Associated Bank Account No. ******5601.  See Exhibit 488.

## NNN.        Plaintiff Gunvant Bhatt

1066.  Plaintiff Gunvant Bhatt ("Bhatt") first learned of the foreign currency arbitrage program through Erickson, who contacted him about investing in the program in 2007.  Erickson was referred to Bhatt by Bhatt's acquaintance who was a client of Oxford Private client Group.  Throughout 2007, Erickson contacted Bhatt twice a month about investing in the program through Oxford.

1067.  During their conversations, Erickson represented that investments in the program guaranteed no loss of principal, earned 12% returns for Non-IRA accounts and 10.5% returns for IRA accounts, and was the safest investment available.

1068.  In January 2008, Bhatt met Beckman twice and Erickson once at restaurants to discuss the program. At these meetings, Beckman represented that investments in the program had a guaranteed principal and would earn safe returns.  Both

Beckman and Erickson represented that they owned the foreign currency arbitrage operations through Oxford, and never differentiated between the various Oxford entities.

1069. Bhatt also received materials from Erickson and Beckman regarding the program. One brochure entitled "The Oxford Portfolio 2008: Overview," represented that program allowed investors to "maintain liquidity as a buyer during this bear period to position for next bull cycle" and to "focus on yield short-term and build for growth long-term." Other documents from Oxford Global Advisors represented the "protected capital level" as 100%, and indicated that investments in the program would provide an annual return of +10.5%. Exhibit 492.

1070. The brochure entitled, "A Global Enhanced Return Strategy," represented that investment in the program is safe because funds are held in individual segregated accounts with well-established, well-capitalized investment and commercial banks, and because the program reduces market exposure. The brochure also represented that funds are "available on short notice," and that the program provides consistent yields and enhanced returns. Exhibit 493.

1071. Based on these representations, Bhatt invested in the program through Erickson, Beckman and Oxford Global Advisors in January 2008, which was then to establish an account for Bhatt with Crown Forex SA. To invest, Bhatt initially sent a check for $200,000.00, payable to "Oxford Global Advisors," to establish a non-IRA account. Exhibit 494.

1072. In conjunction with this initial investment, Bhatt completed a Crown Forex Customer Trading Agreement for Individual Accounts; a Western International Securities

Client Agreement; a Bear Stearns Customer Agreement and Certificate of Limited Trading Authorization, permitting Beckman and Oxford Private Client Group to buy and sell securities and commodities on his behalf; and an Investment Management Agreement with Oxford Private Client Group. Exhibit 495.

1073.  Bhatt received statements for this account from "The Oxford," "Oxford Global Advisors," and, purportedly, Crown Forex SA. Exhibit 496. Bhatt was also able to view his account online.  Bhatt received monthly distributions from his non-IRA account. The monthly distributions were in the form of checks from Oxford Global Advisors, and any problems with the disbursements were handled by Erickson and Beckman.  Exhibit 497. Other distributions came from wire transfers and checks from a "Client Disbursement Account" at Associated Bank.  Exhibit 498.

1074.  In May 2008, Bhatt further invested in the program through Oxford Global Advisors by rolling over IRA proceeds in the amount of $200,000.00 into a self-directed IRA account with Entrust, which was then to transfer the funds to Crown Forex SA. Exhibit 499.

1075.  In conjunction with this investment, Bhatt completed a Crown Forex SA Customer Trading Agreement for Individual Accounts; a Western International Securities Client Agreement; and a Bear Stearns Individual Retirement Account Application, Customer Agreement, and Certificate of Limited Trading Authorization permitting Beckman to trade securities and commodities on his behalf.  Exhibit 500.  Bhatt was able to view the statements for his IRA-account online.  Exhibit 501.

1076.  Bhatt received monthly distributions from his IRA-account, which came in the form of checks from Entrust.  Exhibit 502.  Beckman and Erickson also handled any issues relating to these distributions. Exhibit 503.  In October 2008, however, Erickson was replaced by Jitesh Mehta at Oxford Private Client Group. Exhibit 504.

1077.  Bhatt first learned of potential problems with his investments on July 7, 2009, when he read a Star Tribune article about the lawsuit and Crown Forex SA's bankruptcy.  Bhatt immediately completed and returned withdrawal forms to Oxford Private Client Group, which were processed by Erickson and then submitted to Cook for payment.  Exhibit 505.  Bhatt also submitted withdrawal requests to Entrust, and to the Crown Forex SA trustees. Exhibit 506.

1078.  To date, Bhatt's withdrawal requests have not been honored and he has no access to his funds.  The only information Bhatt has regarding the existence and location of his funds are check copies indicating that his funds were deposited into Oxford Global Advisors, LLC's Well Fargo Account No. ******5606, and wire transfer documents indicating that Bhatt's funds were deposited into and distributed from Crown Forex LLC, rather than Crown Forex SA. See, e.g., Exhibits 494, 498, 507.

## OOO.        Plaintiff Karen L. Gladstone

1079.  Plaintiff Karen Gladstone ("Gladstone") first learned of the foreign currency arbitrage program in fall 2008 through an acquaintance who had invested in the program.

1080.  In  September  2008,  Gladstone  contacted  Beckman  for  additional information regarding the program.  During their conversation, Beckman represented that

investments in the program are instantly liquid and, if the equity markets came back, he would withdraw the funds from the program and switch her account over to the equity side.

1081.  In subsequent conversations with Beckman and Erickson in October 2008, Gladstone was told that investments in the program were guaranteed to earn a 10.5% rate of return.

1082.  Based on these representations, Gladstone invested in the program by rolling over $138,623.19 in IRA proceeds into a self-directed IRA account with Entrust, which was then to invest the funds with Crown Forex SA in Switzerland.  Exhibit 508.

1083.  Gladstone first learned of this lawsuit from Beckman's attorney.  Gladstone immediately submitted a withdrawal form seeking closure of her account and return of all funds therein.  Exhibit 509.

1084.  To date, Gladstone's withdrawal request has not been honored and she has no access to her funds.  The only information Gladstone has regarding the existence and location of her funds are wire transfer documents indicating that Entrust transferred her funds to Crown Forex LLC at Associated Bank Account No. ******1705.  Exhibit 510.

1085.  Gladstone has received no information from Entrust as to why her account statement reflected a transfer to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, when it actually transferred her IRA funds to a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC.  See Exhibit 508.

**PPP.**          **Plaintiff Robert Pajor**

1086. Plaintiff Robert Pajor ("Pajor") first learned of the foreign currency arbitrage program through Pettengill, an associate of Beckman, in June 2006. At this time, Beckman was managing some of Pajor's personal investments and an account for the Pajor Family Foundation.

1087. Throughout 2006, Pettengill pitched investment in the foreign currency arbitrage program to Pajor as "a fixed-return, risk-free currency program." Pettengill indicated that the only possible risk was if one of the two countries involved in the trade defaulted on their currency, but that this was remote because they did not use currency of countries that were not financially strong. Pettengill stated that investments in the program returned a fixed 12% per year and were completely safe.

1088. Pajor also discussed the program with Beckman, who then took Pajor to the Van Dusen mansion to meet Cook for further discussion regarding how the investment worked. Both Beckman and Cook represented investments in the program were absolutely and completely safe. When Pajor asked, "is there any possible way I could lose money in this investment," he was told that the only way this could occur is if one of the countries whose currency was used in the hedge defaulted on that currency. Like Pettengill, Beckman and Cook indicated that this was not a real risk because they only used currency of financially strong countries in the program.

1089. On February 16, 2007, Pajor received from Beckman the requisite documentation for investing in the program, which Beckman instructed him to complete and return. Pajor did not complete the documentation at that time.

1090. In March 2007, Pajor decided to invest in the program through Oxford based on the representations of Pettengill, Beckman and Cook.   To invest, Pajor transferred $229,127.33 in IRA proceeds into a self-directed IRA account that Pettengill established for him at Southwest Securities.   Pettengill was then to use the funds in the IRA to invest in the foreign currency arbitrage program; however, Pettengill failed to invest the funds for several months and offered no explanation for this failure.   In conjunction with this investment, Pajor received account statements from Crown Forex SA. Exhibit 511.

1091. On July 20, 2007, Pajor made additional investments in the program through Oxford both as a Trustee for the Pajor Family Foundation and jointly with his wife. Pajor wrote a check for $270,000.00 to be invested on the Pajor Family Foundation's behalf into the foreign currency arbitrage program.   The check was made payable to "UBS" and was then to be invested in the program through Crown Forex SA. For the joint account with his wife, Pajor wrote a $500,000.00 check payable to "UBS," and the funds were then to be invested in the program through Crown Forex SA.   Exhibit 512.

1092. In conjunction with these investments, Pajor received account statements for the Pajor Family Foundation purportedly from Crown Forex SA. Exhibit 513.   In conjunction with the joint account with his wife, Pajor received accounts statements from UBS Diversified, The Oxford, Oxford Global Advisors, Oxford Global Partners and, purportedly, Crown Forex SA.   Exhibit 514.   The account statements from Oxford Global Advisors and Oxford Global Partners included the following information:   "Please

contact Bo Beckman or Chris Pettengill with questions." At the time, Pajor was not required to complete any agreements or documentation related to these two new accounts.

1093. In August 2007, Pettengill and Beckman indicated Oxford wanted to transfer Pajor's personal IRA account from Southwest Securities to Millennium. Pajor agreed, and IRA funds totaling $231,087.18 were transferred to Millennium on August 29, 2007. Exhibit 515. On September 21, 2007, 229,000 shares at $1.00 per share of UBS Diversified FX Growth LP were purchased from the IRA funds at Millennium. Exhibit 516.

1094. In December 2007, Pettengill, without authorization, put in a request for a minimum distribution of $6,858.00 from the IRA account. See Exhibit 516. The requested distribution was sent to Millennium, and Pajor instructed that the funds remain with Millennium because he did not request or need the distribution.

1095. In fall 2008, Pajor discussed with Beckman that he should either get out of the foreign currency arbitrage program or invest more money in the program, depending on the safety of the investment. Despite describing himself "as an equities guy," Beckman encouraged Pajor to invest all of his funds in the foreign currency program. Beckman again assured Pajor that he could not lose money in this investment.

1096. On October 3, 2008, Pajor invested an additional $200,000.00 into the Pajor Family Foundation's Crown Forex SA account, and an additional $400,000.00 into his joint Crown Forex SA account. Exhibit 517. At this time, Beckman requested that

Pajor complete Crown Forex SA Currency Trading Agreements and Management Agreements with Oxford Global Advisors for each account. See, e.g., Exhibits 518-519.

1097. In October 2008, Beckman indicated that he wanted to transfer Pajor's personal IRA account to Entrust, and Pajor agreed to the transfer. Exhibit 520. On December 10, 2008, at Pajor's request, Entrust received a $43,641 "2008 minimum distribution" and remitted the distribution to Pajor. Id.

1098. On December 15, 2008, Entrust received a check for $8,447.83, which represented the amount plus interest that remained in the Millennium account after Pettengill requested the unauthorized distribution in December 2007. Two days later, there was an asset purchase in this same amount for Crown Forex SA in Switzerland, which Pajor did not request or authorize. See Exhibit 520.

1099. On January 14, 2009, a "Free Receipt Asset" was received by Entrust as a retile from Millennium in the amount of $256,064.00; however, this amount was incorrect and a correcting entry of $24,898.27 was purportedly made by Crown Forex SA in Switzerland. Id. However, Entrust personnel subsequently indicated that the correcting entry was provided to them by Oxford representative Ryan Moeller.

1100. In February 2009, Pajor contacted Beckman regarding issues with the periodic values that were being reported on his three accounts, in response to which Beckman provided an email explanation from Trevor Cook. Exhibit 521. Because the response did not address other inconsistencies with the accounts, Pajor subsequently had a meeting with Beckman and Cook. As a result of this meeting, Pajor received credits/adjustments on the three accounts. Exhibit 522.

1101.  In March 2009, Pajor and his accountant began inquiring with Beckman about the tax implications of these investments.  In response, Pajor received a Currency Strategy summary from Cook, which reiterated that "the client brokerage account is fully segregated account and not commingled with or hypothecated against other funds.  Accounts have daily liquidity," and that "the long and short order result in a fully hedged position that eliminates any foreign exchange fluctuation risk."  Exhibit 523.

1102.  On June 4, 2009, Pajor withdrew $1,000,000.00 from his employee deferred compensation plan, and wired the post-tax amount of $687,500.00 for investment in his Crown Forex SA joint account.  Exhibit 524.   The total amount of Pajor's investments in the program, personally, jointly and as trustee for the Pajor Family Foundation, is $2,462,850.70. See, e.g., Exhibits 511, 513-514, 524.

1103.  In July 2009, Pajor learned of this lawsuit by reading an article in the Star Tribune.  Pajor immediately contacted Beckman who provided him withdrawal forms, and indicated that it would take a few days for the funds to be received.  Pajor completed the withdrawal forms and submitted them to Erickson at Oxford Private Client Group. Exhibit 525.

1104.  On July 20, 2009, Pajor received an email from Beckman attaching an email from Crown Forex SA's CEO Shadi Swais.  Swais' email was a response to Beckman's inquiry in May 2009 about the FINMA investigation of Crown Forex SA, to which Swais responded, "the problem we have with FINAL concerns only a few clients that we had in the past…Crown Forex is doing well as usual, and your client's [sic] investments are safe."  Exhibit 526.

1105.  On July 20, 2009, Pajor also submitted a withdrawal request to Entrust seeking to have all assets transferred out of the Crown Forex SA investment.  Exhibit 527.  In a conversation with an Entrust representative, Pajor was told that the bank accounts for the currency program were apparently fictitious.

1106.  On July 21, 2009, Pajor received letters from Oxford Global Partners, LLC, and Universal Brokerage FX/UBS Fund informing him of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that they "are unable to fulfill withdrawal or redemption requests."  See Exhibit 13.

1107.  In subsequent emails communications from Beckman and Beckman's counsel, Pajor was told that Beckman was searching for investor funds in Switzerland and that Oxford Private Client Group was in the process of verifying client account information.  Beckman told Pajor that he would provide copies of Pajor's investment documents, but Pajor has yet to receive this documentation.  Exhibit 528.

1108.  To date, Pajor's withdrawal requests have not been honored and he has no access to the funds he invested through Oxford personally, jointly, and as a trustee.  The only information Pajor has regarding the existence and location of the investment funds are wire transfer instructions provided by Oxford directed his funds to Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA. See Exhibit 524. A wire transfer verification form confirms that Entrust wired funds to Crown Forex LLC's domestic bank account in Green Bay, Wisconsin, rather than to Crown Forex SA in Switzerland.  Exhibit 529.

**QQQ.**      **Plaintiff David W. Nielsen**

1109. Plaintiff David Nielsen ("Nielsen") first learned of the foreign currency arbitrage program through his brother-in-law, who had been investing with Cook for many years.

1110. Nielsen decided to learn more about the program after his nephew, Kyle Garman, began working for Oxford Global Advisors in 2007.  In October 2007, Nielsen received a letter from Oxford Global Advisors that described the program as offering "principal-protected annual yield of 12 percent." Exhibit 530.

1111. In December 2007, Nielsen met with Garman and Beckman to discuss investing in the program.  During this meeting, Beckman devised an investment strategy whereby Nielsen would transfer his 401k funds into an IRA managed by Beckman, with the bulk of the funds being invested in the foreign currency arbitrage program until Beckman determined that the stock market had improved sufficiently to transfer the funds into equities.

1112.  During subsequent telephone calls and meetings with Garman and Cook in late 2008 and early 2009, it was represented to Nielsen that investments in the program earned a 10.5% fixed rate of return, were principal protected, always liquid, and held in segregated individual accounts.

1113.  Throughout 2008 and early 2009, Nielsen also attended investment seminars at Oxford.  At these seminars, Beckman, Pettengill, Durand and others affiliated with the Oxford Companies advised investors to place their funds in the foreign currency

arbitrage program because the principal would be protected and the program was much safer than the stock market in the near term.

1114. Nielsen also received materials from Oxford regarding the program.  One brochure entitled, "Capital Fixed Yield Enhancement," represented the following about the foreign currency arbitrage program:  "Investment Safety—The 100 percent capital protected strategy means that investors are assured that the money they invest is fully protected from volatility at all times.  Client funds are held in segregated accounts with the largest, most well-established banks and foreign exchange institutions"; "Capital Protection—All currency exposure is hedged with an offsetting position…Because the transaction is done on the same inter-bank market, the positions offset, eliminating all market risk.  It is a 100 percent hedged position"; "Zero Volatility—No market exposure means that the account equity is not subject to the "ups and downs" of the market. Similar to an odometer on a car, account balances only move in one direction—forward. Mathematics and account management guarantee that there is no risk or market exposure"; "Enhanced Returns—The strategy will outperform similar fixed income alternatives…The strategy is able to leverage interest bearing investments up to 2.5 times. That means when average fixed income yields are at 4%, the strategy will net about 10%"; and "Daily Liquidity—Funds are generally available on short notice.  Client money is always held with the largest investment banks, commercial banks and FX institutions." See Exhibit 371.

1115. Another brochure was entitled, "Oxford Global Partners: Prudent Management, Diversified Approach, Long-Term Focused, Capital Preservation, Global

Scope." In this brochure, Oxford emphasized its "focus on capital preservation, superior yields, and secure long-term returns," and stated that "all our investment strategies—and all our strategic alliances—are designed to generate enhanced yield and dependable performance." See Exhibit 78.

1116. Another Oxford brochure entitled, "Oxford Global Advisors: Federal Funds Income Advantage," represented the program as "instantly liquid," "segregated account, not co-mingled with the general assets of the custodian, bank or dealer," "principal protected," and "current yield of 12%+ annually." The brochure also stated that "[y]our principle [sic] is fully hedged by our liquidity providers and affiliate banks." The liquidity providers included Deutsche Bank, Dresdner Bank, Barclays Capital, UBS, JP Morgan, Saxo Bank, Bank of America and The Royal Bank of Scotland. Exhibit 530a.

1117. Based on these representations, Nielsen first invested in the program through Oxford in February 2008. To invest, Nielsen rolled over 401(k) funds in the amount of $155,000.00 into a self-directed IRA with Millennium, which was then to be invested in the program through Oxford. Exhibit 531. Subsequently, the custodian of the self-directed IRA changed from Millennium to Entrust.

1118. In conjunction with his investment, Nielsen originally received account statements from "The Oxford" in the mail, and then subsequently received online statements from Entrust and, purportedly, Crown Forex SA. See, e.g., Exhibits 532-533. To access his Crown Forex SA statements online, Nielsen downloaded a platform from the crownforex.com website, which he did with the assistance of Garman.

1119.  In November 2008, Nielsen invested additional funds in the program through Oxford, which was then to be traded through Crown Forex SA.  To invest, Nielsen wrote a check for $20,000.00, payable to "Crown Forex." Exhibit 534.  The total amount of Nielsen's investment in the program is $198,282.

1120.  In conjunction with this investment, Nielsen completed a Crown Forex SA Customer Trading Agreement for Individual Accounts, a Crown Forex SA Customer Order Authorization and Limited Power of Attorney permitting Oxford Global Advisors to act on his behalf, and an Oxford Global Advisors Management Agreement.  Exhibits 535-536.  Nielsen accessed his account statements for this investment online through the downloaded platform. Exhibit 537.

1121.  In early July 2009, Nielsen first learned of this lawsuit after reading an article in the Star Tribune. Nielsen immediately contacted Garman to discuss the situation, but he was unable to provide much information regarding the status of Nielsen's investments.  Nielsen also called Cook on multiple occasions, but his calls were not returned.

1122.  In late July 2009, Nielsen received letters from Oxford Global Partners, LLC, and Universal Brokerage FX/UBS Fund informing him of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that these entities "are unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

1123.  To date, Nielsen has no access to his investment funds, and the only information he has regarding the existence and location of his funds are check copies

indicating that his funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA. See Exhibit 534.

**RRR.**      **Plaintiff Stephen Laube**

1124. Plaintiff Stephen Laube ("Laube") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in June 2008.

1125. In August 2008, Laube called the telephone number and emailed the address provided on Kiley's radio show for additional information on the program.  In response, Laube received a telephone call from John Loebel, a Universal Brokerage FX representative.

1126. During their August 2008 conversation, Loebel represented that investments in the program were held in segregated accounts, fully liquid, and involved no risk to principal. Loebel described the investment as "guaranteed protection of principal."

1127. Based on these representations, Laube invested in the program through Kiley and Universal Brokerage FX in September 2008.  Laube understood that Kiley and Universal Brokerage would invest his funds through Crown Forex SA, which Loebel had represented was a Swiss bank owned by Universal Brokerage FX.

1128. To invest, Laube rolled over IRA proceeds in the amount of $80,000.00 into a self-directed IRA with Entrust, which was then to transfer the funds to Crown Forex SA in Switzerland.  Exhibit 538.  Laube also established a cash account by writing a personal check in the amount of $20,000.00, which he made payable to "Crown," per

Loebel's instructions. Exhibit 539.   The total amount of Laube's investment in the program is $101,690.81.

1129.  In conjunction with his investments, Laube completed Crown Forex SA Customer Trading Agreements for Individual Accounts, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA.  See Exhibits 540-542.

1130.  On July 23, 2009, Laube learned of this lawsuit when he read an article in the Star Tribune.  When he visited the Universal Brokerage FX, Laube saw the "client notice," informing investors of the lawsuit, Crown Forex SA's bankruptcy proceedings, and that Universal Brokerage FX is "unable to fulfill withdrawal or redemption requests." See, e.g., Exhibit 28.

1131.  Laube called and emailed Universal Brokerage FX to inquire about the status of his investment, but he received no responses in return.

1132.  To date, Laube has no access to his investment funds and the only information he has regarding the existence and location of his funds are wire transfer documents indicating that his funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA.  Exhibit 543.

1133.  Laube has received no information from Entrust as to why it failed to follow the instructions in his Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, Crown Forex SA at St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC.  See Exhibit 538.

SSS.          **Plaintiff Michael S. McGonnell**

1134.  Plaintiff Michael "Shane" McGonnell ("McGonnell") first learned of the foreign currency arbitrage program through an acquaintance.

1135.  In September 2008, McGonnell listened to Kiley's radio show and visited his website for additional information about the program. McGonnell called the telephone number and emailed the address provided on the radio and website, and received in response a letter from H. Victor Penn, a Universal Brokerage FX representative.

1136.  In his letter, Penn described Universal Brokerage FX and its "financial planning and diversification strategies through the use of uncorrelated asset classes."  In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 544.

1137.  Penn's letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1138.  McGonnell also received an investment brochure from Universal Brokerage FX entitled, "Institutional Grade Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program:  "Liquidity: All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial

bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds. Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

1139.  In late September, McGonnell spoke directly with Kiley regarding the foreign currency arbitrage program.  Kiley represented that investments in the program were fully liquid, principal protected, and would earn a minimum of 11% annual returns.

1140.  Based on these representations, McGonnell invested in the program through Kiley and Universal Brokerage FX in October 2008.  To invest, McGonnell rolled over $47,088.73 in IRA proceeds into a self-directed IRA account with Entrust, which was then to invest the funds with Crown Forex SA in Switzerland.  Exhibit 545.  The total amount of McGonnell's investment in the program is $47,382.71.

1141.  In conjunction with his investment, McGonnell completed a Crown Forex SA Customer Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA.  McGonnell was also able to access his accounts online through crownforex.com.  Exhibits 546-547.

1142.  In July 2009, McGonnell learned of this lawsuit through a friend, and then received a letter from Universal Brokerage FX/UBS Fund informing him of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that they "are unable to fulfill withdrawal or redemption requests." See Exhibit 13.

1143.  McGonnell then contacted the Crown Forex SA trustees for information regarding the status of his account, who informed him that the account number he

received from Universal Brokerage FX was not an actual Crown Forex SA account number, and that Crown Forex SA had never received any of his funds.

1144.  To date, McGonnell has no access to his investment funds and the only information he has regarding the existence and location of his funds is wire transfer documents indicating that the funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA.  Exhibit 548.

1145.  When McGonnell requested information as to why Entrust failed to follow the instructions in his Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, Crown Forex SA at St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC, he was told that Entrust acted upon the directive of Universal Brokerage FX.  McGonnell never signed an authorization permitting Universal Brokerage FX to direct his investments, and the only authority given to Universal Brokerage FX was to view his account. Exhibit 549.

**TTT.**       **Plaintiffs Bill and Emma Jean Hunt**

1146.  Plaintiff Bill Hunt and Emma Jean Hunt ("the Hunts") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they began listening in mid-2007.

1147.  Subsequently, the Hunts emailed the address provided on Kiley's radio show to obtain additional information on the program.  In response, the Hunts received a letter from Kiley and materials concerning the investment program in late 2007.  Exhibit 550.

1148. In his letter, Kiley described Universal Brokerage Services and its "financial planning and diversification through uncorrelated asset classes." In the letter, Universal Brokerage Services was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market. These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 550.

1149. Kiley's letter also stated that, "Financial security is paramount to every investor. The safety and integrity of customer funds on deposit are insured by measures enacted by the Federal Government, exchanges and the firm itself. Customer funds are held in segregated accounts providing safety, security and the liquidity." Id.

1150. Included in the materials received was a brochure entitled, "Institutional Investments for the Individual Investor, which made the following representations about the foreign currency arbitrage program: "Liquidity: All positions are 100% liquid on 24 hours basis. Trading Discipline: 100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name. Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds. Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." See Exhibit 69.

1151. Another brochure entitled, "Saxo Bank Capital Guaranteed Bond," described the foreign currency arbitrage program as providing "the security of a guaranteed 100% return of their initial investment." See Exhibit 435.

1152.  In January 2008, the Hunts had telephone conversations with Kiley and Seiwert, during which Kiley and Seiwert represented that investments in the program would be held in separate segregated accounts, were fully liquid 24 hour a day, seven days a week, were insured up to $250,000.00, would earn guaranteed annual returns of 10-12% or more, and involved no risk to principal.

1153.  Kiley and Seiwert also provided the Hunts with Universal Brokerage Client Applications, and a Universal Brokerage General Business Terms Currency Exchange Agreement, which stated funds are held by major institutions in segregated accounts, "customer funds are segregated from the general assets of the Company and the pass thru Bank" and "appropriate stops set so that no single transaction shall risk more than 2% of the customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance."  Exhibit 551.

1154.  Based on these representations, the Hunts invested in the program through Kiley and Universal Brokerage FX in February 2008.  To invest, the Hunts transferred $200,000 into a joint cash account, and IRA funds of $46,884.44 into a self-directed IRA account with Millennium.  Exhibits 552-553.  The total amount of the Hunts' investment in the program is $264,230.00.

1155.  In conjunction with their investments, the Hunts completed Universal Brokerage Applications for each account, and the Universal Brokerage General Business Terms Currency Exchange Agreement. See Exhibit 551. The Hunts received account statements from Universal Brokerage FX via mail. Exhibit 554.

1156.  In July 2009, the Hunts received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing them of this lawsuit, the Crown Forex SA bankruptcy proceedings, and indicating that these entities "are unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

1157.  The Hunts immediately attempted to contact Universal Brokerage FX and Millennium, but have been unsuccessful in obtaining any meaningful information about the status of their investments.

1158.  To date, the Hunts have no access to their funds and Defendants have provided no information regarding the existence and location of their investments.

UUU.       **Plaintiff Mary Eisenbarth**

1159.  Plaintiff Mary Eisenbarth ("Eisenbarth") first learned of the foreign currency arbitrage program through Kiley's radio show, to which she and her husband began listening in 2006.

1160.  In late 2007, the Eisenbarths called the telephone number provided on Kiley's radio show for additional information on the program.  During two subsequent conversations, Kiley represented that investments in the program provided no risk to principal and double digit returns.

1161.  The Eisenbarths also received a letter from Universal Brokerage FX representative Michael Behm, which described Universal Brokerage FX and its "financial planning and diversification strategies through the use of uncorrelated asset classes."  In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market.  These

managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 555.

1162. Behm's letter also stated that, "Financial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1163. Based on these representations, Eisenbarth invested in the program through Kiley and Universal Brokerage FX in February 2008. To invest, Eisenbarth rolled over $72,564.82 in 403(B) retirement proceeds into a self-directed IRA account with Millennium. Exhibit 556. The total amount of Eisenbarth's investment in the program is $75,836.00.

1164. In conjunction with her investment, Eisenbarth completed a Universal Brokerage FX Client Application, and received account statements from Universal Brokerage FX. Exhibits 557-558.

1165. The Eisenbarths learned of this lawsuit in July 2009, when they read an article in the International Forecaster newsletter. The Eisenbarths repeatedly attempted to call Kiley and Behm, but their messages were never returned.

1166. To date, Eisenbarth has no access to her funds and Defendants have provided no information regarding the existence and location of her investment funds.

**VVV.**        **Plaintiff Daryl Vossler**

1167.  Plaintiff Daryl Vossler ("Vossler") first learned of the foreign currency arbitrage program through a friend, who brought Vossler to a meeting with Cook at the Oxford's Van Dusen mansion in July 2008.

1168.  At the meeting, Cook represented that investments in the program provided safety, capital protection, and daily liquidity.  Cook told Vossler that he was guaranteed to earn 10-12% annual returns in the "secure account," which had no risk of loss.  A "naked carry" account offered larger profits but involved some risk of loss. Cook also represented that investor funds are held in individual accounts under their own names at Crown Forex SA in Switzerland.

1169.  When Vossler told Cook that he would need to withdraw some of his funds within a year for his son's college tuition, Cook assured him that his investment in the program would be totally liquid and earn between 10-12%.

1170.  Cook provided Vossler with a brochure entitled, "Capital Protected Fixed Yield Enhancement," which represented the following about the foreign currency arbitrage program:  "Investment Safety—The 100 percent capital protected strategy means that investors are assured that the money they invest is fully protected from volatility at all times.  Client funds are held in segregated accounts with the largest, most well-established banks and foreign exchange institutions"; "Capital Protection—All currency exposure is hedged with an offsetting position…Because the transaction is done on the same inter-bank market, the positions offset, eliminating all market risk.  It is a 100 percent hedged position"; "Zero Volatility—No market exposure means that the

account equity is not subject to the "ups and downs" of the market. Similar to an odometer on a car, account balances only move in one direction—forward. Mathematics and account management guarantee that there is no risk or market exposure"; "Enhanced Returns—The strategy will outperform similar fixed income alternatives…The strategy is able to leverage interest bearing investments up to 2.5 times. That means when average fixed income yields are at 4%, the strategy will net about 10%"; and "Daily Liquidity— Funds are generally available on short notice. Client money is always held with the largest investment banks, commercial banks and FX institutions." See Exhibit 371.

1171. Based on these representations, Vossler invested in the program through Cook and Oxford in August 2008. To invest, Vossler withdrew $200,058.00 in investment funds to establish a cash account with Crown Forex SA. Vossler also rolled over IRA proceeds in the amount of $50,948.15 into a self-directed IRA account with Entrust, which were then to be placed in another Crown Forex SA account. Vossler took another $22,593.00 from his savings to invest in a "naked carry" account. See Exhibits 559-560.

1172. In conjunction with his investments, Vossler completed a Crown Forex SA Customer Trading Agreement, and received account statements purportedly from Crown Forex SA via email from Oxford representatives. Exhibits 561.

1173. Shortly after investing, Vossler contacted Cook with a "nervous feeling" about the investment, and Cook reiterated that Vossler's money was totally safe, would earn 11%, and that he could make a withdrawal at any time within 48 hours.

1174. After investing, Vossler had difficulties accessing his "naked carry" account, and was told that only Cook could access this account. Vossler also contacted Cook and Ryan Moeller at Oxford after the stock market began to drop steadily to ask about the risk and liquidity of his investments. Both represented that Vossler's accounts were not affected by market conditions and were "fully hedged, fully protected."

1175. On July 9, 2009, Vossler read an article in the Star Tribune about this lawsuit, and immediately went to the Van Dusen mansion to inquire about the status of his investments, particularly the additional $100,000.00 that he had invested three days earlier. Vossler was not permitted to enter the mansion or to speak to Cook, and was told by Oxford representatives that they were not allowed to speak with client or return telephone calls.

1176. On July 10, 2009, Vossler returned to the mansion and met with Eric Erickson and Ryan Moeller, who assisted him in the process of completing paperwork to withdraw the funds. When Vossler's account did not show the recent $100,000.00 deposit, Moeller indicated that he would look into it and contact Vossler on the following Monday. No call was forthcoming and Vossler's messages were not returned. Subsequent attempts to meet with and contact Moeller and Cook were unsuccessful.

1177. Vossler received no communications about the status of his investment until July 21, 2009, when Oxford Global Partners, LLC, posted a "client notice" on its website informing clients of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that it is "unable to fulfill withdrawal or redemption requests." See Exhibit 12.

1178. Vossler then contacted the Crown Forex SA trustees to inquire about the status of his accounts.  The trustees indicated that the account information provided "do not show any contractual relationships with Crown Forex SA….And we have no trace of funds  credited to the account of Crown Forex SA by yourself on or your behalf by a third party.  It seems that someone misuse [sic] the name of Crown Forex SA to make you believe an investment on your name or on your behalf in Crown Forex SA." Exhibit 562.

1179.  On August 21, 2009, Vossler received an email from Oxford representative Jitesh Mehta, which forwarded information from Entrust indicating that, "the accounts that Pat Kiley was supposed to have set up at Crown Forex for the clients, never were set up.  All the statements, and account numbers are fraudulent."  Exhibit 563.

1180.  To date, Vossler's withdrawal requests have not been honored and he has no access to his funds.  The only information Vossler has regarding the existence and location of his funds is a check copy and a wire transfer document indicating that a portion of his funds were deposited with Crown Forex LLC as Associated Bank Account No. ******1705, rather than Crown Forex SA.  See Exhibit 559-560.

## WWW.  Plaintiff Eugene G. Helfrich

1181.  Plaintiff Eugene Helfrich ("Helfrich") first learned of the foreign currency arbitrage program through Kiley's radio show.

1182.  Helfrich contacted Durand and Kiley for additional information on the program and received a letter and packet of materials from each of them in January 2004, and May 2006, respectively.  The letters described Universal Brokerage Services and its "financial planning and diversification through uncorrelated asset classes."  In the letters,

Universal Brokerage Services was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market. These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibits 564-565.

1183. The letters also stated the following: "Financial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1184. Included in the materials provided by Durand and Kiley were brochures entitled, "Institutional Grade Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program: "Liquidity: All positions are 100% liquid on 24 hours basis. Trading Discipline: 100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name. Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds. Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." See Exhibit 69.

1185. In March 2006, Helfrich spoke with Kiley regarding the program. Kiley represented that investments in the program were "risk-less," earned guaranteed 10-12% returns, and were totally liquid and could be withdrawn without penalty.

1186. Based on these representations, Helfrich invested in the program through Kiley in June 2006. To invest, Helfrich rolled over IRA proceeds in the amounts of $30,843.11, $55,397.03, and $11,688.31 into a self-directed IRA with Millennium, which was then transferred to Peregrine Financial Group's Forex Division. Exhibits 566-568.

1187. In conjunction with his IRA account, Helfrich originally received account statements from Millennium and Peregrine Financial Group. From April 2007 to April 2008, Helfrich received his account statements from UBS Diversified. Beginning in July 2008, Helfrich received his account statements from Universal Brokerage FX. See, e.g., Exhibit 569.

1188. Helfrich also invested $45,000.00 through UBS Diversified by withdrawing money from his credit union savings account, which was to be invested in the foreign currency arbitrage program. Exhibit 570. In conjunction with this investment, Helfrich completed a UBS Diversified Growth Application and Subscription Agreement, and received account statements from Universal Brokerage FX. Exhibits 571-572. The total amount of Helfrich's investment in the program is $201,114.00.

1189. After receiving an account statement, Helfrich would contact Kiley, who would always assure him that the investment was safe and that the foreign currency arbitrage program was operating as represented. However, after receiving his July 2009 account statements, Helfrich was unable to reach Kiley and his messages were not returned.

1190. On July 21, 2009, Helfrich received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing him of this lawsuit and that

these entities "are unable to fulfill withdrawal or redemption requests." See Exhibit 13. Helfrich repeatedly attempted to contact Kiley about the status of his investments, but there was no answer and his messages were not returned.

1191.  To date, Helfrich has no access to his investment funds and Defendants have provided no information regarding the existence and location of his funds.

## XXX.        Plaintiff Thomas R. Los

1192.  Plaintiff Thomas R. Los ("Los") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in March 2006.

1193.  On August 1, 2006, Los called the telephone number provided on Kiley's radio show for additional information on the program.  Los spoke directly with Kiley, who represented that investments in the program were held in individual accounts, were guaranteed principal protected, instantly liquid and available within 24 hours, and would earn approximately 12% returns.

1194.  As a follow-up to this conversation, Kiley sent Los a letter and materials about the foreign currency arbitrage program.  In his letter, Kiley described Universal Brokerage Services and its "financial planning and diversification through uncorrelated asset classes." In the letter, Universal Brokerage Services was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 573.

1195.  Kiley's letter also stated the following:  "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1196.  The materials provided by Kiley included a brochure entitled, "Institutional Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on a 24 hour basis";  "Trading Discipline:  100% of the time the long USD/JPY position is fully insured," "Funds are deposited with a  commercial bank in the client's name"; "Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds"; "Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." See Exhibit 329.

1197.  Based on these representations, Los invested in the program through Kiley in September 2006.  To invest, Los rolled over IRA proceeds in the amount of $125,000.00 into a self-directed IRA with Millennium, which was then to transfer the funds to Peregrine Financial Group's Forex Division.  Exhibit 574.

1198.  In conjunction with his initial investment, Los completed a Peregrine Financial Group Account Application and Limited Power-of-Attorney that permitted UBS Diversified to manage his investment in the foreign currency arbitrage program. Los originally received account statements from Millennium and Peregrine Financial Group Forex Division.   In 2007, Los began receiving his account statements from UBFX

Diversified.  Beginning in July 2008, Los received his account statements from Universal Brokerage FX.  See, e.g., Exhibits 575-577.

1199.  In February 2008, Los invested an additional $100,000.00 into his IRA account for investment in the program.   However, it required several telephone calls to Kiley and Smith and additional documentation to have this additional amount reflected on his statement. Exhibit 578.

1200.  On September 17, 2008, Los met with Cook at the Van Dusen mansion to discuss additional investment in the program. Cook described it as a "fixed income" investment that would provide 10.5% annual income for a period of four years.  Cook represented that earned interest could be withdrawn at any time without penalty, that the investment principal was protected from loss, and the funds were held in individual accounts.  Cook also provided a brochure that reiterated his representations.

1201.  In a subsequent conversation with Oxford representative Ryan Moeller on September 18, 2008, it was again represented to Los that the "fixed income" investment in the program was safe, fully liquid, principal protected, and held in individual accounts.

1202.  Based on these representations, Los invested in the program through Cook and Oxford on September 18, 2008, and Cook was then to invest the funds in the program with Crown Forex SA in Switzerland.   To invest, Los sent checks and wire transfers payable to "Crown Forex" totaling $200,000.00.  Exhibit 579. The total amount of Los' investment in the program is $516,522.30.

1203. In conjunction with this investment, Los completed a Crown Forex SA Customer Trading Agreement for Individual Accounts and an Oxford Global Advisors

Management Agreement, and received account statements purportedly from Crown Forex SA. Exhibits 580-581. Originally, Crown Forex SA account statements were available online, but later were only available by mail.

1204. At the same time that Los opened this new account, Cook requested that he transfer his IRA account from Millennium to Entrust, and Los completed the paperwork for this transfer. Exhibit 582.

1205. On July 10, 2009, Los received a letter from Millennium informing him of this lawsuit. Exhibit 583. Los repeatedly attempted to contact Cook and Moeller about the status of his investment, but no one answered the calls and his messages were never returned.

1206. On or about July 21, 2009, Los received letters from Oxford Global Partners, LLC and Universal Brokerage/UBS Fund informing him of this lawsuit, Crown Forex SA's bankruptcy proceedings, and that these entities "are unable to fulfill withdrawal or redemption requests." See Exhibit 13.

1207. On July 23, 2009, Los was able to reach Beckman, who provided Los with his final account statements and a withdrawal form. Per Beckman's instructions, Los completed the form and returned it to Adam Edenborg at Oxford on July 27, 2009. Exhibit 584. Edenborg was then to forward the withdrawal request to Cook for processing. Los' attempts to contact Beckman and Oxford after submitting the withdrawal request were unsuccessful.

1208. Los also submitted a withdrawal request to Millennium on July 24, 2009, but has received no response. Exhibit 585.

1209.  To date, Los' withdrawal requests have not been honored and he has no access to his funds.  The only information Los has regarding the existence and location of is funds are wire transfer documents indicating that his funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA. Exhibit 586.

**YYY.**      **Plaintiff Dwight A. Smith**

1210.  Plaintiff Dwight A. Smith ("D.A. Smith") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in late 2007.

1211.  In early 2008, D.A. Smith emailed Kiley for additional information on the program.   In response, D.A. Smith received a letter and materials from Universal Brokerage FX.  Exhibits 587-588.

1212.  In the letter, Brian Seiwert, a Senior Financial Advisor/Technical Analyst for Universal Brokerage FX, described Universal Brokerage FX and its "financial planning and diversification strategies through the use of uncorrelated asset classes." Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 587.

1213.  Seiwert's letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures

enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1214. The materials provided by Universal Brokerage included a brochure entitled, "A Global Enhanced Return Strategy," which represented that investments in the program are safe because funds are held in individual segregated accounts with well-established, well-capitalized investment and commercial banks, and because the program reduces market exposure. The brochure also represented that "funds are completely liquid and available on short notice," and that the program provides consistent yields and enhanced returns. See Exhibit 79.

1215. Another brochure entitled, "Institutional Grade Investments for the Individual Investor," represented the foreign currency arbitrage program as follows: "Liquidity: All positions are 100% liquid on 24 hours basis. Trading Discipline: 100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name. Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds. Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." See Exhibit 129.

1216. On March 12, 2008, D.A. Smith spoke with Kiley and Cook regarding investment in the foreign currency arbitrage program, both of whom described investments in the program as "no risk" and "100% liquid."

1217. On or about May 12, 2008, D.A. Smith flew to Minneapolis to meet with Cook and to learn more about the program. During this meeting, Cook represented that

investments in the program were liquid, principal protected, earned 10.5% returns, were held in individual accounts, and were "risk free."

1218. Based on these representations, D.A. Smith invested in the program through Cook and Universal Brokerage FX on May 22, 2008. To invest, D.A. Smith wrote a $60,000.00 check payable to Universal Brokerage FX. See Exhibit 588.

1219. In conjunction with his investment, D.A. Smith completed a Universal Brokerage Client Application Form, and a Universal Brokerage General Business Terms Currency Exchange Agreement, which stated that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and "appropriate stops set so that no single transaction shall risk more than 2% of the Customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance." Exhibit 589.   D.A. Smith received account statements from Universal Brokerage FX, which originally identified the account holder as Smith, but were later changed at D.A. Smith's request to the Dwight A. Smith Revocable Trust. See, e.g., Exhibit 590.

1220. On July 16, 2008, D.A. Smith met with Kiley and Cook to discuss additional investments in the program. During this meeting, both Kiley and Cook represented that investments in the program were completely safe, instantly liquid, and principal protected. Kiley indicated that he had a 20-year track record of double-digit returns, and stated: "It's impossible to lose money."

1221. Based on these and previous representations, D.A. Smith decided to invest additional funds in the foreign currency program through Oxford Global Advisors in

December 2008. To invest, D.A. Smith rolled over $110,646.55 in IRA proceeds into a self-directed IRA account with Entrust, which was then to invest the funds with Crown Forex SA in Switzerland.  Exhibit 591.  The total amount of D.A. Smith's investment in the program is approximately $170,000.00.

1222.  In conjunction with this additional investment, D.A. Smith completed a Crown Forex SA Customer Trading Agreement for Individual Accounts and received account statements from Oxford Global Advisors, Entrust and, purportedly, Crown Forex SA.  See Exhibit 590; Exhibit 591a.

1223.  In mid-July 2009, D.A. Smith learned of this lawsuit and the Crown Forex SA bankruptcy through articles on the Internet. D.A. Smith immediately sent Kiley a withdrawal request demanding the return of his funds and closure of his account, but the request was returned in the mail as undeliverable.  See Exhibit 592.

1224.  D.A. Smith also contacted the Crown Forex SA trustees for information regarding the status of his account, but received no substantive information regarding the existence and location of his funds.  Exhibit 593.

1225.  To date, D.A. Smith has no access to his funds and the only information he has regarding the existence and location of his funds is a wire transfer documents indicating that the funds were wired to Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA. Exhibit 594. Entrust has offered no explanation as to why it failed to follow the instructions in D.A. Smiths' Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247, Switzerland, and instead transferred the funds into a domestic

Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC. <u>See</u> Exhibit 591.

**ZZZ.        Plaintiffs Joseph and Cheryl Ann Kraus**

1226.   Plaintiffs Joseph and Cheryl Ann Kraus ("the Krauses") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they began listening in 2006.

1227.   On October 1, 2006, the Krauses emailed Kiley for additional information regarding the foreign currency arbitrage program.   Specifically, the Krauses indicated that they were looking to diversify their 401(k) and Roth funds, and "where the best place would be to put our emergency savings money for best interest but quick liquidity." Exhibit 595.

1228.   In response to this email, the Krauses received a letter and materials from Kiley. In his letter, Kiley described Universal Brokerage Services and its "financial planning and diversification through uncorrelated assets."   Universal Brokerage Services was described as an investment advisory firm founded in 1987 that that offered minimum investments, including "Money Managers not correlated to the stock market.   These managers have direct access to all international markets and can capitalize on rising and falling markets."   Exhibit 596.

1229.   Kiley's letter also stated the following:   "Financial security is paramount to every investor.   The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.

Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1230. Included in the materials was a brochure entitled, "Institutional Grade Investments for the Individual Investor," which  made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name. Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

1231. Another brochure entitled, "Saxo Bank Capital Guaranteed Bond," described the foreign currency arbitrage program as providing "the security of a guaranteed 100% return of their initial investment." See Exhibit 435.

1232. In a subsequent conversation with Kiley, the Krauses were told that investments in the program were guaranteed principal protected, liquid "24/7" and were held in segregated accounts.  Kiley also represented that investments in the program would earn 12% annual earnings.

1233. Based on these representations, the Krauses invested in the program through Kiley and Universal Brokerage Services in March 2008.  To invest, the Krauses rolled over IRA proceeds into four self-directed IRA accounts with Millennium.  Exhibits 597-600.

1234. In conjunction with their investments, the Krauses completed Universal Brokerage Client Applications and Subscription Agreements, and received account statements from Universal Brokerage FX for each of their four accounts. Exhibits 601-602.

1235. After investing, Joseph Kraus continued to have monthly conversations with Kiley who reiterated the safety and security of investments in the program. In mid-2009, Kiley asked Joseph Kraus to switch their self-directed IRA accounts from Millennium to Entrust and to invest in the program through Crown Forex SA. The Krauses decided to keep their investments with Millennium.

1236. On July 10, 2009, the Krauses received a letter from Millennium informing them of this lawsuit. The Krauses repeatedly attempted to contact Kiley, Julia Smith, and Cook to make a withdrawal request, but no one answered the phones or returned messages.

1237. On or about July 21, 2009, the Krauses received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing them of this lawsuit and that these entities "are unable to fulfill withdrawal or redemption requests." See Exhibit 13.

1238. To date, the Krauses have no access to their funds and Defendants have provided no information regarding the existence and location of their investments.

**AAAA.        Plaintiff David Bratt**

1239. Plaintiff David Bratt ("Bratt") first learned of the foreign currency arbitrage program in 2008, through Plaintiff Robert Thomssen.

1240.  In June 2008, Bratt had personal meetings with Cook to obtain additional information about the program.   During these meetings, Cook represented that investments in the program were totally liquid with zero volatility, were held and deposited in individual accounts with Crown Forex SA in Switzerland, and would earn a guaranteed interest rate. Cook stated indicated that there was "no way you can lose your money," because economic turbulence had no impact on the rate of return.

1241.  At one of these June 2008 meetings, Bratt also met Pettengill and inquired with him about the "zero risk" aspect of the program.   Pettengill confirmed that the program involved no risk to principal.

1242. Bratt also received a brochure about the program entitled, "Capital Protected Yield Enhancement," which represented the following about the foreign currency arbitrage program:   "Investment Safety—The 100 percent capital protected strategy means that investors are assured that the money they invest is fully protected from volatility at all times.  Client funds are held in segregated accounts with the largest, most well-established banks and foreign exchange institutions"; "Capital Protection—All currency exposure is hedged with an offsetting position…Because the transaction is done on the same inter-bank market, the positions offset, eliminating all market risk.  It is a 100 percent hedged position"; "Zero Volatility—No market exposure means that the account equity is not subject to the "ups and downs" of the market.  Similar to an odometer on a car, account balances only move in one direction—forward. Mathematics and account management guarantee that there is no risk or market exposure"; "Enhanced Returns—The strategy will outperform similar fixed income alternatives…The strategy is

able to leverage interest bearing investments up to 2.5 times.  That means when average fixed income yields are at 4%, the strategy will net about 10%"; and "Daily Liquidity— Funds are generally available on short notice.  Client money is always held with the largest investment banks, commercial banks and FX institutions." See Exhibit 371.

1243.  Based on these representations, Bratt invested in the program through Cook and Oxford Global Advisors. To invest, Bratt instructed his investment brokerage to wire $1,500,000.00 to Crown Forex SA for deposit into his individual account. See, e.g., Exhibit 603.  Shortly thereafter, another $199,000.00 was purportedly invested when Cook transferred the proceeds from a prior sale of Bratt's stock into Bratt's individual Crown Forex SA account.   However, Bratt never received any documentation memorializing the stock sale or the subsequent transfer of the sale proceeds into his account.

1244.  In August 2008, Bratt rolled over $413,000.00 in IRA proceeds into a self-directed IRA with Entrust, which was then to be invested in the program through Crown Forex SA.  Exhibit 604.  The total amount of Bratt's investment in the program is $2,047,183.00.

1245.  In conjunction with these investments, Bratt originally received account statements from Crown Forex SA through www.crownforex.com; however, after Cook assisted Bratt in downloading a program in January 2009, he was able to access his account information online. See, e.g., Exhibit 605.

1246. After the Bernie Madoff scandal became public, Bratt contacted Cook to inquire about the status of his investments.  Cook represented that Bratt's investments were safe and protected because they were held in individual accounts.

1247. On July 9, 2009, Bratt received a call from Plaintiff Thomssen informing him of the Star Tribune article about this lawsuit.  Bratt immediately went to the Van Dusen mansion to discuss the situation with Cook.  Bratt was informed that Cook was in a meeting, but was given withdrawal request forms from Erickson.  Bratt completed the forms and submitted them to Erickson for processing.  Exhibit 606.

1248. To date, Bratt's withdrawal requests have not been honored and he has no access to his funds.  The only information he has regarding the existence and location of his funds are wire transfer documents and bank statements indicating that a large portion of the funds were wired to Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA in Switzerland. Exhibit 607; see also Exhibit 603.

## BBBB.        Plaintiff Robert Thomssen

1249. Plaintiff Robert Thomssen ("Thomssen") first learned of the foreign currency arbitrage program in June 2007, from Plaintiff Mark Sticha who had invested in the program through Beckman.  Thomssen then read a June 24, 2007 article in the Star Tribune regarding the profits Cook and Durand were earning in the program.

1250. On August 28, 2007, Thomssen met with Beckman to discuss the foreign currency arbitrage program.  Beckman explained the program and stated that he would create a plan utilizing the program that would double Thomssen's net worth.

1251. At this meeting, Beckman introduced Thomssen to Cook, and both Beckman and Cook represented that investments in the program were fully hedged with no downside, completely liquid, 100% safe, and were earning 12% annual returns. Thomssen arranged another meeting to review Beckman's "plan" regarding Thomssen's investment in the program.

1252. Beckman and Cook also provided Thomssen with a brochure entitled, "Capital Protected Yield Enhancement," which represented the following about the foreign currency arbitrage program:  "Investment Safety—The 100 percent capital protected strategy means that investors are assured that the money they invest is fully protected from volatility at all times.  Client funds are held in segregated accounts with the largest, most well-established banks and foreign exchange institutions"; "Capital Protection—All currency exposure is hedged with an offsetting position…Because the transaction is done on the same inter-bank market, the positions offset, eliminating all market risk.  It is a 100 percent hedged position"; "Zero Volatility—No market exposure means that the account equity is not subject to the "ups and downs" of the market. Similar to an odometer on a car, account balances only move in one direction—forward. Mathematics and account management guarantee that there is no risk or market exposure"; "Enhanced Returns—The strategy will outperform similar fixed income alternatives…The strategy is able to leverage interest bearing investments up to 2.5 times. That means when average fixed income yields are at 4%, the strategy will net about 10%"; and "Daily Liquidity—Funds are generally available on short notice.  Client

money is always held with the largest investment banks, commercial banks and FX institutions." See Exhibit 371.

1253.  On October 4, 2007, Thomssen met with Cook and Beckman to review the investment "plan" they had prepared. The plan was to liquidate all of Thomssen's stock holdings and mortgage his house in order to invest the entire proceeds into the foreign currency arbitrage program.  Thomssen indicated that he would need additional time to consider the plan.

1254.  On November 15, 2007, Thomssen met with Cook and asked for another explanation of the foreign currency arbitrage program.  Cook explained that he would use "long" and "short" currency pair positions with Thommsen's funds, which would cancel out any risk of loss due to currency fluctuations.  Cook would then leverage the amount of funds by approximately 2.7 times, so that the difference in the interest rates between the currency pairs would be enhanced to approximately 14%, of which 1.5% would constitute Cook's fees.  When Thomssen inquired about the ability to borrow funds at zero interest, Cook indicated that the Islamic law of "Sharia" did not permit interest and therefore Cook did not accrue interest at the Arab bank from which he borrowed.  When Thomssen further inquired as to how it was possible for a bank to operate without charging interest, Cook stated that his company gave the bank so much "other business" that it did not mind foregoing interest.

1255.  On April 26, 2008, Thomssen attended an Oxford Global Partners seminar at the Van Dusen mansion, which included presentations by Beckman, Cook and Gene

Walden.  The foreign currency arbitrage program was discussed at the seminar and similar representations were made as to its liquidity, safety, and principal protection.

1256.  On June 16, 2008, Thomssen and a friend attended a meeting with Cook to obtain more information about the foreign currency arbitrage program.  Thomssen again asked Cook to explain the program, and Cook again represented that the investment was fully hedged, completely liquid, and 100% safe.  The only possible risk identified was if all major banks in Europe simultaneously failed.  Cook emphasized that investment funds were held in segregated accounts in the investor's name at Crown Forex SA in Switzerland, and that Cook could only access the funds for trading purposes. Cook also indicated that Crown Forex SA was in the process of becoming a fully-accredited bank and would achieve such status in the near future.

1257.  On August 15, 2008, Thomssen invested in the program through Cook and Oxford Global Partners. To invest, Thomssen wired $1,000,000.00 from his home mortgage closing company to Crown Forex SA for deposit into his individual account. Exhibit 608.

1258.  In conjunction with his investment, Thomssen completed a Crown Forex SA Customer Trading Agreement for Individual Accounts and an Oxford Global Advisors Management Agreement with Cook's assistance.  Exhibit 609.

1259.  In subsequent telephone conversations with Cook, Thomssen was told that he was receiving interest as of August 15, 2008, at the rate of $327.70 per day, or 11.96% per year.  Cook gave Thomssen two account numbers, one for the "long" hedge trade and

one for the "short" trade, along with a password to access the Crown Forex SA website at www.crownforex.com.

1260.  On December 11, 2008, Thomssen visited Cook at the Van Dusen mansion to deliver a check for $75,000.00, which was to be invested in the program.  Exhibit 609a.  At that point, Thomssen was told that his new daily interest would be $348.00 per day, or 11.82% annually.

1261.  On December 19, 2008, Cook informed Thomssen that his two accounts at Crown Forex SA were being combined into a single account with a new account number. Cook assisted Thomssen in downloading a "trading platform," from which Thomssen could access his Crown Forex SA account online.  See Exhibit 610.

1262. On March 2, 2009, Thomssen contacted Cook to request a $200,000.00 withdrawal from his Crown Forex SA account to his equity account at Merrill Lynch equity accounts.  Cook requested that Thomssen wire the funds to Merrill Lynch through Thomssen's personal bank account, but Thomssen insisted that Cook wire it directly to Merrill Lynch and Cook eventually capitulated. Exhibit 611.  The total amount of Thomssen's investment in the program is $981,044.04.

1263. Following this withdrawal, Thomssen noticed that his daily interest changed to 11.37% and inquired with Cook, who stated that "that's the way the software assigns it when you make a withdrawal."

1264. On July 9, 2009, Thomssen read an article in the Star Tribune regarding this lawsuit.  Thomssen repeatedly attempted to contact Cook at multiple telephone numbers, but there was no answer.  Thomssen then went to the Van Dusen mansion to

meet with Cook directly, but was told that Cook was unavailable due to "meetings." Eric Erickson provided Thomssen with Crown Forex SA withdrawal request forms, which Thomssen completed onsite and returned to Erickson. Erickson indicated that he would fax the forms to Crown Forex SA.

1265. Subsequently, Thomssen made repeated attempts to contact Cook and Beckman, but neither answered or returned his messages.

1266. On July 13, 2009, Thomssen returned to the Van Dusen mansion in an attempt to speak with Cook. After Thomssen was told that Cook was unavailable, Beckman invited Thomssen into the Van Dusen mansion. When Thomssen saw Erickson, he inquired whether his withdrawal forms had been faxed to Crown Forex SA as promised, and Erickson admitted that he had given the forms to Cook.

1267. Beckman and Thomssen then went to Cook's office to determine the status of Thomssen's withdrawal forms. During their conversation, Cook indicated that his first priority was to respond to a subpoena from the SEC, but that he would likely have the trades closed by July 14, 2009, and then the withdrawal forms would be processed and faxed in the order received. Cook stated that client funds would be returned within 2 to 5 business days after the forms were faxed.

1268. To date, Thomssen's withdrawal requests have not been honored and he has no access to his funds. The only information he has regarding the existence and location of his investment funds is wire transfer information and a check copy indicating that the funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA. Exhibits 609a, 611.

CCCC.      **Plaintiff Daniel Lindberg**

1269.  Plaintiff Daniel Lindberg ("Lindberg") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in October 2008.

1270.  In January 2009, Lindberg called the telephone number provided on Kiley's radio show for additional information on the program. Shorty thereafter, Kiley returned the call and represented that investments in the program earned an 11% rate of return over 10+ years, were placed in individual segregated accounts at Swiss banks, and were fully liquid upon request; however, Kiley asked that requests for distributions be made in three month intervals if possible to avoid excess paperwork.

1271.  Based upon these representations, Lindberg invested in the program through Kiley and Universal Brokerage FX in March 2009.  To invest, Lindberg transferred 401(k) funds in the amount of $335,059.11 to a self-directed IRA account with Entrust, which was then directed to invest in the program through Crown Forex SA in Switzerland.  Exhibits 612-613.

1272.  In conjunction with his investment, Lindberg completed a Crown Forex Customer Trading Agreement for Individual Accounts, and received statements from Universal Brokerage FX and, purportedly, Crown Forex SA via mail.  Exhibits 614-615.

1273.  In July 2009, Lindberg made a withdrawal request for $2,683.00.  When the funds were not forthcoming, Lindberg contacted Entrust to inquire and was informed about this lawsuit.  Lindberg sent a formal withdrawal request to Entrust on July 17, 2009, but was told that "he has no available cash in his account with Entrust Midwest

LLC" and "if Universal Brokerage sends us the funds to complete the distribution we will do that at that time."  Exhibits 616-617.

1274.  In late July 2009, Lindberg received a letter from Oxford Global Partners, LLC, informing him of this lawsuit, the Crown Forex SA bankruptcy proceedings, and indicating that Oxford Global Partners are "unable to fulfill withdrawal or redemption requests." See Exhibit 13.

1275.  Subsequently, Lindberg received a letter from Entrust indicating that it had been subpoenaed by the SEC and would be providing client files in response to the subpoena.  Exhibit 618.

1276.  To date, Lindberg has had no access to his funds and the only information he has regarding the existence and location of his funds is wire transfer information indicating that Entrust transferred the funds to Crown Forex LLC's Associated Bank Account No. ******1705, rather than to Crown Forex SA in Switzerland.  Exhibit 619.

1277.  Entrust has offered no explanation as to why it failed to follow the instructions in Lindberg's Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247, Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC. See Exhibit 613.

**DDDD.**    **Plaintiff Michael Lenti**

1278.  Plaintiff Michael Lenti ("M. Lenti") first learned of the foreign currency arbitrage program in April 2008 through another investor, Plaintiff Kelly Lenti.

1279.  In May 2008, M. Lenti participated in a telephone call with Kiley.  During this telephone call, Kiley represented that investments in the program were fully liquid, secure, and earned consistent double-digit returns.

1280.  Subsequently, Kiley provided M. Lenti with a Universal Brokerage Client Application Form and a Universal Brokerage General Business Terms Currency Exchange Agreement," which represented that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and "appropriate stops [are] set so that no single transaction shall risk more than 2% of the customer's balance, and all combined open transactions at any one time shall not risk more than 20% of Customer's balance." Exhibits 620-621.

1281.  Based on these representations, M. Lenti invested in the program through Kiley and Universal Brokerage FX on May 23, 2009, by writing a personal check in the amount of $460,000, payable to "UB/FX."  Exhibit 622.

1282.  In conjunction with his investment, M. Lenti completed the Universal Brokerage Client Application and Universal Brokerage General Business Terms Currency Exchange Agreement, and received account statements via U.S. Mail from Universal Brokerage FX.  See Exhibits 620-621; Exhibit 623.

1283.  In February 2009, M. Lenti made a $10,000.00 withdrawal request to Kiley, and subsequently received a $10,000.00 check from Universal Brokerage FX Management, LLC, signed by Kiley.  After this withdrawal, the total amount of M. Lenti's investment in the program is $469,684.00.  Exhibit 624.

1284. In July 2009, M. Lenti was first informed of this lawsuit through communications with Plaintiff Kelly Lenti. M. Lenti then called Kiley and requested that his funds be withdrawn and his account closed.

1285. To date, M. Lenti's withdrawal request has not been honored and he has no access his funds. The only information M. Lenti has regarding the existence and location of his funds is a check copy indicating that the funds were deposited into Universal Brokerage FX Management LLC's Associated Bank Account No. ******5601. Exhibit 625.

**EEEE.**     **Plaintiff Ronald Higgins**

1286. Plaintiff Ronald Higgins ("Higgins") learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in 2006. On his radio show, Kiley indicated that he had fifty years of experience working as an investment advisor, and that he was a senior partner in an investment firm that had been in operation for twenty years. Kiley represented that his firm's investment in the foreign currency arbitrage program earned consistent double-digit returns for investors, provided profitability during unsettled times, and offered investors access to their funds 24 hours a day, 7 days a week. Kiley repeatedly stated that investments in the program were not impacted by fluctuations in real estate value or the stock market, and that the more volatility and chaos, the more profitable the investments in the program became.

1287. In December 2006, Higgins called the telephone number provided on Kiley's radio show and spoke directly with Kiley. During their conversation, Higgins told Kiley that he had money invested in the stock market, to which Kiley represented that

there were severe financial problems in Europe that would cause the stock market to plummet.  Kiley advised that Higgins transfer his investments into money market funds, which he did.

1288.  In July 2007, Higgins began to consider investing in the foreign exchange market. Higgins viewed internet programs by Kiley wherein he represented investments in the program as fully liquid, with funds held in separate accounts.  Higgins was contacted by Tim Daley, a representative of Universal Brokerage, concerning investments in the program.  Both Kiley and Daley represented that investments in the program would be held in separate accounts, and were fully liquid at all times. Additionally, Mr. Daley represented that there was a $250,000.00 minimum investment required, and there was no risk associated with the program.

1289.  Daley also provided a letter and investment materials to Higgins.  The letter described Universal Brokerage Services ("UBS") and its "financial planning and diversification through uncorrelated asset classes."  In the letter, UBS was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 626.

1290.  Daley's letter also stated that "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are insured by measures enacted by the Federal Government, exchanges and the firm itself.  Customer funds are held in segregated accounts providing safety, security and the liquidity." Id.

1291. One brochure entitled, "Institutional Grade Investments for the Individual Investor," made the following representations about the foreign currency arbitrage program: "Liquidity: All positions are 100% liquid on 24 hours basis. Trading Discipline: 100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name. Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds. Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." See Exhibit 69.

1292. Another brochure entitled, "Federal Funds Income Advantage," represented the program as "instantly liquid," "segregated account, not co-mingled with the general assets of the custodian, bank or dealer," "principal protected," and "current yield of 12%+ annually." The brochure also stated that "[t]he utilization of both our exclusive technology and unparalleled banking relationships negate all currency risks," and "[y]our principle [sic] is fully hedged by our liquidity providers and affiliate banks." The liquidity providers included Deutsche Bank, Dresdner Bank, Barclays Capital, UBS, JP Morgan, Saxo Bank, Bank of America and The Royal Bank of Scotland. See Exhibit 194.

1293. A third brochure entitled "Currencies," further represented that the program provides, "liquidity or access to your funds 24 hours per day," "stability," and "strong returns." See Exhibit 129.

1294. Based on these representations, Higgins invested in the foreign currency arbitrage program through Kiley and UBS Diversified in October 2007. To invest,

Higgins rolled over funds $250,000.00 in IRA proceeds into a self-directed IRA with Millennium, which was then to transfer the funds to UBS Diversified FX Growth LP for investment in the program.  Exhibit 627.

1295.  In conjunction with his investment, Higgins completed a UBS Diversified Growth Application and Subscription Agreement, and received account statements from UBS Diversified and Universal Brokerage FX.  Exhibits 628-629.

1296.  After investing, Higgins made several withdrawal and distribution requests totaling $55,000.00.  Exhibit 630.  Although each request took several weeks to process, Higgins did receive the requested withdrawals and distributions.  Following these withdrawals and distributions, the total amount of Higgins' investment in the program is $222,423.00.

1297. In May 2009, Higgins attempted to contact Daley with a withdrawal request, and was told that Daley no longer worked for UBS and that his new account manager was John Loebel.  When Higgins spoke with Loebel, he was informed that UBS had a new telephone number, a new fax number, and a new email address of www.universalbrokeragefx.com.  During their conversation, Higgins asked Loebel about the possibility of a one-world currency, which would eliminate trading in foreign currencies.  Loebel stated that, if this occurred, UBS would cease trading in currencies and begin arbitrage trading in commodities.

1298.  In July 2009, Higgins received letters from Millennium notifying him that this lawsuit had been initiated, informing him that UBS had notified Millennium that it is unable to fulfill withdrawal or redemption requests, and stating that Millennium had

received subpoena requests from the SEC and would responding to such requests. Exhibit 631.

1299.  Higgins immediately attempted to withdraw the balance of his investment, but his attempts to reach Kiley and other UBS Diversified representatives were unsuccessful. Higgins then contacted Millennium to transfer his money, but was informed that he was unable to access his investment.

1300.  To date, Higgins cannot access his funds and the only information he has regarding the existence or location of his funds are wire transfer documents indicating that withdrawals and disbursements he received were drawn from Crown Forex LLC's Associated Bank Account No. ******1705, rather than from his own account.  See, e.g., Exhibit 632.

**FFFF.Plaintiff Brad Wevodau**

1301.  Plaintiff Brad Wevodau ("Wevodau") learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in January 2008.

1302.  In January 2008, Wevodau called the telephone number and emailed the address provided on Kiley's radio show to obtain additional information on the program.

1303.  In February 2008, Wevodau received a telephone call from Kiley in response to his inquiries. During their conversation, Kiley represented that investments in the program were fully liquid, principal investment would be protected, and investments were held in individual, segregated accounts.  Wevodau also received additional information via Kiley's website, which confirmed the statements above.

1304. Kiley then provided Wevodau with a Universal Brokerage Client Application Form, and a Universal Brokerage General Business Terms Currency Exchange Agreement, which represented that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and that "appropriate stops [are] set so that no single transaction shall risk more than 2% of the customer's balance, and all combined open transactions at any one time shall not risk more than 20% of Customer's balance." Exhibit 633.

1305. Based on these representations, Wevodau invested in the program through Kiley, Universal Brokerage FX, and Crown Forex SA beginning in July 2008.   To invest, Wevodau wrote the following personal checks:  (1) a $133,000.00 check dated July 29, 2008, payable to "Crown Forex"; (2) a $26,500.00 check dated October 6, 2008, payable to "Crown Forex"; (3) a $20,000.00 check dated December 29, 2008, payable to "Crown"; (4) a $8,000.00 check dated March 18, 2009, payable to "Universal Brokerage FX"; (5) $26,000.00 check dated March 18, 2009, payable to "Universal Brokerage FX"; (6) a $5,000.00 check dated April 3, 2009, payable to "Crown FX"; (7) a $7,000.00 check dated May 5, 2009, payable to "Crown"; (8) a $6,000.00 check dated June 1, 2009, payable to "Crown"; and (9) a $6,000.00 check dated July 1, 2009, payable to "Crown." Exhibit 634.  The total amount of Wevodau's investment in the program is $240,000.00

1306. In conjunction with his investment, Wevodau completed the Universal Brokerage Client Application Form, the Universal Brokerage General Business Terms Currency Exchange Agreement, and a Crown Forex SA Customer Trading Agreement for

Individual Accounts, and received account statements purportedly from Crown Forex SA. See Exhibit 633; Exhibits 635-636.

1307.  In late July 2009, Wevodau received a letter from Oxford Global Partners, LLC, informing him of this lawsuit, the Crown Forex SA bankruptcy proceedings, and indicating that Oxford Global Partners is "unable to fulfill withdrawal or redemption requests."  See Exhibit 13.

1308.  To date, Wevodau has no access to his funds and the only information he has regarding the existence and location of his funds are check copies and wire transfer documents indicating that the funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705, and Universal Brokerage FX Management, LLC at Associated Bank No. ******5601, instead of his account at Crown Forex SA.  Exhibit 637.

## GGGG.     Plaintiff Viola Heinemann

1309. Plaintiff Viola Heinemann ("Heinemann") first learned of the foreign currency arbitrage program through Kiley's radio show, to which she began listening in August 2006.

1310. In May 2007, Heinemann participated in a telephone call with Kiley and Michael Behm, a Universal Brokerage representative.  During their conversation, Kiley and Behm represented that investments in the program were insured up to $250,000.00, earned guaranteed double digit returns for up to twenty years, were placed in individual segregated accounts, were principal protected, and were fully liquid upon request.

1311.  Kiley and Behm then provided Heinemann with a UBS Diversified Client Application, and a UBS Diversified General Business Terms Currency Exchange Agreement, which represented that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and that "appropriate stops set so that no single transaction shall risk more than 2% of the customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance."  Exhibits 638-639.

1312.  Based on these representations, Heinemann invested in the program through Kiley and Universal Brokerage FX in August 2007. To invest, Heinemann initially wrote a check in the amount of $100,000.00, payable to "UBS Diversified." Exhibit 640.

1313.  In conjunction with her investment, Heinemann completed the Universal Brokerage Application and the Universal Brokerage General Business Terms Currency Exchange Agreement, and received account statements from Universal Brokerage FX and UBS Diversified via mail. See Exhibits 638-639; Exhibit 641.

1314.  In August 2008, Heinemann invested additional funds in the program through Kiley and Universal Brokerage FX.  Heinemann wrote a personal check in the amount of $100,000.00, which she made payable to "Crown," per Kiley's instructions. Exhibit 642.

1315. In April 2007, Heinemann submitted a withdrawal form to Kiley, requesting a withdrawal from her Universal Brokerage FX account in the amount of

$11,910.00.   Heinemann subsequently received an $11,910.00 check from Universal Brokerage FX Management, LLC, and signed by Kiley.  Exhibit 643.

1316.  On May 13, 2009, Heinemann invested additional funds in the program by writing a personal check for $40,000.00, payable to "UBFX."  Exhibit 644.   The total amount of Heinemann's investment in the program is $240,000.00.

1317.  In late July 2009, Heinemann received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing her of the lawsuit, the Crown Forex SA bankruptcy proceedings, and indicating that these entities "are unable to fulfill withdrawal or redemption requests."  See, e.g., Exhibit 13.

1318.  Upon learning of the lawsuit, Heinemann immediately attempted to contact Kiley about her investment.  She called Kiley's office eight times in August 2009, but received no response. Heinemann also sent a letter Kiley on September 2, 2009, requesting that her account be closed and funds returned.   Heinemann received no response to this letter.  Exhibit 645.

1319.  To date, Heinemann's withdrawal requests have not been honored and she has no access to her funds.  The only information Heinemann has regarding the existence and location of her funds is a check copy indicating that a portion of the funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705. Exhibit 646.

**HHHH.**     **Plaintiffs Sandra and Ivan Phillips**

1320.  Plaintiffs Sandra and Ivan Phillips ("the Phillips") first learned of the foreign currency arbitrage program through Kiley's radio show, to which they began listening in March 2007.

1321.  In March 2007, the Phillips contacted Kiley to discuss the economy and about transferring their investments to Universal Brokerage FX.  During this telephone conversation, Kiley described the foreign currency arbitrage program as "investments in foreign currencies," and represented that that "it doesn't matter whether stocks went up, down or sideways, our investors profit in all kinds of conditions and markets."  Kiley also indicated that he "had relationships with foreign governments."

1322.  In subsequent telephone calls regarding the program, Kiley indicated that investments in the program were held in segregated accounts, were available to the client any time, were fully liquid, and were safe and could be moved offshore if they were threatened domestically.  Kiley also indicated that his clients "had been getting double digit rates of return for many years."

1323.  Prior to investing, the Phillips received a letter and materials from Kiley regarding the program.  In his letter, Kiley described Universal Brokerage Services and its "financial planning and diversification strategies through the use of uncorrelated asset classes."  In the letter, Universal Brokerage Services was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 646a.

1324.  The letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1325.  Included in the materials was a brochure, "Institutional Grade Investments for the Individual Investor, which made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

1326.  Based on these representations, the Phillips invested in the program through Kiley and Universal Brokerage FX in March 2007. To invest, the Phillips rolled over IRA proceeds in the amount of $46,502.41 into a self-directed IRA account with Millennium. Exhibit 647. In conjunction with this account, the Phillips completed a UBS Diversified Growth Application and Subscription Agreement, and received account statements from UBS Diversified and Universal Brokerage FX via mail. Exhibits 648-649.

1327.  The Phillips also wrote a personal check in the amount of $50,000.00, payable to "UBS Diversified," which was to be invested in the program in a cash account. Exhibits 647, 650.  In conjunction with this account, the Phillips received

account statements from UBS Diversified and Universal Brokerage FX.  Exhibit 651. The total amount of the Phillips' investment in the program is $96,502.41.

1328.  In July 2009, the Phillips heard that a problem may exist regarding their investments.  They immediately attempted to contact Kiley, but were told that he was "unavailable."  Subsequently, the Phillips learned of this lawsuit through an article in the Star Tribune.  The Phillips made a withdrawal request through Millennium for their IRA account, but have not received any funds as a result.

1329.  To date, the Phillips have no access to their funds and Defendants have provided no information regarding the existence and location of their funds.

## IIII.        Plaintiff Edward L. Hemenway

1330.  Plaintiff Edward L. Hemenway ("Hemenway") first learned of the foreign currency arbitrage program after he read an article in the Star Tribune about the program.

1331.  Hemenway began listening to Kiley's radio show in November 2007, and subsequently visited Kiley's website for additional information on the program.  On his website, Kiley represented that investments in the program are held in "individually segregated" accounts, "funds are not co-mingled with other customer's accounts," "instantly liquid—accessible 24/7 without penalty," and are "individually insured for $500,000.00."

1332.   In December of 2007, Hemenway called the telephone number provided on the radio show, and spoke to Universal Brokerage FX Senior Financial Advisor Brian Seiwert.  As a follow-up to this conversation, Hemenway received a letter and materials from Universal Brokerage FX.  Exhibit 652.

1333. The letter described Universal Brokerage FX and its "financial planning and diversification strategies through the use of uncorrelated asset classes." In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market. These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 652.

1334. The letter also stated that, "Financial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1335. The materials included a brochure entitled, "Federal Funds Income Advantage," which represented the program as "instantly liquid," "segregated account, not co-mingled with the general assets of the custodian, bank or dealer," "principal protected," and "current yield of 12%+ annually." The brochure also stated that "[t]he utilization of both our exclusive technology and unparalleled banking relationships negate all currency risks," and "[y]our principle [sic] is fully hedged by our liquidity providers and affiliate banks." The liquidity providers included Deutsche Bank, Dresdner Bank, Barclays Capital, UBS, JP Morgan, Saxo Bank, Bank of America and The Royal Bank of Scotland. See Exhibit 194.

1336. In mid-January 2008, Hemenway had another conversation with Seiwert about the currency investment program. Seiwert sent Hemenway an email stating that he represented "a wholesale independent brokerage" dealing in managed currencies, and

representing that "the way trading is done, we do not expose your funds to the market; therefore, there is no down side risk to the principle [sic]."  Exhibit 653.

1337.  Later in January 2008, Hemenway met with Kiley and Seiwert at the Van Dusen mansion.  During this meeting, Kiley and Seiwert represented that investments in the program would earn double digit returns, that there was zero risk to principal, funds were held in segregated individual accounts, and the investment offered complete liquidity.

1338.  In mid-February, Hemenway again met with Seiwert.  When Hemenway requested independent references, Seiwert provided Hemenway a copy of a Star Tribune article written by Gene Walden. Hemenway subsequently contacted Walden to inquire about Kiley and Seiwert, and Walden indicated that he was familiar with them and that he "knew lots of people in the currency program."

1339.  Based on these representations, Hemenway decided to invest in the program.  Hemenway believed that he was investing with Universal Brokerage Limited Partnership.

1340.  To that end, Hemenway met with Brian Seiwert on February 25, 2008, at Universal Brokerage offices in Burnsville, Minnesota.  Hemenway completed a Universal Brokerage Application, which Cook subsequently claimed was "lost somewhere between the secretary and compliance." But see Exhibit 654.

1341.  On April 3, 2008, Hemenway again met with Brian Seiwert for purposes of completing a new application.  The client application form was titled "UBS Diversified FX Growth." Exhibit 655.

1342. To invest, Hemenway rolled over IRA proceeds in the amount of $51,396.08 into a self-directed IRA account with Millennium, which was then to invest the funds into the program. Per instructions, the check was made payable to "Millenium Trust Co. FBO Edward L. Hemenway."  Exhibit 656.

1343.  On December 31, 2008, Hemenway sent a complaint to Trevor Cook, the purported "compliance officer," based on his concerns that the program was not as advertised and represented by Kiley and Seiwert.  Exhibit 657.

1344.  In February 2009, Hemenway met with Cook to discuss the particulars of the foreign currency arbitrage program.  Cook reiterated the representations of double digit returns, zero risk to principal, segregated individual accounts, and complete liquidity. Cook convinced Hemenway to transfer his account from Kiley's program at Universal Brokerage to Cook's "individualized" program at Oxford Global Advisors, which Cook indicated could be done at "no charge." Cook also provided and explained a sample account statement titled, "Crown Forex SA," which he told Hemenway he could expect to receive periodically as an investor with Oxford Global Advisors. Exhibit 658.

1345. To effectuate the transfer, Hemenway completed an Oxford Global Advisors Management Agreement and a Crown Forex Customer Trading Agreement for Individual Accounts. Exhibit 659.  As part of the transfer, Hemenway was also instructed to complete a transfer request form, requesting that his self-directed IRA funds be transferred from Millennium to Entrust.  Exhibit 660.

1346. In conjunction with his transferred investment, Hemenway received statements from Universal Brokerage FX, which contained no indication that he had been assigned a Crown Forex SA Account Number. Exhibit 661.

1347. In May of 2009, Hemenway attempted to have his account liquidated and the funds transferred to Cole Taylor Bank; however, this request was never honored. Exhibit 662.

1348. Upon learning of the lawsuit on July 19, 2009, Hemenway immediately attempted to contact Kiley and Seiwert about his investment, but has received no response. Hemenway also sent a letter to the Crown Forex SA trustees regarding the status of his account, but also has received no response. Exhibit 663.

1349. To date, Hemenway has no access to his funds and Defendants have provided no information regarding the existence and location of his investment.

**JJJJ.**      **Plaintiff Kris A. Fink**

1350. Plaintiff Kris A. Fink ("Fink") first learned of the foreign currency arbitrage program in February 2008, through an acquaintance who had invested with Kiley after hearing his radio show. The acquaintance indicated that he invested in the program because Kiley told him that the principal investment could never be lost.

1351. Subsequently, Fink visited Kiley's website for additional information on the program. On his website, Kiley represented the following about investments in the program:

> Financial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by various exchanges and the Federal Government. Customer

funds are held in segregated accounts providing safety, security and the liquidity that investors deserve. IRA, 401K and retirement accounts are audited extensively by OBRE (over 400 hours) on a yearly basis and are externally audited by at least two independent audit firms. These accounts have the maximum insurance coverage possible for fraud and theft through AIG: Financial Institution Bond -- $10,000,000: Surety coverage for all illegal acts by employees, director and owners. Professional liability (Errors & Omissions) -- $5,000,000: Coverage for the failure to render professional services. Directors and Officers -- $5,000,000: Coverage for wrongful acts by any officer or director. These accounts are cleared through NASD registered brokerage firms and carry SIPC insurance which protects each account to $500,000.

Exhibit 664.

1352. In March 2008, Fink contacted Tim Daley at Universal Brokerage FX for additional information on the program. In response, Daley sent Fink a letter and materials regarding Universal Brokerage FX and the foreign currency arbitrage program. In his letter, Daley described Universal Brokerage FX and its "financial planning and diversification strategies through the use of uncorrelated asset classes." In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market. These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 665.

1353. Daley's letter also stated that, "Financial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1354. Prior to investing, Fink also received a brochure entitled "Institutional Grade Investments for the Individual Investor," which represented the following regarding investments in the program: "Liquidity:  All positions are 100% liquid on a 24 hour basis";  "Trading Discipline:  100% of the time the long USD/JPY position is fully insured," "Funds are deposited with a  commercial bank in the client's name"; "Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds"; "Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." See Exhibit 329.

1355.  In a subsequent telephone conversation with Daley, Fink was told that there was no downside risk to the principal, that the funds were insured and guaranteed, and that the funds would be held in individual accounts at Entrust.

1356. Based on these representations, Fink invested in the program through Universal Brokerage FX on July 1, 2008. Exhibit 666. To invest, Fink rolled over IRA proceeds in the amount of $400,000.00 into a self-directed IRA account with Entrust, which was then to invest in the program with Crown Forex SA in Switzerland. Exhibit 667.

1357. In conjunction with her investment, Fink completed a Crown Forex SA Customer Trading Agreement for Individual Accounts with the assistance of Daley, and received account statements from Entrust and, purportedly, Crown Forex SA in the mail. Exhibits 668-669.  The Entrust statements reflected that her funds were transferred to Crown Forex SA in Switzerland. Fink was also able to access her Crown Forex SA statements online at www.crownforex.com.  Exhibit 670.

1358.  Beginning in January 2009, Fink requested a series of distributions from her account. See, e.g., Exhibit 671.  For each distribution, it typically took multiple days to weeks to receive the distributions.

1359.  On July 18, 2009, Fink learned of this lawsuit from the acquaintance who had introduced her to the foreign currency arbitrage program.   Subsequently, Fink received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing her of this lawsuit, the Crown Forex SA bankruptcy proceedings, and that these entities "are unable to fulfill withdrawal or redemption requests."  See Exhibit 13.

1360.  Fink then contacted officials at FINMA handling the Crown Forex SA bankruptcy regarding the status of her account, but they were unable to provide any information.  Fink then contacted the Crown Forex SA trustees regarding the status of her account and was informed of the following:  "According to the file we have, you name and your account do not exist in the trading system of Crown Forex SA."  Exhibit 672.

1361.  To date, Fink has no access to her funds and the only other information she regarding the existence and location of her funds is a wire transfer document indicating that the funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA. See Exhibit 667.

1362.  Fink has received no information from Entrust as to why it failed to follow the instructions in her Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, which is located in Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC.  Fink also

has received no explanation for why her accounts statements from Entrust showed that her investment funds had been transferred to Crown Forex SA at St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, when this was not the case. <u>See</u> Exhibit 667, 673.

**KKKK.      Plaintiff Mark Cobb**

1363.  Plaintiff Mark Cobb ("Cobb") first learned of the foreign currency arbitrage program through Kiley's column in the International Forecaster newsletter, which he began reading in May 2007.   In his column, Kiley represented the following about investments in the program:

> Our IRA accounts are insured to $500,000 per account and are held in SEGREGATED ACCOUNTS.  They are held with the largest independent custodian in the U.S.—over 9,500 accounts and 900 million in assets.  <u>All accounts are always 24 hours per day liquid.</u>  Statements can also be checked 24 hours per day so you have an up-to the second accountings. Clients also have a choice <u>if they would like to use some of our European based holding companies.</u>  Cash accounts also offer typical FDIC and other insurance and guarantee backing.  This is all you need to know."

1364. In April 2008, Cobb contacted Kiley for additional information on the program.  During their conversation, Kiley reiterated the representations in his column that investments in the program were fully liquid, principal protected, were held in individual accounts, earned a double-digit rate of return, and offered security.

1365. Based on these representations, Cobb invested in the foreign currency arbitrage program with Crown Forex SA through Kiley in August 2008.  To invest, Cobb wrote a $55,000.00 personal check payable to "Crown Forex," to establish a cash account with Crown Forex SA.  Exhibit 674.

1366.  Cobb also rolled over $89,531.82 in IRA proceeds into a self-directed IRA with Entrust, which was then directed to invest the funds with Crown Forex SA in Switzerland. Exhibits 675-676.  The total amount of Cobbs' investment in the program is $144,531.82.

1367.  In conjunction with his investments, Cobb completed Crown Forex SA Customer Trading Agreements for Individual Accounts with the assistance of Julia Smith, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA via mail.  Exhibits 677-678.

1368.  In August 2009, Cobb received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing him of this lawsuit, the Crown Forex SA bankruptcy proceedings, and that these entities "are unable to fulfill withdrawal or redemption requests."  See Exhibit 13.

1369.  Subsequently, Cobb sent an email to the Crown Forex SA trustees requesting information on the status of his account.  In response, Cobb was told that "According to the file we have, your name does not exist in the clients' trading system of Crown Forex SA."  Exhibit 679.

1370.  To date, Cobb has no access to his funds and the only information he has regarding the existence and location of his funds are a check copy and a wire transfer document indicating that the funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA in Switzerland.  Exhibit 680.

1371.  Cobb has received no information from Entrust as to why it failed to follow the instructions in his Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC.

**LLLL.**     **Plaintiff Jerome Reynolds**

1372.  Plaintiff Jerome Reynolds ("Reynolds") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in April 2008.

1373.  In April 2008, Reynolds telephoned Kiley's office to arrange a meeting meet with Kiley.  Subsequently, Reynolds and Kiley met on several occasions.

1374.  At these meetings, Kiley represented that all funds invested in the program would be held in separate segregated accounts and fully liquid 24 hours a day, seven days a week; investments in the program were insured up to $250,000.00; earned guaranteed annual returns of 10-12% or more; and involved no risk to principal.

1375.  As a follow-up, Kiley also sent Reynolds a letter and materials about the program.  In his letter, Kiley described Universal Brokerage FX and its "financial planning and diversification strategies through uncorrelated asset classes."  In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offered minimum investments, including "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 681.

1376. Kiley's letter also stated the following: "Financial Security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1377. Included in the materials provided Reynolds was a brochure entitled, "Institutional Grade Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program: "Liquidity: All positions are 100% liquid on 24 hours basis. Trading Discipline: 100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name. Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds. Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time." See Exhibit 69.

1378. At a May 9, 2008 meeting, Kiley presented Reynolds with a Universal Brokerage Client Application, and a Universal Brokerage General Business Terms Currency Exchange Agreement, which stated that the funds are held by major institutions in segregated accounts, "customer funds are segregated from the general assets of the Company and the pass thru Bank" and "appropriate stops set so that no single transaction shall risk more than 2% of the customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance." Exhibit 682.

1379.  Based on these representations, Reynolds decided to invest in the program through Kiley in August 2008.  Based upon Kiley's representations, Reynolds believed his funds would be invested in the program with Crown Forex SA.

1380.  To invest, Reynolds rolled over $117,173.54 in 401k funds into a self-directed IRA account with Entrust.  Exhibit 683.

1381.  In conjunction with his investment, Reynolds completed the Universal Brokerage Client Application, the Universal Brokerage General Business Terms Currency Exchange Agreement, and a Crown Forex SA Customer Trading Agreement for Individual Accounts with the assistance of Julia Smith. Exhibit 684.  Reynolds was never provided copies of these completed documents.

1382.  Reynolds received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA via regular mail.   Exhibit 685.

1383.  On July 21, 2009, Reynolds received letters from Universal Brokerage FX/UBS Fund and Oxford Global Partners, LLC, informing him of this lawsuit, the Crown Forex SA bankruptcy proceedings, and indicating that these entities "are unable to fulfill withdrawal or redemption requests." See Exhibit 13.

1384.  Reynolds immediately attempted to contact Kiley and the Universal Brokerage FX offices, but there was no answer and the voicemail was not accepting messages.  Reynolds also sent an email to the trustees in the bankruptcy of Crown Forex SA in Switzerland to inquire about the status of his investment, but has received no response.

1385.  To date, Reynolds has no access to his funds and the only information he regarding the existence and location of his funds is a wire transfer document indicating that the funds were wire to Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA.  Exhibits 686-687.

1386.  Reynolds has received no information from Entrust as to why it failed to follow the instructions in his Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC. See Exhibit 683.

**MMMM.    Plaintiff Anthony J. Skufca**

1387.  Plaintiff Anthony J. Skufca ("Skufca") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in 2005.

1388.  In early 2007, Skufca called the telephone number provided on Kiley's radio show for additional information on the program. In response, Skufca received a telephone call from Kyle Garman at Universal Brokerage FX.

1389.  On various occasions from early to mid-2007, Skufca spoke on the telephone with Kiley, Garman, and Tim Daley about the foreign currency arbitrage program.  During each conversation, they represented that investments in the program were held in separate segregated accounts, fully liquid 24 hours a day, seven days a week, earned guaranteed annual returns of 10-12% or more, and involved no risk to principal because of hedging.

1390. Skufca also received an investment packet from Kiley and Universal Brokerage FX in early 2007, which reiterated the representations of segregated accounts, instant liquidity, security and principal protection.

1391. Based on these representations, Skufca invested in the program through Kiley and Universal Brokerage FX in November 2007. To invest, Skufca rolled over $77,953.94 in 401k proceeds into a self-directed IRA account with Millennium, which was then to place to the funds in the foreign currency arbitrage program. Exhibit 688.

1392. In conjunction with his investment, Skufca completed a Universal Brokerage Client Application with the assistance of Julia Smith, and received account statements from Universal Brokerage FX and Millennium via regular mail. Exhibits 689-690.

1393. On July 10, 2009, Skufca received a letter from Millennium informing him of the lawsuit. Skufca immediately attempted to contact Kiley and the Universal Brokerage FX offices, but there was no answer and Skufca's messages were never returned.

1394. To date, Skufca has no access to his funds and Defendants have provided no information regarding the existence and location of his funds.

**NNNN.**     <u>**Plaintiff David Burt**</u>

1395. Plaintiff David Burt ("Burt") first learned of the foreign currency arbitrage through Kiley's radio show, to which he began listening in mid-2007. On his show, Kiley represented investments in the program as safe with no loss of funds, and available within 24 hours.

1396. Subsequently, Burt called the telephone number provided on the radio show for additional information on the program.  In response, Burt received a telephone call from Tim Daley, who identified himself as a representative of Universal Brokerage FX.  During this and subsequent conversations with Daley in mid-2007, Burt was told that the program provided a "protection of principal" investment and a guaranteed rate of return.

1397. Daley also sent Burt a brochure entitled, "Institutional Grade Investments for the Individual Investor," which represented the foreign currency arbitrage program as follows:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly.  Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See, e.g., Exhibit 129.

1398. Based on these representations, Burt invested in the program through Universal Brokerage on November 14, 2007.  To invest, Burt wrote a personal check in the amount of $30,000.00, payable to Universal Brokerage FX, and endorsed a check to Universal Brokerage FX in the amount of $20,000.00.  Exhibit 691.

1399. In conjunction with his investment, Burt completed a Universal Brokerage Client Application, and a Universal Brokerage General Business Terms Currency Exchange Agreement, which stated that funds are held by major institutions in segregated accounts, "[c]ustomer funds are segregated from the general assets of the Company and the pass thru Bank," and "appropriate stops set so that no single transaction shall risk

more than 2% of the Customer's balance, and all combined open transactions at any time shall not risk more than 20% of the Customer's balance." Exhibit 692.

1400. Burt received account statements from Universal Brokerage FX via mail. See, e.g., Exhibit 693.

1401. In 2008, Burt invested additional funds in the amount of $90,000.00 into the program. To invest these additional funds, Burt wrote the following personal checks: (1) a $10,000.00 check dated February 20, 2008, payable to Universal Brokerage FX; (2) a $40,000.00 check dated September 9, 2009, payable to "Crown 4x," as instructed; and (3) a $40,000.00 check dated September 24, 2008, payable to "Crown 4x," as instructed. Exhibit 694. The total amount of Burt's investment in the program is $140,000.00.

1402. On November 5, 2008, Burt received an email from Daley reiterating that, "the way trading is done, we do not expose our clients funds to the market; therefore, there is no down side risk to the principle. Bear in mind, these are non-correlated assets; therefore, any "Crises" anywhere in the world (terrorist attacks or an equity exchange drop, like the 9% drop on the Shanghai Exchange the end of last February), only enhances our performance." Exhibit 695.

1403. On July 25, 2009, Burt received a letter from Universal Brokerage FX/UBS Fund informing him of this lawsuit, the Crown Forex SA bankruptcy proceedings, and that they "are unable to fulfill withdrawal or redemption requests." See Exhibit 13.

1404. Burt immediately attempted to contact Daley and Universal Brokerage FX via email and telephone, but never received a response. See, e.g., Exhibit 696.

1405.  To date, Burt has no access to his funds and the only information he has regarding the existence and location of his funds are check copies indicating that the funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705. Exhibit 697.

## OOOO.        Plaintiff Bruce T. Peacock

1406.  Plaintiff Bruce T. Peacock ("Peacock") first learned of the foreign currency arbitrage program in October 2007, through Kiley's radio show and website.

1407.  In spring 2008, Peacock contacted Kiley for additional information on the program.  In response, Peacock received materials from Jared Jenkins, which included a brochure entitled, "Institutional Grade Investments for the Individual Investor."  This brochure made the following representations about the foreign currency arbitrage program:  "Liquidity:  All positions are 100% liquid on 24 hours basis.  Trading Discipline:  100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name.  Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.  Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

1408.  In May 2008, Peacock had telephone conversations with Jenkins, Kiley and Cook regarding investments in the program.  They represented that investments in the program provided a secure principal and would earn returns of 10% per year.  Cook represented the program as "completely safe."

1409.  Based on these representations, Peacock invested in the program through Kiley and Universal Brokerage FX on June 20, 2008. To invest, Peacock wrote a check from his business account in the amount of $88,000.00, payable to Universal Brokerage FX, and established an account on behalf of his business, Lake Geneva, LLC.  Exhibit 698.

1410.  In conjunction with this investment, Peacock completed a Universal Brokerage Client Application and a Universal Brokerage General Business Terms Currency Exchange Agreement, and received account statements from Universal Brokerage FX via regular mail.  Exhibits 699-700.

1411.  On September 16, 2008, Peacock invested $60,000.00 in additional funds into the program by writing two checks from his business accounts to Universal Brokerage FX.  Exhibit 701.

1412.  On April 23, 2009, Peacock invested another $25,000.00 into the program by writing a business check to Universal Brokerage.  Exhibit 702.  The total amount of Peacock's investment in the program is $173,000.00.

1413.  In July 2009, Peacock learned about potential problems with his investment when Kiley's website was shut down, and no one was answering calls at Universal Brokerage FX.  Peacock immediately contacted Jenkins and submitted withdrawal forms to him.  Exhibit 703.

1414.  To date, Peacock's withdrawal request has not been honored and he has no access to his funds.  The only information Peacock has regarding the existence and location of his funds are check copies indicating that the funds were deposited with

Universal Brokerage FX Management, LLC's Associated Bank Account No. ******5601. Exhibit 704.

**PPPP. <u>Plaintiff Donald Kincaid</u>**

1415.  Plaintiff Donald Kincaid ("Kincaid") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in April 2008.

1416.  In February 2009, Kincaid called the telephone number provided on Kiley's radio show to obtain additional information on the program.  In response, Kincaid received a letter from Barbara Pefley, Investment Advisor for Universal Brokerage FX.

1417.  In her letter, Pefley described Universal Brokerage FX and its "financial planning and diversification strategies through the use of uncorrelated asset classes."  In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers <u>not correlated to the stock market</u>.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 705.

1418.  Pefley's letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1419.  In March 2009, Kincaid spoke with Pefley about investing in the program. During their conversation, Pefley represented that investments in the program were liquid and could be withdrawn at any time, principal protected, and held in segregated accounts.

1420. Based on these representations, Kincaid invested in the program through Universal Brokerage FX in April 2009. To invest, Kincaid rolled over $99,436.78 in 401k proceeds into a self-directed IRA with Entrust, which was then directed to invest the funds with Crown Forex SA. Exhibit 706.

1421. In conjunction with his investment, Kincaid completed a Crown Forex SA Customer Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA. Exhibits 707-708.

1422. In July 2009, Kincaid learned of this lawsuit while searching the Internet. He immediately attempted to contact Universal Brokerage FX, but there was no answer and his calls were never returned.

1423. To date, Kincaid has no access to his funds and the only information he has regarding the existence and location of his funds is a wire transfer document indicating that the funds went to Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA in Switzerland. Exhibit 709.

1424. Kincaid has received no information from Entrust as to why it failed to follow the instructions in his Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC. See Exhibit 706.

QQQQ.    **Plaintiff Lawrence Kim Treiber**

1425. Plaintiff Lawrence Kim Treiber ("Treiber") first learned of the foreign currency arbitrage program through Kiley's radio show.

1426. On April 16, 2009, Treiber called the telephone number provided on the radio show to obtain additional information on the foreign currency arbitrage program. In response, Treiber received a letter and materials from Jared Jenkins, an Investment Advisor at Universal Brokerage FX.

1427. In his letter, Jenkins described Universal Brokerage FX and its "financial planning and diversification strategies through the use of uncorrelated asset classes." In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market. These managers have direct access to all international markets and can capitalize on rising and falling markets." Exhibit 710.

1428. Jenkins' letter also stated that, "Financial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1429. The materials provided by Jenkins included a brochure entitled, "Institutional Grade Investments for the Individual Investor," which made the following representations about the foreign currency arbitrage program: "Liquidity: All positions are 100% liquid on 24 hours basis. Trading Discipline: 100% of the time the long USD/JPY position is fully insured" and "Funds are deposited with a commercial bank in the client's name. Statements are issued quarterly. Customer funds are held in segregated accounts—they are not co-mingled with other clients' or company funds.

Customer funds are always 100% liquid—24 hours per day and may be withdrawn at any time."  See Exhibit 69.

1430.  Another brochure entitled, "Currencies," also represented that the program provides "liquidity or access to your funds 24 hours per day," "stability," and "strong returns."  See Exhibit 129.

1431.  In conversations in April and May 2009, Jenkins represented that investments in the program were held in individual accounts at Crown Forex SA in Switzerland, would earn 11.5% annual returns, there would be no trading losses, and funds would be available "24/7" online.

1432.  Based on these representations, Treiber invested in the program through Universal Brokerage FX in June 2009. To invest, Treiber rolled over IRA proceeds in the amount of $100,000.00 into a self-directed IRA with Entrust, which was then directed to invest the funds in the program with Crown Forex SA.  Exhibit 711.

1433.  In conjunction with his investment, Treiber completed a Crown Forex SA Customer Trading Agreement for Individual Accounts, and received account statements from Universal Brokerage FX.  Exhibit 712-713.

1434.  In late June 2009, Treiber was unable to reach anyone at Universal Brokerage FX.   After Kiley's radio show was no longer being broadcast, Treiber suspected that there may be issues with his investment and searched the internet for information. As a result of his search, Treiber located an article in the Star Tribune about this lawsuit.  He immediately and repeatedly attempted to contact Universal Brokerage FX and Jenkins, but no one answered the calls and his messages were never returned.

1435.  To date, Treiber has no access to his funds and the only information he has regarding the existence and location of his funds is a wire transfer document indicating that the funds were wired to Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA.  Exhibit 714.

1436.  Treiber has received no information from Entrust as to why it failed to follow the instructions in his Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC.  See Exhibit 714.

## RRRR.      Plaintiffs Robert A. Roof

1437.  Plaintiff Robert A. Roof ("Roof") first learned of the foreign currency arbitrage program through Kiley's radio show, to which he began listening in July 2007.

1438.  In August 2008, Roof visited Kiley's website, which provided the following representations:

> Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by various exchanges and the Federal Government.  Customer funds are held in segregated accounts providing safety, security and the liquidity that investors deserve.  IRA, 401K and retirement accounts are audited extensively by OBRE (over 400 hours) on a yearly basis and are externally audited by at least two independent audit firms.  These accounts have the maximum insurance coverage possible for fraud and theft through AIG:   Financial Institution Bond -- $10,000,000: Surety coverage for all illegal acts by employees, director and owners.    Professional liability (Errors & Omissions) -- $5,000,000:  Coverage for the failure to render professional services.  Directors and Officers -- $5,000,000:  Coverage for wrongful acts by any officer or director.  These accounts are

cleared through NASD registered brokerage firms and carry
SIPC insurance which protects each account to $500,000.

See Exhibit 58.

1439.  Roof called the telephone number provided on the radio show to obtain additional information on the program, and spoke with Kiley about investing in the program.

1440.  During this and subsequent telephone conversations in August and September 2008, Kiley represented that investments in the program are "fully liquid 24/7" and held "at Entrust Midwest in your separate account in your name."

1441.  Based on these representations, Roof invested in the program through Kiley in October 2008.  To invest, Roof rolled over $373,378.73 in IRA proceeds into a self-directed IRA account with Entrust, which was then directed to invest the funds in the program with Crown Forex SA.  Exhibits 715-717.

1442.  In conjunction with his investment, Roof completed a Crown Forex SA Customer Trading Agreement for Individual Accounts with the assistance of Julia Smith, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA.  Exhibits 718-721.

1443.  After investing, Roof spoke with Kiley on multiple occasions regarding the status of his investment.  Kiley always indicated that the investments were secure and doing well.

1444.  In August 2009, Roof returned from traveling and discovered that Kiley's radio show was no longer being broadcast and his website was shut down.  Roof

immediately attempted to contact Kiley and Universal Brokerage FX offices, but no one answered the calls.

1445.  Roof then contacted Entrust and was told that there were "problems" with his investment.  Subsequently, Roof made withdrawal requests to Entrust and Crown Forex SA, but his funds were not forthcoming.

1446.  To date, Roof's withdrawal requests have not been honored and he has no access to his funds.  The only information Roof has regarding the existence and location of his investment are wire transfer documents indicating that the funds were wired to Crown Forex LLC at Associated Bank Account No. ******1705, rather than Crown Forex SA.  Exhibits 722-723.

1447.  Roof has received no information from Entrust as to why it failed to follow the instructions in his Buy/Sell Direction Letter that the funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC. See Exhibit 720.  Roof  also has received no explanation for why his invoices from Entrust showed that his investment funds had been transferred to Crown Forex SA at St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, when this was not the case.  Exhibit 717.  Roof also has received no explanation for why his account invoices from Entrust showed that his investment funds had been transferred to Crown Forex SA at St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, when this was not the case.  See, e.g., Exhibit 724.

**SSSS.**        **Plaintiff Bonnie E. Gloth**

1448.   Plaintiff Bonnie Gloth ("Gloth") first learned of the foreign currency arbitrage program when she received an unsolicited letter from Walt Krawza of Universal Brokerage FX in April 2008.

1449.   The letter described Universal Brokerage FX and its "financial planning and diversification strategies through the use of uncorrelated asset classes."  In the letter, Universal Brokerage FX was described as an investment advisory firm founded in 1987 that offers clients, "Money Managers not correlated to the stock market.  These managers have direct access to all international markets and can capitalize on rising and falling markets."  Exhibit 725.

1450.   The letter also stated that, "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in segregated accounts providing safety, security and liquidity." Id.

1451.   As a follow-up to the letter, Krawza left Gloth a voicemail indicating that he had received her information because she had previously visited Kiley's website or listened to his radio show.

1452.   In May 2008, Gloth returned Krawza's call but was informed that he had been terminated from Universal Brokerage FX. Instead, Gloth spoke directly with Kiley about the foreign currency arbitrage program.  During this and subsequent conversations in June and July 2008, Kiley represented that investments in the program were completely protected, held in separate, secure accounts with Crown Forex SA in

Switzerland, were fully liquid and available within 24 hours of notifying Universal Brokerage FX of the withdrawal request. Kiley also indicated that Gloth could expect a rate of return of approximately 12% per year.

1453. Based on these representations, Gloth invested in the program through Universal Brokerage, which was then to open accounts with Crown Forex SA.  To invest, Gloth rolled over IRA proceeds into a self-directed IRA account with Entrust, which was then to transfer the funds to Crown Forex SA in Switzerland, and wrote checks in the amount of $300,000.00 and $6,349.73 payable to "Crown" that were purportedly used to fund two cash accounts with Crown Forex SA.  Exhibits 726-727.

1454. In conjunction with her investment, Gloth entered into Crown Forex SA Customer Trading Agreements, and received account statements from Universal Brokerage FX and, purportedly, Crown Forex SA.  Exhibits 728-729.

1455. In March and June 2009, Gloth requested withdrawals of $12,000.00 and $80,000.00, respectively, from her Crown Forex SA accounts. These withdrawals were honored and the funds were sent to Gloth via wire transfer.  Exhibit 730.

1456. On July 6, 2009, Gloth sought information regarding her account balances and was told that her cash account contained $231,776.83, and her IRA account contained $10,557.30.   Exhibit 731; see also Exhibit 729.   That same day, Gloth requested another withdrawal of $4,000.00 from her accounts; however, this withdrawal was never honored.  Exhibit 732.

1457. On or about July 11, 2009, Gloth's sister heard a radio program indicating that Kiley and his entities may be experiencing financial problems, and contacted Gloth

regarding this information.  Gloth immediately sent emails to Kiley and Smith to obtain information about the status of her investments, but these emails were not returned. Gloth then learned of the Star Tribune article, which informed her of this lawsuit.

1458.  On July 16, 2009, Gloth formally requested closure of her Crown Forex SA accounts and that the funds be transferred to her personal bank account.  Exhibit 733.

1459.  To date, Gloth's withdrawal request has not been honored, and she has no access to her funds.  The only information Gloth has regarding the existence and location of her investment funds are check copies and wire transfer documents indicating that the funds were deposited with Crown Forex LLC at Associated Bank Account No. ******1705 and Universal Brokerage FX Management LLC at Associated Bank Account No. ******5601, rather than Crown Forex SA. See Exhibits 727, 734.

1460.  Gloth has received no information from Entrust as to why it failed to follow the instructions in her Buy/Sell Direction Letter that her personal IRA funds be sent to Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland, and instead transferred the funds into a domestic Associated Bank account in Green Bay, Wisconsin held by Crown Forex LLC.  See Exhibit 726.

## IV.   DEFENDANT ENTRUST

1461.  Plaintiffs entered into Agreements with Entrust, appointing Entrust as the custodian and/or administrator of their retirement accounts.

1462. Pursuant to their Agreements with Entrust, Plaintiffs transferred their investment funds to Entrust, as custodian and/or administrator for Plaintiffs' self-directed

indivudal retirement accounts.   The Agreements provided that Entrust would act only upon the express authorization of the customer.

1463.  By entering into the agreements with Plaintiffs, representing themselves as custodians and/or administrators and assuming the role as custodian and/or administrator over Plaintiffs' retirement accounts, Entrust became obligated to hold and safeguard Plaintiffs' funds and became fiduciaries over the funds entrusted to them.

1464.  These fiduciary and custodial duties arise under common law as well as IRS Code Section 408.  Section 408(a) states that IRA accounts must be trust or custodial accounts, and contains numerous legal requirements for IRA accounts.  Additionally, the trustee must be a federal or state chartered bank or nonbank trustee that has obtained approval from the IRS to act as a trustee or custodian.

1465.  Once their funds were transferred to Entrust, Plaintiffs then instructed Entrust to transfer their funds pursuant to Buy Direction Letters or similar agreements. The Buy Direction Letters, or similar documents, instructed Entrust to transfer Plaintiffs' funds to "Crown Forex SA, St. Hubert 38, 2854 Bassecourt P.O. Box 247 Switzerland." See, e.g., Exhibits 66-68, 267, 283, 344, 349-350, 360, 409, 448, 459, 471, 474, 477, 508, 538, 545, 591, 613, 667, 683, 706, 714, 720, and 726.

1466.  Entrust negligently failed to transfer Plaintiffs' funds to Crown Forex SA in Switzerland; instead, transferring the funds to Crown Forex LLC, a separate, distinct and ficticious entity that has no affiliation with Crown Forex SA.  The Crown Forex LLC account where the funds were transferred was a domestic account at Associated Bank in Green Bay, Wisconsin.

1467.  In many instances, Entrust took investment direction from persons other than Plaintiffs, who had no authorization for making investment decisions regarding Plaintiffs' accounts.

1468.  As a result of the incorrect and unauthorized transfers, Plaintiffs' funds were converted and misappropriated.

1469.  Plaintiffs have contacted Entrust in an attempt to withdraw their assets and have been informed that there are no funds available, despite the fact that Entrust continues to provide statements which identify and represent a positive monetary value for each account.

1470.  Plaintiffs investments with Entrust qualify as retirement plans under section 408 of the Internal Revenue Code, 26 U.S.C. § 408.

## V.   DEFENDANT ASSOCIATED BANK

1471.  Defendants Kiley and Cook opened and maintained the following bank accounts at Associated Bank:  (1) Universal Brokerage FX Management LLC; (2) Crown Forex LLC; (3) Basel Group LLC; (4) Oxford Global FX LLC; and (5) Market Shot LLC.  Associated Bank was told by Defendants Kiley and Cook that one or more of these accounts would hold client investment funds.

1472.  Defendants used these Associated Bank accounts to divert client funds from the intended recipients, misappropriate client funds, and convert client funds for their own purposes.

1473. Associated Bank failed to enforce customer identification and account opening procedures, and to perform any commercially reasonable due diligence as it

relates to these accounts. Upon information and belief, Associated Bank declined to enforce account opening and customer identification procedures and to perform due diligence as it relates to Defendants and their accounts because Defendants were customers whose activities profited Associated Bank.

1474. Had Associated Bank followed banking regulations and commercially reasonable practices in the opening and monitoring of these accounts, it would have learned that one or more of these account holders were non-registered entities lacking any Secretary of State documentation or valid tax identification numbers and using fictitious addresses.

1475. Upon information and belief, Associated Bank also failed to enforce regulations and procedures relating to account monitoring, compliance, suspicious activity reporting, and anti-money laundering that would have identified account irregularities, inconsistent payees and endorsements, and suspicious account activity related to Defendants' Associated Bank accounts.

1476. Had Associated Bank followed banking regulations, commercially reasonable practices, and other statutory banking provisions, it would not have permitted checks payable to "Crown Bank," "Crown Forex S.A.," "Crown," to be deposited into the Crown Forex LLC account; or checks payable to "UBS Diversified" to be deposited into the Universal Brokerage FX Management LLC account. See e.g., Exhibits 66-68, 74, 82, 283, 349-350, 360, 409, 448, 474, 477, 484a, and 634. ¶ 331.

1477. Associated Bank's negligence in failing to enforce banking regulations, to follow commercially reasonable practices, and to comply with other statutory banking

provisions provided Defendants the mechanism to perpetrate and continue their fraudulent scheme undetected and undeterred.

## VI.   LOCATION OF FUNDS.

1478. Documents obtained through expedited discovery have revealed that a significant portion of Plaintiffs' funds were deposited into Crown Forex LLC's Associated Bank Account No. ******1705, UBS Diversified Growth's Wells Fargo Account No. ******2710, and Universal Brokerage FX Management LLC's Associated Bank Account No. ******5601.

1479. In the last two years, approximately $190 million has moved through these three accounts, with a large portion going directly to Defendants and to other individuals and/or entities unrelated to Plaintiffs.  See Affidavit of Patricia J. Loo [Docket No. 131].

1480. Since April 2007, Beckman and his wife have received $6,606,108.99 from the Crown Forex LLC's Associated Bank Account No. ******1705 and from UBS Diversified Growth's Wells Fargo Account No. ******2710.  Exhibit 735.

1481. Since April 2007, Cook has received $3,428,239.90 from UBS Diversified Growth's Wells Fargo Account No. ******2710.  Id.  Exhibit 736.

1482. Since February 2007, Market Shot, LLC, an entity for which Cook is the account signatory, received $5,809,000.00 from UBS Diversified Growth's Wells Fargo Account No. ******2710.  See Exhibit 7; Exhibits 736-737.

1483. Since March 2007, Pettengill has received $4,400,000.00 from UBS Diversified Growth's Wells Fargo Account No. ******2710.  Exhibit 738.

1484.  Since October 2007, Oxford Global Advisors has received $4,420,000 from UBS Diversified Growth's Wells Fargo Account No. ******2710, and $58,470.82 from Crown Forex LLC's Associated Bank Account No. ******1705.  Exhibit 739.

1485.  Since December 2008, Oxford Global Partners has received $710,000.00 from Crown Forex LLC's Associated Bank Account No. ******1705.  Exhibit 740.

1486.  Since December 2007, various other Oxford companies have received the following amounts:  Oxford FX Growth received $3,451,000.00 from UBS Diversified Growth's Wells Fargo Account No. ******2710; Oxford Global Investments received $500,000.00 from Crown Forex LLC's Associated Bank Account No. ******1705; Oxford Global FX received $1,350,000.00 from UBS Diversified Growth's Wells Fargo Account No. ******2710, and $1,797,000.00 from Crown Forex LLC's Associated Bank Account No. ******1705; and an unspecified "Oxford" company received $50,000.00 from Crown Forex LLC's Associated Bank Account No. ******1705.  See Exhibits 739-742.

1487.  Since March 5, 2008, Crown Forex LLC has received $8,799,435.00 from UBS Diversified Growth's Wells Fargo Account No. ******2710.  Exhibit 743.

1488.  Since July 2008, UBS Diversified has received $23,612,000.00 from Crown Forex LLC's Associated Bank No. ******1705, and $450,000.00 from Universal Brokerage FX Management LLC's Associated Bank Account No. ******5601.  Exhibit 744; see also Exhibits 739-742.

1489.  On June 29, 2009, shortly after the Ohio Plaintiffs requested withdrawal of their funds from Defendants, $3,223,600.00 was withdrawn from Crown Forex LLC's Associated Bank Account No. ******1705.   See Exhibit 742.

## COUNT I
### (Breach of Contract: Defendants Cook, Kiley, Durand, Beckman, Pettengill, UB Entities and Oxford Companies)

1490.  Plaintiffs restate and reallege paragraphs 1 through 1489 of this Complaint as if set forth herein.

1491.  In soliciting and accepting Plaintiffs' investments, Cook, Kiley, Beckman, Pettengill, and Durand, were acting as agents for themselves and for the UB Entities and Oxford Companies.

1492.  Defendants have breached their oral and written contracts with Plaintiffs to pay guaranteed returns, immediately liquidate investments upon request, preserve investment principal, hold the funds in segregated accounts, secure the funds with reputable liquidity providers, and/or insure the funds.

1493.  Defendants' actions and omissions have caused Plaintiffs to incur damages in excess of $35 million.

## COUNT II
### (Fraud: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1494.  Plaintiffs restate and reallege paragraphs 1 through 1493 of this Complaint as if set forth herein.

1495.  Cook, Kiley, Beckman, Pettengill, and Durand, for themselves and as agents of the UB Entities and the Oxford Companies, knowingly misrepresented to Plaintiffs the features of the foreign currency arbitrage investment.

1496.  Specifically, Defendants falsely represented that the investments had a guaranteed rate of return, that Plaintiffs' principal was protected, that the investments were instantly liquid, that investment funds were maintained in segregated accounts, that funds were secured by reputable liquidity providers, and that the funds were insured.

1497.  Defendants falsely represented to some Plaintiff that funds were being transferred to Crown Forex SA or Crown Bank, when the funds were actually deposited in an account entitled Crown Forex LLC., a non-existent, non-registered entity over which Defendant Kiley and his assistant Julia Smith had control.

1498.  Plaintiffs justifiably relied on these misrepresentations to their detriment.

1499.  Defendants' fraudulent conduct has caused Plaintiffs to incur damages in excess of $35 million.

## COUNT III
### (Minn. Stat. § 80A.68: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1500.  Plaintiffs restate and reallege paragraphs 1 through 1499 of this Complaint as if set forth herein.

1501.  Cook, Kiley, Beckman, Pettengill and Durand, for themselves and as agents of the UB Entities and the Oxford Companies, violated Minn. Stat. § 80A.68 by employing devices, schemes and artifices to defraud; making untrue statements of material facts or omitting to state material facts necessary to make the statements made,

in light of the circumstances under which they were made, not misleading; and engaging in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with the sale to Plaintiffs of foreign currency arbitrage investments.

1502. Plaintiffs reasonably relied on Defendants' representations regarding the guaranteed rates of return, their principal being protected, the investment being instantly liquid and held in segregated accounts with reputable institutions, and Plaintiffs would not have made the investments if Defendants had truthfully represented all material facts.

1503. Defendants either knew or recklessly disregarded that their representations were materially inaccurate and omitted material information, and that their misrepresentations and omissions would mislead Plaintiffs.

1504. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in excess of $35 million.

## COUNT IV
### (Minn. Stat. § 80A.69: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1505. Plaintiffs restate and reallege paragraphs 1 through 1504 of this Complaint as if set forth herein.

1506. Cook, Kiley, Beckman, Pettengill, and Durand, for themselves and as agents of the UB Entities and the Oxford Companies, provided investment advice to Plaintiffs as to the advisability of investing in the foreign currency arbitrage program.

1507. Defendants received compensation for the investment advice provided to Plaintiffs.

1508.  In providing advice to Plaintiffs, Defendants employed a device, scheme, or artifice to defraud Plaintiffs, and/or engaged in an act, practice or course of business that operated as a fraud or deceit upon Plaintiffs in connection with the sale to Plaintiffs of the foreign currency arbitrage investments.

1509.  Plaintiffs reasonably relied on Defendants' representations regarding the fixed interest return, their principal being protected, the investment being instantly liquid, and funds being held in segregated accounts with reputable institutions, and Plaintiffs would not have made the investment if Defendants had truthfully represented all material facts.

1510.  Defendants either knew or recklessly disregarded that their representations were materially inaccurate and omitted material information, and that their misrepresentations and omissions would mislead Plaintiffs.

1511. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered in excess of $35 million in damages.

## COUNT V
### (Violation of Rule 10b-5 of the Securities Exchange Act of 1934: 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1512.  Plaintiffs restate and reallege paragraphs 1 through 1511 of this Complaint as if set forth herein.

1513.  In connection with the sale of securities, Defendants made false statements, and failed to disclose material facts that a reasonable investor would want to know that,

in light of the circumstances under which they were made, rendered such statements misleading to Plaintiffs.

1514.  In connection with the sale of securities, Defendants employed a scheme to defraud Plaintiffs.

1515.  In connection with the sale of securities, Defendants engaged in a practice or course of conduct that operated as a fraud and deceit upon Plaintiffs.

1516.  Defendants engaged in the aforementioned conduct with the intent to mislead Plaintiffs and/or with recklessness that was the functional equivalent of an intent to mislead Plaintiffs.

1517.  Defendants' misrepresentations, undisclosed facts, and other acts and omissions were material to Plaintiffs' decision to purchase these securities.

1518.  Plaintiffs have suffered damages in excess of $35 million as a result of Defendants' conduct in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

## COUNT VI
### (Violation of the Commodities Exchange Act, 7 U.S.C. § 1, *et. seq.*, 7 U.S.C. § 6(b), 7 U.S.C. § 6(o), and 7 U.S.C. § 25: Defendants Kiley, Cook, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1519.  Plaintiffs restate and reallege paragraphs 1 through 1518 of this Complaint as if set forth herein.

1520.  In connection with the sale of and trading in commodities, Defendants knowingly and intentionally made false statements, made material omissions, and failed to disclose material facts that a reasonable investor would want to know.

1521. In connection with the sale of and trading in commodities, Defendants intentionally employed a scheme to cheat and defraud Plaintiffs.

1522. In connection with the sale of and trading in commodities, Defendants willfully made, or caused to be made, false reports, false statements, false performance tables and false records.

1523. In connection with the sale of and trading in commodities, Defendants intentionally engaged in practices and conduct that operated as a fraud and deceit upon Plaintiffs.

1524. In connection with the sale of and trading in commodities, Defendants intentionally engaged in contracts designed to defraud and mislead Plaintiffs.

1525. In connection with the sale of and trading in commodities, Defendants intentionally misappropriated Plaintiffs' funds and used Plaintiffs funds for Defendants' own personal benefit.

1526. Defendants' material misrepresentations and omissions were made with the intent that the Plaintiffs rely upon Defendants' misrepresentations and omissions.

1527. Plaintiffs reasonably relied upon the misrepresentations of Defendants.

1528. Defendants' misrepresentations, material omissions, fraudulent schemes and other acts were material to Plaintiffs' decisions to purchase and trade in commodities.

1529. Defendants conduct, misrepresentations and omissions were made with the intent to mislead and deceive Plaintiffs and/or with recklessness that was a gross departure from the applicable standard of care, which operated as the functional equivalent of the intent to mislead Plaintiffs.

1530. Defendants' fraudulent actions and inactions were violations of the Commodities Exchange Act § 1, et seq., including, but not limited to, violations of 7 U.S.C. § 6(b), 7 U.S.C. § 6(o), and 7 U.S.C. § 25.

1531. Plaintiffs have been, and continue to be, proximately damaged by Defendants' fraudulent, deceitful, and violative conduct in excess of $35 million in damages.

**COUNT VII**
**(Civil Theft: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)**

1532. Plaintiffs restate and reallege paragraphs 1 through 1531 of this Complaint as if set forth herein.

1533. Defendants made false representations of material fact regarding the foreign currency arbitrage investments, and Defendants made these representations knowing that they were false, or in reckless disregard of the truth or falsity of same.

1534. Defendants made the false representations for their pecuniary gain and to deprive Plaintiffs of property by inducing them to transfer funds to Defendants.

1535. As a result of Defendants' conduct, Plaintiffs parted with their property and Defendants have wrongfully retained the funds.

1536. The fraudulent conduct of Defendants in the procurement of Plaintiffs' money constitutes theft by swindle in violation of Minn. Stat. § 609.52.

1537. Pursuant to Minn. Stat. § 604.14, subd. 1, by virtue of Defendants' theft, Plaintiffs are entitled to recover the value of their investments, which exceeds $35 million, plus punitive damages.

## COUNT VIII
### (Common Law Bailment: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1538.  Plaintiffs restate and reallege Paragraphs 1 through 1537 of this Complaint as if set forth herein.

1539.  Plaintiffs delivered their investment funds to Defendants, but retained ownership of those funds.

1540.  Plaintiffs delivered their funds to Defendants and Defendants accepted receipt of the funds.

1541.  Plaintiffs' delivered the funds to Defendants based on agreements that Defendants would invest the funds and hold them in trust, but that the funds would remain accessible to Plaintiffs and would be returned upon Plaintiffs' requests for liquidation, redemption or withdrawal.

1542.  The delivery of the funds to Defendants gave rise to a duty of care in holding the funds.

1543.  Plaintiffs' funds are no longer accessible, their withdrawal requests have not been honored, and the funds have been damaged, lost or wrongfully retained.

1544.  Defendants have failed to provide any information identifying the existence or location of the funds, and have failed to return the funds as agreed upon.

1545.  The funds were damaged, lost or wrongfully retained as a result of Defendants misconduct and/or negligence.

1546.  As a result of Defendants' misconduct and/or negligence as a bailor, Plaintiffs have suffered damages in excess of $35 million.

**COUNT IX**
**(Negligent Misrepresentation: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)**

1547.  Plaintiffs restate and reallege paragraphs 1 through 1546 of this Complaint as if set forth herein.

1548.  Defendants supplied false information to Plaintiffs regarding their investments.  Defendants knew and intended that Plaintiffs would rely on the information.

1549.  Defendants failed to exercise reasonable care or competence in communicating the investment information to Plaintiffs.

1550.  Plaintiffs justifiably relied on the information Defendants supplied regarding the investments.

1551.  As a proximate result of Defendants' misrepresentations, Plaintiffs have suffered in excess of $35 million in losses.

**COUNT X**
**(Conversion: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)**

1552.  Plaintiffs restate and reallege paragraphs 1 through 1551 of this Complaint as if set forth herein.

1553.  Defendants' continued use of Plaintiffs' funds and failure to return Plaintiffs' funds following Plaintiffs' repeated requests for return of all funds represents an intentional conversion of Plaintiffs' property rights by wrongful use, act or disposition of Plaintiffs' funds that has proximately caused serious interference with Plaintiffs' property rights.

1554. Plaintiffs have been damaged and will continue to be damaged by Defendants' wrongful conversion of Plaintiffs' funds and other property in an amount in excess of $35 million.

## COUNT XI
### (Civil Conspiracy: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1555.  Plaintiffs restate and reallege paragraphs 1 through 1554 of this Complaint as if set forth herein.

1556.  Defendants jointly developed a secret plan and scheme by which they obtained personal benefits and financial gain through self-dealing, fraud, and other actions adverse to Plaintiffs' interests and investments.

1557.  Defendants conspired together to keep their actions secret from Plaintiffs.

1558.  As a result of Defendants' conspiracy, Plaintiffs have sustained damages in an amount in excess of $35 million.

## COUNT XII
### (Minnesota Consumer Fraud: Minn. Stat. § 325F.69: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1559.  Plaintiffs restate and reallege paragraphs 1 through 1558 of this Complaint as if set forth herein.

1560.  Cook, Kiley, Beckman, Pettengill, and Durand, for themselves and as agents for the UB Entities and the Oxford Companies, employed fraud, false pretense, false promise, misrepresentation, misleading statements and/or deceptive trade practices in soliciting Plaintiffs to purchase the above-referenced investments, in violation of Minn. Stat. § 325F.69

1561. Plaintiffs were misled, deceived, and damaged thereby in an amount in excess of $35 million.

## COUNT XIII
### (Minnesota Deceptive Trade Practices Act: Minn. Stat. § 325D.44: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1562. Plaintiffs restate and reallege paragraphs 1 through 1561 of this Complaint as if set forth herein.

1563. Defendants engaged in deceptive trade practices in violation of Minn. Stat. § 325D.44 through their actions in (1) representing that the investments had characteristics, uses, and benefits that they do not have; (2) advertising the investments with the intent not to sell them as advertised; (3) making or allowing to be made statements that were likely to cause confusion or misunderstanding as to the Defendants' affiliations, connections, or associations with the investments; and (4) engaged in other conduct which created a likelihood of confusion or misunderstanding relating to the investments.

1564. Defendants willfully engaged in such trade practices knowing them to be deceptive.

1565. Plaintiffs were damaged by these violations, and are entitled to recover their actual damages in an amount in excess of $35 million, plus attorneys' fees and costs from Defendants pursuant to Minn. Stat. § 325D.45.

## COUNT XIV
### (Breach of Fiduciary Duty: Defendants Cook, Kiley, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1566.  Plaintiffs restate and reallege paragraphs 1 through 1565 of this Complaint as if set forth herein.

1567.  Defendants owed Plaintiffs fiduciary duties and obligations in their capacity as investment advisors.

1568.  Defendants' fiduciary obligations to Plaintiffs included (1) the duty to accurately inform Plaintiffs about the investments; (2) the duty to supervise and manage Plaintiffs' accounts and investments with reasonable care; (3) the duty to keep Plaintiffs fully advised as to the condition of their investments, and not mislead Plaintiffs as to their status; (4) refrain from acting in self-interest at the expense of Plaintiffs; (5) the duty not to misrepresent any material facts related to Plaintiffs' investments or accounts; and (6) the duty to adequately supervise those managing Plaintiffs' accounts and investments.

1569.  Defendants breached their fiduciary duties owed to Plaintiffs by misrepresenting the nature of the investments, misappropriating funds entrusted to them for investments, concealing these breaches from Plaintiffs, and failing to provide adequate supervision.

1570.  As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs have been damaged in an amount in excess of $35 million.

## COUNT XV
## (Vicarious Liability: UB Entities and Oxford Companies)

1571.  Plaintiffs restate and reallege paragraphs 1 through 1570 of this Complaint as if set forth herein.

1572.  Defendant Cook was acting within the scope of his actual and/or apparent authority as an agent and representative of the UB Entities and Oxford Companies when he defrauded Plaintiffs and misappropriated their investments.

1573.  Defendant Kiley was acting within the scope of his actual and/or apparent authority as an agent and representative of the UB Entities and Oxford Companies when he defrauded Plaintiffs and misappropriated their investments.

1574. Defendant Beckman was acting within the scope of his actual and/or apparent authority as an agent and representative of the UB Entities and Oxford Companies when he defrauded Plaintiffs and misappropriated their investments.

1575. Defendant Pettengill was acting within the scope of his actual and/or apparent authority as an agent and representative of the UB Entities and Oxford Companies when he defrauded Plaintiffs and misappropriated their investments.

1576.  Defendant Durand was acting within the scope of his actual and/or apparent authority as an agent and representative of the UB Entities and Oxford Companies when he defrauded Plaintiffs and misappropriated their investments.

1577.  Plaintiffs justifiably and detrimentally relied on Cook, Kiley, Beckman, Pettengill and Durand's actual and/or apparent authority to promote and sell investments and securities through and on behalf of the UB Entities and Oxford Companies.

1578.  The UB Entities and Oxford Companies are jointly and severally liable for the unlawful conduct of their agents/representatives Cook, Kiley, Beckman, Pettengill and Durand in misleading and defrauding the Plaintiffs under common law principles of vicarious liability and agency.

## COUNT XVI
### (Accounting: Defendants Kiley, Cook, Beckman, Durand, Pettengill, UB Entities and Oxford Companies)

1579.  Plaintiffs restate and reallege paragraphs 1 through 1578 of the Complaint as if set forth herein.

1580.  By virtue of Defendants' failure to place Plaintiffs' funds in individual, segregated accounts and with the entities that they represented would hold the funds, Plaintiffs lack necessary records and documents to determine the amount, location, and existence of their investment funds and accounts.

1581.  Defendants have failed to return Plaintiffs' funds and have access to all information regarding the amount, location and existence of funds and accounts.

1582.  As a result, Plaintiffs are entitled to the equitable remedy of an accounting.

## COUNT XVII
### (Breach of Contract: Entrust)

1583.  Plaintiffs restate and reallege paragraphs 1 through 1582 of the Complaint as if set forth herein.

1584.  Entrust entered into contracts with Plaintiffs whereby Entrust became the administrator or custodian of Plaintiffs' retirement accounts.

1585.  As custodian or administrator, Entrust obligated itself to certain contractual duties, including, but not limited to, the duty to follow the instructions and investment

directives of the customer, to prevent unauthorized transfers of Plaintiffs' assets, and the duty to act only upon the express consent and approval of the customer.

1586. Entrust breached one or more of these contractual duties by failing to follow the investment direction of the customer, making unauthorized account transfers, and acting without the express consent and approval of the customer, among other breaches.

1587. As a direct and proximate result of the breach of contractual duties by Entrust, Plaintiffs have suffered damages, including but not limited to the loss of their investments, in an amount to be proven at trial.

## COUNT XVIII
### (Negligence: Entrust)

1588. Plaintiffs restate and reallege paragraphs 1 through 1587 of the Complaint as if set forth herein.

1589. Entrust owed Plaintiffs the duty to perform the functions as plan custodian, administrator and trustee with due and reasonable care applicable to banks, custodians, administrators and financial institutions, including the duty to transfer funds as directed by the investor, the duty to prevent unauthorized transfers of Plaintiffs' assets, the duty to implement standards and policies to protect against fraud and theft in the management and administration of Plaintiffs' accounts, and the duty to perform the ministerial functions as plan custodian, administrator and trustee.

1590. Entrust also had a duty to its customers to ensure that their investment accounts were being treated and recorded accurately according to the rules and

regulations promulgated by the federal government, including, but not limited to IRS Code 408.

1591. Entrust breached one or more of the above-described duties of care owed to Plaintiffs by failing to follow the investment direction of its customers, allowing unauthorized transfers of Plaintiffs' assets, taking investment direction from unauthorized persons; investing Plaintiffs' money into unauthorized accounts, failing to comply with IRS Code 408, and failing to act with due and reasonable care applicable to banks, custodians, administrators and financial institutions.

1592. As a direct and proximate cause of the above-described breaches of duties owed by Entrust, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT XIX
### (Breach of Fiduciary Duty: Entrust)

1593. Plaintiffs restate and reallege paragraphs 1 through 1592 of the Complaint as if set forth herein.

1594. Entrust owed a fiduciary duty to Plaintiffs. Entrust gained the trust and confidence of Plaintiffs by representing themselves as custodian and/or administrators of retirement accounts, subject to IRS regulations and internal terms and conditions designed to protect customers assets. Entrust also represented itself to Plaintiffs as having superior knowledge and authority relating to investments, retirement accounts, and the management of those accounts and Plaintiffs viewed Entrust as having superior knowledge and authority relating to investments, retirement accounts, tax consequences, and custodial and administrator management of retirement accounts.

1595. Plaintiffs placed their trust and confidence in Entrust to follow Plaintiffs' direction regarding investments, to invest on behalf of Plaintiffs' behalf as instructed, to properly manage Plaintiffs' accounts, to abide by their own internal policies, guidelines, terms and conditions designed to safeguard Plaintiffs' assets and prevent theft, fraud and other damages, and to prevent unauthorized transfers of Plaintiffs' assets.

1596. Based upon this trust and confidence, Plaintiffs granted Entrust the authority to accept Plaintiffs' assets, and to transfer those assets pursuant to the express direction of Plaintiffs.

1597. Entrust, as custodian and/or administrators of Plaintiffs' retirement accounts acted on behalf of Plaintiffs in transferring assets and managing the accounts.

1598. Entrust breached their fiduciary duties to Plaintiffs by failing to properly manage Plaintiffs' retirement accounts, making unauthorized transfers from Plaintiffs' accounts, failing to follow Plaintiffs' investment direction; allowing unauthorized agents to direct the investment of Plaintiffs' assets, and failing to obtain express authorization from Plaintiffs prior to investing and/or transferring assets from Plaintiffs' accounts.

1599. As a direct and proximate cause of the above-described breach of fiduciary duties owed by Entrust, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT XX
### (Negligence: Associated Bank)

1600. Plaintiffs restate and reallege paragraphs 1 through 1599 of the Complaint as if set forth herein.

1601.  Associated Bank has a general duty to act with reasonable and ordinary care under the circumstances.

1602.  Under the above described circumstances, in light of its knowledge that Defendants' Associated Bank accounts would hold client investment funds, and given applicable banking regulations and procedures, Defendant Associated Bank owed a duty of care to Plaintiffs.

1603.  Associated Bank failed to follow and enforce customer identification regulations and procedures, failed to perform a risk-based analysis, and failed to utilize reasonable due diligence and investigation in opening accounts for Defendants and their entities.

1604.  Associated Bank failed to investigate and report suspicious activities and currency transactions relating to Defendants' accounts.

1605.  Associated Bank failed to recognize and investigate "red flags" and indicia of fraud relating to Defendants' accounts.

1606.  Associated Bank accepted deposits and transfers into Defendants' accounts that were made payable to unrelated entities that had no banking relationship with Associated Bank.

1607.  By failing to exercise ordinary care, Associated Bank created an unreasonable risk of harm to others, including Plaintiffs.

1608.  By failing to enforce banking regulations and provisions, failing to utilize commercially reasonable banking practices, and failing to follow its own policies and procedures, Associated Bank breached its duty of care to Plaintiffs.

1609.  Under the above-described circumstances, it was foreseeable to Associated Bank that its acts constituting a failure to exercise reasonable and ordinary care, and constituting failures to enforce banking regulations and provisions, utilizing reasonable banking practices, and following its own policies and procedures, would cause harm to others, including Plaintiffs, who deposited or transferred money into Defendants' Associated Bank accounts.

1610.  But for Associated Bank's breach of its duty of care in opening and monitoring Defendants' accounts, the Defendants would not have had the mechanism to divert, misappropriate and convert Plaintiffs' investment funds and Plaintiffs' funds would not have been deposited into Defendants' Associated Bank accounts.

1611.  But for Associated Bank's breach of its duty of care, it would have or should have timely discovered the fraudulent conduct perpetrated through Defendants' Associated Bank accounts.

1612.  As a direct and proximate cause of Defendant Associated Bank's breaches of its duty of care, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT XXI
### (Minnesota Statute § 336.3-306 – Claims to an Instrument: Associated Bank)

1613.  Plaintiffs restate and reallee paragraphs 1 through 1612 of the Complaint as if set forth herein.

1614.  Plaintiffs and/or their agents drafted checks payable to "Crown Bank," "Crown Forex S.A.," and "Crown," which were received by Associated Bank.  See e.g., Exhibits 74, 82, 360, 409, and 634.

1615.  Associated Bank had no account for an entity named Crown Forex SA. Upon information and belief, Associated Bank had no accounts for entities named Crown or Crown Bank.

1616.  Associated Bank had an account for an entity named Crown Forex LLC.

1617.  The checks made payable to Crown Forex S.A., or other entities, were improperly deposited by Associated Bank into the account of a separate, distinct and fictious entity, Crown Forex LLC.

1618.  The checks which were deposited into the Crown Forex LLC account by Associated Bank were not payable to Crown Forex LLC.  See e.g., Exhibits 74, 82, 360, 409, 634.

1619.  Plaintiffs have made claims to the checks and their proceeds against various individuals and entities based upon fraud, conversion, civil theft, violations of the Commodities Exchange Act, violation of the Securities Exchange Act of 1934, breach of contract, civil conspiracy and other theories, for their conduct in conducting, participating and maintaining a massive investment scheme designed to defraud investors, including Plaintiffs.  Plaintiffs' claims against these individuals and entities entitle Plaintiffs to a property or possessory right in the proceeds of the checks.

1620.  As to the improperly deposited checks, Associated Bank was not a holder in due course under Minnesota Statute § 336.3-302.

1621.  Pursuant to Minnesota Statute § 336.3-306, Associated Bank is subject to Plaintiffs' claims of property and/or possessory rights or the proceeds of the checks.

## RELIEF REQUESTED

Plaintiffs respectfully request that the Court:

A.      Award compensatory damages in excess of $35 million, punitive damages and Plaintiffs' costs, disbursements, and attorneys' fees.

B.      Order an Accounting of the Defendants according to all applicable Generally Accepted Accounting Principles by a disinterested, licensed accountant.

C.      Award such other relief as the Court deems just and equitable.


Dated:  November 4, 2009.          **MESSERLI & KRAMER, P.A.**


                                    s/ John Harper III
                                   John Harper III
                                   Molly R. Hamilton
                                   1400 Fifth Street Towers
                                   100 South Fifth Street
                                   Minneapolis, MN  55402
                                   Telephone:  (612) 672-3600


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable by a jury.


                                    s/ John Harper III
                                   John Harper III
                                   Molly R. Hamilton
                                   Messerli & Kramer, P.A.
                                   Attorneys for Plaintiffs


777990.1