J. Ashwin Madia
**MADIA LAW, LLC**
345 Union Plaza
333 Washington Avenue North
Minneapolis, MN 55401
Tele: (612) 349-2723
Fax: (612) 349-2760
jamadia@madialaw.com

Brian K. Gallik
Jim Barr Coleman
(Admitted *Pro Hac Vice)*
**GOETZ, GALLIK & BALDWIN, P.C.**
35 North Grand
P.O. Box 6580
Bozeman, MT 59771-6580
Telephone: (406) 587-0618
Facsimile: (406) 587-5144
bgallik@goetzlawfirm.com
jbarr@goetzlawfirm.com

ATTORNEYS FOR INTERVENOR-PLAINTIFFS

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
* * * * * * * * * * *

| | |
|---|---|
| HOWARD and SHARON PHILLIPS; *ET AL.*, | Case No. 09-CV-1732 (MJD/JJK) |
| Plaintiffs, | |
| v. | |
| TREVOR COOK, *ET AL.*, | **RUSSELL AND DENISE BARNINGS & REPUBLIC MEMORIAL FUND'S COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants. | |
| RUSSELL and DENISE BARNINGS; and REPUBLIC MEMORIAL FUND, an Arizona non-profit Charitable Foundation, | |
| Intervenor-Plaintiffs, | |
| v. | |
| TREVOR COOK, PATRICK KILEY, individually, and d/b/a UBS DIVERSIFIED; UBS DIVERSIFIED; UNIVERSAL BROKERAGE SERVICES, LLC; UBS DIVERSIFIED GROWTH, LLC; UBS DIVERSIFIED FX MANAGEMENT, LLC; UBS DIVERSIFIED FX GROWTH, LP; UBS DIVERSIFIED FX ADVISORS, LLC; UNIVERSAL BROKERAGE FX; and OXFORD GLOBAL PARTNERS, LLC, | |
| Defendants. | |

## I.

### NATURE OF ACTION.

This is an action arising out of the laws of the state of Minnesota and federal laws governing or regulating the sale of securities.  It seeks to recover funds invested by Plaintiffs with Defendants, and possibly other individuals and/or entities presently unknown to Plaintiffs, together with their attorneys' fees, costs and other damages.

## II.

### PARTIES.

**A.   Plaintiffs**

1.      The Plaintiffs, Russell and Denise Barnings, husband and wife, are residents of Kalispell, Montana.  As set forth in greater detail below, they deposited nearly everything they earned through Columbia Chiropractic, LLC, a Washington Limited Liability Company, into Plaintiff, Republic Memorial Fund  (of which both are directors).   Both Barnings and Republic Memorial, in turn invested foundation and personal  funds with Mr. Cook, Mr. Kiley, and the other Defendant companies identified below.

2.      Plaintiff, Republic Memorial Fund, is an Arizona, non-profit charitable foundation.  Plaintiff Russell Barnings is a director of Republic.   Collectively, Barnings and Republic Memorial Fund are referred to in this Complaint as "Barnings" or "Plaintiffs."

3.      Plaintiffs invested over $1.5 million dollars with Defendants, and, despite demand, have not received any of their funds from these Defendants.  As of July 1, 2009, the date of their last statements from Defendants, they had a total account value of $1,651,617.00.  *See* Exhibits A-1 and A-2.  Despite diligent efforts, they have been unable to locate their investments, have been advised only that Defendants Universal Brokerage FX, UBS Fund and Oxford Global Partnes, LLC "[a]re unable to fulfill withdrawal or redemption requests[,]" *see* Exhibits B-1 and B-2, and thus are unsure if such investments even exist.

**B.   Defendants.**

4.      Defendant Trevor Cook ("Cook"), upon information and belief, is a resident

of the State of Minnesota.   He represents to the public, and represented to Barnings, that he is an investment advisor and/or wealth manager providing financial products and investment opportunities.   He also holds himself out as the "Managing Partner/Institutional Sales," with "MN License # 20299068."    A copy of Cook's business card, provided to Barnings, is attached as Exhibit C.    He also holds himself out as being affiliated with the following entities:  UBS, SAXO, IFX, Millennium, RJO, PFG, and Chase.   Exhibit C.    Upon information and belief, Cook also holds himself out as the Chief Investment Director of Defendant, Oxford Global Partners, LLC.   Cook is one of two (2) "Organizers" of Oxford Global Partners, LLC and is identified by the Secretary of State as the contact person for this LLC.  Upon information and belief, Cook is either an owner, employee, agent or otherwise affiliated with Defendants Kiley, UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP,  Universal Brokerage FX and UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC.

    5.      Defendant Patrick Kiley ("Kiley")  holds himself out to the public, and held himself out to Barnings,  as  "Chief Economist/Technical Analyst," and "Sr. Financial Strategist -Wealth Management Group and Institutional Accounts" for Universal Brokerage Services ("UBS").  His business card is attached as Exhibit C.    He also holds himself out as being associated with UBS, SAXO, IFX, Millennium, RJO and PFG.   According to records obtained from the Minnesota Secretary of State, Kiley was the organizer of, and is the contact person for,  Defendants UBS Diversified Growth, LLC, Defendant UBS Diversified FX Management, LLC, UBS Diversified FX Growth, L.P., and Defendant UBS Diversified FX Advisors, LLC.  Defendant Kiley appears, or appeared, on a radio program, which aired in Eastern Washington, where the Plaintiffs lived until recently, promoting the financial products of UBS and other companies.   This show was entitled "Follow the Money."   In his show, and on his website, Kiley promoted "[w]ealth planning solutions that safeguard and develop your current and future wealth . . . . ."   The "Wealth Management Group" of which he purports to be a part, allegedly "[o]versees several billions in assets, as

well as representations in London, Lichtenstein, Zurich, Denmark, Australia, New Zealand, and Dubai (opened April 2008) that help orchestrate thousands of timely and **sophisticated arbitrage transactions** each date." Exhibit D. (Emphasis in the original). Kiley represented that "**[a]rbitrage** is the simultaneous purchase and selling of an asset or security between foreign markets in order to profit from the price discrepancy. This is known in the industry as a "**risk-less**" transaction." *Id.* He further represented that "[W]ealth Management Group accounts are **individually segregated** – funds are not co-mingled with other customer's accounts. The Wealth Manage Group client accounts are **totally liquid** - accessible 24/7 **without penalty.**" *Id.* (Emphasis in the original). Upon information and belief, Kiley is either an owner, employee, agent or otherwise affiliated with Defendants Cook, UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP, Universal Brokerage FX , UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC.

6.      Defendant UBS Diversified is located at 12644 Tiffany Court, Suite 100, Burnsville, Minnesota, 55337. According to records obtained from the Minnesota Secretary of State, UBS Diversified is an Assumed Business name registered by Defendant Pat Kiley on or about June 24, 2004. Defendant Kiley is listed as the person who conducts business under this assumed business name. Upon information and belief, it is associated or affiliated with Defendants Kiley and Cook, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP, Universal Brokerage FX, UBS Diversified Growth, LLC, and UBS Diversified FX Advisors, LLC.

7.      Defendant Universal Brokerage Services LLC is a Minnesota LLC formed on or about July 21, 2004. Upon information and belief, it is associated or affiliated with Defendants Cook and Kiley, UBS Diversified, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP, UBS Diversified Growth, LLC, Universal Brokerage FX and UBS Diversified FX Advisors, LLC.

8.      Defendant UBS Diversified Growth, LLC, is a Minnesota LLC, located at

12644 Tiffany Court, Suite 100, Burnsville, Minnesota 55337.  According to the articles of organization dated October 22, 2004,  this LLC was organized by Defendant Kiley, who is identified by the Minnesota Secretary of State as the "contact person" for this Defendant. Upon information and belief, it is associated or affiliated with Defendants Kiley, UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP,  Universal Brokerage FX and UBS Diversified FX Advisors, LLC.

9.     Defendant UBS Diversified FX Management, LLC is a Minnesota Limited Liability Company, located at 12644 Tiffany Court., Suite 100, Burnsville, Minnesota 55337. According to the articles of organization, dated October 13, 2006, Defendant Kiley is the registered agent and "contact person" for this Defendant.  Upon information and belief, it is associated or affiliated with Defendants Cook and Kiley, UBS Diversified, UBS Diversified FX Growth, LP, UBS Diversified Growth, LLC, Universal Brokerage FX and UBS Diversified FX Advisors, LLC.

10.     Defendant UBS Diversified FX Growth, LP, is a Minnesota Limited Partnership formed on or about October 13, 2006.   It is located at 12644 Tiffany Court, Suite 100, Burnsville, Minnesota, 55337.  The general partner of the limited partnership is co-Defendant UBS Diversified FX Management, LLC.   Defendant Kiley is listed as the manager of the general partner and the agent for service of process.   Upon information and belief, it is associated or affiliated with Defendants Cook and Kiley, UBS Diversified, UBS Diversified FX Management, LLC, UBS Diversified Growth, LLC, Universal Brokerage FX and UBS Diversified FX Advisors, LLC.

11.     Defendant UBS Diversified FX Advisors, LLC is or was a Minnesota LLC, organized on or about October 13, 2006 by Defendant Kiley, who is also listed as the contact person for this LLC.  Its address is 12644 Tiffany Court, Suite 100, Burnsville, Minnesota, 55337.  Upon information and belief, it is associated or affiliated with Defendants Cook and Kiley, UBS Diversified, UBS Diversified FX Management, LLC, UBS Diversified FX

Growth, LP, UBS Diversified Growth, LLC, and Universal Brokerage FX.

12.     Defendant Universal Brokerage FX is located at 12644 Tiffany Court, Suite 100, Burnsville, Minnesota 55337.  Upon information and belief, it is associated or affiliated with Defendants Cook and Kiley, UBS Diversified, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP, UBS Diversified Growth, LLC, and UBS Diversified FX Advisors, LLC.

13.     Defendant Oxford Global Partners, LLC,  is located at 1900 LaSalle  Avenue, Minneapolis, Minnesota.  According to records obtained from the Minnesota Secretary of State, Oxford Global Partners is a limited liability company in good standing with the Minnesota Secretary of State.  It was organized under and in accordance with the laws of the state of Minnesota, on or about September 4, 2008 by Defendant Trevor Cook and Hollie Beckman.  Also located at this same address is Oxford Global Advisors and Oxford Private Client Group.  Upon information and belief these companies are affiliated with each other. Upon information and belief some of the Plaintiffs funds are or were deposited or invested with this Defendant, as reflected, in part, by the mailing to Plaintiffs (referred to as "Investors")  by Oxford Global Partners, LLC of a notice on or about July 21, 2009, that it "[i]s unable to fulfill withdrawal or redemption requests." Exhibit B-2.

## II.

## JURISDICTION AND VENUE.

14.     Pursuant to 28 U.S.C. § 1331, this Court has federal jurisdiction over the subject matter of this action under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et. seq.*

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## III.

## FACTS COMMON TO ALL COUNTS

16.     Defendant Kiley has a radio show in which he speaks about investment opportunities and the economy.  This radio show appears on a Christian radio network which

is broadcast in Eastern Washington and Northern and Central Idaho.

17.    In, February or March, 2005, Plaintiff Russ Barnings first heard of Pat Kiley and Universal Brokerages.  Defendant Kiley had a regular radio show on a station in Spokane, Washington, on Saturday mornings, as part of a weekly show called "Follow the Money with Pat Kiley." He also appeared as a guest on the local radio show titled, "It Seems to Me."

18.    Defendant Kiley stated that funds invested with or through him were guarded carefully against loss; that the funds were always liquid and redeemable 24 hours a day, 7 days a week.  Exhibit D, p. 1.  He further advised that even a conservative investor could make stable returns in a slack or down market by using arbitrage and international markets. These claims, and more, were made on the radio and on the websites for Kiley's businesses (www.universalbrokeragefx.com and www.patkiley.com) as well as in person, later on, when Mr. Barnings traveled to Minnesota to meet Kiley, and his partner, Trevor Cook, in person on or about February 18-20, 2007.  During this meeting, Kiley and Cook repeated the representations set forth on the radio and websites.  Examples of his web site are attached as Exhibit D.

19.    In 2006, after listening to Kiley's investment radio show for months, the Plaintiffs, Russell and Denise Barnings, through Republic Memorial, contacted Defendant Kiley for information regarding the financial products and services touted on his radio show. In response, Plaintiffs received a letter from Mr. Kiley.  A copy of that letter is attached as Exhibit E.

20.    In that letter, Mr. Kiley, the "Sr. Financial Strategist-Wealth Management Group and Institutional Accounts," provided information about Defendant Universal Brokerage Services ("UBS").  Kiley represented that his company's "[r]oots began in 1987 as an investment advisory firm for corporations, pension funds, investment banks and other institutional investors.  In 1999, as stock valuations moved rapidly higher, UBS saw a great need for these strategies among retail investors.  The Wealth Management Group at UBS

offers retail client's the same strategies and money managers as our corporate clients." Exhibit E.  After summarizing the "three primary areas with reduced minimum investments," in UBS, Mr. Kiley represented: "Financial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in **segregated** accounts, providing safety, security and liquidity."  *Id.*  (Emphasis in the original).  His letter then discussed the extensive testing and personal screening of "[e]ach and every" UBS Broker, including their licensing, and invited Plaintiff "[t]o visit our offices and meeting with the staff."  *Id.*    Mr. Barnings also received in the mail a document from UBS titled "Institutional Grade Investments for the Individual Investor."    Exhibit F.  That document discussed, in part "The World of FOREX", an "[a]cronym for Foreign Exchange and "FX" is an even shorter abbreviation."  *Id.* at p. 3.  It represented in part, that "[A]ll positions are 100% liquid on a 24 hour basis."    In addition, it represented that customer funds are "[n]ot co-mingled with other clients' or company funds . . . ."  *Id.* at 4.  Further, the UBS document advised that "[T]he transparency of our activities is essential to our client's satisfaction.  Trades can be checked at any time by the investors 24 hours a day via the internet.  Client funds are held in segregated accounts that are insured by a Fidelity bond at Deutsche Bank in New York City.  Only the client can withdraw their funds — liquidity is 24 hours per day.*"  Id.* at p. 6.

21.    On November 22, 2006, in reliance upon the representations of Defendants Cook and Kiley summarized above, Plaintiffs sent a wire transfer to Defendants in the amount of $100,000.00.  This money was wired, pursuant to Defendant Kiley's handwritten instructions, to a UBS Diversified Growth account with Wells Fargo Bank, in Burnsville, Minnesota.  Plaintiffs' account statement reflected an "Account Identifier"of XXXXXM010, and an "Account Type" of "lat trans."

22.    On November 29, 2006, in reliance upon the representations of Defendants Cook and Kiley summarized above, Plaintiffs sent a wire transfer to Defendants in the

amount of $125,000.00.

23.     By December 1, 2006, the Plaintiffs' account statement for UBS Diversified reflected a value of $211,500.  This reflected the two (2) wire transfers totaling $125,000.00, less a "6% entry fee R.E. P. Kiley."  Their account statement reflected the allocation of the funds to "UBSa ($52,875)"; "UBSb ($52,875)"; "UBSc ($52,875)"; and "UBSd ($52,875)."

24.     On January 17, 2007, in reliance upon the representations of Defendants Cook and Kiley summarized above,  Plaintiffs sent a wire transfer to Defendants in the amount of $100,000.00.  This was deposited into the UBS Diversified account.  Another "6% entry fee re Pkiley" was deducted from the deposit.

25.     Russell Barnings traveled to Minnesota in February, 2007, and met with Defendants Cook and Kiley.  He went to the offices located on 12644 Tiffany Court, Burnsville, Minnesota.  During the meeting the Defendants represented and assured Plaintiff that his funds were safe, segregated and liquid, twenty-four hours a day, seven days a week. They represented that the funds would be invested in various products, all over the world, including securities, commercial paper, bonds, metals, but always with the highest quality because security of principal was the primary goal and profit a secondary consideration. Barnings also contacted the Minnesota Better Business Bureau where Barnings found that Universal Brokerage received a favorable rating.  Shortly thereafter, and in reliance upon the truth of Kiley and Cook's representations, both oral and in writing, Plaintiffs sent additional wire transfers or checks to UBS for investment with that entity (entities).

26.     On March 1, 2007, in reliance upon the representations of Defendants Cook and Kiley summarized above, Plaintiffs sent a wire transfer to Defendants in the amount of $150,000.00.  They also deposited two (2) checks, totaling $282,596.60, that same day with UBS Diversified.   These checks represented the sale of Plaintiffs' precious metals investments.  According to the Account Statement, dated March 22, 2007, Plaintiffs' current account value was $747,905, as of that date.

27.     In April, 2007,  in reliance upon the representations of Defendants Cook and

Kiley summarized above, Plaintiffs sent a check to UBS Diversified for $75,000.00. A "[o]ne-time entry fee re Pkiley" in the amount of $4,500 was deducted by UBS. These funds were the proceeds of a personal injury settlement received by Plaintiffs and transferred to Defendants upon the advise of Defendants.

28.     In May, 2007, in reliance upon the representations of Defendants Cook and Kiley summarized above, Plaintiffs sent a check to UBS Diversified for $30,000.00.

29.     By letter dated May 14, 2007, Plaintiffs sent a letter to Pat Kiley, stating that they "[e]njoyed talking with you the other day. I have enclosed the lawsuit check as you said . . . ." In this same letter, Plaintiffs advised Kiley that "[w]e are planning another trip to Minneapolis when we get the office sold and start a new life – chapter."

30.     The August 1, 2007, Account Statement reflected a change in the account type from "lat trans" to "lat trans var" a change that was unknown to Plaintiffs.

31.     In August, 2007, in reliance upon the representations of Defendants Cook and Kiley summarized above, Plaintiffs sent a check to UBS Diversified for $40,000.00.

32.     In December, 2007, in reliance upon the representations of Defendants Cook and Kiley summarized above, Plaintiffs sent a check to UBS Diversified for $60,000.00. There was a "one-time entry fee re Pkiley of 0.5875," or $3,525, deducted from this deposit. The January 1, 2008 Account Statement for Plaintiffs' account, that reflected this deposit, was prepared by "Universal Brokerage FX," located at the same address as UBS Diversified, and Plaintiffs account now had a new identifier (XXXXXK230) and the account type changed to "Non Qual."

33.     In January, 2008, in reliance upon the representations of Defendants Cook and Kiley summarized above,  Plaintiffs sent a check to UBS Diversified for $15,000.00.

34.     In March, 2008, in reliance upon the representations of Defendants Cook and Kiley summarized above, Plaintiffs sent a check to Universal Brokerage, FX, for $30,000.00.

35.     In June, 2008, in reliance upon the representations of Defendants Cook and

Kiley summarized above, Plaintiffs sent a check to Universal Brokerage, FX for $30,000.00. A "one-time entry fee r.e. Pkiley" of 0.5875 % ($1,763) was deducted from the account.

36.     On June 27, 2008, in reliance upon the representations of Defendants Cook and Kiley summarized above,  Plaintiffs wired $200,000 to Universal Brokerage FX.   This represented the proceeds from the sale of Plaintiffs' chiropractic business.

37.     In September, 2008, in reliance upon the representations of Defendants Cook and Kiley summarized above Plaintiffs sent another check, this time in the amount of $100,000 to Universal Brokerage FX, which deposited that amount, less another entry fee in the amount of $4,875 (4.875%) into an account named "Republic Memorial Fund B." This represents a personal loan from Mr. Barnings' mother.   Although titled differently, it contained the same account identifier and account type information as the "Republic Memorial Fund," which had a balance of over $1.5 million dollars.

38.     In October, 2008, in reliance upon the representations of Defendants Cook and Kiley summarized above Plaintiffs sent a check to Universal Brokerage FX for $20,000, that was deposited, less a 0.5875% entry fee, into the Plaintiffs' account labeled, Republic Memorial Fund Account.

39.     By November 1, 2008, Plaintiffs Republic Memorial Fund Account Statement reflected a value of $1,472,917.00.  Their "Republic Memorial Fund B" Account Statement reflected a value that same day of $95,886.00.

40.     In November, 2008, Plaintiffs requested and received two (2) separate withdrawals of $2,500 each from their Republic Memorial Fund account. These withdrawals were sent to Plaintiffs by Check Numbers 5181 and 5182.

41.     That same month, Plaintiffs requested and received two (2) separate withdrawals of  $2,000 and $3,000 (for a total of $5,000) from the Account Labeled "Republic Memorial Fund B."  The Plaintiffs received these withdrawals by check, with numbers 5205 and 5204.

42.     In December, 2008, in reliance upon the representations of Defendants Cook

and Kiley summarized above, Plaintiffs deposited two (2) checks totaling $9,793, less a 0.05875 "one-time entry fee r.e. Pkiley" into the Universal Brokerage FX Account labeled "Republic Memorial Fund."

43.     As Plaintiffs had earlier advised Kiley, in their May 14, 2007 letter, as of January 1, 2009, Plaintiffs had sold the chiropratic business to start a new life-chapter in Montana.

44.     Plaintiffs requested and received, as reflected in their January 1, 2009 Account Statement for the "Republic Memorial Fund B" account, a check for $5,000.00.

45.     Plaintiffs requested and received, as reflected in their February 1, 2009 Account Statement for the "Republic Memorial Fund B" account, a check for $5,000.00.

46.     Plaintiffs requested and received, as reflected in their March 1, 2009 Account Statement for the "Republic Memorial Fund B" account, a check for $5,000.00.

47.     Plaintiffs requested and received, as reflected in their April 1, 2009 Account Statement for the "Republic Memorial Fund B" account, a check for $5,000.00.

48.     By July, 2009, Plaintiffs had sold their home in Washington State and moved to Montana.  Their account balances, according to the UBS Brokerage FX Statements dated July 1, 2009, totaled $1,580,304 for the Republic Memorial Fund and $71,313 for the Republic Memorial Fund B accounts.

49.     In late June and early July Plaintiff Barnings noted that calls made to Kiley or Cook were not being returned.  He was told by Julia Smith, secretary to Kiley, that Kiley was there but in a meeting or with a client and would call back soon.

50.     On July 10, 2009, Plaintiffs' calls went unanswered.  This continued.  On July 13, 2009, Plaintiff Barnings called Kiley and Cook repeatedly without response.

51.     On July 14, 2009, Plaintiff Barnings discovered a copy of a civil lawsuit filed in U.S. District Court for the District of Minnesota, claiming severe financial injury by Trevor Cook, with whom Plaintiffs had many dealings.  He read the complaint.  The conditions explained in that lawsuit, *Phillips, et. al., v. Cook et. al.*, Case No. 09-CV-1732

(MJD/JJL), were very much like his own.

52.     On July 14, 2009, after reviewing the complaint referenced above, Plaintiff Barnings called Universal Brokerage, Kiley and Cook, to demand immediate closure of their accounts and return of all funds held by them.  Those demands went unanswered.

53.     On July 15, 2009, Plaintiffs emailed Universal Brokerage FX requesting that it contact him "[r]egarding the CLOSING of the account; #XXXXXK230 Call me ASAP!" Exhibit G.

54.     On July 19, 2009, Defendant Kiley sent an email to Plaintiffs stating, "Thank you for contacting me, I will be contacting you within one business day.  Please contact us if you have any questions or need help with anything.  We are here to help!"  Exhibit H. Plaintiffs called and received no response.

55.     On July 19, 2009, Plaintiffs emailed Universal Brokerage FX demanding again the closing of their accounts and redemption of their money, stating: "You ignore my calls and emails!!!  Once again by this email, I am herewith demanding return of all the funds in the above named account IMMEDIATELY!!  You advertise liquidity and availability of funds 24/7.  That is a lie.  Criminal Complaints will be filed if I do not hear from you now." Exhibit I.

56.     Four minutes later, that same day, July 19, 2009, Plaintiffs sent another email to Universal Brokerage FX stating: "Close this account immediately and return all funds stated on the statement you sent out dated 7-1-09.  Call or email me to verify your receipt of this message!!!!!!!!!"  Exhibit J.

57.     Plaintiffs sent similar demands by certified mail.

58.     Plaintiffs received no response, either by phone, email or regular mail until July 21, 2009.   Despite demand, they did not receive any of their funds.

59.     On July 21, 2009, Universal Brokerage FX and UBS Fund sent the following letter to Plaintiffs, which they received on August 8, 2009:

        7.21.09

Dear Investors:

The purpose of this letter is to inform you of recent developments at Universal Brokerage FX ("UBFX") and the UBS Diversified FX Growth Fund ("UBS Fund"). UBFX and UBS Fund have received subpoenas from the U.S. Securities and Exchange Commission requesting certain documents. Our attorneys are responding to these requests. In addition, nine individuals have filed a civil lawsuit making allegations including fraud.

UBFX and UBS Fund are not accepting investor funds. Investors should not send funds to UBBX, UBS Fund, Crown Forex, or indirectly to Crown Forex via Entrust or Millenium. UBFX and UBS Fund have received information that Crown Forex is in bankruptcy proceedings. For more information regarding Crown Forex, see the following website: www.crownforex.info. UBFX and UBS Fund are unable to fulfill withdrawal or redemption requests.

Sincerely,

Universal Brokerage FX & UBS Fund

Exhibit B-1.

60.     On July 21, 2009, Oxford Global Partners, LLC sent the following letter to

Plaintiffs, which they received on August 8, 2009:

7.21.09

Dear Investors:

The purpose of this letter is to inform you of recent developments at Oxford Global Partners, LLC ("OGP"). OGP has received subpoenas from the U.S. Securities and Exchange Commission as well as the U.S. Commodity Futures Trading Commission requesting certain documents. Our attorneys are responding to these requests. In addition, nine individuals have filed a civil lawsuit making allegations including fraud in an attempt to obtain their investment proceeds from another company, Universal Brokerage FX. As part of that lawsuit, these plaintiffs have sued a number of parties, including OGP.

OGP is not accepting investor funds. Investors should not send funds to OGP, Crown Forex, or indirectly to Crown Forex via Entrust. OGP has received information that Crown Forex is in bankruptcy proceedings. For more information regarding Crown Forex, see the following website: www.crownforex.info. OGP is unable to fulfill withdrawal or redemption requests.

Sincerely,

Oxford Global Partners, LLC

Exhibit B-2.

61.     The information at the web site identified in paragraphs 58 and 59, above,

included, among other details, a requirement that "[a]ll claims in the bankruptcy of Crown

Forex SA shall be submitted to the trustees in bankruptcy no later than June 30, 2009, . . .

along with other information." Exhibit K.   Thereafter, information posted on that same web

site indicated that

> "[a] forex trading platform was and may still be illegally operated abroad
> under the name of CROWN FOREX SA.  Any trading activities on this
> platform that may have taken place after May 19, 2009 at 8:00 (Swiss time) are
> not binding upon CROWN FOREX SA, in liquidation.  [*I]t . . . recently
> appeared that US financial intermediaries have been collecting funds from
> investors for alleged further investment with an entity named CROWN FOREX
> before and after the opening of CROWN FOREX SA in liquidation.  Those
> investors were told that their funds would be held in segregated accounts*.
> Please note that:

1. since December 9, 2008, Laurent WINKELMANN and Phillppe von BREDOW are the only authorized legal representatives of CROWN FOREX SA; no power of attorney have been delivered to any third person or entity since that date;

2. Since December 9, 2008, no new client and no new account have been accepted by CROWN FOREX SA

3. *Since December 9, 2008, . . . WINKELMANN and . . . BREDOW have not authorized any reimbursement to investors in CROWN FOREX SA,* in liquidation and that since December 24, 2008, the Swiss Financial market Supervisory Authority (FINMA), in order to insure equal treatment of creditors has forbidden any reimbursement to investors;

4. Since May 19, 2009, . . . CROWN FOREX SA has suspended its activities and has accepted or received no fund from investors

5. CROWN FOREX SA, in liquidation does not hold segregated bank accounts

6. CROWN FOREX SA, in liquidation does not hold any account with ASSOCIATED BANK in the US

7. CROWN FOREX SA in liquidation and CROWN FOREX, LLC are two different and separate entities

8. Account statements with false account numbers may have been issued in the name of CROWN FOREX SA in favour of persons who are not registered as client of CROWN FOREX SA, in liquidation.  Account statements may therefore not be sufficient to substantiate the existence of a contractual relation or of a claim against CROWN FOREX SA, in liquidation.

Any person having been made to be believe anything contrary to the above, may wish to contact the financial intermediary they have dealt with, seek legal advice and/or contact the local enforcement or regulatory authorities.

*Id.* (Emphasis added).

62.     Despite repeated demands upon Defendants Cook and Kiley and their UBS and Oxford Companies, Plaintiffs have not received any proceeds from their accounts and are unsure whether such accounts even exist.  They have sought legal advice and have contacted law enforcement and regulatory authorities.

## *COUNT I.*

### *(Breach of Contract)*

63.     The Plaintiffs incorporate by reference ¶¶ 1 - 62 of this Complaint.

64.     In soliciting and accepting the Plaintiffs' investments, Cook and Kiley were acting as agents for themselves and for Defendants UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP, Universal Brokerage FX , UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC.

65.     Defendants orally and in writing promised the Plaintiffs that in consideration for investing Plaintiffs' funds with Defendants, and paying them a fee, that they would guarantee returns, immediately liquidate their investments upon request, preserve their investment principal, hold their  funds in segregated accounts, secure their funds with reputable liquidity providers, and/or insure ("ensure") the funds.

66.     Defendants breached their oral and written promises with the Plaintiffs to pay guaranteed returns, immediately liquidate investments upon request, preserve investment principal, hold the funds in segregated accounts, secure the funds with reputable liquidity providers, and/or insure ("ensure") the funds.

67.     The Defendants' actions and omissions constituted a breach of their oral and written promises, which breach is the factual and legal cause of Plaintiffs' damages in excess of $1.5 million, in an amount to be proved at trial.

## *COUNT II.*

### *(Fraud)*

68.     The Plaintiffs incorporate by reference ¶¶ 1 -67 of this Complaint

69.     Defendants Kiley and Cook, for themselves, and as agents for Defendants UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP,  Universal Brokerage FX , UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC, knowingly misrepresented to Plaintiffs the features of their investments and such misrepresentations constituted fraud.

### *a.      Identity of Person Who Made Fraudulent Statements.*

70.     The identities of the persons making the fraudulent statements are Defendants Kiley and Cook.

### *b.      Time of Misrepresentations.*

71.     Defendant Kiley made the misrepresentations during his weekly radio shows in 2006, 2007, 2008 and 2009.  He repeated these misrepresentations in the written material sent to Plaintiffs, as set forth as Exhibit I and on his web site.  *See* Exhibit H.  Defendants Kiley and Cook repeated the misrepresentations set forth in Exhibit H & I to Barnings, orally, over the phone and when Mr. Barnings traveled to Burnsville, Minnesota, in February, 2007 and met with both Cook and Kiley.   The misrepresentations also took the form of account statements mailed to Plaintiffs on December 1, 2006, January 1, 2007, January 18, 2007, March 22, 2007, April 1, 2007, April 10, 2007, July 1, 2007, August 1, 2007, September 1, 2007, October 1, 2007, November 1, 2007, December 1, 2007, January 1, 2008, January 29, 2008, February 1, 2008, March 1, 2008, April 1, 2008, May 1, 2008, June 1, 2008, June 13, 2008, July 1, 2008, August 1, 2008, September 1, 2008, September 9, 2008, October 1, 2008, October 17, 2008, November 1, 2008 (2 statements), November 6, 2008, December 1, 2008 (2 statements), December 5, 2008, January 1, 2009 (2 statements), February 1, 2009 (2 statements), March 1, 2009 (2 statements), April 1, 2009 (2 statements), May 1, 2009 (2 statements), June 1, 2009 (2 statements), and July 1, 2009 (2 statements).     The

misrepresentations also took the form of wiring instructions sent to Plaintiffs by Kiley which purported to show funds being deposited into Plaintiffs' own account.

### c.       *Place of the Misrepresentation*.

72.     There were several places where the misrepresentations took place.  First, the misrepresentations took place at 12644 Tiffany Court, Suite 100, Burnsville, Minnesota, when Mr. Barnings traveled to meet with Defendants Cook and Kiley, and met them in their office located at that address.  The misrepresentations also took place in Electric City, Washington, where the Plaintiffs obtained their statements and received other correspondence from the Defendants, as more particularly set forth above.  It was also in Electric City, Washington, where Plaintiffs listened to Defendant Kiley's radio show and used the internet to view his web site.

### d.       *Content of Misrepresentation.*

73.     The contents of Defendants Cook's and Kiley's misrepresentations include the following:

* Defendants Cook and Kiley falsely represented that the investments purchased through them and their affiliated companies had a guaranteed rate of return;

* Defendants Cook and Kiley falsely represented that Plaintiffs' principal invested through them and their affiliated companies was protected from loss;

* Defendants Cook and Kiley falsely represented that Plaintiffs' investments with them and their business entities were instantly liquid ("24/7");

* Defendants Cook and Kiley falsely represented  that Plaintiffs' funds invested with them and their affiliated companies were maintained in segregated accounts;

* Defendants Cook and Kiley falsely represented that Plaintiffs' funds

invested with them and their companies were secured by reputable liquidity providers;

\*      Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them or their companies were insured.

These misrepresentations are expressly set forth in Exhibits D, E, & F, and implicit in the statements of account mailed to Plaintiffs, and wiring instructions, as summarized in paragraph 71.   The fact that these statements were in fact misrepresentations is evidenced by the inability of Plaintiffs to obtain any of their funds and the express statements by Oxford, UBS and Universal Brokerage FX that such funds "are unable to fulfill withdrawal or redemption requests."   Exhibits B-1 and B-2.  The falsity of these representations is also evidenced by the failure of Defendants Cook and Kiley to return any of Plaintiffs funds, let alone return phone calls or otherwise communicate with the Plaintiffs concerning the status or location of the funds they invested with these Defendants.   The falsity of several of these statements, including the existence of accounts and  the existence of separate accounts, is further demonstrated by the website information for Crown Forex SA, set forth in paragraph 60, above which is incorporated by reference, stating that a forex trading platform "[w]as and may still be illegally operated abroad under the name of CROWN FOREX SA" and that some "[U]S financial intermediaries have been collecting funds for alleged further investment with an entity named CROWN FOREX before and after the opening of the bankruptcy of CROWN FOREX SA," and essentially that such accounts were "false."

### e.      *Method by Which Misrepresentations were Communicated.*

74.      Defendants Cook and Kiley communicated the misrepresentations through the following methods of communication: (1) internet; (2) telephone; (3) United States Mail; (4) electronic mail; (5) radio shows; (6) fax; and (7) orally, in person, when Mr. Barnings traveled to Minnesota and met with both Defendants personally.

### f.      *The Persons or Entities to Whom the Misrepresentations Were Communicated.*

75.      The persons and entities to whom the misrepresentations were  communicated

were Russ Barnings, his wife Denise, and their foundation.

### g.    *Injury.*

76.    The Plaintiffs justifiably relied on the representations to their detriment, and that reliance resulted in Plaintiffs suffering injury by the loss of more than $1.5 million dollars, in an amount to be proved at trial.   This fact is established by reviewing the deposits and wire transfers made by the Plaintiffs with Defendants, coupled with the account statements prepared by Defendants acknowledging these deposits, and the letters and emails sent by UBS and Oxford, affiliated with Defendants Cook and Kiley, advising that none of those entities can satisfy any requests for redemptions or withdrawal of funds, along with information from "CROWN FOREX SA in liquidation" that alleged investments with that entity through third financial intermediaries are or may be false and unauthorized.  Finally, Plaintiffs have received none of their funds since they made demand upon Defendants in July, 2009.

## *COUNT III.*

### *(Minnesota Statute § 80A.68)*

77.    The Plaintiffs incorporate by reference ¶¶ 1 - 76 of this Complaint.

78.    Defendants Cook and Kiley, for themselves, and as agents for Defendants UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP,  Universal Brokerage FX , UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC, violated Minnesota Statute § 80A.68 by employing devices, schemes and artifices to defraud; making untrue statements of material facts or omitting material facts necessary to make the statements made, in light of the circumstances under which they are made, not misleading; and engaged in acts, practices in a course of business that operated as a fraud or deceit upon the Plaintiffs in connection with the sale to Plaintiffs of the investments at issue.  In connection with the sale of securities, Defendants employed a scheme to defraud Plaintiffs.

79.    This scheme appears to have relied upon the use of Christian radio channels

and listeners of Christian radio channels to create an aura of truth, integrity and honesty to lure listeners to invest their funds with Defendants Kiley and Cook.  They supplemented this message, broadcast over the airwaves, with a website which contained written promises and representations of segregated and "totally liquid" accounts with "double digit annual returns."  Thereafter, Defendants Kiley and Cook would send written material in response to inquiries from individuals like Plaintiffs assuring that "*[f]inancial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in segregated accounts providing safety, security and liquidity*." Exhibit E (emphasis added).  Written materials, such as those attached to this complaint were then sent to investors, like Plaintiffs.  Defendants would then help individuals, like Plaintiffs, complete account applications and wiring instructions and send statements that purported to reflect segregated accounts and which showed consistent "double digit" returns, furthering their fraudulent scheme.  This scheme, in turn, caused Plaintiffs to invest more funds with Defendants.  Ultimately, Plaintiffs were unable to obtain any of their funds and were advised by letter dated July 21, 2009, to review a Crown Forex website that, in turn, stated that the deadline for claims against that bankrupt estate was June 30, 2009 – three weeks earlier; and that false account numbers have been issued in the name of Crown Forex SA in favor of persons who are not registered as clients of CROWN FOREX SA.  The Defendants' scheme may be, and likely is, more detailed and far reaching than summarized above, but Plaintiffs do not presently have access to that information, as it is in the custody and control of the Defendants, who have not responded to Plaintiffs' requests for their funds, other than to direct Plaintiffs to the CROWN FOREX in liquidation web site and advise that they can not meet withdrawal or redemption requests.

80.     In connection with the sale of securities, Defendants engaged in the foregoing practice or course of conduct that operated as a fraud and/or deceit upon Plaintiffs.

81.     The demonstrably false representations of these Defendants, as summarized

above, coupled with the inability of Plaintiffs to obtain a single penny of their investments and information obtained from CROWN FOREX in liquidation's web site, discussing the existence of false and ficticious accounts from US financial intermediaries, collecting funds from investors for alleged further investment with an entity named CROWN FOREX, before and after the opening of the bankruptcy of CROWN FOREX SA, in liquidation reflects that Defendants engaged in the aforementioned conduct with the intent to mislead Plaintiffs and/or with recklessness that was the functional equivalent of an intent to mislead Plaintiffs.

82.     Defendants' misrepresentations and undisclosed facts and other acts or omissions were material to Plaintiffs' decision to purchase the securities.  The availability of an investment that (1) actually existed; (2) is safe; (3) segregated; (4) with a proven track record of returns; and (5) liquid were fundamental to Plaintiffs' decision to invest nearly their entire life's savings with these Defendants.

### a.     Identity of Person(s) Who Made Fraudulent Statements.

83.     The identities of the persons making the fraudulent statements are Defendants Kiley and Cook.

### b.     Time of Misrepresentations.

84.     Defendant Kiley made the misrepresentations during his weekly radio shows in 2006, 2007, 2008 and 2009.  He repeated these misrepresentations in the written material sent to Plaintiffs, as set forth as Exhibit I and on his web site.  *See* Exhibit H.  Defendants Kiley and Cook repeated the misrepresentations set forth in Exhibit H & I to Barnings, orally, over the phone and when Mr. Barnings traveled to Burnsville, Minnesota, in February, 2007 and met with both Cook and Kiley.   The misrepresentations also took the form of account statements mailed to Plaintiffs on December 1, 2006, January 1, 2007, January 18, 2007, March 22, 2007, April 1, 2007, April 10, 2007, July 1, 2007, August 1, 2007, September 1, 2007, October 1, 2007, November 1, 2007, December 1, 2007, January 1, 2008, January 29, 2008, February 1, 2008, March 1, 2008, April 1, 2008, May 1, 2008, June 1, 2008, June 13, 2008, July 1, 2008, August 1, 2008, September 1, 2008, September 9, 2008, October 1, 2008,

October 17, 2008, November 1, 2008 (2 statements), November 6, 2008, December 1, 2008 (2 statements), December 5, 2008, January 1, 2009 (2 statements), February 1, 2009 (2 statements), March 1, 2009 (2 statements), April 1, 2009 (2 statements), May 1, 2009 (2 statements), June 1, 2009 (2 statements), and July 1, 2009 (2 statements).   The misrepresentations also took the form of wiring instructions sent to Plaintiffs by Kiley which purported to show funds being deposited into Plaintiffs' own account.

### c.    *Place of the Misrepresentation*.

85.    There were several places where the misrepresentations took place.  First, the misrepresentations took place at 12644 Tiffany Court, Suite 100, Burnsville, Minnesota, when Mr. Barnings traveled to meet with Defendants Cook and Kiley, and met them in their office located at that address.  The misrepresentations also took place in Electric City, Washington, where the Plaintiffs obtained their statements and received other correspondence from the Defendants, as more particularly set forth above.  It was also in Electric City, Washington, where Plaintiffs listened to Defendant Kiley's radio show and used the internet to view his web site.

### d.    *Content of Misrepresentations/Untrue Statements of Material Fact.*

86.    The contents of Defendants Cook's and Kiley's misrepresentations and/or untrue statements of material fact include the following:

> *    Defendants Cook and Kiley falsely represented that the investments purchased through them and their affiliated companies had a guaranteed rate of return.  This was an untrue statement of material fact which Plaintiffs relied upon to their detriment;

> *    Defendants Cook and Kiley falsely represented that Plaintiffs' principal invested through them and their affiliated companies was protected from loss.  As demonstrated by their inability to obtain any funds from their account, *see e.g,* Exhibits B-1 and B-2, this was an untrue statement of material fact which Plaintiffs relied upon to their

detriment;

\*       Defendants Cook and Kiley falsely represented that Plaintiffs' investments with them and their business entities were instantly liquid ("24/7").  As demonstrated by their inability to obtain any funds from their account, *see e.g,* Exhibits B-1 and B-2, this was an untrue statement of material fact which Plaintiffs relied upon to their detriment;

\*       Defendants Cook and Kiley falsely represented  that Plaintiffs' funds invested with them and their affiliated companies were maintained in segregated accounts.  As demonstrated by their inability to obtain any funds from their account, *see e.g,* Exhibits B-1 and B-2, this was an untrue statement of material fact which Plaintiffs relied upon to their detriment;

\*       Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them and their companies were secured by reputable liquidity providers.  As demonstrated by their inability to obtain any funds from their account, *see e.g,* Exhibits B-1 and B-2, this was an untrue statement of material fact which Plaintiffs relied upon to their detriment.

\*       Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them or their companies were insured.  As demonstrated by their inability to obtain any funds from their account, *see e.g,* Exhibits B-1 and B-2, this was an untrue statement of material fact which Plaintiffs relied upon to their detriment.

These misrepresentations are expressly set forth in Exhibits D, E, & F, and implicit in the statements of account mailed to Plaintiffs, and wiring instructions, as summarized in paragraphs 71 and 84.    The fact that these statements were in fact misrepresentations or

contained untrue statements is evidenced by the inability of Plaintiffs to obtain any of their funds and the express statements by Oxford, UBS and Universal Brokerage FX that such funds "are unable to fulfill withdrawal or redemption requests." Exhibits B-1 and B-2. The falsity of these representations is also evidenced by the failure of Defendants Cook and Kiley to return any of Plaintiffs funds, let alone return phone calls or otherwise communicate with the Plaintiffs concerning the status or location of the funds they invested with these Defendants. The falsity of several of these statements, including the existence of accounts and the existence of separate accounts, is further demonstrated by the website information for Crown Forex SA, set forth in paragraph 60, above which is incorporated by reference, stating that a forex trading platform "[w]as and may still be illegally operated abroad under the name of CROWN FOREX SA" and that some "[U]S financial intermediaries have been collecting funds for alleged further investment with an entity named CROWN FOREX before and after the opening of the bankruptcy of CROWN FOREX SA," and essentially that such accounts were "false."

### e.   Method by Which Misrepresentations were Communicated.

87.   Defendants Cook and Kiley communicated the misrepresentations through the following methods of communication: (1) internet; (2) telephone; (3) United States Mail; (4) electronic mail; (5) radio shows; (6) fax; and (7) orally, in person, when Mr. Barnings traveled to Minnesota and met with both Defendants personally.

### f.   The Persons or Entities to Whom the Misrepresentations Were Communicated.

88.   The persons and entities to whom the misrepresentations were communicated were Russ Barnings, his wife Denise, and their foundation.

### g.   Injury.

89.   Plaintiffs reasonably relied upon the Defendants' representations regarding the guaranteed rates of return, their principal being protected, the investment being instantly liquid, and held in segregated accounts with reputable institutions, and Plaintiffs would not have made the investments if Defendants had truthfully represented all material facts. The

Plaintiffs justifiably relied on the representations to their detriment, and that reliance resulted in Plaintiffs suffering injury by the loss of more than $1.5 million dollars.  This fact is established by reviewing the deposits and wire transfers made by the Plaintiffs with Defendants, coupled with the account statements prepared by Defendants acknowledging these deposits, and the letters and emails sent by UBS and Oxford, affiliated with Defendants Cook and Kiley, advising that none of those entities can satisfy any requests for redemptions or withdrawal of funds, along with information from "CROWN FOREX SA in liquidation" that alleged investments with that entity through third financial intermediaries are or may be false and unauthorized.  Finally, Plaintiffs have received none of their funds since they made demand upon Defendants in July, 2009.

90.     Defendants either knew or recklessly disregarded that their representations were materially inaccurate, and omitted material information, and that their misrepresentations and omissions would mislead the Plaintiffs.

91.     As a legal and factual result of the Defendants' wrongful conduct, Plaintiffs suffered damages in excess of $1.5 million, in an amount to be proved at trial.

## *COUNT IV.*

### *(Minnesota Statute § 80A.69)*

92.     The Plaintiffs incorporate by reference ¶¶ 1 - 91 of this Complaint.

93.     Minnesota Statute § 80A.69 prohibits certain conduct in providing investment advice:

(a)     It is unlawful for a person that advises others for compensation, either directly or indirectly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities:

(1)     to employ a device, scheme or artifice to defraud another person; or

(2)    to engage in an act, practice, or course of business that operates
or would operate as a fraud or deceit upon another person . . . .

94.    Defendants Cook and Kiley, for themselves and as agents for Defendants UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP, Universal Brokerage FX , UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC, provided investment advice to Plaintiffs as to (1) the advisability of investing in their entities.

95.    Defendants received compensation for the investment advice provided to Plaintiffs and this compensation is reflected, in part, in the statements sent to Plaintiffs reflecting "one-time entry fees" associated with the purchase of investments through Defendants. *See, e.g.*, ¶¶ 23, 24, 27, 32, 35, 37, 38, *supra.*

96.    In providing advice to Plaintiffs, Defendants employed a scheme, device or artifice to defraud Plaintiffs, and or engaged in acts, practices or a course of business that operated as a fraud or deceit upon Plaintiffs in connection with the sale to Plaintiffs of the investments at issue.

97.    This scheme appears to have relied upon the use of Christian radio channels and listeners of Christian radio channels to create an aura of truth, integrity and honesty to lure listeners to invest their funds with Defendants Kiley and Cook. They supplemented this message, broadcast over the airwaves, with a website which contained written promises and representations of segregated and "totally liquid" accounts with "double digit annual returns." Thereafter, Defendants Kiley and Cook would send written material in response to inquiries from individuals like Plaintiffs assuring that "*[f]inancial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in segregated accounts providing safety, security and liquidity*." Exhibit E (emphasis added). Written materials, such as those attached to this complaint were then sent to investors, like Plaintiffs.    Defendants would then help individuals, like

Plaintiffs, complete account applications and wiring instructions and send statements that purported to reflect segregated accounts and which showed consistent "double digit" returns, furthering their fraudulent scheme.    This scheme, in turn, caused Plaintiffs to invest more funds with Defendants.    Ultimately, Plaintiffs were unable to obtain any of their funds and were advised by letter dated July 21, 2009, to review a Crown Forex website that, in turn, stated that the deadline for claims against that bankrupt estate was June 30, 2009 – three weeks earlier; and that false account numbers have been issued in the name of Crown Forex SA in favor of persons who are not registered as clients of CROWN FOREX SA.    The Defendants' scheme may be, and likely is, more detailed and far reaching than summarized above, but Plaintiffs do not presently have access to that information, as it is in the custody and control of the Defendants, who have not responded to Plaintiffs' requests for their funds, other than to direct Plaintiffs to the CROWN FOREX in liquidation web site and advise that they can not meet withdrawal or redemption requests.

98.    In connection with the sale of securities, Defendants engaged in the foregoing practice or course of conduct that operated as a fraud and/or deceit upon Plaintiffs.

99.    The demonstrably false representations of these Defendants, as summarized above, coupled with the inability of Plaintiffs to obtain a single penny of their investments and information obtained from CROWN FOREX in liquidation's web site, discussing the existence of false and ficticious accounts from US financial intermediaries, collecting funds from investors for alleged further investment with an entity named CROWN FOREX, before and after the opening of the bankruptcy of CROWN FOREX SA, in liquidation reflects that Defendants engaged in the aforementioned conduct with the intent to mislead Plaintiffs and/or with recklessness that was the functional equivalent of an intent to mislead Plaintiffs.

100.    Defendants' misrepresentations and undisclosed facts and other acts or omissions were material to Plaintiffs' decision to purchase the securities.    The availability of an investment that (1) actually existed; (2) is safe; (3) segregated; (4) with a proven track record of returns; and (5) liquid were fundamental to Plaintiffs' decision to invest nearly their

entire life's savings with these Defendants.

### a.   *Time of Misrepresentations.*

101.    Defendant Kiley made the misrepresentations during his weekly radio shows in 2006, 2007, 2008 and 2009.  His weekly radio show aired on radio stations that catered to Christians.  He directly repeated these misrepresentations in the written material sent to Plaintiffs, as set forth as Exhibit I and indirectly on his web site.  *See* Exhibit H.  Defendants Kiley and Cook repeated the misrepresentations set forth in Exhibit H & I to Barnings, orally, over the phone and when Mr. Barnings traveled to Burnsville, Minnesota, in February, 2007 and met with both Cook and Kiley.   The misrepresentations also took the form of account statements mailed to Plaintiffs on December 1, 2006, January 1, 2007, January 18, 2007, March 22, 2007, April 1, 2007, April 10, 2007, July 1, 2007, August 1, 2007, September 1, 2007, October 1, 2007, November 1, 2007, December 1, 2007, January 1, 2008, January 29, 2008, February 1, 2008, March 1, 2008, April 1, 2008, May 1, 2008, June 1, 2008, June 13, 2008, July 1, 2008, August 1, 2008, September 1, 2008, September 9, 2008, October 1, 2008, October 17, 2008, November 1, 2008 (2 statements), November 6, 2008, December 1, 2008 (2 statements), December 5, 2008, January 1, 2009 (2 statements), February 1, 2009 (2 statements), March 1, 2009 (2 statements), April 1, 2009 (2 statements), May 1, 2009 (2 statements), June 1, 2009 (2 statements), and July 1, 2009 (2 statements).    The misrepresentations also took the form of wiring instructions sent to Plaintiffs by Kiley which purported to show funds being deposited into Plaintiffs' own account.

### b.   *Place of the Misrepresentation*.

102.    There were several places where the misrepresentations took place.  First, the misrepresentations took place at 12644 Tiffany Court, Suite 100, Burnsville, Minnesota, when Mr. Barnings traveled to meet with Defendants Cook and Kiley, and met them in their office located at that address.  The misrepresentations also took place in Electric City, Washington, where the Plaintiffs obtained their statements and received other correspondence from the Defendants, as more particularly set forth above.  It was also in

Electric City, Washington, where Plaintiffs listened to Defendant Kiley's radio show and used the internet to view his web site.

        ***c.***     ***Content of Misrepresentations/Untrue Statements of Material Fact.***

103.    As stated, the contents of Defendants Cook's and Kiley's misrepresentations and/or untrue statements of material fact include the following:

    \*     Defendants Cook and Kiley falsely represented that the investments purchased through them and their affiliated companies had a guaranteed rate of return. This was an untrue statement of material fact which Plaintiffs relied upon to their detriment;

    \*     Defendants Cook and Kiley falsely represented that Plaintiffs' principal invested through them and their affiliated companies was protected from loss. As demonstrated by their inability to obtain any funds from their account, *see e.g,* Exhibits B-1 and B-2, this was an untrue statement of material fact which Plaintiffs relied upon to their detriment;

    \*     Defendants Cook and Kiley falsely represented that Plaintiffs' investments with them and their business entities were instantly liquid ("24/7"). As demonstrated by their inability to obtain any funds from their account, *see e.g,* Exhibits B-1 and B-2, this was an untrue statement of material fact which Plaintiffs relied upon to their detriment;

    \*     Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them and their affiliated companies were maintained in segregated accounts. As demonstrated by their inability to obtain any funds from their account, *see e.g,* Exhibits B-1 and B-2, this was an untrue statement of material fact which Plaintiffs relied upon to their detriment;

* Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them and their companies were secured by reputable liquidity providers.  As demonstrated by their inability to obtain any funds from their account, *see e.g,* Exhibits B-1 and B-2, this was an untrue statement of material fact which Plaintiffs relied upon to their detriment.

* Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them or their companies were insured.  As demonstrated by their inability to obtain any funds from their account, *see e.g,* Exhibits B-1 and B-2, this was an untrue statement of material fact which Plaintiffs relied upon to their detriment.

These misrepresentations are expressly set forth in Exhibits D, E, & F, and implicit in the statements of account mailed to Plaintiffs, and wiring instructions, as summarized in paragraphs 71, 84, 101.   The fact that these statements were in fact misrepresentations or contained untrue statements is evidenced by the inability of Plaintiffs to obtain any of their funds and the express statements by Oxford, UBS and Universal Brokerage FX that such funds "are unable to fulfill withdrawal or redemption requests."  Exhibits B-1 and B-2.  The falsity of these representations is also evidenced by the failure of Defendants Cook and Kiley to return any of Plaintiffs funds, let alone return phone calls or otherwise communicate with the Plaintiffs concerning the status or location of the funds they invested with these Defendants.   The falsity of several of these statements, including the existence of accounts and  the existence of separate accounts, is further demonstrated by the website information for Crown Forex SA, set forth in paragraph 60, above which is incorporated by reference, stating that a forex trading platform "[w]as and may still be illegally operated abroad under the name of CROWN FOREX SA" and that some "[U]S financial intermediaries have been collecting funds for alleged further investment with an entity named CROWN FOREX before and after the opening of the bankruptcy of CROWN FOREX SA," and essentially that

such accounts were "false."

### e.      Method by Which Misrepresentations were Communicated.

104.    Defendants Cook and Kiley communicated the misrepresentations through the following methods of communication: (1) internet; (2) telephone; (3) United States Mail; (4) electronic mail; (5) radio shows; (6) fax; and (7) orally, in person, when Mr. Barnings traveled to Minnesota and met with both Defendants personally.

### f.      The Persons or Entities to Whom the Misrepresentations Were Communicated.

105.    The persons and entities to whom the misrepresentations were communicated were Russ Barnings, his wife Denise, and their foundation.

106.    Plaintiffs reasonably relied upon Defendants' representations regarding the fixed interest return, their principal being protected, the investment being instantly liquid, and funds being held in segregated accounts with reputable institutions, and Plaintiffs would not have made the investments if Defendants had truthfully represented all material facts.

107.    Defendants either knew or recklessly disregarded that their representations were materially inaccurate and omitted material information, and that their misrepresentations and omissions would mislead the Plaintiffs.

108.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered in excess of $1.5 million in damages, in an amount to be proved at trial.

### COUNT V.

### (Rule 10b-5 of Securities Exchange Act of 1934: 15 USC § 78j(b) and 17 CFR § 240.10b-5 )

109.    The Plaintiffs incorporate by reference ¶¶ 1 -108 of this Complaint.

110.    In connection with the sale of securities, Defendants made false statements, and failed to disclose material facts that a reasonable investor would want to know these statements, in light of the circumstances under which they were made, rendered such statements misleading to Plaintiffs.  The following statements made by Defendants Cook and Kiley, to Plaintiffs, by letter sent through the United States Mail, over the internet and fax,

and in person were misleading and false:

       \*     Defendants Cook and Kiley falsely represented that the investments purchased through them and their affiliated companies had a guaranteed rate of return;

       \*     Defendants Cook and Kiley falsely represented that Plaintiffs' principal invested through them and their affiliated companies was protected from loss;

       \*     Defendants Cook and Kiley falsely represented that Plaintiffs investments with them and their business entities were instantly liquid ("24/7");

       \*     Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them and their affiliated companies were maintained in segregated accounts;

       \*     Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them and their companies were secured by reputable liquidity providers;

       \*     Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them or their companies were insured.

As demonstrated by the actions of Defendants and their companies, along with the announcements by "CROWN FOREX in liquidation" and the inability of Plaintiffs to access any of their funds, these statements are demonstrably false and misleading.

      111.    In connection with the sale of securities, Defendants employed a scheme to defraud Plaintiffs. This scheme appears to have relied upon the use of Christian radio channels and listeners of Christian radio channels to create an aura of truth, integrity and honesty to lure listeners to invest their funds with Defendants Kiley and Cook. They supplemented this message, broadcast over the airwaves, with a website which contained written promises and representations of segregated and "totally liquid" accounts with "double

digit annual returns." Thereafter, Defendants Kiley and Cook would send written material in response to inquiries from individuals like Plaintiffs assuring that "*[f]inancial security is paramount to every investor. The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself. Customer funds are held in segregated accounts providing safety, security and liquidity*." Exhibit E (emphasis added). Written materials, such as those attached to this complaint were then sent to investors, like Plaintiffs. Defendants would then help individuals, like Plaintiffs, complete account applications and wiring instructions and send statements that purported to reflect segregated accounts and which showed consistent "double digit" returns, furthering their fraudulent scheme. This scheme, in turn, caused Plaintiffs to invest more funds with Defendants. Ultimately, Plaintiffs were unable to obtain any of their funds and were advised by letter dated July 21, 2009, to review a Crown Forex website that, in turn, stated that the deadline for claims against that bankrupt estate was June 30, 2009 – three weeks earlier; and that false account numbers have been issued in the name of Crown Forex SA in favor of persons who are not registered as clients of CROWN FOREX SA. The Defendants' scheme may be, and likely is, more detailed and far reaching than summarized above, but Plaintiffs do not presently have access to that information, as it is in the custody and control of the Defendants, who have not responded to Plaintiffs' requests for their funds, other than to direct Plaintiffs to the CROWN FOREX in liquidation web site and advise that they can not meet withdrawal or redemption requests.

112. In connection with the sale of securities, Defendants engaged in the foregoing practice or course of conduct that operated as a fraud and/or deceit upon Plaintiffs.

113. The demonstrably false representations of these Defendants, as summarized above, coupled with the inability of Plaintiffs to obtain a single penny of their investments and information obtained from CROWN FOREX in liquidation's web site, discussing the existence of false and ficticious accounts from US financial intermediaries, collecting funds from investors for alleged further investment with an entity named CROWN FOREX, before

and after the opening of the bankruptcy of CROWN FOREX SA, in liquidation reflects that Defendants engaged in the aforementioned conduct with the intent to mislead Plaintiffs and/or with recklessness that was the functional equivalent of an intent to mislead Plaintiffs.

114.  Defendants' misrepresentations and undisclosed facts and other acts or omissions were material to Plaintiffs' decision to purchase the securities.  The availability of an investment that (1) actually existed; (2) is safe; (3) segregated; (4) with a proven track record of returns; and (5) liquid were fundamental to Plaintiffs' decision to invest nearly their entire life's savings with these Defendants.

115.  Plaintiffs have suffered in excess of $1.5 million in damages as a result of Defendants' conduct in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.1b-5.

## *COUNT VI.*

### *(Civil Theft)*

116.  The Plaintiffs incorporate by reference ¶¶ 1 - 115 of this Complaint.

117.  Defendants made false representations of material fact regarding the investments at issue, and Defendants made those representations knowing that they were false, or in reckless disregard of the truth or falsity of the same.

118.  Defendants made the false representations for their pecuniary gain and to deprive Plaintiffs of property by inducing them to transfer funds to Defendants.

119.  As a result of Defendants' conduct, Plaintiffs parted with their property, and Defendants have wrongfully retained the funds.

120.  The conduct of Defendants in the procurement of Plaintiffs' money constitutes theft by swindle, in violation of Minnesota Statute § 609.52.

121.  Pursuant to Minnesota Statute § 604.14, subdivision 1, by virtue of Defendants' theft, Plaintiffs are entitled to recover the value of their investments, plus punitive damages, in an amount to be proved at trial.

## *COUNT VII.*

### *(Common Law Bailment )*

122.    The Plaintiffs incorporate by reference ¶¶ 1 - 121 of this Complaint.

123.    Plaintiffs delivered their investment funds to Defendants, but retained ownership of those funds.

124.    Plaintiffs delivered their funds to Defendants, and Defendants accepted receipt of the funds.

125.    Defendants delivered the funds to Defendants based on promises and agreements that Defendants would invest the funds and hold them in trust, but that the funds would remain accessible to Plaintiffs and would be returned upon Plaintiffs' request for liquidation, redemption, or withdrawal.

126.    The delivery of the funds to Defendants gave rise to a duty of care in holding the funds.

127.    Plaintiffs funds are no longer accessible, their withdrawal requests have not been honored, and the funds have been damaged, lost, or wrongfully retained.  *See, e.g.*, Exhibits B-1 and B-2.

128.    Defendants have failed to provide any information identifying the existence or the location of the funds, and have failed to return the funds as agreed upon.

129.    The funds were damaged, lost, or wrongfully retained as a result of the Defendants' misconduct and/or negligence.

130.    As a result of Defendants' misconduct and/or negligence as a bailor, Plaintiffs have suffered damages in excess of $1.5 million, in an amount to be proved at trial.

## *COUNT VIII.*

### *(Negligent Misrepresentation)*

131.    The Plaintiffs incorporate by reference ¶¶ 1 - 130 of this Complaint.

132.    Defendants supplied false information to Plaintiffs regarding their investments.

Defendants knew and intended that Plaintiffs would rely on the information.

133.    Defendants failed to exercise reasonable competence in communicating the investment information to Plaintiffs about their investments, including the deadline for submitting claims to CROWN FOREX in liquidation, to the extent any of Defendants' clients had legitimate accounts with that entity.

134.    Plaintiffs justifiably relied on the information Defendants supplied regarding investments.

135.    As a proximate result of Defendants' misrepresentations, Plaintiffs have suffered in excess of $1.5 million in damages, in an amount to be proved at trial.

## *COUNT IX.*

### *(Conversion)*

136.    The Plaintiffs incorporate by reference ¶¶ 1 - 135 of this Complaint.

137.    Defendants' continued use of Plaintiffs' funds, and failure to return Plaintiffs' funds following Plaintiffs' repeated requests for return of all funds, represents an intentional conversion of Plaintiffs' property rights by wrongful use, act, or disposition of Plaintiffs' funds that has proximately caused serious interference with Plaintiffs' property rights.

138.    Plaintiffs have been damaged, and will continue to be damaged, by Defendants' wrongful conversion of Plaintiffs' funds and other property in an amount in excess of $1.5 million, in an amount to be proved at trial.

## *COUNT X.*

### *(Civil Conspiracy)*

139.    The Plaintiffs incorporate by reference ¶¶ 1 - 138 of this Complaint.

140.    Defendants, and most likely others currently unknown to Plaintiffs, or known to Plaintiffs but whose participation is unclear or unknown,  jointly developed a secret plan, a scheme by which they obtained personal benefits and financial gain through self-dealing, fraud, and other actions adverse to Plaintiffs' interests and investments.

141.    Defendants conspired together to keep their actions secret from the Plaintiffs,

and took overt acts in furtherance of the conspiracy, including creating a web site that contained misleading and false information; sending information by fax and U.S. mail to the Plaintiffs soliciting investments in their fraudulent scheme and by sending account statements to the Plaintiffs which purported to represent segregated accounts and the guaranteed rate of return promised by the Defendants..

142.    As a result of Defendants' conspiracy, Plaintiffs have sustained damages in excess of $1.5 million, in an amount to be proved at trial.

## *COUNT XI.*

### *(Minnesota Consumer Fraud: Minnesota Statute § 325F.69)*

143.    The Plaintiffs incorporate by reference ¶¶ 1 - 142 of this Complaint.

144.    Defendants Cook and Kiley, for themselves, and as agents for Defendants UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP, Universal Brokerage FX , UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC, employed fraud, false pretense, false promises, misrepresentations, misleading statements, and/or deceptive trade practices in soliciting Plaintiffs, consumers, to purchase the above-referenced investments, with the intent that Plaintiffs and others rely upon those false statements and misrepresentations in connection with the solicitation and sale of the investment product, all in violation of Minnesota Statute § 325F.69.

145.    The fraud, false promises, misrepresentations, misleading statements and/or deceptive trade practices included the following:

    *    Defendants Cook and Kiley falsely represented that the investments purchased through them and their affiliated companies had a guaranteed rate of return;

    *    Defendants Cook and Kiley falsely represented that Plaintiffs' principal invested through them and their affiliated companies was protected from loss;

    *     Defendants Cook and Kiley falsely represented that Plaintiffs investments with them and their business entities were instantly liquid ("24/7");

    *     Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them and their affiliated companies were maintained in segregated accounts;

    *     Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them and their companies were secured by reputable liquidity providers;

    *     Defendants Cook and Kiley falsely represented that Plaintiffs' funds invested with them or their companies were insured.

Their use of Christian radio programs to provide an aura of reliability or truthfulness was also deceptive.

146.    Defendants and their agents intended that Plaintiffs rely upon their misrepresentations when deciding whether to invest their money with Defendants.

147.    Defendants and their agents acted with culpability in making their misrepresentations to Plaintiffs.

148.    In reasonable reliance upon Defendants' misrepresentations, Plaintiffs invested their money with Defendants.  Plaintiffs would not have invested their money with Defendants had they known the Defendants' representations were untrue.

149.    As a factual and legal result of Plaintiffs' reliance upon the Defendants' misrepresentations, Plaintiffs suffered damages in excess of $1.5 million, in an amount to be determined at trial.

150.    Plaintiffs' action provide a public benefit.  Defendants' deceptive representations have been broadly disseminated and Plaintiffs seek relief of a public nature.  As the pending action makes clear, Plaintiffs are not alone, and at least fifty (50) other individuals have filed claims against these Defendants, and others, as having suffered from

the same issues as Plaintiffs, with no response from Defendants, other than to say that funds are not available for redemption or withdrawal.  Plaintiffs seek injunctive relief in this case requesting that the Court Order Defendants to freezing Defendants' assets and property, for an accounting of all funds to remedy the issues and complaints created by these Defendants.

## *COUNT XII.*

### *(Minnesota Deceptive Trade Practices Act: Minnesota Statute § 325D.44)*

151.    The Plaintiffs incorporate by reference ¶¶ 1 - 150 of this Complaint.

152.    Defendants engaged in deceptive trade practices, in violation of Minnesota Statute § 325D.44, through their actions in (1) representing that the investments had characteristics, uses, and benefits that they do not have; (2) advertising the investments with the intent not to sell them as advertised; (3) making or allowing to be made statements that would likely cause confusion or misunderstanding as to Defendants' affiliations, connections, or associations with the investments; and (4) engage in other conduct which created a likelihood of confusion or misunderstanding related to the investments.

153.    Defendants deceptive trade practice relied upon the use of Christian radio channels and listeners of Christian radio channels to create an aura of truth, integrity and honesty to lure listeners to invest their funds with Defendants Kiley and Cook.  They supplemented this message, broadcast over the airwaves, with a website which contained written promises and representations of segregated and "totally liquid" accounts with "double digit annual returns."  Thereafter, Defendants Kiley and Cook would send written material in response to inquiries from individuals like Plaintiffs assuring that "*[f]inancial security is paramount to every investor.  The safety and integrity of customer funds on deposit are ensured by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in segregated accounts providing safety, security and liquidity*."  Exhibit E (emphasis added).   The foregoing statement was intended to, and did, create confusion and misunderstanding as to the role of the United States government with respect to the "[s]afety and integrity of customer funds on deposit . . ." with the Defendants

as well as the affiliation or connection of the U.S. Government in these investments. Written materials, such as those attached to this complaint were then sent to investors, like Plaintiffs. These misrepresentations, and others, violated Min. Stat. § 325D.44 because Defendants (1) represented the investment products had characteristics that they did not have; (2) represented that the investment products they sold were of a particular standard or quality, when in fact it was of another standard or quality; and (3) engaged in conduct that created a likelihood of confusion or of misunderstanding.

154.    Defendants willfully engaged in such trade practices which constitute violations of Minn. Stat. § 325D44, while knowing that their representations were false, deceptive and misleading.

155.    Plaintiffs were damaged by these violations, and are entitled to recover for their actual damages in an amount in excess of $1.5 million, together with attorneys' fees and costs from Defendants pursuant to Minnesota Statute § 325D.45.

156.    Plaintiffs' action provide a public benefit.    Defendants' deceptive representations have been broadly disseminated and Plaintiffs seek relief of a public nature. As the pending action makes clear, Plaintiffs are not alone, and at least fifty (50) other individuals have filed claims against these Defendants, and others, as having suffered from the same issues as Plaintiffs, with no response from Defendants, other than to say that funds are not available for redemption or withdrawal.  Plaintiffs seek injunctive relief in this case requesting that the Court Order Defendants to freezing Defendants' assets and property, for an accounting of all funds to remedy the issues and complaints created by these Defendants.

## *COUNT XIII.*

### *(Breach of Fiduciary Duty)*

157.    The Plaintiffs incorporate by reference ¶¶ 1 - 156 of this Complaint.

158.    Defendants owed Plaintiffs fiduciary duties and obligations in their capacity as investment advisors.

159.    Defendants' fiduciary obligations to Plaintiffs included (1) the duty to

accurately inform Plaintiffs about the investments; (2) the duty to supervise and manage Plaintiffs' accounts and investments with reasonable care; (3) the duty to keep Plaintiffs fully advised as to the condition of their investments, and not mislead Plaintiffs as to their status; (4) the duty to refrain from acting in self-interest at the expense of Plaintiffs; (5) the duty not to misrepresent any material facts related to Plaintiffs' investments or accounts; and (6) the duty to adequately supervise those managing Plaintiffs' accounts and investments.

160.    Defendants breached their fiduciary duties owed to Plaintiffs by misrepresenting the nature of the investments, misappropriating funds entrusted to them for investments, concealing these breaches from Plaintiffs, failing to provide adequate supervision and to the extent there was a legitimate account with CROWN FOREX in liquidation, by failing to advise Plaintiffs of the deadline to submit claims by June 30, 2009, instead waiting until July 21, 2009 to send notices of the bankruptcy, even though the authorized legal representatives of CROWN FOREX had not accepted new clients or accounts or authorized any redemptions since December, 2008 and suspended its activities on May 19, 2009.

161.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs have been damaged in an amount in excess of $1.5 million, in an amount to be proved at trial.

## *COUNT XIV.*

### *(Vicarious Liability LLCS and LP)*

162.    The Plaintiffs incorporate by reference ¶¶ 1 - 161 of this Complaint.

163.    Defendant Cook was acting within the scope of his actual and/or apparent authority as an agent and representative of  Defendants UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP,  Universal Brokerage FX , UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC, when he misrepresented facts or defrauded Plaintiffs and/or misappropriated their investments.

164.    Defendant Kiley was acting within the scope of his actual and/or apparent authority as an agent and representative of  Defendants UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP,  Universal Brokerage FX , UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC, when he misrepresented facts or defrauded Plaintiffs and/or misappropriated their investments.

165.    Plaintiffs justifiably and detrimentally relied on Cook and Kiley's actual and/or apparent authority to promote and sell investments and securities through and on behalf of Defendants Defendants UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP,  Universal Brokerage FX , UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC.

166.    Defendants Defendants UBS Diversified, Universal Brokerage Services, LLC, UBS Diversified FX Management, LLC, UBS Diversified FX Growth, LP,   Universal Brokerage FX , UBS Diversified FX Advisors, LLC and Defendant Oxford Global Partners, LLC, are jointly and severely liable for the unlawful conduct of their agents/representatives Cook and Kiley in misleading and defrauding the Plaintiffs under common law principles of vicarious liability and agency.

## *COUNT XV.*

### *(Accounting)*

167.    The Plaintiffs incorporate by reference ¶¶ 1 - 166 of this Complaint.

168.    By virtue of the Defendants' failure to place Plaintiffs' funds in individual, segregated accounts, and with the entities that they represented would hold the funds, Plaintiffs lack necessary records and documents to determine the amount, location, and existence of their investment funds and accounts.

169.    Defendants have failed to return Plaintiffs' funds, and have access to all information regarding the amount, location and existence of the funds and accounts.

170.    As a result, Plaintiffs are entitled to request and receive the equitable remedy

of an accounting.

## *COUNT XVI.*

### *(ALTER EGO - PIERCING THE CORPORATE VEIL*
### *& Minn. Stat. § 322B.303, subd 2.)*

171.     The Plaintiffs incorporate by reference ¶¶ 1 - 170 of this Complaint.

171.     The Defendant LLCs and LP were used by Defendants Cook and Kiley for fraudulent purposes, as summarized above.   In the alternative, Defendants Cook and Kiley were the alter egos of such companies.

172.     Piercing the corporate veil is necessary to avoid injustice or fundamental unfairness.

173.     Due to the nature of Cook and Kiley's involvement with the entities, and the presence of alter-ego factors, along with the need to avoid injustice or fundamental unfairness, this Court should exercise its equitable authority and pierce the corporate veils of Defendant companies and hold Defendants Cook and Kiley responsible for judgments against the LLCs and LP.

## *RELIEF REQUESTED*

The Plaintiffs respectfully request that this Court:

A.     Issue an Order enjoining Defendants from disposing of any of their property or funds in which Plaintiffs hold any form of interest, whether legal or equitable;

B.     Issue an Order enjoining Defendants from disposing of any of the property or funds in Plaintiffs' accounts with Defendants, or any entity over which Defendants exercise any control;

C.     Issue a Preliminary and Permanent injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure that Defendants not dispose of any of Defendants' property or funds in which Plaintiffs hold any form of interest;

D.     Issue a Temporary Restraining Order preserving the status quo by ordering that Defendants Kiley and Cook shall not directly or indirectly transfer any assets

to outside of the United States with the exception of ordinary expenses related to any litigation, e.g., attorney's fees for attorneys located outside the United States;

E.      For an Order holding Defendants Cook and Kiley personally responsible for any judgment(s) against the LLC(s) and/or LP;

F.      For an award in compensatory damages in the amount of $1,651,617.00.

G.      For an award of punitive damages.

H.      For an award of Plaintiffs' costs, disbursements, and attorneys' fees.

I.      For an order of an accounting of the Defendants according to all applicable. generally accepted accounting principles by a disinterested, licensed accountant; and

J.      For such other and further relief as this Court deems just and equitable.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable by a jury.

DATED this 10th day of November, 2009.

> J. Ashwin Madia
> MADIA LAW, LLC
> 345 Union Plaza
> 333 Washington Avenue North
> Minneapolis, MN 55401
>
> -and-
>
> Brian K. Gallik
> Jim Barr Coleman
> GOETZ, GALLIK & BALDWIN, P.C.
> 35 North Grand
> P.O. Box 6580
> Bozeman, MT 59771-6580
>
>
> By_____*s/*___***Brian K. Gallik***_____
>          Brian K. Gallik
>          (MT Bar # 202674)
>
> *ATTORNEYS FOR PLAINTIFFS BARNINGS &*
> *REPUBLIC MEMORIAL FUND*